## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DENNIS A. RHODES,** | : | |
| **GERALD A. BENDER and** | : | |
| **EDWARD H. WOLFERD, JR.,** | : | |
| **individually and on behalf of all** | : | |
| **others similarly situated,** | : | **Civil Action No.** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **ROSEMARY DIAMOND, FRANCIS S.** | : | |
| **HALLINAN, DANIEL G. SCHMIEG,** | : | |
| **LAWRENCE T. PHELAN, JUDITH T.** | : | |
| **ROMANO, FRANCIS FEDERMAN,** | : | |
| **THOMAS M. FEDERMAN,** | : | |
| **PHELAN HALLINAN & SCHMIEG, LLP,** | : | |
| **and FEDERMAN & PHELAN, LLP,** | : | |
| | : | |
| **Defendants.** | : | |

### CLASS ACTION COMPLAINT

On behalf of themselves and all others similarly situated, plaintiffs Dennis A. Rhodes, Gerald A. Bender and Edward H. Wolferd, Jr. ("Plaintiffs") bring this action for damages and injunctive relief under (1) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.; (2) Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270 *et seq*.; (3) Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201 *et seq*.; and (4) common law protections in the Commonwealth of Pennsylvania and the State of New Jersey governing tortious interference with contractual relations.

Except for averments concerning their own acts and the acts of Defendants that impaired Plaintiffs' direct pecuniary interest, Plaintiffs' allegations are based on information

and belief. Plaintiffs' information and belief are derived from an investigation undertaken by their attorneys, which included, among other things: (1) interviews of witnesses; (2) review and analysis of court and other public records; and (3) review and analysis of legal journals, Congressional testimony, news media reports and published commentaries disseminated by representatives of the Office of the United States Trustee. Additional evidentiary support confirming the truth of the allegations in this Complaint will be established through discovery in this litigation from Defendants, as well as from non-parties, including, without limitation, (1) offices of the sheriff in 67 counties in Pennsylvania and 21 counties in New Jersey and (2) "almost every major lender and loan servicer" that, according to PHS' web site (www.fedphe.com), hired Defendants to prosecute state court mortgage foreclosure actions and appear in related bankruptcy court proceedings.

## NATURE OF THE CASE

1.      This is a proposed class action on behalf of all consumers who (1) reside in the Commonwealth of Pennsylvania or the State of New Jersey; (2) were defendants in state court mortgage foreclosure proceedings prosecuted by the law firm of Phelan Hallinan & Schmeig, LLP (formerly operating under the name of Federman & Phelan, LLP) and its members and associates (collectively "PHS" or "Defendants"); and (3) avoided sheriff's sales of their homes through the filing of petitions for relief under the United States Bankruptcy Code. With respect to Plaintiffs and members of the proposed Classes, as defined more particularly below:

- ▪ Defendants systematically inflated claims by overstating the amount of fees paid to county sheriffs in connection with foreclosure sales that were stayed by operation of 11 U.S.C. § 362; and

▪ After their clients' foreclosure sales did not proceed to completion, Defendants systematically misappropriated substantial sums of money refunded by county sheriffs to PHS, funds that were the rightful property of Plaintiffs and members of the Classes.

Because of Defendants' wrongful conduct, Plaintiffs and other Class members have sustained damages estimated to be well in excess of five million dollars. In addition, because Defendants persist in their practice of inflating claims relating to the amount of sheriffs' sale fees and misappropriating fees returned by county sheriffs after the cancellation of foreclosure sales, Plaintiffs and the Classes request an injunction restraining Defendants from their ongoing exploitation of distressed homeowners struggling to survive the worst economic crisis since the Great Depression.

## JURISDICTION AND VENUE

2.      This action is instituted against Defendants for injuries sustained by Plaintiffs and Class members resulting from Defendants' violations of Section 1692f(1) of the FDCPA, 15 U.S.C. § 1692f(1). To remedy those violations, Plaintiffs seek actual and statutory damages, together with costs of suit and reasonable attorneys' fees, as authorized by 15 U.S.C. §§ 1692j(a), 1692k(a) and 1692k(a)(2)(B). Federal question jurisdiction is conferred upon this Court by 15 U.S.C. § 1692k(d) and by 28 U.S.C. §§ 1331, 1334 and 1337.

3.      This action is also instituted against Defendants for injuries sustained by Plaintiffs and Class members resulting from Defendants' violations of two Pennsylvania statutes, the UTPCP and FCEUA. To remedy those violations, Plaintiffs seek actual and statutory damages (including treble damages), together with costs of suit and reasonable

attorneys' fees, as authorized by 73 P.S. § 201-9.2 and 73 P.S. § 2270.5. In addition, Plaintiffs and Class members seek damages under common law remedies in the Commonwealth of Pennsylvania and the State of New Jersey for tortious interference with contractual relations. Beyond the injunctive relief described in paragraph 1 and the damages described in paragraphs 2 and 3 above, Plaintiffs and Class members also seek restitution and disgorgement of funds obtained by Defendants as a result of their violations of federal, Pennsylvania and New Jersey law.

4.      The Court may adjudicate Plaintiffs' state law claims under traditional principles of pendant jurisdiction. In addition, under the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, diversity jurisdiction exists because Congress has amended 28 U.S.C. § 1332 to confer federal jurisdiction over class actions like this one in which (1) there are 100 or more members of the proposed Class; (2) at least some members of the proposed Class have a different citizenship from Defendants; and (3) the aggregate claims of the proposed Class exceed five million dollars. *See* 28 U.S.C. § 1332(d)(2) and (6).

5.      This Court has *in personam* jurisdiction over Defendants, *inter alia*, because Defendants live in and/or maintain a principal office, have employees and agents, and regularly transact business within this District.

6.      Venue is proper in this District because many of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

7.      Plaintiff Dennis A. Rhodes is a consumer within the meaning of 15 U.S.C. § 1692a(3), who resides within this District in Berks County, Pennsylvania.

4

8.      Plaintiff Gerald A. Bender is a consumer within the meaning of 15 U.S.C. § 1692a(3), who resides within this District in Berks County, Pennsylvania.

9.      Plaintiff Edward H. Wolferd, Jr. is a consumer within the meaning of 15 U.S.C. § 1692a(3), who resides within this District in Lancaster County, Pennsylvania.

10.     Defendant PHS is a mortgage foreclosure law firm having its principal place of business at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103. Identified in the records of the Pennsylvania Department of State as Entity Number 2945744, PHS is a domestic limited liability general partnership organized and existing under the laws of the Commonwealth of Pennsylvania. PHS was first formed under the name Federman Phelan, LLP. PHS, which now purports to be the "largest" and "premier foreclosure operation" in Pennsylvania, has 17 attorneys and "over 250 support personnel." It maintains an additional office at 400 Fellowship Road, Suite 100, Mount Laurel, New Jersey 08054.

11.     Defendant Federman & Phelan, LLP was a mortgage foreclosure law firm also having its principal place of business at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103. Before it was renamed PHS, Federman & Phelan, LLP was a domestic limited liability general partnership organized and existing under the laws of the Commonwealth of Pennsylvania.

12.     Defendant Lawrence T. Phelan is the managing partner of PHS, doing business in the firm's Philadelphia office. Phelan was admitted to practice law in the Commonwealth of Pennsylvania on November 24, 1980, and he presently maintains Pennsylvania Attorney Identification Number 32227. Phelan was previously a member and founding partner of Federman & Phelan, LLP.

13.     Defendant Francis S. Hallinan is a member of PHS doing business in the firm's Philadelphia office. Hallinan was admitted to practice law in the Commonwealth of Pennsylvania on December 2, 1991, and he presently maintains Pennsylvania Attorney Identification Number 62695. Hallinan was previously a member of Federman & Phelan, LLP.

14.     Defendant Daniel G. Schmeig is a member of PHS doing business in the firm's Philadelphia office. Schmeig was admitted to practice law in the Commonwealth of Pennsylvania on December 10, 1991, and he presently maintains Pennsylvania Attorney Identification Number 62205. Schmeig was previously a member of Federman & Phelan, LLP.

15.     Defendant Judith T. Romano is a member of PHS doing business in the firm's Philadelphia office. Romano manages the firm's Bankruptcy Department. She was admitted to practice law in the Commonwealth of Pennsylvania on November 21, 1991, and presently maintains Pennsylvania Attorney Identification Number 58745. Romano was previously associated with Federman & Phelan, LLP.

16.     Defendant Rosemarie Diamond is a member of PHS in charge of the firm's Mount Laurel, New Jersey office. Apart from her admission to the New Jersey Bar in 1999, Diamond was admitted to practice law in the Commonwealth of Pennsylvania on December 17, 1992, and she presently maintains Pennsylvania Attorney Identification Number 65639.

17.     Defendant Frank Federman was a member and founding partner of Federman & Phelan, LLP. Frank Federman maintains a current address at 8327 Cedar Road, Elkins Park, Pennsylvania 19027. Frank Federman was admitted to practice law in

the Commonwealth of Pennsylvania on May 1, 1961, and he presently maintains

Pennsylvania Attorney Identification Number 12248.

18.     Defendant Thomas M. Federman was a member of Federman & Phelan,

LLP. Thomas Federman currently maintains a legal practice under the name of Federman

& Associates, LLC at 305 York Road, Suite 300, Jenkintown, Pennsylvania 19027.

Thomas Federman was admitted to practice law in the Commonwealth of Pennsylvania

on January 16, 1992, and he presently maintains Pennsylvania Attorney Identification

Number 64068.

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this lawsuit individually and as a class action under Rule

23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

following Class ("FDCPA Class"):

> All homeowners who, at any time during the period from March 25,
> 2008 through the present, (1) were defendants in state mortgage
> foreclosure actions prosecuted by Phelan Hallinan & Schmeig, LLP,
> Federman & Phelan, LLP or their attorneys; (2) filed a bankruptcy
> petition resulting in a stay of sheriff's sale proceedings that were
> prosecuted under state law by Phelan Hallinan & Schmeig, LLP,
> Federman & Phelan, LLP or their attorneys; and (3) sustained damages
> resulting from one or more bankruptcy claims asserted by Phelan
> Hallinan & Schmeig, LLP, Federman & Phelan, LLP or their attorneys
> that overstated and failed to properly account for fees assessed by
> county sheriffs for a cancelled foreclosure sale.

20.     Plaintiffs also bring this lawsuit individually and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of

the following Class ("State Law Class"):

> All homeowners who, at any time during the period from March 25,
> 2005 (in the case of Pennsylvania residents) or March 25, 2003 (in the
> case of New Jersey residents) through the present, (1) were defendants
> in state mortgage foreclosure actions prosecuted by Phelan Hallinan &

Schmeig, LLP, Federman & Phelan, LLP or their attorneys; (2) filed a bankruptcy petition resulting in a stay of sheriff's sale proceedings that were prosecuted under state law by Phelan Hallinan & Schmeig, LLP, Federman & Phelan, LLP or their attorneys; and (3) sustained damages resulting from one or more bankruptcy claims asserted by Phelan Hallinan & Schmeig, LLP, Federman & Phelan, LLP or their attorneys that overstated and failed to properly account for fees assessed by county sheriffs for a cancelled foreclosure sale.

21.     The FDCPA Class and the State Law Class are collectively referred to in this Complaint as the "Classes."

22.     This litigation is properly maintainable as a class action.

23.     The Classes are so numerous and geographically dispersed that joinder of all members in impracticable. Defendant PHS' web site boasts that it is the "largest [mortgage foreclosure] firm in Pennsylvania" and "one of the few law firms to handle foreclosures, bankruptcies and asset recovery actions for the entire states of New Jersey and Pennsylvania." According to RealtyTrac®, a national research firm based in Irvine, California, there were 42,949 foreclosure filings in Pennsylvania and 69,612 foreclosure filings in New Jersey during 2008 alone, filings that are far fewer than for the entire Class periods taken as a whole. In addition, a search of the Public Access to Court Electronic Records ("PACER") system maintained by the Administrative Office of the U.S. Courts reveals that, since 1990, Defendants have appeared as counsel of record on behalf of mortgage lenders or servicers in over 50,000 bankruptcy cases in the Eastern, Middle and Western Districts of Pennsylvania and the District of New Jersey, the majority of them filed by borrowers seeking relief to preserve their homes under Chapter 13 of the United States Bankruptcy Code.

24.     There are questions of law and fact common to the Classes. These common questions relate to the existence of the wrongful conduct alleged, and to the type

and common pattern of injury sustained as a result thereof. The questions include but are not limited to:

a.    Whether Defendants as a matter of regular practice filed proofs of claims that overstated the amount of fees due from Plaintiffs and members of the Classes to county sheriffs in connection with foreclosure sales that did not proceed to completion.

b.    Whether Defendants as a matter of regular practice converted to their own use (and/or the use of their clients) fees refunded by county sheriffs to Defendants in connection with foreclosure sales that did not proceed to completion, the amounts of which should have been returned to or credited to the accounts of Plaintiffs and members of the Classes.

c.    The identity of the participants in the conduct complained of herein, including lenders or mortgage servicing organizations with which representatives of Defendants may have conspired to deprive Plaintiffs and members of the Classes of their legal rights and property.

d.    The duration, sequence and character of the conduct alleged in this Complaint, including particular acts performed by Defendants (and perhaps others) in depriving Plaintiffs and members of the Classes of their legal rights and property.

e.    Whether the conduct alleged in this Complaint violated the FDCPA.

f.    Whether the conduct alleged in this Complaint constitute violations of the FCEUA and/or UTPCPL.

g.    Whether the conduct alleged in this Complaint constitutes tortious interference with contractual relations in violation of the common laws of the Commonwealth of Pennsylvania and the State of New Jersey.

h.      Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Classes.

i.      The appropriate measure of damages sustained by Plaintiffs and other members of the Classes.

j.      Whether restitution and disgorgement of profits are appropriate forms of relief for the wrongful conduct alleged in this Complaint, and

k.      Whether injunctive relief is warranted to restrain Defendants from engaging prospectively in the wrongful conduct alleged in this Complaint.

25.      Plaintiffs are members of both Classes.  Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes. In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action litigation.

26.      The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

27.      Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

28.      The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Members of the classes are readily ascertainable, *inter alia*, through records maintained in the regular course of business by Defendants, Defendants' certified public accountant and the offices of county sheriffs throughout Pennsylvania and New Jersey. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate a substantively complex matter such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## PERVASIVE ABUSE IN THE MORTGAGE FORECLOSURE INDUSTRY

30.     In Pennsylvania, New Jersey and throughout the United States, there is an epidemic of mortgage foreclosures that the Pew Charitable Trust characterized as "Defaulting on the Dream" of homeownership for as many as one in 33 households within the next two years.[1] During 2008, there were more than 3 million new foreclosure filings, which set a national record for distressed homeowners, representing an increase of 81 percent from 2007 and 225 percent from 2006.[2] These alarming statistics do not include new foreclosures that are looming on the immediate horizon. According to the Mortgage Bankers Association, as of March 5, 2009,  the number of mortgages at least 30

---

[1]   www.pewcenteronthestates.org/uploadedFiles/PCS_DefaultingOnTheDream_Report_FINAL041508_01.pdf
[2]   www.usatoday.com/money/economy/housing/2009-01-14-foreclosure-record-filings_N.htm

days past due stood at 3.6 million, or 7.88 percent of the country's 45.4 million home loans; at the same time, Pennsylvania's delinquency rate was 8.32 percent of all home loans, about 130,000 of the state's 1.561 million mortgages, while 7.68 percent (or 97,920 of New Jersey's 1.275 million mortgages) were behind on payments.[3]

      31.    Federal, state and local officials have recognized and reacted to public outcry concerning the foreclosure crisis. On March 4, 2009, the United States Department of the Treasury issued guidelines for the "Making Homes Affordable Program," which is intended to "prevent the destructive impact of foreclosures on families, communities and the national economy."[4] Citing an "unprecedented increase in mortgage foreclosures" (and its accompanying "social dislocation, declining housing values, neighborhood blight, homelessness, and a general decline in neighborhood morale and safety"), New Jersey's Administrative office of the Courts in January 2009 implemented a mandatory program under which mortgage lenders or servicers are required to submit to mediation requested by homeowners who are facing the prospect of losing their houses to foreclosure.[5] Previously, in April 2008, the Court of Common Pleas of Philadelphia County noted that it had in 1983 and 2004 granted relief "in the form of a temporary stay and postponements in the Sheriff Sale of foreclosed residential properties," and, apart from imposing a new temporary foreclosure moratorium, it established a "Residential Mortgage Foreclosure Diversion Pilot Program" under which "[o]wner-occupied residential properties which are subject to execution to enforce a residential mortgage cannot proceed to Sheriff Sale unless a conciliation conference is held…."[6]

---

[3]  http://www.philly.com/philly/business/20090306_Mortgage_foreclosures_up_in_fourth_quarter.html
[4]  http://www.treas.gov/press/releases/reports/guidelines_summary.pdf
[5]  http://www.judiciary.state.nj.us/civil/foreclosure/Foreclosure%20Mediation%20Information.pdf
[6]  http://fjd.phila.gov/pdf/regs/2008/cpjgcr-2008-01.pdf

32.     While the lives of millions of homeowners and their families have been turned upside down by the mortgage foreclosure crisis (and our country as a whole is mired in the worst economic misery in generations), painful times have presented unprecedented opportunities for profit to law firms like PHS that specialize in the prosecution of mortgage foreclosure actions and related bankruptcy matters. PHS and other like-minded firms have cashed in on these opportunities in ways that are both morally bankrupt and unlawful.

33.     In a March 30, 2008 article aptly titled "Foreclosure Machine Thrives on Woes," the *New York Times* identified several recent cases in which homeowners forced into bankruptcy under threat of losing their homes to foreclosure have been victimized by "improper fees" charged by mortgage servicers and their lawyers. As the *Times* reported:

> [A] small army of law firms and default servicing companies, who represent mortgage lenders, have been raking in mounting profits. These little-known firms assess legal fees and a host of other charges, calculate what the borrowers owe and draw up the documents required to remove them from their homes. As the subprime mortgage crisis has spread, the volume of the business has soared, and firms that handle loan defaults have been the primary beneficiaries. Law firms, paid by the number of motions filed in foreclosure cases, have sometimes issued a flurry of claims without regard for the requirements of bankruptcy law, several judges say.[7]

34.     Institutionalized exploitation of insolvent homeowners and abuse of our system of justice has become so prevalent among mortgage servicers and their law firms that the Office of the United States Trustee (UST), part of the U.S. Department of Justice,

---

[7]     http://www.nytimes.com/2008/03/30/business/30mills.html?_r=1&sq=morgenson&st=nyt&scp=8&pagewanted=all. *See also* Ray Glier, "Legal Eagles Swooping in on Foreclosure Work," *Atlanta Business Chronicle*, October 24, 2008 ("Glier") ("Not only do the law firms get a set fee from the banks, but some also tack on their own fees to the foreclosure process, such as fax fees, auction fees and sheriff fees, among other charges"), www.bizjournals.com/atlanta/stories/2008/10/27/focus5.html?b=1225080000%5E1720032&brthrs=1

has made it a priority to identify and punish creditors and counsel that file false or inaccurate claims in foreclosure-related bankruptcy cases.[8]

35.    On May 6, 2000, a subcommittee of the United States Senate's Committee on the Judiciary convened a hearing on the topic "*Policing Lenders and Protecting Homeowners: Is Misconduct In Bankruptcy Fueling the Foreclosure Crisis?*" Testimony at the hearing provided by Clifford J. White III, the Executive Director of the UST, leaves no doubt that the answer to the question posed is a resounding yes.[9] Director White testified:

> Protecting consumer debtors is one of the most important objectives of the [UST]'s enforcement efforts. One of the basic principles of our bankruptcy system is that the honest but unfortunate debtor deserves a fresh start. Those who prey upon debtors for their own financial gain undermine that basic principle.
>
> Among the more egregious mortgage-related schemes that we encounter are those perpetrated by consumers facing foreclosures on their loan … [We] have been involved in significant litigation involving national mortgage servicing firms. Most of these cases involve homeowners who are behind in their mortgage payments and file for relief under chapter 13 of the Bankruptcy Code. To date, we have commenced actions or intervened in 16 pending cases involving mortgage servicers in eight judicial districts around the country. In addition, we are actively reviewing more than 30 cases in which we have not yet filed court papers.

---

[8]    Pamela A. MacLean, "Mortgage Industry Probes Grow," *The National Law Journal*, July 28, 2008 ("Allegations of shoddy accounting and padded bankruptcy claims have grown to such a pitch against the mortgage loan servicing industry and its lawyers that investigations have been launched by the Executive Office for U.S. Trustees and the Federal Trade Commission (FTC)"). *See also* Glier (The UST "says business is too good for some law firms that handle actual foreclosures. The government and its judges in some states -- particularly Texas, Florida, Ohio, Nevada, and one case in Georgia -- are investigating lenders and their lawyers for tacking on fees to distressed homeowners and running up their mortgage payments").

[9]    http://www.usdoj.gov/ust/eo/public_affairs/articles/docs/2008/nac_200812.pdf.

> The US[T] has investigated complaints that some mortgage servicers
> were filing inaccurate papers in court claiming that debtors owe more
> money than they actually owe. We also investigated complaints that
> some mortgage servicers were tacking on charges that were
> undisclosed and impermissible under the terms of the loan contract or
> other applicable law.

36. Director White further explained in his Senate testimony that "in response to an increasing number of complaints about the accuracy of bankruptcy court filings," the UST established a "working group" to "review the complaints and devise a coordinated approach for addressing the problem." While this has prompted the UST to undertake substantial "civil litigation of mortgage servicing issues [that] requires resource intensive fact finding and resolution of strongly contested legal issues,"[10] Director White acknowledged that his agency must pragmatically take into account "the difficulty of case selection" and "focus its attention on cases in which the integrity of the bankruptcy system as a whole is at stake." In other instances, the UST believes that "creditor abuse is best addressed," *inter alia*, by "debtors' lawyers who dispute loan agreement terms."

37. Despite the UST's effort "to protect homeowners from lenders who improperly inflate their claims,"[11] the magnitude of the problem of creditor abuse is of scandalous proportions. This is underscored by an empirical study of 1,700 foreclosure-related Chapter 13 cases conducted by University of Iowa College of Law Professor Katherine M. Porter (funded by the National Conference of Bankruptcy Judges' Endowment for Education), which found that questionable fees were added to borrowers'

---

[10] *See, e.g.*, *In re Countrywide Home Loans, Inc.*, 387 B.R. 467 (Bankr. W.D.Pa. 2008); *In re Parsley*, 384 B.R. (Bankr. S.D. Tex. 2008); *In re O'Neal*, No. 07-51027 (September 22, 2008); *In re Allen*, No. 06-60121, 2007 WL.174018 (Bank. S.D. Tex. June 18, 2007)
[11] http://www.usdoj.gov/ust/eo/public_affairs/articles/docs/2008/nac_200812.pdf

bills in nearly half of the mortgage loans she examined.[12] The data complied and analyzed by Professor Porter support her conclusion that "flawed mortgage servicing practices are a key contributor to the current crisis in the home mortgage market."

38.     As Professor Porter testified at the May 6, 2009 Senate Judiciary Subcommittee hearing on misconduct in the mortgage servicing industry:

> While bankruptcy is supposed to offer families one last chance to save their homes from foreclosure, the reality is that bankruptcy gives mortgage servicers new opportunities to engage in abusive practices. My study of 1700 bankruptcy cases showed that mortgage lenders routinely disobey clear rules of bankruptcy law and attempt to collect thousands more dollars than consumers believe is owed. These findings, along with dozens of published cases from bankruptcy courts, highlight how mortgage servicers' current practices permit them to impose unwarranted fees without scrutiny or sanction.
>
> The existing system does not ensure that borrowers pay only what is due under the terms of their mortgage notes. Instead, mortgage servicers can and do take advantage of struggling homeowners. Such misbehavior can cripple a family's efforts at homeownership. Without improved laws and enforcement activity, homeowners in financial trouble -- both inside and outside bankruptcy -- remain vulnerable to mortgage servicers' misbehaviors and mistakes. The costs of such abuse are devastating: families wrongfully lose their homes, the number of foreclosures is driven upward, and the integrity of the legal system is undermined.

39.     As alleged in further detail below, Plaintiffs and members of the Classes have been victimized in precisely this fashion by the predatory practices of Defendants, highly profitable lawyers that tout themselves as the "largest" and "premier foreclosure operation" in Pennsylvania.

---

[12]   Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Texas L.Rev. 121 (2008) ("Porter Study"). *See also* Gretchen Morgenson, "Dubious Fees Hit Borrowers in Foreclosure," *New York Times*, November 6, 2007,
 http://www.nytimes.com/2007/11/06/business/06mortgage.html?fta=y&pagewanted=all

## DEFENDANTS SYSTEMATICALLY FILE INFLATED CLAIMS FOR SHERIFF'S SALE FEES AND MISAPPROPRIATE REFUNDS BELONGING TO PLAINTIFFS AND MEMBERS OF THE CLASSES

### 1.  Plaintiff Dennis A. Rhodes

40.     By virtue of a judgment in a mortgage foreclosure lawsuit prosecuted by PHS on behalf of Countrywide Home Loans, the Sheriff of Berks County, Pennsylvania scheduled a sheriff's sale of the family residence of Plaintiff Rhodes, located at 1748 Cotton Street, Reading, Pennsylvania, to be held on January 11, 2008. PHS paid the sum of $2,000 to the Berks County Sheriff as a deposit for fees expected to be incurred in connection with the scheduled sale.

41.     On January 10, 2008, Plaintiff Rhodes filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Pursuant to 11 U.S.C. § 362, the sheriff's sale identified in the immediately preceding paragraph was stayed. Plaintiff Rhodes proposed a payment plan under which all arrearages on his mortgage would be satisfied, including all legitimate costs incurred in connection with PHS' foreclosure action.

42.     On January 28, 2008, PHS, on behalf of Countrywide Home Loans, filed a proof of claim against Plaintiff Rhodes in the United States Bankruptcy Court for the Eastern District of Pennsylvania, a copy of which is attached here as Exhibit A.  Among other things, the proof of claim filed by PHS sought reimbursement of the sum of $2,000 that had been paid as a deposit to the Berks County Sheriff in connection with the stayed sheriff's sale. This proof of claim represented that the claim would be amended "upon receipt of the most recent Sheriff's Refund, which is unavailable at the present time."

43.     On May 8, 2008, the Berks County Sheriff refunded to PHS $909.08 out of the sum of $2,000 that had been deposited with the Sheriff in connection with the stayed sheriff's sale. PHS did not amend its proof of claim to reflect the actual charges incurred to the Berks County Sheriff, but instead converted $909.08 to its own use and/or that of its clients. Nearly one year later, PHS still has not amended its overstated proof of claim.

### 2. Plaintiff Gerald A. Bender

44.     By virtue of a judgment in a mortgage foreclosure lawsuit prosecuted by PHS on behalf of Wachovia Bank, N.A., the Sheriff of Berks County, Pennsylvania scheduled a sheriff's sale of the family residence of Plaintiff Bender, located at 1022 Lancaster Avenue, Reading Pennsylvania, to be held on June 6, 2008. PHS paid the sum of $2,000 to the Berks County Sheriff as a deposit for services expected to be rendered in connection with the scheduled sale.

45.     On June 4, 2008, Plaintiff Bender filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Pursuant to 11 U.S.C. § 362, the sheriff's sale identified in the immediately preceding paragraph was stayed. Plaintiff Bender proposed a payment plan under which all arrearages on his mortgage would be satisfied, including all legitimate costs incurred in connection with PHS' foreclosure action.

46.     On July 3, 2008, PHS, on behalf of Wachovia Bank, N.A., filed a proof of claim against Plaintiff Bender in the United States Bankruptcy Court for the Eastern District of Pennsylvania, a copy of which is attached here as Exhibit B. Among other things, the proof of claim filed by PHS sought reimbursement of the sum of $2,000 that

had been deposited with the Berks County Sheriff in connection with the stayed sheriff's sale. This proof of claim represented that the "[m]ost recent Sheriff's Refund is unavailable at the present time."

47.     On October 9, 2008, the Berks County Sheriff refunded to PHS $601.13 out of the sum of $2,000 that had been deposited with the Sheriff in connection with the stayed sheriff's sale. PHS did not amend its proof of claim to reflect the actual amount of money paid to the Berks County Sheriff, but instead converted the $601.13 to its own use and/or that of its clients. PHS still has not amended its overstated proof of claim.

### 3.  Plaintiff Edward H. Wolferd, Jr.

48.     By virtue of a judgment in a mortgage foreclosure lawsuit prosecuted by PHS on behalf of Wells Fargo Bank, N.A., the Sheriff of Lancaster County, Pennsylvania scheduled a sheriff's sale of the family residence of Plaintiff Wolferd, located at 1428 River Hill Road, Pequea, Pennsylvania, to be held on August 2, 2005. PHS paid the sum of $2,500 to the Lancaster County Sheriff as a deposit for services expected to be rendered in connection with the scheduled sale.

49.     On August 1, 2005, Plaintiff Wolferd filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Pursuant to 11 U.S.C. § 362, the sheriff's sale identified in the immediately preceding paragraph was stayed. Plaintiff Wolferd proposed a payment plan under which all arrearages on his mortgage would be satisfied, including all legitimate costs incurred in connection with PHS' foreclosure action.

50.     On September 14, 2005, PHS, on behalf of Wells Fargo Bank, N.A., filed a proof of claim against Plaintiff Wolferd in the United States Bankruptcy Court for the

Eastern District of Pennsylvania, a copy of which is attached here as Exhibit C. Among other things, the proof of claim filed by PHS sought reimbursement of the sum of $2,500 that had been deposited with the Lancaster County Sheriff in connection with the stayed sheriff's sale. This proof of claim represented that the claim would be amended "upon receipt of the most recent Sheriff's Refund, which is unavailable at the present time."

51.     On October 31, 2005, the Lancaster County Sheriff refunded to PHS $849.84 out of the sum of $2,500 that had been deposited with the Sheriff in connection with the stayed sheriff's sale. On or about November 22, 2005, counsel for Plaintiff Wolferd incurred the time and expense of communicating with an associate attorney at PHS to object informally to the overstated proof of claim filed by PHS in bankruptcy court. Only then did PHS withdraw its false claim for sheriff's fees, with its amended proof of claim dated November 22, 2005 (Exhibit D) constituting a formal acknowledgment of its attempt to overcharge Plaintiff Wolferd by $849.84.

**4. Defendants' Systematic Misconduct Harms Homeowners on a Classwide Basis**

52.     By its own description, PHS is a "high volume foreclosure law firm."[13] According to its web site, the firm "adheres to the Fannie Mae and Freddie Mac fee schedules." In May of 2004, while under pressure from advocacy groups for disadvantaged homeowners and sympathetic government officials, Federman & Phelan, LLP "said it would drop its [fixed] fee from $1,250 to $450 for low-income people whose cases come to the firm through housing-counseling programs."[14] Specifically excluded from that understanding were "charge[s] by the Philadelphia Sheriff's Office to list the

---

[13]
http://www.careerbuilder.com/JobSeeker/Jobs/JobDetails.aspx?ipath=EXIND&siteid=cbindeed&Job_DID=J8H2K2756W53ZSWTHPY&cbRecursionCnt=1&cbsid=24e954be7e9c49d1995e445484fbf775-289921626-wr-6

[14]   Jane M. Von Bergen, "Philadelphia Law Firm to Lower Foreclosure Fees," *Philadelphia Inquirer*, June 18, 2004 ("The **main** Philadelphia law firm that **handles thousands of mortgage foreclosures a year in the city** has agreed to lower its fees to homeowners in danger of losing their homes") (emphasis supplied).

houses for sale," a cost that is "passed through the attorneys." Whether or not this fee-reduction proposal was ever effectively implemented for the poorest of homeowners, Defendants continued to charge non-discounted fixed fees to its clients in the great majority of its foreclosure actions.

53.     The Honorable Jeff Bohn of the United States Bankruptcy Court for the Southern District of Texas recently described how the "fixed-fee business model" has been "an overwhelming financial success" for "high volume foreclosure law firms" like PHS:

> Over the past several years, attorneys' fees and costs have risen steadily – some clients would doubtless say astronomically. Corporations in particular have reacted by demanding concessions such as flat fee pricing for each file. In the consumer bankruptcy field, many financial institutions – Fannie Mae in this case – have negotiated flat fee engagements with certain law firms to avoid large fees that can accrue under an hourly rate system. In theory, this arrangement seems appropriate: fixed fees minimize costs that are primarily passed on to consumer debtors. ***In practice, this arrangement has fostered a corrosive "assembly line" culture of practicing law***.[15]

54.     In arriving at this conclusion, Judge Bohn rejected the contention that abusive activities by mortgage foreclosure law firm are mere "isolated instance[s] of human error that are not commonplace." Finding instead that such misconduct is frequent, Judge Bohn cited several published opinions from districts throughout the country in which sanctions were imposed for "substantial and material errors" by "law firms representing mortgages in bankruptcies in several states." This prompted the Court to lament that the legal "profession has suffered from ever decreasing standards" among mortgage foreclosure lawyers that simply "must stop."[16]

---

[15]  *In re Parsley*, 384 B.R. 138, 183  (Bankr. S.D.Tex. 2008) (emphasis supplied).

[16]  *In re Parsley*, 384 B.R. at 174-77, *citing In re Allen*, 2007 Bankr. LEXIS 2063 (Banr. S.D. Tex June 18, 2007); *In re Ulmer*, 363 B.R. 777 (Bankr. D.S.C. 2007); *In re Osborne*, 375 B.R. 216 (Bankr. M.D. La. 2007); *In re Rivera*, 342 B.R. 435 (Bankr. D.N.J. 2006). *See also In re Parsley*, 384 B.R. at 184.

55.     PHS, the "largest" mortgage foreclosure law firm in the Philadelphia region, prosecutes "thousands" of foreclosure actions throughout "the entire states of New Jersey and Pennsylvania," all with a mere 17 attorneys and a staff of over 250 support personnel.  Given the crushing workload of this firm and the paucity of qualified lawyers available there to perform or supervise the work properly, PHS epitomizes the "'assembly line' culture of practicing law" described by Judge Bohn. With many critical functions delegated on a day-to-day basis to inadequately supervised non-lawyer staff, PHS is vulnerable to the criticism that, even with the fee-reduction that this firm purportedly promised to poverty-stricken homeowners (*see* ¶ 52 above), it is a "foreclosure mill" that has as its primary mission the enormous profits to be made through a high volume, speed-driven, and essentially automatic-pilot practice[17] -- one that has little or no regard for the professional responsibility that all members of the Bar are obligated to exercise.

56.     In habitually filing sworn proof of claims that inaccurately demand payment of sheriff's fees by homeowners facing loss of their property through foreclosure (and in routinely pocketing funds returned by sheriffs after foreclosure sales are stayed by operation of bankruptcy law), Defendants have until now had good reason to believe they were free to profit with impunity from their unlawful scheme.

57.     As Professor Katherine Porter's study found, consumers tend to respond to inflated mortgage claims by "'lumping it,' rather than seeking any formal redress."

---

[17]     See Jeff Blumenthal, "For Specialty Law Firms, Foreclosures Mean More Business," *Philadelphia Business Journal*, October 19, 2007 ("[T]he standard fee, set by Fannie Mae, for handling a foreclosure case from its filing to sheriff's sale is $1,250 if uncontested. Hourly billing rates are established if the case degenerates into litigation but they are not high enough to attract interest from big firms. Foreclosure firms make up for the low rates by having fewer lawyers and more support staff…. [A] staff-attorney ratio of from five-to-one to 10-to-one keeps costs down and allows support staff to handle the paper-intense research while lawyers focus on court proceedings and client interaction"), http://philadelphia.bizjournals.com/philadelphia/stories/2007/10/22/story13.html

According to Professor Porter, this reflects a fundamental reality well understood by foreclosure law firms like PHS and one that beleaguered homeowners are typically unable to do anything about:

> The vast majority of all claims (96%) pass undisturbed through the bankruptcy system without objection. Attorneys do not aggressively enforce their clients' rights against mortgage companies because the costs are too high and the incentives are too low in the current system. The combination of widespread deficiencies in claims and the lack of objections weakens the integrity of the bankruptcy process and can harm both debtors and other creditors by skewing distributions in favor of mortgage creditors.[18]

58.     For Defendants, this is a "heads-we-win, tails-you-lose" proposition for the distressed consumers they prosecute. On rare occasions when Defendants' wrongful conduct is discovered and redressed (as with Plaintiff Wolferd and a minority of other insolvent homeowners who incur the trouble and expense of objecting to Defendants' bogus proofs of claim), Defendants quickly retreat from the overstated amount claimed for payment of sheriff's fees. In such cases, Defendants file amended proofs of claim that set forth a significantly lower actual amount of fees that do reflect a proper deduction for refunds returned by sheriffs to Defendants after foreclosure sales have been stayed by bankruptcy filings. In the overwhelming majority of other cases, however, Defendants keep the sheriff's refunds for themselves and/or their clients, notwithstanding the *pro forma* representations in their sworn proofs of claim that sheriff's fee amounts would be recalculated once the actual amount of the fees have been determined. Defendants seldom take affirmative steps to amend their overstated proofs of claim -- and, even then, most of those steps do not appear to be of their own initiative, but are instead defensive actions to silence legitimate complaints about the falsity of Defendants' claims.

---

[18]   Porter Study, 87 Texas L.Rev. at 147.

59.     Above and beyond cases directly involving their own individual clients, counsel for the proposed Classes have reviewed and analyzed a randomly selected sample of 300 proofs of claim filed by a cross-section of PHS lawyers in Chapter 13 actions pending in the United States Bankruptcy Courts for the Eastern, Middle and Western Districts of Pennsylvania and the District of New Jersey, with this sample limited to claims in which reimbursement for sheriff's fees was sought by PHS. In 261 of these cases, Defendants failed to amend the proofs of claim to properly account for deposits refunded by county sheriffs in connection with sheriffs' sales stayed by operation of bankruptcy law.

60.     As a direct and proximate cause of the foregoing unlawful conduct by Defendants, Plaintiffs and members of the Classes have sustained damages, the precise amount of which is undeterminable in the absence of discovery from the financial books and records of Defendants and non-parties, including county sheriffs throughout the Commonwealth of Pennsylvania and the State of New Jersey, as well as the "major lenders and loan servicers" on whose behalf PHS ostensibly acted in connection with state mortgage foreclosure actions and related bankruptcy proceedings. (Although it is now premature to draw any responsible conclusion, appropriate discovery may reveal that Defendants have conspired with other entities and persons not parties to this action). Upon information and belief, the aggregate damages suffered by Plaintiff and members of the Classes are very substantial.

## COUNT I
## Violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.

61.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

62.     At all times relevant to this Complaint, Plaintiffs and all members of the Classes are "consumers" within the meaning of 15 U.S.C. § 1692a(3).

63.     At all times relevant to this Complaint, Defendants have been "debt collectors" within the meaning of 15 U.S.C. § 1692a(6). *See also Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) ("the Act applies to attorneys who 'regularly' engage in consumer-debt collection activity").

64.     Beginning well before March 25, 2008 and continuing through the present, Defendants committed unfair practices proscribed by 15 U.S.C. § 1692f(1) because, in systematically submitting inflated claims against Plaintiffs and members of the Classes for sheriff's fees that were not actually incurred and in failing to properly account for refunds, the amount of "debt" that Defendants sought to collect was not "expressly authorized by the agreement creating the debt," and was not otherwise "permitted by law."

65.     Defendants failed to maintain thorough, ongoing procedures that were reasonably calculated to prevent inaccurate and inflated claims for sheriffs' fees charged to Plaintiffs and members of the Classes.

66.     As a direct and proximate result of Defendants' violations of the FDCPA, Plaintiffs have sustained actual and statutory damages for which Defendants are liable, together with reasonable attorneys fees and the costs of prosecuting this litigation.

### COUNT II
### Violations of Pennsylvania's Fair Credit Extension
### Uniformity Act, 73 P.S. § 2270 *et seq*.

67.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

68.     Defendants acted intentionally with the purpose of coercing Plaintiffs and members of the Classes to pay debts that they did not in fact owe.

69.     Defendants' conduct, as alleged throughout this Complaint, violates the federal FCDPA.

70.     Defendants' violations of the federal FCDPA are, by statutory definition, violations of the state FCEUA, 73 P.S. § 2270.4(a).

71.     Defendants' conduct otherwise constitutes an unfair or deceptive practice with regard to the collection of debts within the meaning of 73 P.S. § 2270.4.

72.     As a direct and proximate result of Defendants' violations of the FCEUA, members of the Class have sustained actual and statutory damages for which Defendants are liable, together with reasonable attorneys fees and the costs of prosecuting this action.

## COUNT III
### Pennsylvania's Unfair Trade Practices
### and Consumer Protection Law, 73 P.S. § 201-1 *et seq*.

73.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

74.     Defendants' debt collection practices constituted acts of trade or commerce within the meaning of 73 P.S. § 201-2(3).

75.     Defendants' debt collection practices violated the FCEUA, 73 P.S. § 2270.1 *et seq*.

76.     Defendants debt collection practices also constituted deceptive conduct that created a likelihood of confusion and/or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

77.     As a direct and proximate result of Defendants' violations of the UTPCPL and the FCEUA, members of the Class have sustained actual and statutory damages for which Defendants are liable (including treble damages pursuant to 73 P.S. § 201-9(2)), together with reasonable attorneys fees and the costs of prosecuting this action.

### COUNT IV
### Tortious Interference With Contractual Relations

78.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

79.     Plaintiffs and members of the Classes executed a Mortgage and a Note (collectively "Mortgage Note") that specifically defined the terms and conditions governing the financing by mortgage lenders for purchases of residential properties. None of the Mortgage Notes executed by Plaintiffs and members of the Classes authorized or permitted any mortgage lender, mortgage holder, mortgage servicer or representative thereof (collectively "Lender or Lender's Agent") to demand or receive payment of fees or costs that were not actually incurred in connection with the enforcement of any legal right under the Mortgage Notes. The Mortgage Notes established a contractual relationship between Plaintiffs and members of the Classes, on one hand, and the Lender or Lender's Agent, on the other hand.

80.     In filing sworn claims that Plaintiffs and members of the Classes owed an inflated amount of sheriffs' fees in connection with foreclosure sales that were stayed by operation of bankruptcy law, and in retaining for themselves and/or their clients deposits that were returned by county sheriffs, Defendants purposefully induced or caused their clients to violate the terms of the Mortgage Notes and thus to breach their contracts with Plaintiffs and members of the Classes.

81.     In tortiously interfering with the contractual relationships between their clients, on one hand, and Plaintiffs and members of the Classes, on the other, Defendants acted without privilege or justification.

82.     As a direct and proximate result of Defendants' aforementioned conduct, members of the Class have sustained damages in an amount yet to be determined.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demands a trial by jury of all of the claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     The conduct of Defendants be determined to have violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.

C.     The conduct of Defendants be determined to have violated Pennsylvania's Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1 *et seq*.

D.     The conduct of Defendants be determined to have violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et. seq*.

E.     Defendants be found liable to Plaintiffs and members of the class under the common laws of the Commonwealth of Pennsylvania and the State of New Jersey for tortious interference with contractual relations.

F.      Judgment be entered against Defendants for damages sustained by Plaintiffs and the members Classes to the maximum extent allowed by law, together with the costs of this action, including reasonable attorneys' fees.

G.      Judgment be entered ordering restitution and disgorgement of funds obtained by Defendants as a result of their wrongful conduct.

H.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)   Inflating claims by overstating the amount of fees owed to county sheriffs in connection with foreclosure sales that are stayed by operation of 11 U.S.C. § 362; and

(2)   Withholding from insolvent homeowners any sum of money refunded by county sheriffs to PHS after foreclosure sales have been stayed by operation of 11 U.S.C. § 362.

I.      Plaintiffs and members of the Classes have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

Dated: March 25, 2009                          Respectfully submitted,


**BURKE & HESS**


By:  /s/ Michael D. Hess
    Michael D. Hess
    951 Rohrerstown Road, Suite 102
    Lancaster, Pennsylvania 17601
    Telephone: (717) 391-2911
    Facsimile: (717) 391-5808

       - and -

    **JOHN G. NARKIN**
    3000 Atrium Way, Suite 234
    Mount Laurel, New Jersey 08054
    Telephone: (856) 222-2913
    Facsimile: (856) 222-2911


    *Attorneys for Plaintiffs and the Classes*