**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS A. RHODES,** | : | |
| **GERALD A. BENDER ,** | : | |
| **EDWARD H. WOLFERD, JR.,** | : | |
| **and DIANE and CHARLES J. GILES,** | : | |
| **individually and on behalf of all** | : | |
| **others similarly situated,** | : | **Civil Action No. 5:09-cv-01302-CDJ** |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **ROSEMARIE DIAMOND, FRANCIS S.** | : | |
| **HALLINAN, DANIEL G. SCHMIEG,** | : | |
| **LAWRENCE T. PHELAN, JUDITH** | : | |
| **T. ROMANO, PHELAN HALLINAN &** | : | |
| **SCHMIEG, LLP, PHELAN HALLINAN &** | : | |
| **SCHMIEG, P.C., WELLS FARGO &** | : | |
| **COMPANY, WELLS FARGO BANK, N.A.,** | : | |
| **COUNTRYWIDE HOME LOANS** | : | |
| **SERVICING LP and COUNTRYWIDE** | : | |
| **HOME LOANS, INC. (both now owned by** | : | |
| **BANK OF AMERICA),** | : | |
| **Defendants.** | : | |

## AMENDED COMPLAINT - CLASS ACTION

**BURKE HESS & NARKIN**
John G. Narkin
3000 Atrium Way, Suite 234
Mount Laurel, NJ 08054
Tel: (856) 222-2913
Fax: (856) 222-2912

**BURKE & HESS**
Michael D. Hess
951 Rohrerstown Road
Suite 102
Lancaster, PA 17601
Tel: (717) 391-2911
Fax: (717) 391-5808

*Attorneys for Plaintiffs and the Proposed Classes*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND OVERVIEW……………………………….  1

II.  JURISDICTION AND VENUE………………………………….   4

III.  THE PARTIES……………………………………………………   5

      A.  Plaintiffs…………………………………………………...   5

      B.  Defendants………………………………………………   6

IV.  FACTUAL ALLEGATIONS………………………………….  10

      A.  Pervasive Abuse In The Mortgage Foreclosure Industry…..……  10

         1.  Record Numbers of Homeowners are at Risk
            of Losing Their Homes……………………………………. 10

         2.  Government's Response to the Foreclosure Crisis………… 13

         3.  Unscrupulous Mortgage Servicers and Their Attorneys
            Systematically Exploit and Profit From the
            Mortgage Foreclosure Crisis……………………………  19

            a.  "Egregious Mortgage-Related Schemes"
               Are "Known Problems" in the Foreclosure Industry…19

            b.  Countrywide's Documented History
               of Mortgage Servicing Abuse………………………  23

            c.  Wells Fargo's Documented History
               of Mortgage Servicing Abuse………………………  26

B.  PHS Systematically Abuses Distressed Homeowners
and the Legal System……..……………………………………..   36

1.  PHS Inflates Foreclosure Costs
on an Institutionalized Basis……………………………   37

a.  PHS Systematically Misappropriates
Sheriffs' Deposit Refunds………………………..   37

b.  PHS Systematically Uses Wholly-Owned
"Vendors"to Inflate Foreclosure Costs …...……….. 45

2.  PHS Systematically Prosecutes Foreclosure Actions
in the Names of Parties Without Legal Standing to Sue…51

3.  PHS's Wrongful Conduct Is Facilitated
By Its Thoughtless, Mechanical Application
of Client-Mandated Computer Programs……………… 67

V.  CLASS ACTION ALLEGATIONS…………………………….73

VI.  CLAIMS FOR RELIEF……………………………………… 77

COUNT I:   VIOLATIONS OF 18 U.S.C. §1962(c) (RICO)... …… 77

A.  The Phelan Hallihan &  Schmeig
Mortgage Foreclosure and Bankruptcy Enterprise……………78

B.  Defendants' Use of the U.S. Mails
and Interstate Wire Facilities…………………………………83

C.  Conduct of the RICO Enterprise's Affairs………………..…  91

D.  Defendants' Pattern of Racketeering Activity……………… 96

E.  Damages Caused by the Defendants' Scheme …………… 96

COUNT II:   VIOLATIONS OF 15 U.S.C. § 162 *et seq.* (FDCPA)...97

COUNT III:   VIOLATIONS OF 73 P.S. § 201-1(UTPCPL)……… 99

COUNT IV:  COMMON LAW FRAUD……………………...101

COUNT V:   BREACH OF CONTRACT…………………… 102

COUNT VI:   BREACH OF DUTY OF GOOD FAITH
            AND FAIR DEALING……………………………..103

COUNT VII:   MONEY HAD AND RECEIVED………...…………104

COUNT VIII:   NEGLIGENT MISREPRESENTATION………….105

VII.   JURY TRIAL DEMAND………..……………………………………106

VIII.   PRAYER FOR RELIEF………… …………………………………….106

On behalf of themselves and all others similarly situated, Plaintiffs Dennis A. Rhodes, Gerald A. Bender, Edward H. Wolferd, Jr., and Diane and Charles J. Giles ("Plaintiffs") bring this action against Defendants for damages and injunctive relief.

Except for allegations concerning their own acts and the wrongful acts of Defendants that damaged Plaintiffs' interests, Plaintiffs' allegations are based on information and belief. Plaintiffs' information and belief are derived from an investigation undertaken by their attorneys, which includes, among other things (1) interviews of witnesses; (2) review and analysis of court and other public records; and (3) review and analysis of legal journals, Congressional testimony, news media reports and published commentaries disseminated by representatives of the Office of the United States Trustee and other public agencies. Additional evidentiary support confirming the truth of the allegations in this Complaint will be established through discovery from Defendants and non-parties with knowledge of the systematic conduct alleged herein.

## I.   INTRODUCTION AND OVERVIEW

1.      This is a proposed class action on behalf of all homeowners who, during the period from January 15, 2004 through the present ("Class Period") (1) resided in the Commonwealth of Pennsylvania or the State of New Jersey; (2) were defendants in mortgage foreclosure actions prosecuted by the law firm of Phelan Hallinan & Schmeig, LLP or Phelan Hallinan & Schmeig, P.C. and their attorneys (collectively "PHS"); (3) were forced to pay systematically inflated or fabricated charges imposed by PHS in mortgage foreclosure actions that did not result in sheriffs' sales because of loan modification agreements, bankruptcy filings or distress sales. These systematically inflated or fabricated charges include, without limitation (a) misappropriation or theft of

sheriff's deposit refunds that were not credited properly to homeowners' accounts (¶¶ 78-101, below); (b) unreasonable attorneys' fees or attorney fees that were not actually incurred; (c) excessive real estate title and litigation support costs generated through inside transactions with affiliated companies owned and controlled by Defendants Lawrence T. Phelan, Francis S. Hallinan and Daniel G. Schmieg; (d) unessential property inspection and valuation fees ; and (e) duplicative costs for "services" already included in independent charges assessed by PHS. (¶¶ 102-110, below)

2.      This action is also brought on behalf of Pennsylvania and New Jersey homeowners who during the Class Period were prosecuted by PHS on behalf of "plaintiffs" that did not hold legal title to mortgages or notes relied upon by PHS in filing its foreclosure actions -- circumstances that at times caused PHS or its agents to record phony assignments with county land record agencies (¶¶ 112-144, below). In disregard of its duty of candor to the courts, among other professional and legal obligations, PHS has maintained the pretense of an attorney-client relationship with entities that have no standing to sue homeowners in foreclosure lawsuits. This contrived "representation" continues throughout state court foreclosure proceedings prosecuted by PHS and, in many instances, it persists through false creditor claims filed by PHS in federal bankruptcy actions (¶¶ 134-135, 175f and n. 182, below). As a direct and intended result of this artifice, PHS obtains for itself opportunities to reap the inflated or fabricated fees identified in ¶ 1, above.

3.      The fraudulent schemes perpetrated by PHS are made possible through the knowing cooperation of lenders or mortgage servicers that retain PHS to prosecute foreclosure actions, including Defendants Wells Fargo Bank, N.A., and Countrywide

Home Loans, Inc. (¶¶ 56-73, below). These "clients" are aware of PHS' systematic pattern of misconduct, but they encourage, facilitate and turn a blind eye to it. This is because (1) they benefit financially from PHS' wrongdoing, which is aided and abetted by computerized case management and invoicing systems that such "clients" require PHS to use  (¶¶ 148-159, below); (2) they benefit operationally from their long-term, mutually profitable relationship with a large-volume law firm that claims to be "the region's premier foreclosure operation, representing almost every major lender and loan servicer"[1] (¶¶ 192-193, below); and (3) they understand that PHS's institutionalized misconduct is but one local extension of their own established pattern of mortgage foreclosure abuses, for which they have been excoriated by federal and state judges, academic commentators, government agencies and respected experts throughout the United States. (¶¶ 56-73, below). In these and other ways, PHS and its "clients" conduct their business through an enterprise controlled by them through a pattern of racketeering. (¶¶ 175-193, below).

4.      Because of Defendants' wrongful conduct, Plaintiffs and other Class members have sustained damages substantially in excess of five million dollars. In addition, because Defendants persist in their unlawful practices, despite frequent public exposure and/or judicial condemnation of their misconduct, Plaintiffs and the Classes request an injunction requiring Defendants to undertake and implement institutionalized changes to their business and accounting practices, which in their current form exploit distressed homeowners struggling to survive in the worst financial crisis since the Great Depression.

---

[1] www.fedphe.com.

## II.   JURISDICTION AND VENUE

5.       This action is instituted against Defendants for injuries sustained by Plaintiffs and Class members resulting from Defendants' violations of the Racketeer Influenced and Corruption Act ("RICO"), 18 U.S.C. §1962(c), and the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692(e)(2)(A) and (B), 1692f(1), and 1692(g)(2). To remedy these violations, Plaintiffs seek actual and statutory damages (including treble damages under RICO), together with costs of suit and reasonable attorneys' fees. Federal question jurisdiction is conferred upon this Court by 18 U.S.C. § 1964(c); 15 U.S.C. § 1692k(d); and 28 U.S.C. §§ 1331, 1334 and 1337.

6.       This action is also instituted against Defendants for injuries sustained by Plaintiffs and Class members resulting from Defendants' violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201 *et seq.* To remedy Defendants' violations of the UTPCPL, Plaintiffs seek actual and statutory damages (including treble damages), together with costs of suit and reasonable attorneys' fees, as authorized by 73 P.S. § 201-9.2.

7.       In addition, Plaintiffs and Class members seek damages under common law remedies under the laws of the Commonwealth of Pennsylvania and the State of New Jersey. State law causes of action available to redress Defendants' systematic misconduct include common law fraud, breach of contract, breach of good faith and fair dealing, money had and received, and negligent misrepresentation. In addition to actual and statutory damages, Plaintiffs and members of the Classes also seek (1) an accounting, restitution and disgorgement of funds obtained by Defendants as a result of their

violations of federal, Pennsylvania and New Jersey law; and (2) appointment of an auditor or special master to (a) ascertain the amount of money wrongfully taken by Defendants from Plaintiffs and members of the Classes; (b) recommend specific business management and accounting procedures that Defendants must adopt and implement to avoid future repetition of the wrongful conduct documented throughout this Complaint; and (c) monitor Defendants' compliance with any business management or accounting procedure that may be ordered by the Court in granting injunctive relief in this action.

8.      The Court may adjudicate Plaintiffs' state law claims under principles of pendant jurisdiction. Moreover, under the Class Action Fairness Act of 2005, federal jurisdiction over class actions exists where, as here, any member of a class of plaintiffs is a citizen of a State different from any Defendant, and the aggregated amount in controversy exceeds five million dollars. *See* 28 U.S.C. §§ 1332(d)(2) and (6).

9.      This Court has *in personam* jurisdiction over Defendants, *inter alia*, because Defendants live in and/or maintain a principal office, have employees and agents, and regularly transact business within this District.

10.      Venue is proper in this District because many of the events giving rise to Plaintiffs' claims occurred in this District.

### III.  PARTIES

### A.  Plaintiffs

11.      Plaintiff Dennis A. Rhodes is a homeowner and a consumer within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Rhodes resides within this District in Berks County, Pennsylvania.

12.     Plaintiff Gerald A. Bender is a homeowner and consumer within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Bender resides within this District in Berks County, Pennsylvania.

13.     Plaintiff Edward H. Wolferd, Jr. is a homeowner and a consumer within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Wolferd resides within this District in Lancaster County, Pennsylvania.

14      Plaintiffs Diane and Charles J. Giles, husband and wife, were homeowners and are consumers within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Diane and Charles Giles reside in Barnegat Township, New Jersey.

## B.     Defendants

15.     Defendant Phellan Hallinan & Schmieg, LLP is a mortgage foreclosure law firm having its principal place of business at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103. PHS is a domestic limited liability general partnership organized and existing under the laws of the Commonwealth of Pennsylvania.

16.     Organized and operating as a professional corporation under the laws of the State of New Jersey, PHS also maintains an office at 400 Fellowship Road, Suite 100, Mount Laurel, New Jersey 08054.

17.     Defendant Lawrence T. Phelan purports to be the managing partner of PHS offices in both Pennsylvania and New Jersey.[2] Phelan is admitted to practice law in the Commonwealth of Pennsylvania. Although he is not licensed to practice law in New Jersey, Phelan serves as president and majority shareholder of PHS's New Jersey professional corporation.

---

[2] www.fedphe.com/index.html

18.     Defendant Francis S. Hallinan is a member of PHS, doing business in the firm's Philadelphia office. Hallinan is PHS's "administrative partner" who "oversees the firm's practices in both Pennsylvania and New Jersey." PHS describes Hallinan as "the 'behind the scenes' manager who ensures that the job gets done."[3] Hallinan is admitted to practice law in the Commonwealth of Pennsylvania and serves as vice president of PHS's New Jersey professional corporation.

19.     Defendant Daniel G. Schmieg, a one-time freelance cartoonist from Texas,[4] is now a member of PHS, doing business in the firm's Philadelphia office. Schmieg is admitted to practice law in the Commonwealth of Pennsylvania.  He serves as secretary of PHS's New Jersey professional corporation.

20.     Defendant Rosemarie Diamond is a member of PHS who, like Defendant Lawrence Phelan, also purports to be "Managing Partner of the New Jersey office of PHS."[5] Following her admission to practice in Pennsylvania in 1992, Diamond was admitted to the New Jersey Bar in 1999. Perhaps as a means of qualifying for designation as a counsel/trustee for Freddie Mac, or for other client recruitment purposes, Diamond is sometimes held out to others by PHS as a member of Phelan Hallihan Schmieg & Diamond P.C., an entity that apparently has no legal existence.[6]

21.     Defendant Judith T. Romano is a member of PHS, doing business in the firm's Philadelphia office. Romano is PHS's in-house "general counsel," who during the Class Period has had managerial responsibility for the firm's bankruptcy practice. She is

---

[3] www.fedphe.com/pages/FSH.htm
[4] www.fedphe.com/pages/DGS.htm
[5] www.fedphe.com/pages/RD.htm
[6] http://www.freddiemac.com/service/msp/pdf/desigcounsel.pdf at 15; http://www.sm-online.com/sm/ar-AFN08.pdf at 8.

admitted to practice law in the Commonwealth of Pennsylvania.

22.     Defendant Wells Fargo & Company ("WFC") is a diversified financial services company maintaining its principal executive offices at 420 Montgomery Street, San Francisco, California 94163. WFC provides retail, commercial and corporate banking services in 39 states, including Pennsylvania and New Jersey, and in the District of Columbia.  As of December 31, 2008, WFC had assets of $1.3 trillion, loans of $865 billion, deposits of $781 billion and stockholders' equity of $99 billion. Based on assets, WFC is the fourth largest bank holding company in the United States.

23.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), WFC's principal subsidiary, is a national banking association chartered in Sioux Falls, South Dakota, with principal offices at WFC's headquarters in San Francisco, California. As of December 31, 2008, Wells Fargo had assets of $539 billion, or 41% of WFC's assets. Wells Fargo provides and services residential mortgages through its division Wells Fargo Home Mortgage (or through the division's alternate name, America's Servicing Company), which maintains its headquarters at 7000 Vista Dr., West Des Moines, Iowa 50266-93.

24.     Defendant Countrywide Financial Corporation ("CFC") was a Delaware Corporation that maintained its principal executive offices at 4500 Park Granada, Calabasas, California 91302, which originated and serviced residential mortgages throughout the United States through the wholly owned subsidiaries identified in ¶¶ 25-26 below. On July 1, 2008, after CFC faced bankruptcy amid payment defaults and foreclosures tied to sub-prime mortgages, CFC merged with and became a wholly owned subsidiary of Bank of America Corporation ("Bank of America") in exchange for stock valued at $ 4.1 billion.

25.     Defendant Countrywide Home Loans, Inc. was a New York corporation maintaining its principal executive offices at 4500 Park Granada, Calabasas, California 91302. Countrywide Home Loans, Inc. provided, originated, purchased, securitized, sold, and serviced home loans. In 2006, Countrywide financed 20 percent of all mortgages in the United States (at a value of about 3.5 percent of United States Gross Domestic Product), a proportion greater than any other mortgage company.

26.     Defendant Countrywide Home Loans Servicing, LP was a Texas limited partnership doing business at 7105 Corporate Drive, Plano, Texas 75024. It was owned directly by Countrywide GP, Inc. and Countrywide LP, Inc., each a Nevada corporation and a wholly owned subsidiary of Countrywide Home Loans, Inc. Defendant Countrywide Home Loans Servicing, LP "serviced" mortgage loans originated, *inter alia*, by Defendant Countrywide Home Loans, Inc., Fannie Mae, Freddie Mac, Ginnie Mae, the U.S. Department of Housing and Urban Development and the U.S. Veterans Administration. After the July 1, 2008 CFC/Bank of America merger, Countrywide GP, Inc. and Countrywide LP, Inc. sold their partnership interest in Defendant Countrywide Home Loans Servicing, LP to a Bank of America holding company for approximately $19.7 billion. As of June 30, 2008, Countrywide Home Loans Servicing, LP's assets included approximately $15.3 billion of Mortgage Servicing Rights and $4.4 billion of reimbursable servicing advances. It now conducts business as BAC Homes Loans Servicing, LP.

27.     Defendant Bank of America is a Delaware Corporation with principal executive offices at 100 N. Tryon Street, Charlotte, North Carolina 28255. Bank of America's acquisition of CFC, Countrywide Home Loans, Inc., Countrywide Home

Loans Servicing, LP made it the largest mortgage lender and servicer in the United States.

28.     Throughout this Complaint, CFC, Countrywide Home Loans, Inc., Countrywide Home Loans Servicing, LP and Bank of America are collectively referred to as "Countrywide."

## IV.     FACTUAL ALLEGATIONS

### A.     Pervasive Abuse In The Mortgage Foreclosure Industry

### 1.     Record Numbers of Homeowners Are at Risk of Losing Their Homes

29.     In Pennsylvania, New Jersey and throughout the United States, there is an epidemic of mortgage foreclosures that the Pew Charitable Trust characterized as "Defaulting on the Dream" of homeownership.[7] As the Pew Charitable Trust warned almost two years ago, "[f]oreclosure can have a devastating impact on homeowners and their families. It can ruin their credit for years, adversely affect their jobs and children's schooling, and take away what for many Americans is their principal investment opportunity and chance to get ahead."[8]

30.     On November 19, 2009, the Mortgage Bankers Association ("MBA") reported that 14.2 percent (almost one in ten) homeowners with mortgages on their property were more than 30 days delinquent on their loans as of September 30 2009, the highest level since 1972, when the MBA first began compiling delinqency data.[9] The percentage of loans in foreclosure as of September 30, 2009 was 4.47 percent, as

---

[7]  *Defaulting on the American Dream*, PEW CHARITABLE TRUST, April 2009 ("Pew Report"), www.pewcenteronthestates.org/uploadedFiles/PCS_DefaultingOnTheDream_Report_FINAL041508_01.pdf

[8]  Pew Report at 11-12.

[9]  Press Release, *Delinquencies Continue to Climb in Latest MBA National Delinquency Survey*, MORTGAGE BANKERS ASSOCIATION, Nov. 19, 2009, http://www.mortgagebankers.org/NewsandMedia/PressCenter/71112.htm;

compared to 2.7 percent for the same date in 2008, according to the MBA; this translates into a total of one in seven American mortgageholders now in dire financial straits. Overall, more than **five million** households are in jeopardy of losing their homes.[10]

31.    About a month before the MBA released the above numbers, the Congressional Oversight Committee, pursuant to Section 125(b)(1) of Title 1 of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, released a report on October 9, 2009 entitled "An Assessment of Foreclosure Mitigation Efforts after Six Months" ("Congressional Report").[11] The Congressional Report descrbed the gravity of the nation's mortgage foreclosure problem in appropriately stark terms:

> The United States is now in the third year of a foreclosure crisis unprecedented since the Great Depression, with no end in sight. Of the 75.6 million owner-occupied residential housing units in the United States, approximately 68 percent (51.6 million) of homeowners carry a mortgage to finance the purchase of their homes. Since 2007, 5.4 million of these homes have entered foreclosure, and 1.9 million have been sold in foreclosure. Absent a significant upturn in the broader economy and the housing market, another 3.5 million homes could enter foreclosure by the end of 2010.

> Foreclosure rates are now nearly quadruple historic averages (see Figures 1 and 2).… Homeowners avoiding foreclosure, but still losing their homes in pre-foreclosure sales (short sales) or deeds-in-lieu (DIL) transactions further add to this crisis.

Congressional Report at 6 (footnotes omitted).

---

[10]  David Streitfeld, *U.S. Mortgage Delinquencies Reach a Record High*, N.Y. TIMES, Nov. 20, 2009 (http://www.nytimes.com/2009/11/20/business/20mortgage.html); Renae Merle, *Problem Mortgages Hit New High at 14 Percent*, Nov 20, 2009, WASH. POST, Nov. 20, 2009 (http://www.washingtonpost.com/wp-dyn/content/article/2009/11/19/AR2009111903885.html); E. Scott Richard, *Foreclosures Will Keep Rising Through 1010, Report Says*, L.A. TIMES, Nov. 20, 2009 (http://www.latimes.com/business/la-fi-mortgage-defaults20-2009nov20,0,1052221.story); Renae Merle, *Foreclosure, Delinquency Rates Spike Amid Growing Unemployment*, WASH.POST,Nov.19,2009,(http://www.washingtonpost.com/wpdyn/content/article/2009/11/19/AR2009111902097.html); Julie Haviv, *One in 7 U.S. Mortgages Foreclosing or Are in Default*, REUTERS, Nov. 19, 2009, (http://www.reuters.com/article/idUSN1937065020091119).

[11]  A PDF copy of the Congressional Report can be found on a link contained in http://cop.senate.gov/reports/library/report-100909-cop.cfm

32.     Charts set forth in the Congressional Report, which reflect information superceded by the more discouraging MBA November 19, 2009 data, illustrate an escalating human tragedy that cannot be captured by statistics alone.[12]



Figure 1: Percentage of Single Family Residential Mortgages Delinquent

\*          \*          \*



Figure 2: Percentage of Single Family Residential Mortgages in Foreclosure

---

[12]   The statistics alone are chilling: One alarming statistic is the estimate that "2 million children will lose their homes to foreclosure," which would not only deprive them of a place to live, but destabilize their educational foundation. *See* Congressional Report at 7 n.7, *citing*, FirstFocus, *The Impact of the Mortgage Crisis on Children* (Apr. 30, 2008) ( www.firstfocus.net/Download/HousingandChildrenFINAL.pdf) (*citing* Russell Rumberger, *The Causes and Consequences of Student Mobility*, Journal of Negro Education, Vol. 72, No. 1, at 6-21, (2003)). For a real life human story behind the frightening numbers, *see* Erik Eckholm, *A Surge of Homeless Children Tests School Aid Program*, N.Y. TIMES, Sept. 5, 2009 (http://www.nytimes.com/2009/09/06/education/06homeless.html).

33.     One primary "foreclosure driver" is peristent unemployment.[13]  On December 4, 2009, the U.S. Department of Labor, Bureau of Labor Statistics, reported that the unemployment rate stood at a rate of 10 percent of the American workforce, or approximately 15.4 million people, not including another 861,000 discouraged people who are no longer actively seeking employment because they believe no jobs are available.[14] (By contrast, at the start of the recession in December 2007, the number of unemployed persons was 7.5 million, and the jobless rate was 4.9 percent). Among the employed, the number of persons working part time who would have preferred full-time work was 9.2 million.

34.     Despite historically low interest rates (as of December 1, 2009, the average interest rate for a conventional 30-year mortgage was just 4.65 percent),[15] and despite efforts by federal, state and local governments to contain the still-mushrooming foreclosure crisis, record numbers of people continue to face the nightmare of losing their homes.

## 2.  Government's Response to the Mortgage Foreclosure Crisis

35.       All levels of government in the United States have recognized and reacted to the personal catastrophes wrought by the foreclosure crisis, with varying decrees of success.

36.       On March 4, 2009, the U.S. Department of the Treasury issued initial guidelines for what was called the "Making Home Affordable Program," the purpose of

---

[13]   *See* Congressional Report at 103; 5 ("Rising unemployment, generally flat or even falling home prices, and impending mortgage rate resets threaten to cast millions more out of their homes, with devastating effects on families, local communities, and the broader economy. Ultimately, the American taxpayer will be forced to stand behind many of these mortgages").

[14]   Bureau of Labor Statistics, Economic News Release, Dec. 4, 2009(http://www.bls.gov/news.release/empsit.nr0.htm)

[15]   Press release, ZILLOW MORTG. RATE MONITOR, Dec. 1, 2009 (http://www.prnewswire.com/news-releases/thirty-year-fixed-mortgage-rate-continues-rapid-fall-lowest-rate-since-zillow-mortgage-marketplace-launched-in-april-2008-78212772.html)

which is to "prevent the destructive impact of foreclosures on families, communities and the national economy."[16] Approved by Congress at a cost to American taxpayers of $75 billion, the Helping Families Stay in Their Homes Act of 2009 was signed into law by President Barack Obama on May 20, 2009,[17] establishing what is now known as the Home Affordable Modification Plan ("HAMP"). As the President said at the time of the bill's signing:

> [T]oo many Americans are hurting.  They're Americans desperate to find a job, or unable to make ends meet despite working multiple jobs; Americans who pay their bills on time but can't keep their heads above water; Americans living in fear that they're one illness or one accident away from losing their home -- hardworking Americans who did all the right things, met all of their responsibilities, yet still find the American Dream slipping out of reach.

37.    HAMP tries to support loan modifications that will provide sustainable, affordable mortgage payments for up to 3 to 4 million borrowers by offering "pay-for-success" incentives to investors, lenders, servicers, and homeowners.[18] For servicers, these incentives include receipt of an up-front payment of $1,000 for each successful modification after completion of the trial period, and "pay for success" fees of up to $1,000 per year, provided the borrower remains current, as well as other financial rewards. As of June 17, 2009, Defendant Countrywide, by itself, received $5.2 billion in federal taxpayer incentives to work with borrowers to avoid foreclosure.[19]

---

[16]   http://www.treas.gov/press/releases/reports/guidelines_summary.pdf
[17]   http://www.whitehouse.gov/the_press_office/Remarks-by-the-President-at-Signing-of-the-Helping-Families-Save-Their-Homes-Act-and-the-Fraud-Enforcement-and-Recovery-Act/
[18]   *See* Testimony dated September 9, 2009 by U.S. Treasury Department Assistant Secretary For Financial Institutions, Michael S. Barr, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity. (http://makinghomeaffordable.gov/pr_09092009.html)
[19]   Martin Crutsinger, *Treasury Adds $3.1 Billion to Foreclosure Program*, A. P., June 17, 2009 (http://www.boston.com/business/articles/2009/06/17/treasury_adds_31b_to_foreclosure_program/)

38.     Despite the magnitude of the problem and its expense to American taxpayers, HAMP has not achieved the success desired by the federal government. This was apparent on October 10, 2009 with the issuance of the Congressional Report, which expressed concern about the limited scope and scale of the Making Home Affordable Program and questioned whether the Treasury Department's strategy will lead to permanent mortgage modifications for many homeowners.[20] The Congressional Report singled out for criticism some members of the mortgages servicing industry for failing to meet the obligations they assumed under HAMP:

> A key element to HAMP's success is the degree to which servicers comply with the Program's guidelines. If borrowers face incorrectly rejected applications, unreasonably long wait times for responses to questions and completed applications, lost paperwork, and incorrect information, HAMP will not reach its full potential.
>
> \*       \*       \*
>
> Preliminary information … suggests some participating servicers violate HAMP guidelines in a number of … serious ways, including requiring borrowers to waive legal rights, offering non-compliant loan modifications, refusing to offer HAMP modifications, charging borrowers a fee for the modification, and selling homes at foreclosure while the HAMP review is pending. Others have found such violations as "[d]enials of HAMP modifications for reasons not permitted in the guidelines," such as "insufficient income" and "too much back-end debt," assertions by participating servicers that they are not bound by HAMP, and incorrect "claims of investors denying HAMP modifications."

Congressional Report at 106-07 (footnote omitted).

39.     Uncertainty over the possibility that HAMP is "foundering" became even more pronounced on November 28, 2009, when *The New York Times* quoted Assistant Treasury Secretary Thomas Barr as stating that the "banks are not doing a good enough

---

[20]  *See* Congressional Report at 6-7 (link available at http://cop.senate.gov/reports/library/report-100909-cop.cfm).

job. Some of the firms ought to be embarrassed, and they will be."[21]  While Secretary Barr promises that recalcitrant mortgage servicers[22] will be made to "suffer the consequences," some observers think these may be "empty threats" because "Treasury relies on voluntary agreements and cash incentives to get servicers to help homeowners."[23]

40.     Both the Philadelphia Court of Common Pleas and the State of New Jersey have been in the vanguard of state and local efforts to lessen the pain of everyday citizens facing loss of their homes through foreclosure. Both of these programs are mandatory. Citing an "unprecedented increase in mortgage foreclosures" (and the accompanying "social dislocation, declining housing values, neighborhood blight, homelessness, and a general decline in neighborhood morale and safety"), New Jersey's Administrative Office of the Courts in January 2009 implemented a mandatory program under which mortgage lenders or servicers are required to submit to mediation requested by homeowners.[24]

41.     Months before the foreclosure crisis gave rise to the federal HAMP program and the New Jersey mediation program, on April 16, 2008, the First Judicial District of

---

[21]  Peter S. Goodman, *U.S. Will Push More Firms to Reduce More Loan Payments*, N.Y. TIMES, Nov. 28, 2009  (http://www.nytimes.com/2009/11/29/business/economy/29modify.html). One real-life example of intransigent conduct by Bank of America (as successor to Countrywide) and its law firm, PHS, is described in an article written by Barry Carter, *Fearing the Approach of the Sheriff's Officer*, NEWARK STAR LEDGER, Dec. 30, 2009 (http://www.nj.com/news/ledger/jersey/index.ssf?/base/news-15/1262139307228080.xml&coll=1).

[22]  Both Bank of America and Wells Fargo have been singled out as institutions that have "lagged" behind other servicers in responding to the federal government's mortgage relief initiative. *See* Darrell Delamonte, *BofA/Countrywide Lags Other Lenders in HAMP Loan Modifications*, DSNEWS.COM, Oct. 15, 2009 (http://www.dsnews.com/articles/bofa-countrywide-lags-other-lenders-in-hamp-loan-modifications-2009-10-15); Alan Zibel, *Two Big Banks Lag in Mortgage Aid Program*, A.P., Aug. 4, 2009 (http://www.dailybreeze.com/ci_12989252); Alan Zibel, *Foreclosure Wave Feared As Mortgage Aid Lags Behind Goal*, A.P., Dec. 11, 2009 (http://www.boston.com/business/articles/2009/12/11/foreclosure_wave_feared_as_mortgage_aid_lags_behind_goal/ ) *See also* http://makinghomeaffordable.gov/docs/MHA%20Public%20111009%20FINAL.PDF at 4-5.

[23]  Theo Francis, *Treasury's Mortgage Modification: Empty Threats?*, BUS. WEEK, Dec. 2, 2009 (http://www.businessweek.com/bwdaily/dnflash/content/dec2009/db2009121_237976.htm)
[24]   Press Release, *Statewide Mortgage Foreclosure Mediation Program Launched*, OFFICE OF N.J. ATTY. GEN, Jan. 9, 2009 (http://www.nj.gov/oag/newsreleases09/pr20090109a.html).

Pennsylvania, Philadelphia Court of Common Pleas, established a "Residential Mortgage Foreclosure Diversion Pilot Program" under which "[o]wner-occupied residential properties which are subject to execution to enforce a residential mortgage cannot proceed to Sheriff Sale unless a conciliation conference is held…."[25]

42.     Philadelphia's program is viewed as a "national model to keep people in their homes."[26] As the *New York Times* reported on November 17, 2009, "In a nation confronting a still-gathering crisis of foreclosure, Philadelphia's program has emerged as a model that has enabled hundreds of troubled borrowers to retain their homes. Other cities, from Pittsburgh to Chicago to Louisville, have examined the program and adopted similar efforts."[27]  From the Program's inception in April 2009 through September 2009, 6,300 conferences have been scheduled with approximately 1,600 homes saved from sheriffs' sale, not including another 3,000 cases that may be resolved as the parties continue to negotiate.[28]

43.     While the Philadelphia program accomplishes what it can, homeowner advocates and foreclosure lawyers alike are mindful of the program's limitations. For example, at a hearing on foreclosure mitigation held by the Congressional Oversight Panel on September 24, 2009, Irwin Trauss, supervising attorney with the Consumer Housing Unit at Philadelphia Legal Assistance, testified:

---

[25]    First Judicial District of Pennsylvania, Philadelphia Court of Common Pleas, Joint General Court Regulation No. 2008-01, April 16, 2009 (http://fjd.phila.gov/pdf/regs/2008/cpjgcr-2008-01.pdf).

[26]    Jon Hurdle, *Philadelphia Program is Model in U.S. Housing Crisis*, REUTERS, Sept. 26, 2009 (http://www.reuters.com/article/gc03/idUSTRE48P58I20080926)

[27]    Peter S. Goodman, *Philadelphia Gives Homeowners a Chance to Stay Put*, N.Y. TIMES, Nov. 17, 2009 (http://www.nytimes.com/2009/11/18/business/18philly.html?_r=1).

[28]    Testimony of Hon. Annette M. Rizzo, Judge of the Court of Common Pleas for the First Judicial District of Philadelphia County, at Hearing on Foreclosure Mitigation Efforts Under TARP Before the Congressional Oversight Panel, Sept. 24, 2009 ("COP Hearing"), at 8. *See also* Testimony of Irwin Trauss at COP Hearing at 6. PDF copies of the COP Hearing testimony can be found on a link located in http://cop.senate.gov/hearings/library/hearing-092409-philadelphia.cfm.

[V]oluntary modifications resulting from programs such as the [Philadelphia] Diversion Program and [federal] MHA will not enable families to save their homes in the vast numbers required to significantly stem the tide of foreclosures. Voluntary modifications, while helpful to some people, in my experience, only help at the margins. Preventing foreclosures in the numbers necessary to have a significant impact on the continued erosion of the housing market and the mass dislocation of people from their homes requires something more. We are faced now with loans that are defaulting for a combination of reasons. In addition to the millions of loans that are in default because they were unaffordable and unsustainable when they were made, we now have millions of defaults that are the result of the rising tide of unemployment. To address this situation we need a multi-pronged approach that is not dependent on the willingness of the mortgage servicers to agree to the solution and is not dependent on the lenders determining for themselves whether they have complied with the requirements of the program.[29]

44.    PHS partner Rosemarie Diamond, identified above at ¶ 20, co-wrote an article circulated to her colleagues at the USFN, a foreclosure industry group that refers to itself by the registered trademark, "America's Mortgage Banking Attorneys."[30] This article, published on February 12, 2009, asserts that the Philadelphia program has produced "near chaos" and "little success," yielding mostly failed mediations that "waste valuable judicial resources" and create "delay as an unproductive by-product." Diamond, the only author of the article whose firm practices in Philadelphia, wrote:

Thus far, Philadelphia County has spent nearly $1 million promoting and managing the program. Of the 686 mandatory conciliation conferences attended by this author's firm on behalf of its clients, only 31 matters were settled as a result of the conferences. During that same time period, direct loss mitigation efforts between the lenders and borrowers resolved 103 of the pending actions. In essence, the direct efforts of the parties are

---

[29]   http://cop.senate.gov/hearings/library/hearing-092409-philadelphia.cfm
[30]   Peter Mehler, Rosemarie Diamond and Michele Sensale, *Mediation: Views from OH, PA, NJ, and CT*, USFN, Feb 12, 2009 (http://www.usfn.org/AM/Template.cfm?Section=Home&CONTENTID=11901&TEMPLATE=/CM/HTMLDisplay.cfm&SECTION=Article_Library).

three times more successful than the court-sponsored mediation program.

If Defendant Diamond's statement is true, it is an indictment of PHS' refusal to participate in good faith in Philadelphia's Residential Mortgage Foreclosure Diversion Pilot Program more than it is a *bona fide* criticism of the program itself.

45.     As demonstrated below, the institutionalized practices of some mortgage servicers and their attorneys (PHS prominently among them) have exacerbated the toxic explosion of residential mortgage foreclosures that has eluded solution by federal, state and local government. Whether a solution can be found is uncertain, but judicial authority can and should be exercised to require mortgage servicers and their lawyers to follow established legal rules, and to punish them severely when they don't.

### 3.     Unscrupulous Mortgage Servicers and Their Attorneys Systematically Exploit and Profit From the Mortgage Foreclosure Crisis

#### a.   "Egregious Mortgage-Related Schemes" Are "Known Problems" in the Foreclosure Industry

46.     While the lives of millions of homeowners and their families have been turned upside down by the foreclosure crisis, painful times have presented unprecedented opportunities for profit to servicers and law firms like PHS that specialize in the prosecution of residential foreclosure actions and related bankruptcy matters. They have cashed in on these opportunities in ways that are both morally bankrupt and unlawful.

47.     In a March 30, 2008 article, the *New York Times* identified several cases in which homeowners forced into bankruptcy under threat of losing their homes to foreclosure have been victimized by "improper fees" charged by mortgage servicers and their lawyers. As the *Times* reported:

> [A] small army of law firms and default servicing companies, who represent mortgage lenders, have been raking in mounting profits. These little-known firms assess legal fees and a host of other charges, calculate what the borrowers owe and draw up the documents required to remove them from their homes. As the subprime mortgage crisis has spread, the volume of the business has soared, and firms that handle loan defaults have been the primary beneficiaries. Law firms, paid by the number of motions filed in foreclosure cases, have sometimes issued a flurry of claims without regard for the requirements of bankruptcy law, several judges say.[31]

48.     Institutionalized exploitation of financially distressed homeowners and abuse of the nation's system of justice has become so prevalent among mortgage servicers and their law firms that the Office of the United States Trustee ("UST"), part of the U.S. Department of Justice, has made it a priority to identify and punish creditors and counsel that file false or inaccurate claims in foreclosure-related bankruptcy cases.[32]

49.     On May 6, 2008, a subcommittee of the United States Senate's Committee on the Judiciary convened a hearing on the topic "*Policing Lenders and Protecting Homeowners: Is Misconduct In Bankruptcy Fueling the Foreclosure Crisis?*" Testimony provided at the hearing by Clifford J. White III, Executive Director of the UST, leaves no doubt that the answer is yes. Director White testified:

> Protecting consumer debtors is one of the most important objectives of the [UST]'s enforcement efforts. One of the basic principles of our bankruptcy system is that the honest but unfortunate debtor deserves a

---

[31]Gretchen Morgenson and Jonathan D. Glaser, *Foreclosure Machine Thrives on Woes*, N.Y.TIMES, Mar. 30, 2008 (http://www.nytimes.com/2008/03/30/business/30mills.html?_r=1&sq=morgenson&st=nyt&scp=8&pagewanted=all.) *See also* Ray Glier, *Legal Eagles Swooping in on Foreclosure Work*, ATLANTA BUS. CHRON., Oct. 24, 2008 ("Glier") ("Not only do the law firms get a set fee from the banks, but some also tack on their own fees to the foreclosure process, such as fax fees, auction fees and sheriff fees, among other charges"), www.bizjournals.com/atlanta/stories/2008/10/27/focus5.html?b=1225080000%5E1720032&brthrs=1

[32]     Pamela A. MacLean, *Mortgage Industry Probes Grow*, NAT'L. L.J., July 28, 2008 ("Allegations of shoddy accounting and padded bankruptcy claims have grown to such a pitch against the mortgage loan servicing industry and its lawyers that investigations have been launched by the Executive Office for U.S. Trustees and the Federal Trade Commission") (http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1202423359052). *See also* Glier (The UST "says business is too good for some law firms that handle actual foreclosures. The government and its judges in some states -- particularly Texas, Florida, Ohio, Nevada, and one case in Georgia -- are investigating lenders and their lawyers for tacking on fees to distressed homeowners and running up their mortgage payments").

fresh start. Those who prey upon debtors for their own financial gain undermine that basic principle.

Among the more egregious mortgage-related schemes that we encounter are those perpetrated upon consumers facing foreclosures on their loan … [We] have been involved in significant litigation involving national mortgage servicing firms. Most of these cases involve homeowners who are behind in their mortgage payments and file for relief under chapter 13 of the Bankruptcy Code. To date, we have commenced actions or intervened in 16 pending cases involving mortgage servicers in eight judicial districts around the country. In addition, we are actively reviewing more than 30 cases in which we have not yet filed court papers.

The US[T] has investigated complaints that some mortgage servicers were filing inaccurate papers in court claiming that debtors owe more money than they actually owe. We also investigated complaints that some mortgage servicers were tacking on charges that were undisclosed and impermissible under the terms of the loan contract or other applicable law.[33]

50.     Director White explained in his Senate testimony that "in response to an increasing number of complaints about the accuracy of bankruptcy court filings," the UST established a "working group" to "review the complaints and devise a coordinated approach for addressing the problem."

51.     During 2008, the UST initiated 68 actions against "systematic abuses" by mortgage servicers, including Defendant Countrywide, which has been the subject of litigation by UST in at least six states.[34] The UST's effort to uncover and punish abuses by mortgage servicers and their lawyers has continued into 2009, resulting in thoughtful judicial opinions that have shed light on improper practices that are a systemic blight on

---

[33]   Statement of Clifford J. White Before the Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts, United States Senate, May 6, 2008 ("White Testimony") at 2; 5-6 (http://www.justice.gov/ust/eo/public_affairs/testimony/docs/testimony20080506.pdf)

[34]   United States Trustee Program, *Annual Report for Fiscal Year 2008*, at 9-10 (http://www.justice.gov/ust/eo/public_affairs/annualreport/docs/ar2008.pdf); United States Trustee Program, FY 2010 Budget Request at 25-26 (http://www.justice.gov/jmd/2010justification/pdf/fy10-ustp.pdf); Kathy M. Kristof, *U.S. Investigates Countrywide Fees*, L.A. TIMES, Nov. 29, 2007 (http://www.latimes.com/business/la-fi-countrywide29nov29,1,4192234.story.)

the residential mortgage foreclosure industry (*see* ¶¶ 56-73, below).

52.     Despite the UST's effort "to protect homeowners from lenders who improperly inflate their claims or who seek to foreclose on property without a proper showing of arrearages,"[35] the magnitude of the institutionalized problem of mortgage servicing abuse remains of scandalous proportions, and the ability of the UST to address the problem effectively is limited by budgetary and human resource constraints, as well as by confinement of the UST's jurisdictional mandate to cases arising under the United States Bankruptcy Code.

53.     The seriousness of this issue has been underscored by an empirical study of 1,700 foreclosure-related Chapter 13 cases conducted by University of Iowa College of Law Professor Katherine M. Porter (funded by the National Conference of Bankruptcy Judges' Endowment for Education). Professor Porter found that questionable fees were added to borrowers' bills in nearly half of the mortgage loans she examined.[36] The data complied and analyzed by Professor Porter support her conclusion that "flawed mortgage servicing practices are a key contributor to the current crisis in the home mortgage market."[37]

54.     While abusive mortgage servicing practices are often pronounced in bankruptcy proceedings, they harm non-bankrupt homeowners in a no less of an insidious way. Professor Porter observed that "[t]he misbehavior and mistakes of mortgage servicers [identified] in the bankruptcy data are not specific to the bankruptcy process. Indeed, the reliability of mortgage servicing may be worse for ordinary, nonbankrupt

---

[35]   Doreen Soloman, *Collaborative Efforts Help Protect Debtors From Unscrupulous Mortgage Schemes*, EXECUTIVE OFFICE OF U.S. TRUSEES, http://www.usdoj.gov/ust/eo/public_affairs/articles/docs/2008/nac_200812.pdf

[36]   Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 Texas L.Rev. 121, 124 (2008) ("Porter Study") (http://www.utexas.edu/law/journals/tlr/assets/archive/v87/issue1/porter.pdf).
*See also* Gretchen Morgenson, *Dubious Fees Hit Borrowers in Foreclosure*, Nov. 6, 2007 (http://www.nytimes.com/2007/11/06/business/06mortgage.html?fta=y&pagewanted=all)

[37]   Porter Study at 124.

Americans."[38]

55.     As Professor Porter testified at the May 6, 2008 Senate Judiciary

Subcommittee hearing on misconduct in the mortgage servicing industry:

> While bankruptcy is supposed to offer families one last chance to save
> their homes from foreclosure, the reality is that bankruptcy gives
> mortgage servicers new opportunities to engage in abusive practices.
> My study of 1700 bankruptcy cases showed that mortgage lenders
> routinely disobey clear rules of bankruptcy law and attempt to collect
> thousands more dollars than consumers believe is owed. These
> findings, along with dozens of published cases from bankruptcy
> courts, highlight how mortgage servicers' current practices permit
> them to impose unwarranted fees without scrutiny or sanction.
>
> The existing system does not ensure that borrowers pay only what is
> due under the terms of their mortgage notes. Instead, mortgage
> servicers can and do take advantage of struggling homeowners. Such
> misbehavior can cripple a family's efforts at homeownership. Without
> improved laws and enforcement activity, homeowners in financial
> trouble -- **both inside and outside bankruptcy** -- remain vulnerable
> to mortgage servicers' misbehaviors and mistakes. The costs of such
> abuse are devastating: families wrongfully lose their homes, the
> number of foreclosures is driven upward, and the integrity of the legal
> system is undermined.[39]

**b.  Countrywide's Documented History of Mortgage Servicing Abuse**

56.     After a trial in an adversary proceeding initiated by the UST, on July 31,

2009, Chief Judge Marilyn Shea-Stonum of the United States Bankruptcy Court for the

Northern District of Ohio (citing Professor Porter as "one of the most deservedly

respected scholars working to shed light on bankruptcy practices across the country")

imposed sanctions against Defendant Countrywide for systematic mortgage servicing

---

[38]  *Id.* (emphasis supplied). *See also* Written Testimony of Katherine Porter Before the Committee on the
Judiciary, Subcommittee on Administrative Oversight and the Courts, United States Senate, May 6, 2008
("Porter Testimony") at 2 (http://judiciary.senate.gov/pdf/08-05-06Porter_Testimony.pdf), *citing*, Federal
Trade Commission, *Mortgage Servicing: Making Sure Your Payments Count*
(http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea10.shtm).("Any homebuyer can be a victim of
abusive or illegal mortgage servicing. The documented instances of misbehavior are not limited to
situations when a family files bankruptcy.")
[39]  Porter Testimony at 1-2 (emphasis supplied).

practices determined to be " not reasonable," "reckless," an "abuse of process" and a "known problem" that Countrywide failed to correct despite "firm warnings from bankruptcy courts throughout the country."[40] Among other things, Judge Shea-Stonum found that:

> (1) "Countrywide's system for filing proofs of claim was designed to allow each actor in the process to act with indifference to the truth,"[41] which evidences "Countrywide's disregard for diligence and accuracy."[42]

> (2) Although Countrywide claimed to have made "improvements" to its discredited procedures, "none of them have sufficiently altered the nature of Countrywide's business model to prevent the same type of error and abuse from taking place in other … cases"[43]

> (3) "One problem with relying on the mortgage servicing industry to voluntarily improve its practices is the industry's incentives to increase costs. Its interests are not aligned with the borrower, nor even in some circumstances with its investor."[44]

---

[40] *McDermott v. Countrywide Home Loans, Inc.*, Case No. 07-51027, Adv. No. 08-5031 (Bank. N.D. Ohio, July 31, 2009), Slip. Op. at 2, 3-4, 9. A copy of Judge Shea-Stonum's July 31, 2009 Opinion is attached as Exhibit A in the accompanying submission entitled "Compendium of Exhibits to Amended Class Action Complant," which is filed contemporaneously with this Amended Complaint. Documents included in this compendium are hereinafter identified as "Ex. __."

[41] *Id*. at 8.

[42] *McDermott v. Countrywide Home Loans, Inc.*, 2009 Bankr. LEXIS 2666, at *30-31 (Bank. N.D. Ohio, May 1, 2009).

[43] Ex. A at 8-9.

[44] *Id*. at 7-8, *quoting* Porter Study at 126-27. As a paper written by the Federal Reserve Bank of Boston concluded, "[t]he rules by which servicers are reimbursed for expenses may provide a perverse incentive to foreclose rather than modify" delinquent loans. Peter S. Goodman, *Mortgage Lenders Have Little Incentive to Help Homeowners*, N.Y. TIMES, July 30, 2009 (http://www.nytimes.com/2009/07/30/business/30services.html). Rich Miller, who oversaw "training" programs at Countrywide and worked as a project manager at Bank of America, told the *New York Times* that Bank of America's "short-term strategy" was to respond reluctantly to loan modification requests because there was greater profit to be made by waiting and hoping the economy will improve and delinquent customers will resume making payments. *Id.* David Dickey, a former Countrywide/Bank of America mortgage sales team leader, likewise told the *Times* that "[i]f they do a loan modification, they get a few shekels from the government," but "[t]here's all sorts of things behind the scenes" when it comes to the fee-generating rewards of foreclosures. *Id.* The dismal record of loan modifications compiled by Bank of America (*see* above at ¶ 39 n. 21 and 22) is eloquent testimony to its appreciation of "the perverse incentive to foreclose rather than modify" troubled homeowners' loan obligations.

57.     In addition to the "firm warnings from bankruptcy courts throughout the country" mentioned by Judge Shea-Stonum,[45] Countrywide's mortgage abuses have also been the subject of investigation by the federal government, not only by the UST, but by the Federal Trade Commission and the Federal Bureau of Investigation.[46] This on top of civil actions brought by the Attorneys General of California and 10 other states, who obtained a settlement valued at $8.6 billion as a remedy for Countrywide's institutionalized "lending practices [that] turned the American dream into a nightmare for tens of thousands of families by putting them into loans they couldn't understand and

---

[45] *See, e.g.*, *Walton v. Countrywide Home Loans, Inc.*, 2009 WL 1905035, at *9 (S.D. Fla. June 9, 2009) (rejecting bankruptcy court conclusion that UST failed to state a claim for injunctive relief based on allegations that "Countrywide is a major national lender and servicer of secured loans that frequently seeks the payment of money from bankruptcy estates or the foreclosure of consumer mortgages. Countrywide has in the past … repeatedly failed to ensure the accuracy of its motions and pleadings when seeking relief from bankruptcy courts, which has abused the bankruptcy process and prejudiced parties in interest. Further, Countrywide's practices and conduct are likely to continue…."); *In re Countrywide Home Loans, Inc*., 387 B.R. 467, 399 (Bankr. W.D.Pa. 2008) ("cases appear to reflect a common pattern, thread, or theme that runs through them involving the manner in which Countrywide, generally, calculates and determines the extent of its bankruptcy claims."); *In re Parsley*, 384 B.R. 138, 184 (Bankr. S.D. Tex. 2008) (criticizing "Countrywide's corporate culture" that "condones blocking personnel from communicating with outside counsel," "discourages the checking of outside counsel's work," and "promotes payment histories that are so confusing to the vast majority of persons, including attorneys and judges — not to mention borrowers — that it becomes necessary for legal assistants to 'simplify' them — leading to more errors and confusion; court called upon Countrywide to "reevaluate its policies and procedures … to ensure that its actions do not undermine the integrity of the bankruptcy system"); *Hill v. Countrywide (*No. 01-22574, Show Cause Order, Hearing Transcript (Bankr. W.D. Pa. Dec. 20-21, 2007) (Countrywide "recreated" escrow letters produced in post-discharge dispute, which the presiding judge described as "a smoking gun that something is not right in Denmark"; settlement required Countrywide to pay $100,000 to debtor in damages) (*see also* Gretchen Mortgenson, *Lender Tells Judge It 'Recreated' Letters*, N.Y. TIMES, Jan. 8, 2008, (http://www.nytimes.com/2008/01/08/business/08lend.html?_r=2&pagewanted=all)).

[46]   *See* Countrywide Form 10-Q filed with the U.S. Securities and Exchange Commission for the period ended June 30, 2008, Note 26 to Consolidated Financial Statements at 52-53 (http://sec.gov/Archives/edgar/data/25191/000104746908009150/a2187147z10-q.htm); Jonathan Stempel, *Countrywide Faces FTC Probe Over Loan Serving*, REUTERS, Aug. 11, 2008 (http://www.reuters.com/article/idUSN1140200320080811);
 *See also* http://www.ftc.gov/foia/frequentrequest.shtm (link for PDF copy of FTC's response to Freedom of Information Act request for consumer complaints against Countrywide; 1,269 complaints were received by FTC during the period from October 2005 through April 27, 2009).

ultimately couldn't afford," which in turn caused "catastrophic damage" to victimized homeowners.[47]

### c.   Wells Fargo's Documented History of Mortgage Servicing Abuse

58.     Defendant Wells Fargo's record of institutionalized mortgage servicing abuse appears to be even worse than that of Defendant Countrywide. For example, on April 10, 2008, the Hon. Elizabeth W. Magner of the United States Bankruptcy Court for the District of Louisiana sanctioned Wells Fargo for a "systematic" policy and "corporate practice" that fails to "notify borrowers of the assessment of fees, costs, or charges [including sheriff's fee refunds] at the time they are incurred," a practice that exists during all stages of [Wells Fargo's] loan's administration and is not peculiar to loans involved in a bankruptcy."[48] Describing Wells Fargo's conduct as "duplicitous and misleading," Judge Manger observed:

> Although Wells Fargo was specifically asked to reconcile the amounts reflected on its prior proofs of claim with the amounts claimed on its account history, it did not. A review by the Court revealed why: the proofs of claim filed in the 2004 and 2007 Bankruptcies were so significantly erroneous that a reconciliation was not possible. Charges for NSF fees, tax searches, property preservation fees, and unapproved bankruptcy fees appeared on the proofs of claim filed in this and previous cases without explanation or substantiation.

> *     *     *

> The Court finds that Wells Fargo was negligent in its practices and took insufficient remedial action following this Court's rulings in *Jones v. Wells Fargo* to remedy problems with its accounting. The

---

[47] News Release, *Attorney General Brown Announces Landmark $8.68 Billion Settlement with Countrywide*, OFFICE OF CALIF. ATTY. GEN., Oct. 8, 2008 (http://www.ag.ca.gov/newsalerts/release.php?id=1618).  *See also* Issue Paper, *Unfair and Unsafe: How Countrywide's Irresponsible Practices Have Harmed Borrowers and Shareholders*, CENTER FOR RESPONSIBLE LENDING, Feb. 7, 2008 (http://www.responsiblelending.org/mortgage-lending/research-analysis/unfair-and-unsafe-countrywide-white-paper.pdf).

[48]   *In re Stewart*, 391 B.R. 327, 340, 342, 351 (Bankr. E.D. La. 2008), *aff'd in part,  rev'd in part on other ground*s, 391 B.R. 577 (E.D.La. 2008). *See also In re Jones*, 366 B.R. 584 (Bankr.E.D.La. 2007) and *In re Jones*, 2007 WL 2480494 (Bankr.E.D.La.2007).

Court will assess damages in the amount of $10,000.00, plus $12,350.00 in legal fees, for the abusive imposition of unwarranted fees and charges.[49]

59.    Judge Manger's decision was affirmed on appeal by the District Court, but it remanded for further consideration part of her ruling that granted injunctive relief. On remand, Judge Magner again granted injunctive relief, which required Wells Fargo to "conduct an audit of all proofs of claim filed on its behalf in this District in cases pending on, or filed after, April 13, 2007, and to provide a complete loan history on every account."[50] In an opinion dated October 14. 2008, the Judge Manger explained:

> Given the admitted misapplication of payments systematically practiced by Wells Fargo, it is likely that trustees and debtors are paying on proofs of claim that are clearly erroneous. This Court can only assume that a review of the loans in question will necessitate amendments to proofs of claim.
>
> *    *    *
>
> Wells Fargo maintains that it can flaunt this Court's rulings and its own contractual responsibilities and force every debtor to "prove" that it has misapplied payments. This is a ridiculous waste of judicial resources and an unacceptable burden on the trustees and debtors of the District. Having admitted to a systematic error in the administration of its loans, it is incumbent upon Wells Fargo to correct its error for all affected debtors. To do otherwise is to ignore its obligation to correct pleadings that are no longer accurate.[51]
>
> *    *    *
>
> The imposition of monetary sanctions to reimburse Debtor for costs and legal fees incurred will not, in this Court's opinion, deter Wells Fargo from future objectionable conduct. Wells Fargo is a national lender, listed on the New York Stock Exchange, with

---

[49]   *In re Stewart*, 391 B.R. at 356-57.

[50]   *In re Stewart*, 2008 Bankr. LEXIS 3226, at *9-10 (Bankr.E.D.La. October 14 2008) ("*Stewart II*"). One year later, these audits were still "ongoing," but Judge Manger found that "audits of the first fifty (50) accounts revealed discrepancies, in all but two cases, between the proper amortization of Wells Fargo loans and the proofs of claims on file." *In re Jones*,  2009 Bankr. LEXIS 3317, at *1, 2 (Bankr. E.D.La. Oct. 1, 2009).

[51]   *Stewart II* at 11.

considerable financial resources. The imposition of a $67,202.45
damage award is de minimis, and insufficient to act as a deterrent
to future misconduct.[52]

60.     Although she found as a matter of adjudicated fact that "Wells Fargo has

demonstrated a pattern of overcharging borrowers and misapplying payments,"[53] Judge

Manger hoped that her previous orders had "secured Wells Fargo's attention and that

[Wells Fargo's] offer to amend its practices is real."[54] However, as Judge Manger came

to realize, "the Court's belief that Wells Fargo would correct its previously flawed

accountings was not confirmed" and injunctive relief was necessary to enforce "Wells

Fargo's obligation to do so."[55]

61.     A full year after Judge Manger arrived at this understanding, she wrote

another opinion, this one dated October 1, 2009, which involved a different case where,

after trial, the Court (1) found that Wells Fargo "willfully and egregiously" collected

"undisclosed, unapproved fees and costs" during bankruptcy proceedings;[56] and (2)

ordered the payment of damages, attorneys' fees and costs by Wells Fargo, and (with

consent given in open court by Wells Fargo's counsel and its vice president for

bankruptcy operations), ordered injunctive relief in the form of remedial accounting

procedures to be adopted by Wells Fargo.[57] Wells Fargo appealed Judge Manger's orders,

inter alia, by making a "disingenuous" claim that it did not consent to injunctive relief.[58]

On appeal, the District Court affirmed "all findings of fact" and the "majority of the

---

[52]   *Stewart II* at 12-13, *quoting*, *In re Jones*, 2007 Bankr. LEXIS 2984, 2007 WL 2480494, at * 5 (Bankr.
E.D.La. 2007). The United States District Court for the Eastern District of Louisiana affirmed Judge
Magner's determinations in *In re Stewart*, 2009 U.S. Dist. LEXIS 76851 (E.D. La., Aug. 7, 2009).
[53]   *Stewart II* at 43.
[54]   *Stewart II* at 39, *quoting*, *In re Jones*, 2007 Bankr. LEXIS 2984, 2007 WL 2480494, at *7.
[55]   *Stewart II* at 39-40
[56]   *In re Jones*,  2009 Bankr. LEXIS 3317, at *1, 2 (Bankr. E.D.La. Oct. 1, 2009).
[57]   *Id.*, at *4.
[58]   *Id.*, at *4-5, *quoting*, *Jones v. Wells Fargo*, 391 B.R. 577, 611 (E.D.La. 2008).

rulings" by the Bankruptcy Court, but it remanded for further consideration the question of injunctive relief in light of the "subsequent and substantial change in Wells Fargo's position" on appeal.[59]

62. In her October 1, 2009 opinion, Judge Manger again explained the necessity of injunctive relief as a means of addressing Wells Fargo's persistent failure to correct known deficiencies in its accounting systems (and its "arrogant defiance of federal law"),[60] all which involve "transgressions" that affect "most likely every debtor with a Wells Fargo loan[61]":

> Wells Fargo has, on more than one occasion, distorted the facts, record and law. While parties have every right to fully litigate their position, the sheer number and magnitude of the post-trial pleadings filed in this and the appellate courts and the lapses in professionalism practiced, convince this Court that Wells Fargo has no interest in voluntarily correcting its mistakes.[62]

> *     *     *

> Wells Fargo asserts that every debtor in the district should be made to challenge, by separate suit, the proofs of claim or motions for relief from the automatic stay filed by Wells Fargo. It has steadfastly refused to audit the pleadings or proofs of claim on file in the district for errors and has refused to voluntarily correct any errors that come to light except through threat of litigation. Although its own representatives have admitted that it routinely misapplied payments on loans and improperly charged fees, they have refused to correct past errors. They stubbornly insist on limiting any change in their conduct prospectively, even as they seek to collect on loans in other cases for amounts owed in error.[63]

63. As Judge Manger observed, "Wells Fargo administers over 7.7 million loans nationwide. Just one improper fee or interest accrual of $ 10.00 per loan in any given year

---

[59] *Id.*, at *5, 8.
[60] *Id.*, at *32.
[61] *Id.*, at *22
[62] *Id.*, at *21-22.
[63] *Id.*, at *23-24.

amounts to $ 77 million in revenue," which "could potentially signal billions in improperly earned revenue."[64] The alternative to injunctive relief – individual litigation by financially hardpressed homeowners – is no solution to a problem of this size and scope. Again, according to Judge Manger:

> Because litigation with Wells Fargo has already cost this and other plaintiffs considerable time and expense, the Court can only assume that others who challenge Wells Fargo's claims will meet a similar fate. Over eighty (80%) of the chapter 13 debtors in this district have incomes of less than $ 40,000.00 per year. The burden of extensive discovery and delay is particularly acute to their interests. In this Court's experience, it takes four to six months for Wells Fargo to produce a simple accounting of a loan's history and over four court hearings. These debtors simply do not have the personal resources to demand much less verify the production of a simple accounting for their loans through a litigation process.[65]

64.   Given their own personal encounters with Wells Fargo's institutionalized misconduct, other judges have expressed similar frustration. For example, on June 8, 2009, the Hon. Marvin Isgur of the United States Bankruptcy Court for the Southern District of Texas held that Wells Fargo and its counsel continued to file "intentionally inaccurate proofs of claim," which led the Court, like Judge Manger, to "caution" them that "immediate corrective actions should be taken to avoid similar actions in the future."[66] Likewise, the Hon. Audrey R. Evans of the United States Bankruptcy Court for the Eastern District of Arkansas granted an injunction against America's Servicing Company (an alternate name for the Wells Fargo's mortgage servicing division) in an effort to correct Wells Fargo's "servicing procedures" that "are not organized to ensure accuracy and accountability."[67]

---

[64] *Id.*, at *31 and n.59.
[65] *Id.*, at *24.
[66] *In re Collins*, 2009 WL 1607737, at *1, 2, 3, 7  (Bankr. S.D. Tex, June 8, 2009).
[67] *In re Moffitt,* 390 B.R. 368, 388  (Bankr. E.D. Ark. 2008).

65.     In similar circumstances, the Hon. John K. Olson of the United States Bankruptcy Court for the Southern District of Florida imposed more than $95,000 in sanctions against Wells Fargo and its foreclosure counsel for filing 45 "false affidavits" claiming that debtors owed penalty interest. Judge Olson concluded that this conduct resulted from Wells Fargo's "wayward accounting," which was "not unique to this case," and which resulted in a "systematic process of turning out unexamined and form pleadings" -- an "abuse of process" that required sanctions to deter the "continued recklessness" of Wells Fargo and its foreclosure lawyers.[68] Although his comment might be considered offensive by those who labor hard and honestly in the meat processing industry, Judge Olson observed that Wells Fargo and its counsel systematically "churn out unrefined and unexamined" legal documents with "all of the diligence and attention that goes into sausage making."[69]

66.     As reckless and recalcitrant as Wells Fargo has been in continuing its systematic policy of saddling struggling homeowners with overstated and, in some cases, fabricated fees, Wells Fargo is no less defiant in pursuing its institutionalized practice of initiating mortgage foreclosure actions in the absence of any legal standing to do so.[70]

67.     In several recent cases from jurisdictions throughout the United States, courts have identified repeated instances where Wells Fargo and its lawyers have raced to

---

[68] *In re Haque*, 395 B.R. 799, 803, 804, 805  (Bankr. S.D. Fla. 2008).

[69] *Id* at 805.

[70]  Wells Fargo's related institutionalized practice of targeting neighborhoods populated by racial and ethnic minorities for deceptive marketing of expensive sub-prime mortgages that ended in foreclosure has also prompted the City of Baltimore, the State of Illinois and the NAACP to file lawsuits on behalf of homeowners against Wells Fargo. *See* Michael Powell, *Bank Accused of Pushing Mortgage Deals on Blacks*, N.Y.TIMES, June 6, 2009
(http://www.nytimes.com/2009/06/07/us/07baltimore.html?_r=2&hp=&adxnnl=1&adxnnlx=1259241059-V/SvPvNoOfWVA9zwqlXeAA);
Press Release, *Madigan Sues Wells Fargo For Discriminatory and Deceptive Mortgage Lending Practices*, ILL. ATTY. GEN., July 31, 2009  (http://www.illinoisattorneygeneral.gov/pressroom/2009_07/20090731.html);  Press Release, *NAACP Files Landmark Lawsuit Against Wells Fargo and HSBC*, March 13, 2009, NAACP (http://www.naacp.org/news/press/2009-03-13/index.htm).

the courthouse to file legal actions to remove families from their homes, without bothering to satisfy the fundamental requirement that creditors must hold legal title to or an equitable interest in mortgages on homeowners' property **at the time foreclosure actions are filed**.[71]

68.     Observing that Wells Fargo is no "stranger" to the improper practice of bringing foreclosure actions on the basis of "anticipatory assignments" that may or may not be recorded after legal proceedings have begun against homeowners, the Hon. Timothy Patrick O'Reilly of the Court of Common Pleas for Allegheny County, Pennsylvania granted summary judgment in favor of homeowners and struck "assignments" that Wells Fargo recorded **after** its foreclosure action commenced.[72]

69.     In similar fashion, by order and memorandum dated October 14, 2009, the Hon. Keith C. Long of the Commonwealth of Massachusetts Land Court invalidated a mortgage foreclosure judgment obtained by Wells Fargo because (despite Wells Fargo's "incorrect representation" to the court) Wells Fargo was not the owner of a mortgage at the time of its notice of sale of a family's home.[73] Judge Long explained:

> The issues in this case are not merely problems with paperwork or a matter of dotting i's and crossing t's. Instead, they lie at the heart of the protections given to homeowners and borrowers by the Massachusetts legislature. To accept the plaintiffs' arguments is to allow them to take someone's home without any demonstrable right to do so, based upon the assumption that they ultimately will

---

[71]    *See, e.g.*, *Wells Fargo v. Jordan*, 2009 Ohio 1092; 2009 Ohio App. LEXIS 881, at *11, 12 (Ohio App., Eighth Jud. Dist., Mar. 12, 2009), *app. den.*, 123 Ohio St. 3d 1407; 2009 Ohio 5031; 914 N.E.2d 204; 2009 Ohio LEXIS 2730 (Sept. 30, 2009) (*citing*, *In re Foreclosure Cases*, 2007 WL 3232430 (N.D. Ohio, Oct. 31, 2007) (Boyko, J.); *In re Foreclosure Cases*, 521 F. Supp.2d 650 (S.D. Ohio 2007) (Rose, J.) and *Wells Fargo Bank, N.A. v. Byrd*, 178 Ohio App.3d 285, 2008-Ohio-4603, 897 N.E.2d 722 (Sep. 12, 2008).

[72]    *Wells Fargo v. Janosik*, No. GD08-2561 (Pa. C.P. Allegheny Co., Mar. 23, 2009), Slip.Op. at 5 (Ex. B), *citing*, *Wells Fargo v. Long*, 934 A.2d 76 (Pa. Super. 2007), *aff'd*, 970 A.2d 488 (Table) (Pa. Superior 2009); *Wells Fargo v. Janosik*, Order to Strike Recorded Assignments of Mortgage, entered April 3, 2009 (Ex. C).

[73]    *U.S. Bank, N.A. et. al. v. Ibanez et. al.*, No.08 MISC 38675517; LCR 679; 2009 Mass. LCR LEXIS 134, at *61-62 (Mass. Land Court, Oct. 14, 2009).

be able to show that they have that right and the further assumption that potential bidders will be undeterred by the lack of a demonstrable legal foundation for the sale and will nonetheless bid full value in the expectation that that foundation will ultimately be produced, even if it takes a year or more. The law recognizes the troubling nature of these assumptions, the harm caused if those assumptions prove erroneous, and commands otherwise.

70.     The Hon. Arthur M. Schack of the New York Supreme Court for Kings County is a prominent critic of mortgage industry members like Wells Fargo that file foreclosure actions without legal standing.[74] In one case, Judge Schack voided bogus after-the-fact assignments relied upon by Wells Fargo and its counsel in their attempt to remove people from their homes through foreclosures.[75] In another case, Judge Schack found that Wells Fargo "lacks standing to prosecute this matter because … it does not now, and has never owned the subject mortgage," and he ordered Wells Fargo's foreclosure lawyer to appear at a hearing and show cause why she and her law firm should not be sanctioned for filing a "frivolous" complaint that "asserts material factual statements that are false."[76] Responding to a suggestion by CBS News correspondent Seth Doane that he was throwing foreclosure cases out of court on the basis of a "small"

---

[74]    Michael Powell, *As a Foreclosure Judge, Arthur Schack Tosses Out Cases, Brooklyn Style*, N.Y. TIMES, Aug. 30, 2009 (http://www.nytimes.com/2009/08/31/nyregion/31judge.html?_r=5&emc=eta1); Amir Efrati, *Some Judges Stiffen Foreclosure Standards*, WALL ST. J, July 26, 2008 (http://meetings.abanet.org/webupload/commupload/RP282000/sitesofinterest_files/WSJjudgesstiffenforeclosures072608.com.pdf); Deborah Cassens Weiss, *Meet Judge Arthur Schack, Foreclosure Watchdog*, ABA J., July 28, 2008 (http://www.abajournal.com/news/article/meet_judge_arthur_schack_foreclosure_watchdog/);

[75]    *Wells Fargo v. Farmer*, 19 Misc.3d 1141(A), 2008 WL 2309006 (N.Y.Sup. June 5, 2008). This invalid assignments at issue in this case were made by Argent Mortgage Company, LLC and Ameriquest Mortgage Company, both of which were owned by ACC Capital Holdings, a company that in 2006 agreed to pay $325 million to settle federal and state regulators claims of deceptive lending practices before being acquired by Citigroup on August 31, 2007. 2008 WL 2309006, at *3, *citing*, Eric Dash, *Citigroup Buys Parts of a Troubled Mortgage Lender*, N.Y.TIMES, September 1, 2007 (http://query.nytimes.com/gst/fullpage.html?res=9C04E4D61430F932A3575AC0A9619C8B63).      Both Argent and Ameriquest also "executed" the bogus assignments relied upon by PHS in asserting a right to prosecute mortgage foreclosure actions against Plaintiffs Gerald Bender and Diane and Charles Giles in this case, assignments recorded months **after** PHS filed its foreclosure complaints. *See*   (¶¶ 112-143, below).

[76]    *Wells Fargo v. Reyes,* 20 Misc.3d 1104(A), 2008 WL 2466257, at * 1, 6  (N.Y. Sup. June 18, 2008).

"procedural issue," Judge Schack stated, "I don't think it's a small issue when somebody lives in a house and you're going to disrupt their lives and take away their home."[77]

71.     Together with Judge O'Reilly in Pittsburgh and Judge Long in Boston, other courts concur with Judge Schack's reasoning, and they have taken comparable remedial action.[78]

72.     In ruling that foreclosure plaintiffs must demonstrate that they are "the holder and owner of a Note and Mortgage **as of the date the Complaint was filed**" because it is a jurisdictional prerequisite for standing under Article III of the United States Constitution, the Hon. Christopher A. Boyko of the United States District Court for the Northern District of Ohio dismissed 14 foreclosures brought on behalf of investors in mortgage-backed securities.[79]   In the process, Judge Boyko delivered a blistering admonishment to plaintiffs who ignored this centuries-old requirement of American jurisprudence:

> Plaintiff's, "Judge, you just don't understand how things work," argument reveals a condescending mindset and quasi-monopolistic system where financial institutions have traditionally controlled, and still control, the foreclosure process. Typically, the homeowner who finds himself/herself in financial straits fails to make the required mortgage payments and faces a foreclosure suit, is not interested in testing state or federal jurisdictional

---

[77] Seth Doane, *N.Y. Judge Takes On Foreclosures*, CBS EVENING NEWS.COM, Sept. 12, 2009 (*See* http://www.cbsnews.com/stories/2009/09/12/eveningnews/main5306009.shtml and video clip therein).

[78] *See, e.g., In re Parades*, 2009 WL 3571536  (Bankr. S.D.N.Y., Oct. 9, 2009) (Hon. Robert D. Drain disallowed and expunged proof of claim filed erroneously in the name of servicer of mortgage that held no ownership interest); *In re Wells*, No. 08-17639, 2009 WL 1872401 (Bankr. N.D. Ohio June 19, 2009) (disallowing claim because purported creditor did not show the note was negotiated to claimant bank); *In re Mitchell*, No. 07-16226-LBR, 2009 WL 1044368 (Bankr. D. Nev. March 31, 2009) (holding that MERS lacked standing to pursue stay relief when it could not show that it was either holder of the mortgage note or a transferee in possession of the note); *In re Jacobsen*, 2009 WL 567188 (Bankr. W.D. Wash. 2009) (denying motion for stay relief because movant had not established either identity of holder of note or movant's authority to act on behalf of that party); *In re Hayes*, 393 B.R. 259 (Bankr. D. Mass. 2008) (denying motion for relief from stay when mortgagee failed to show proper chain of title from loan originator). *See also Landmark National Bank v. Kesler*, 216 P.3d 158 (Kan. Sup. Ct. 2009) (MERS has no right or standing to bring an action for foreclosure).

[79]  *In re Foreclosure Cases*, 2007 WL 3232430 (N.D. Ohio, Oct. 31, 2007) (emphasis in original).

requirements, either *pro se* or through counsel. Their focus is either, "how do I save my home," or "if I have to give it up, I'll simply leave and find somewhere else to live."

In the meantime, the financial institutions or successors/assignees rush to foreclose, obtain a default judgment and then sit on the deed, avoiding responsibility for maintaining the property while reaping the financial benefits of interest running on a judgment. The financial institutions know the law charges the one with title (still the homeowner) with maintaining the property. There is no doubt every decision made by a financial institution in the foreclosure process is driven by money. And the legal work which flows from winning the financial institution's favor is highly lucrative. There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary, they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through. Counsel for the institutions are not without legal argument to support their position, but their arguments fall woefully short of justifying their premature filings, and utterly fail to satisfy their standing and jurisdictional burdens. The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate.

The Court will illustrate in simple terms its decision: "Fluidity of the market" — "X" dollars," "contractual arrangements between institutions and counsel" — "X" dollars, "purchasing mortgages in bulk and securitizing" — "X" dollars, "rush to file, slow to record after judgment" — "X" dollars, "the jurisdictional integrity of United States District Court" — "Priceless."[80]

73.    As alleged in further detail below, Defendants Countrywide and Wells Fargo are incorrigible recidivists that have victimized Plaintiffs and members of the Classes in a manner consistent with their systematic pattern of foreclosure abuses nationwide, all as documented by the many judges identified in the paragraphs above. In

---

[80]   *Id.* at 3 n.3

the instance of the Pennsylvania and New Jersey homeowners who comprise the Classes in this litigation, the instrument of these abuses is PHS, whose activities benefit that law firm and its clients in ways both dishonest and illegal.

**B.   PHS Systematically Abuses Distressed Homeowners and the Legal System**

74.   Mortgage servicers like Defendants Countrywide and Wells Fargo depend upon accommodating foreclosure and bankruptcy counsel like PHS to aggressively prosecute distressed homeowners on a large-volume basis. Without such law firms, widespread mortgage servicing abuse could not take place.

75.   By its own description, PHS is the "premier foreclosure operation" in the "region," "one of the few firms to handle foreclosures, bankruptcies and asset recoveries for the entire states of New Jersey and Pennsylvania."[81] "[R]epresenting almost every major lender and servicer" in the United States, PHS claims that it is the "largest" residential mortgage foreclosure firm in Pennsylvania and the "only" such firm in Pennsylvania to be "both Fannie Mae and Freddie Mac designated counsel."[82] In the City of Philadelphia alone, PHS has prosecuted "thousands" of foreclosure actions annually since 2004,[83] a number that has grown exponentially with the foreclosure crisis that caused the Philadelphia Court of Common Pleas to implement its Residential Mortgage Foreclosure Diversion Pilot Program in April 2008. According to sworn deposition testimony given by Defendant Hallinan in another case, PHS handled an estimated 24,000 to 26,000 foreclosure prosecutions in Pennsylvania and New Jersey during 2008

---

[81]   http://www.fedphe.com/
[82]   *Id.*
[83]   Jane M. Von Bergen, *Philadelphia Law Firm to Lower Foreclosure Fees*, PHILA. INQUIRER, July 18, 2004 (Describing PHS's predecessor, Federman & Phelan LLP, as the "main Philadelphia law firm that handles thousands of mortgage foreclosures a year in the city").