alone.[84] PHS says that it handles its enormous volume of work with a mere "17 attorneys and over 250 support personnel."[85]

76.     PHS claims that it is able to obtain a supernatural level of "speed and efficiency" through two principal means: (1) its ability to "leverage technology" by "completely computeriz[ing]" its two offices with "every case management and invoice reporting systems [sic]" used by the residential mortgage foreclosure industry, including LenStar, VendorScape, NewTrak, iClear, Alltel and NewInvoice, all of which are "client-based web sites"[86]; and (2) its ownership and control of the "majority of its vendors to ensure a turnaround time as quick as humanly possible."[87]

77.     While the "speed" with which PHS prosecutes its foreclosure actions serves the interest of clients like Defendants Countrywide and Wells Fargo, it is also the means by which PHS prosecutes far more foreclosure and bankruptcy cases than any comparably staffed law firm could possibly handle in a professionally responsible manner. As an accompanying benefit, such "speed" also "ensures" that PHS is in an optimal position to extract as much fees as "humanly possible" from financially strapped homeowners.

### 1.     PHS Inflates Foreclosure Costs On An Institutionalized Basis

#### a.     PHS Systematically Misappropriates Sheriffs' Deposit Refunds

78.     After it obtains foreclosure judgments against defaulted borrowers, PHS sets in motion a process by which borrowers' homes are scheduled for auction at a

---

[84]  Transcript of Deposition Testimony of Francis S. Hallinan on March 17, 2009 ("Hallinan Transcript") in the matter entitled *Bank of New York v. Ukpe*, Docket No. F-10209-08 (Superior Court of New Jersey, Chancery Division, Atlantic County) at 51-52, 61-62. (Ex. D).
[85]  http://www.fedphe.com/
[86]  http://www.fedphe.com/. *See also* PHS listings in 2006 USFN Membership Directory at 11, 14 (http://www.zp-production.com/sm/pdf/ar-USFN06.pdf)
[87]  http://www.fedphe.com/.

sheriffs' sale.   As part of this process, county sheriffs require upfront deposits for payment of their fees, which include costs of providing public notice of sale, as well as other administrative functions required by law. To proceed with its mission of displacing families from their homes, PHS advances the payment of these fees to county sheriffs.

79.    Sheriffs' sales are often cancelled as a result of (1) loan modifications; (2) the filing by borrowers of bankruptcy petitions; or (3) distress sales of homeowners' properties. When a sheriffs' sale is cancelled, sheriffs refund to PHS the "unused" portion of the deposit, which represents fees not actually incurred by the sheriffs. Under a loan modification, a Chapter 13 repayment plan or a distress sale, borrowers must pay the actual amount of money overdue on their loan accounts, including reasonable costs of foreclosure proceedings brought by PHS. This sum is known as "arrearages." In calculating the proper amount of arrearages, refunds issued by sheriffs to PHS are not properly included (or, if they are included, a corresponding credit must be subsequently issued to the borrowers' accounts).

80.    In violation of its legal and professional duties, and as a matter of institutionalized practice (1) PHS does include the total amount of sheriffs' fee deposits in arrearages charged to homeowners, without deducting refunds received by PHS;  (2) PHS does not take affirmative steps to credit homeowners' accounts for those refunds; and (3) PHS misappropriates and converts money from those refunds to its own use and/or that of its clients -- unless a specific demand for a refund credit is proactively pressed by counsel for the homeowners, a demand that PHS knows is seldom made.[88] PHS and/or its clients thereby obtain millions of dollars in unearned profits, presumably

---

[88]   *See* Porter Study at 147 ("The vast majority of all claims (96%) pass undisturbed through the bankruptcy system without objection. Attorneys do not aggressively enforce their clients' rights against mortgage companies because the costs are too high and the incentives are too low…").

none of which is reported to the Internal Revenue Service as taxable income, despite the penalties provided under 26 U.S.C. § 7201.

81.     Plaintiffs and class members in this action are victims of PHS's theft of sheriffs' deposit refund scheme.

**Plaintiff Dennis A. Rhodes**

82.     PHS initiated and prosecuted a foreclosure action against Plaintiff Dennis A. Rhodes on behalf of Bank of New York, as trustee for investors of securities backed by a pool of mortgages serviced by Defendant Countrywide. After it obtained a foreclosure judgment against Plaintiff Rhodes, PHS paid a $2,000 deposit to the Sheriff for Berks County, Pennsylvania in connection with a sheriffs' sale of the Rhodes family residence scheduled for January 11, 2008.

83.     On January 10, 2008, Plaintiff Rhodes filed a bankruptcy petition and thereby averted loss of his home through sheriffs' sale. On January 28, 2008, PHS, purportedly on behalf of Bank of New York, executed and filed a proof of claim in bankruptcy court, seeking payment of the full $2,000 sheriffs' deposit purportedly owed by Plaintiff Rhodes as part of his arrearages. This legal document, signed by PHS lawyer Jay B. Jones,[89] falsely represented that PHS would amend its claim "upon receipt of the most recent Sheriff's Refund, which is unavailable at the present time."

84.     On May 8, 2008, the Berks County Sheriff refunded to PHS $909.08 out of $2,000 deposited in connection with the stayed sheriffs' sale of Plaintiff Rhodes' home. Rather than make good on the promise to amend its proof of claim "upon receipt" of the sheriffs' refund, PHS instead misappropriated and converted $909.08 to its own use and/or that of Countrywide.

---

[89]   Ex. E.

85.     On March 25, 2009, Plaintiff Rhodes and his co-plaintiffs filed their initial Complaint in this action ("Initial Complaint"), which exposed PHS's unlawful institutionalized practice of misappropriating and converting sheriffs' refunds.

86.     Just days after the filing of the Initial Complaint, PHS filed an amended proof of claim dated April 7, 2009, which at last identified the sheriffs' deposit refund that PHS received on Plaintiff Rhodes' account **eleven months before**.[90] As Judge Shea-Stonum observed, Defendant "Countrywide's system for filing proofs of claim was designed to allow each actor in the process to act with indifference to the truth" and a "disregard for diligence and accuracy."[91] In this respect, PHS and/or Countrywide obtained an interest-free "loan" through their false proof of claim, money that would have otherwise been stolen outright by PHS and/or Countrywide but for the filing of this lawsuit.

### Plaintiff Gerald A. Bender

87.     PHS initiated and prosecuted a foreclosure action against Gerald A. Bender, purportedly on behalf of "Wachovia Bank, N.A.," as "trustee" for investors of securities backed by a pool of mortgages serviced by America's Servicing Company, part of Defendant Wells Fargo, N.A.[92] After it obtained a foreclosure judgment against Plaintiff Bender, PHS paid a $2,000 deposit to the Sheriff for Berks County, Pennsylvania in connection with a sheriffs' sale of the Bender family residence scheduled for June 6, 2008.

---

[90]   Ex. F. At the same time, PHS lawyer Andrew L. Spivack also filed a Mortgage Analysis for Payment Change on Plaintiff Rhodes' account, which was improperly submitted by PHS on behalf of **<u>Countrywide</u>**, the mortgage servicer, which Spivack misidentified as Plaintiff Rhodes' "secured creditor." (Ex. G).

[91]   *See above* at ¶ 56.

[92]   As documented below at ¶¶ 112-120, **two years before** PHS brought its foreclosure action against Plaintiff Bender, ostensibly on "behalf of" Wachovia, U.S. Bank, N.A. had already succeeded to Wachovia's position as "trustee" for investors owning this pool of mortgages. Neither PHS nor an apparently unaware Wachovia had any authority to bring this foreclosure lawsuit.

88.     On June 4, 2008, Plaintiff Bender filed a bankruptcy petition and thereby averted loss of his home through sheriffs' sale. On July 3, 2008, PHS, purportedly on behalf of "Wachovia," executed and filed a proof of claim in bankruptcy court, seeking payment of the full $2,000 sheriffs' deposit purportedly owed by Plaintiff Bender to "Wachovia" as part of his arrearages. This legal document, signed by PHS lawyer Jay B. Jones,[93] stated that the "[m]ost recent Sheriff's Refund is unavailable at the present time."

89.     On October 9, 2008, the Berks County Sheriff refunded to PHS $601.13 out of $2,000 deposited with the Sheriff in connection with stayed sheriffs' sale of Plaintiff Bender's home. PHS misappropriated and converted $601.13 to its own use and/or that of Wells Fargo.

90.     Just days after his filing of the Initial Complaint on March 25, 2009, PHS filed an amended proof of claim dated April 7, 2009, which at last identified the sheriffs' deposit refund that PHS received on Plaintiff Bender's account **six months before**.[94] In this respect, PHS and/or Wells Fargo obtained an interest-free "loan" of funds that belonged to Plaintiff Bender, money that would have otherwise been stolen outright by PHS and/or Wells Fargo but for the filing of this lawsuit.

### Plaintiff Edward H. Wolferd, Jr.

91.     PHS initiated and prosecuted a foreclosure action against Plaintiff Edward H. Wolferd, Jr. on behalf of Defendant Wells Fargo. After it obtained a foreclosure judgment against Plaintiff Wolferd, PHS paid a $2,500 deposit to the Sheriff for

---

[93] Ex. H. PHS, having improperly brought a foreclosure action against Plaintiff Bender in the name of Wachovia (which had no legal interest to assert against Plaintiff Bender) compounded its transgression in bankruptcy court by filing a false proof of claim on behalf of a purported creditor identified as "Wachovia Bank, N.A., as Trustee, Pooling and Serving Agreement dated as of November [sic]." The false proof of claims signed by PHS lawyers in this case state on their face that the penalty under 11 U.S.C. §§ 152 and 3571 for presenting fraudulent claims is a fine of up to $500,000 or imprisonment for up to five years, or both.

[94] Ex. I.

Lancaster County, Pennsylvania in connection with a sheriffs' sale of Plaintiff Wolferd's residence scheduled for August 3, 2005.

92.     On August 1, 2005, Plaintiff Wolferd filed a bankruptcy petition and thereby averted loss of his home through sheriffs' sale. On September 14, 2005, PHS, on behalf of Defendant Wells Fargo, executed and filed a proof of claim in bankruptcy court, seeking payment in the full of the $2,500 sheriffs' deposit purportedly owed by Plaintiff Wolferd as part of his arrearages. This legal document, signed by PHS lawyer Jay B. Jones,[95] falsely represented that PHS would amend its claim "upon receipt of the most recent Sheriff's Refund, which is unavailable at the present time."

93.     On October 31, 2005, the Lancaster County Sheriff refunded to PHS $849.84 out of the sum of $2,500 deposited with the Sheriff in connection with the stayed sheriff's sale. On or about November 22, 2005, counsel for Plaintiff Wolferd incurred the time and expense of communicating with PHS to demand a proper credit for the returned sheriffs' deposit. Only then did PHS withdraw its overstated claim for sheriffs' fees by filing an amended proof of claim dated November 22, 2005.[96]

94.     Independent of the false bankruptcy claims asserted by PHS against Plaintiffs Rhodes, Bender and Wolferd, before they filed the Initial Complaint, counsel for the proposed Classes reviewed and analyzed a randomly selected sample of 300 proofs of claim filed by a cross-section of PHS lawyers in Chapter 13 actions pending in the United States Bankruptcy Courts for the Eastern, Middle and Western Districts of Pennsylvania and the District of New Jersey, with that sample limited to filings in which PHS asserted a claim for the full amount of a sheriffs' deposit. In 261 (or 87 percent) of

---

[95] Ex. J.
[96] Ex. K.

these 300 cases, PHS failed to correct its overstated proofs of claim to properly account for deposits refunded by county sheriffs.

95.     While homeowners who have not filed for bankruptcy are more vulnerable to mortgage servicing abuse than those who have availed themselves of that legal protection,[97] PHS operates in every case on the premise that it can charge whatever it pleases to homeowners as long as debtors' counsel, as in an estimated 96 percent of bankruptcy cases,[98] do not affirmatively step up to resist PHS's systematic exploitation of their clients. This disregard of its legal obligations is without justification.

96.     As Judge Elizabeth Manger remarked in one of several published opinions rebuking Defendant Wells Fargo for its institutionalized practice of filing inaccurate bankruptcy claims: "[I]t is likely that trustees and debtors are paying on proofs of claim that are clearly erroneous. … Wells Fargo maintains that it can flaunt this Court's rulings and its own contractual responsibilities and force every debtor to 'prove' that it has misapplied payments. This is a ridiculous waste of judicial resources and an unacceptable burden on the trustees and debtors of the District[99]…. It is incumbent upon Wells Fargo to correct its error for all affected debtors. To do otherwise is to ignore its obligation to correct pleadings that are no longer accurate." [100]

97.     Judge Manger recognized that, whenever Wells Fargo forces homeowners and their counsel to act affirmatively to fix one of Wells Fargo's inaccurate claims, it

---

[97]   *See* Porter Testimony at 2, *citing* Federal Trade Commission, *Mortgage Servicing: Making Sure Your Payment Counts.*)
[98]   *See* Porter Study at 147.
[99]   *Contrast with* Defendant's Memorandum of Law in Support of their Motion to Dismiss the [Initial] Complaint Pursuant to F.R.C.P 12b(6), at 10-11 (Docket Item 2-2)  ("It is the duty of debtors' counsel on behalf of their clients to ensure that sums are properly credited to their client[s'] post-petition account -- something usually accomplished in a phone call and[,] if that fails, by motion to the Bankruptcy Court").
[100]  *See* ¶ 59 above, *quoting*, 2008 Bankr. LEXIS 3226, at *11 (Bankr.E.D.La. October 14 2008)

causes quantifiable damage in the form of costs and fees incurred,[101] independent of other forms of damages sustained. Judge Marilyn Shea-Stonum reached the same conclusion concerning Defendant Countrywide's systematic assertion of bogus foreclosure fee claims:

> [T]he reality is that the typical consumer bankruptcy practitioner deals with extensive information gathering and documentation requirements for very modest compensation; against that busy backdrop few practitioners undertake a careful review of every mortgage claim. [ ] Those that do often find themselves dealing with initial information from the mortgage claimant that sometimes appears designed to be deliberately impenetrable. The cryptic presentation of the information by mortgage holders or those charged with servicing the mortgage holders' contract with the mortgagor can have the effect of visiting upon the mortgagor significant cost in getting the most basic information about the mortgage status as perceived by the mortgagee. This may or may not be part of an actual design to discourage mortgagors from asserting their rights. Whether that is an intended consequence of the mortgagee's agent's behavior, it is often the effect of that behavior.[102]

98.    Plaintiff Wolferd had the misfortune of being victimized by PHS's theft of sheriffs' deposit refund scheme both in a capacity of bankrupt individual and as a non-bankrupt homeowner attempting to reach a loan modification agreement with Wells Fargo.

99.    After more than three years of post-petition payments under Plaintiff Wolferd's Chapter 13 plan, Wells Fargo obtained an order granting it relief from the Bankruptcy Code's automatic stay on January 6, 2009.[103] On February 10, 2009, PHS filed a praecipe for a writ of execution of its earlier foreclosure judgment against Plaintiff

---

[101]  *Id. See also* ¶¶ 62-63, quoting, *In re Jones*, 2009 Bankr. LEXIS 3317, at *23-24; 31 and n.59 (Bankr. E.D.La. Oct. 1, 2009).

[102]  *McDermott v. Countrywide Home Loans, Inc.*, Adv. No. 08-5031 (Bank. N.D. Ohio, July 31, 2009) (Ex. A) at 3-4, *citing* Porter Study at 121, 168.

[103]  Plaintiff Wolferd's bankruptcy case was dismissed on May 14, 2009.

Wolferd, accompanied by a check payable to the Lancaster County Sheriff in the amount of $ 2,500.

100.    A sheriffs' sale of Plaintiff Wolferd's home was scheduled and continued several times while Plaintiff Wolferd and Defendant Wells Fargo discussed a possible loan modification. Plaintiff Wolferd executed such an agreement on September 11, 2009, despite its requirement that he pay arrearages comprised in part of inflated, undocumented and unexplained mortgage foreclosure "costs."[104] His assistant having been told by a Wells Fargo representative that these charges were non-negotiable and that "the [foreclosure] lawyer always keeps that money as its fees," Plaintiff Wolferd surrendered to Wells Fargo's demands rather than accept the alternative of losing his home to foreclosure. The sheriffs' sale of Plaintiff Wolferd's home was cancelled again.

101.    Plaintiff Wolferd is currently making the payments required under Wells Fargo's non-negotiable loan modification. On November 3, 2009, PHS received a refund in the amount of $503.32 from the Lancaster County Sheriff. As of the date of this Amended Complaint (notwithstanding the allegations about misappropriation of sheriffs' deposit refunds first made in the Initial Complaint on March 25, 2009), PHS and Wells Fargo have taken no steps to credit this sheriffs' refund to Plaintiff Wolferd's account.

**b.   PHS Systematically Uses Wholly-Owned "Vendors" to Inflate Foreclosure Costs**

102.    While PHS portrays its ownership and control of "the majority of its vendors" as a benign timesaving device,[105] it is more accurately the means by which PHS multiplies its already profitable fees in foreclosure cases. It is also the means by which PHS ignores or evades legal obstacles (such as the absence of a would-be plaintiff's legal

---

[104] *See* Ex. L.
[105] *See* http://www.fedphe.com/

45

title) that could otherwise eliminate the money-making potential of the automated case referrals it receives via "client-based" software programs required by mortgage servicers like Defendants Countrywide and Wells Fargo. (*See* ¶¶ 148-158, below).

103.    Defendants Lawrence Phelan, Francis Hallinan and Daniel Schmieg are owners of a company named Full Spectrum Holdings, which is comprised of Full Spectrum Legal Services, Inc. ("Full Spectrum") and Land Title Services of New Jersey, Inc. ("Land Title"),[106] which in turn owns Land Title Services of Pennsylvania. All of these entities are located on the second floor (PHS occupies the first) of an office building located at 400 Fellowship Road, Mt. Laurel, New Jersey 08054, a multi-million dollar facility owned by a company called Camelot Enterprises, LLC, which is owned by Defendant Phelan.

104.    Defendant Hallinan is president of Full Spectrum, a New Jersey domestic corporation that, among other things, claims to provide title services both in New Jersey and Pennsylvania, where it purportedly employs "a team of qualified courthouse searchers … [who] provide detailed property searches, copies of recorded documents, and can act as liaisons for the county offices."[107]

105.    At various times and in a manner that parallels the conflicting representations made by PHS with respect to the identity of its "managing partner" in New Jersey and the different variations on name used by the law firm's New Jersey office,[108] Defendant Phelan and an individual named Eugene L. Terzano, Jr. have both been identified as president of Land Title. Terzano, licensed as a "resident producer" by the New Jersey Department of Banking and Insurance, appears to have been placed in

---

[106] *See Bank of New York v. Upke*, 2009 WL 4895253, at *3 (D.N.J. Dec. 9, 2009).
[107] *See* http://www.fullspectrumlegal.com/Services.html
[108] *See* ¶¶ 17, 20, above.

this position by PHS in an effort to circumvent Opinion No. 688, issued by the Advisory Committee on Professional Ethics of the New Jersey Supreme Court, which held that "principals of a law firm may [not] establish a separate title abstract company, in the form of a limited liability company, to provide title reports for their law firm's clients." [109]

106.    As the Advisory Committee explained:

> [L]awyers should not be able to freely refer a client in need of a service related to the legal representation or its subject matter to any business enterprise in which they maintain an ownership or controlling interest, or from which they drive income or profit.
>
> It is clear that a client has a special trust in, and is frequently dependent upon, the independent judgment of the lawyer, which is always to be exercised in the client's best interests, free from any outside influences. The possibility of referral of legal clients to another business of the lawyer introduces an extraneous and potentially conflicting motive, which can threaten or interfere with the lawyer's independence of judgment. At the same time, because of the trust and dependence that the client must place on the lawyer, a client's ability to independently evaluate the desirability or necessity of following through on such a referral is presumptively impaired. The situation is inherently coercive, rendering even the standard approach of full disclosure and informed consent suspect.
>
> …. [A lawyer may only refer a legal client to a business the lawyer owns, operates, controls, or will profit from, if the lawyer has (1) disclosed to the client in writing, acknowledged by the client, the precise interest of the lawyer in the business, and that the same services may be obtained from other providers, and (2) advised the client, orally and in writing, of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel of the client's choice as to whether utilization of the business in question is in the client's interest. [110]

---

[109]  N.J. Advisory Committee on Professional Ethics, Opinion 688 (Mar. 13, 2000), Ex. M.
[110]  *Id*., at 2.

107.    Given the systematic disregard of their own rights by PHS and its clients, Plaintiffs do not care whether PHS honors the duty of professional responsibility that it owes to its clients. While PHS or its clients are "reimbursed" for "costs" charged by Full Spectrum, Land Title and other entities owned and controlled by the principals of PHS, it is the foreclosed-upon homeowners who actually pay their inflated or fabricated "costs." In this respect, both PHS and its clients have a common rather than conflicting motive – to maximize payment of costs "recovered" from people against whom they bring foreclosure actions.[111]

108.    Proofs of claim that PHS files in bankruptcy court – with or without authorization from clients with proper legal standing  – demonstrate a lack of intelligible basis supporting many of the charges for which PHS seeks reimbursement from debtors. PHS's proofs of claim routinely reflect higher fees for title work than do the claims of other mortgage foreclosure law firms practicing in Pennsylvania and New Jersey -- precisely because PHS's principal lawyers themselves profit from those higher charges. To obscure the true extent and nature of those fees, PHS presents its claims, in the apt words of Judge Shea-Stonum, in ways that are both "impenetrable" and "cryptic."[112]

---

[111] For example, Defendant Hallinan testified that "Full Spectrum Legal Services is a vendor for LandSafe Title Company" and that "Full Spectrum does the courthouse abstracting on behalf of LandSafe Title in some instances." See Hallinan Transcript at 27-28 (Ex. N). LandSafe Title Company, now a wholly owned subsidiary of Bank of America, was part of Countrywide's LandSafe, Inc. subsidiary, based in Plano Texas along with Defendant Countrywide Home Loans Servicing, LP.  LandSafe, Inc. was a conglomeration of Countrywide subsidiaries that included LandSafe Appraisal Services Inc., LandSafe Title Agency Inc., LandSafe Credit Services Inc. and LandSafe Flood Determination Inc. *See* Steve Bergsman, *The LandSafe Story*, MORTGAGE BANKING, Aug. 3, 2003 (http://www.allbusiness.com/finance/3595413-1.html). The LandSafe subsidiaries enabled Countrywide to engage in the predatory lending practices that led to the $8.6 billion settlement obtained by state attorneys general throughout the United States. *See* above at ¶ 57.

[112] *See* ¶ 97, above, *quoting*, *McDermott v. Countrywide Home Loans, Inc.*, Adv. No. 08-5031 (Bank. N.D. Ohio, July 31, 2009) (Ex. A) at 3-4.

109.    Examples of its practice of obscuring costs beyond understanding are evident from charges asserted by PHS against Plaintiffs:

(a)    Rhodes Proof of Claim dated January 28, 2008 (Ex. E) (claiming $525 for undocumented and unexplained "services" described as "title bringdown," "property search/divorce check" and "record owner lien certificate/title report");

(b)    Bender Proof of Claim dated July 2, 2008 (Ex. H) (claiming $1,105.51 for undocumented and unexplained "services" described as "BPO fees," "property preservation," "due diligent [sic] inquiry," "Freedom of Information Act letters," "record owner lien certificate," "property search," and "title bringdown");

(c)    Wolferd Proof of Claim dated September 6, 2005 (Ex. J) (claiming $615 for undocumented and unexplained "services" described as "property preservation," "title bringdown," "record owner lien certificate" and "notice of sale"); and

(d)    Wolferd Loan Modification form (Ex. L) (claiming $3,015.50 for undocumented and unexplained "services" described as "Corp Recov/Title/Mod Fees/Atty/FC/BPO/Appraisal");

Perhaps most egregiously, after counsel for Plaintiffs Diane and Charles Giles discovered that PHS brought its foreclosure lawsuit without authorization on behalf of a party without legal standing to sue (*see* ¶¶ 121-133) and after Mr. and Mrs. Giles found a buyer willing to purchase their home at price far below its true market value, PHS had the audacity to demand that Mr. and Mrs. Giles pay $7,817.50 for "legal fees and costs" of a lawsuit that PHS had no right to bring in the first place.[113] Only because counsel for Mr. and Mrs. Giles resisted PHS's attempt to plunder the dwindling financial resources of his

---

[113]  *See* Letter dated December 10, 2007 from Phelan Hallinan & Schmieg, PC to Jerry J. Dasti (Ex. NN).

clients did Wells Fargo recognize the illegitimacy of PHS's claim for "legal fees and costs," which was quietly removed from Wells Fargo's final payoff statement.[114]

110.    While a few of the above examples involve amounts of money may be modest to more fortunate Americans, these charges represent substantial, life-sustaining sums to families struggling to stay in their home, when literally every nickel counts. But, for the lawyers of PHS and their clients, each overcharge, multiplied by thousands of homeowners, represents a pot of gold unlawfully obtained.[115]

111.    Beyond the overstated, fabricated and obfuscated foreclosure costs systematically claimed by PHS, in some cases Full Spectrum, Land Title or other PHS-controlled entities fail altogether to perform the "services" for which homeowners are charged, or such "services" are performed so incompetently that they are worthless or actually have a negative value. As shown below, title searches purportedly obtained by PHS through its wholly owned companies fail to properly identify record owners of properties upon which PHS seeks to foreclose, resulting in unauthorized lawsuits that produce foreclosure judgments that are null and void as a matter of law. Even more disturbing, there is compelling evidence that Full Spectrum and other companies owned by Lawrence Phelan, Francis Hallinan and Daniel Schmieg help PHS fraudulently **manufacture** legal standing for one of its biggest mortgage servicer clients, Defendant Wells Fargo.

---

[114]  *See* Statement dated January 9, 2008 from America's Servicing Company to Plaintiff Diane Giles (Ex. NN).
[115]  *See*, *e,g*., above at ¶ 63 and n. 64 (Hon. Elizabeth W. Magner fears that false proofs of claim filed by Wells Fargo alone "could potentially signal billions in improperly earned revenue").

## 2.   PHS Systematically Prosecutes Foreclosure Actions in the Name of Parties Without Legal Standing To Sue

112.   By Complaint dated June 22, 2007, signed by Defendant Hallinan, PHS brought a mortgage foreclosure action against Plaintiff Gerald A. Bender in the Court of Common Pleas for Berks County, Pennsylvania, Case No. C1-04-11635. The Plaintiff in this lawsuit was identified as "Wachovia Bank, N.A., Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1 ['Series 2004-WWF1 PSA']"[116] The servicer of the mortgages owned by the investors of the Series 2004-WWF1 PSA certificates -- PHS's actual client -- was Defendant Wells Fargo,[117] an entity that the Hon. Timothy Patrick O'Reilly of the Court of Common Pleas for Allegheny County said is no "stranger" to the improper practice of bringing foreclosure actions on the basis of "anticipatory assignments" that may or may be real.[118]

113.   In connection with the filing of his Complaint against Plaintiff Bender, Defendant Hallinan executed a verification attesting that (1) he was "attorney" for "Wachovia" in the foreclosure action against Plaintiff Bender; (2) he was "authorized" by "Wachovia" to make a verification on "Wachovia's" behalf pursuant to Pa.R.C.P. 1024; (3) the statements made in the Complaint were "based on information provided" by "Wachovia," which Hallinan purportedly "believed to be true and correct to the best of its knowledge, information and belief"; (4) he "intended to substitute a verification" from

---

[116]   *See* Ex. O.

[117]   *See* Bender Proof of Claim dated July 2, 2008 (Ex. H).

[118]   *See* ¶ 68, above, *quoting*, *Wells Fargo v. Janosik*, No. GD08-2561 (Pa. C.P. Allegheny Co., Mar. 23, 2009), Slip.Op. at 5, *aff'd*, 970 A.2d 488 (Table) (Pa. Superior 2009) (Ex. B) (*citing*, *Wells Fargo v. Long*, 934 A.2d 76 (Pa. Super. 2007)). *See also* ¶¶ 66-71, above (and cases cited therein).

Wachovia "upon receipt" and (5) he understood that his verification was made "subject to the penalties of 18 Pa.C.S. Sec. 4904 relating to unsworn falsifications to authorities," a second degree misdemeanor requiring "a fine of at least $1000." With the possible exception of the final part of his verification, all of Hallinan's statements were false.

114.    In paragraph 3 of the Complaint that he signed and verified, Defendant Hallinan also alleged falsely that:

> On 09/24/2004 mortgagor(s) made, executed and delivered a mortgage upon the premises hereinafter described to ARGENT MORTGAGE COMPANY, LLC ["Argent"] which mortgage is recorded in the Office of the Recorder of BERKS County, in Book 4157, Page: 265. **PLAINTIFF [*i.e.*, Wachovia Bank, N.A., Trustee for the Series 2004-WWF1 PSA] is now the legal owner of the mortgage and is in the process of formalizing an assignment of same**. The mortgage and assignment(s), if any, are matters of public record and are incorporated by reference in accordance with Pa.C.C.P. 1019(g); which rule relieves the Plaintiff from its obligation to attach documents to pleadings if those documents are of public record.

115.    When Defendant Hallinan caused this Complaint to be filed on June 22, 2007, Wachovia was no longer trustee for the Series 2004-WWF1 PSA, having been long ago been displaced as trustee by U.S. Bank, N.A. as a result of Wachovia's sale of its entire corporate trust and institutional custody businesses to U.S. Bank, N.A. on December 30, 2005.[119]

---

[119]  Press Release, *Wachovia Announces Sale of its Corporate Trust and Institutional Custody Businesses*, WACHOVIA, Nov. 28, 2005 (https://www.wachovia.com/foundation/v/index.jsp?vgnextoid=f3082e3d3471f110VgnVCM200000627d6fa2RCRD&vgnextfmt=default&key_guid=4dc7948df51eb110VgnVCM100000ca0d1872RCRD);
Press Release, *U.S. Bank Completes Acquisition of the Corporate Trust and Institutional Custody Businesses of Wachovia*, U.S. BANCORP, Jan. 9, 2006
 (http://phx.corporate-ir.net/phoenix.zhtml?c=117565&p=irol-newsArticle&ID=802061&highlight=);
Internal Corporate Publication, Welcome From the U.S. Bank Corporate Trust Services President, U.S. BANK CORPORATE TRUST CONNECTION, Spring 2006
 (http://www.usbank.com/commercial_business/products_and_services/corp_trust/pdf/CorpTrustSpr06.pdf

116.    On October 11, 2007, four months after PHS filed its false and misleading foreclosure complaint against Plaintiff Bender, PHS's employees or agents simultaneously recorded two purported assignments of Plaintiff Bender's mortgage with the Recorder of Deeds for Berks County, Pennsylvania:

>    a.   An "assignment" from Argent to Ameriquest Mortgage Company ("Ameriquest"), purportedly executed on September 20, 2004 by Tracy Phanzy and John Grudzien, both purportedly "authorized officers" of Argent, and notarized by Janice M. Baker, an "agent" of Argent, whose notary commission expired on May 19, 2007;[120]

>    b.   An "assignment" from Ameriquest to Wachovia, as Trustee for the Series 2004-WWF1 PSA, also purportedly executed on September 20, 2004 by Tracy Phanzy and John Grudzien, both purportedly "authorized officers" of Ameriquest, and notarized by Janice M. Baker, an "agent" of Ameriquest, whose notary commission expired on May 19, 2007.[121] The Argent-to-Ameriquest "assignment" is identical to the purported Ameriquest-to-Wachovia assignment, except that a line intended for the purported "assignee" was apparently "whited out" before the addition of a handwritten entry identifying Wachovia as purported assignee.

117.    By the time that PHS's employees or agents recorded these "assignments" on October 11, 2007, both Ameriquest and Argent had permanently shut their doors. On August 30, 2007, Citigroup acquired the remaining assets of ACC Capital Holdings, owner of Ameriquest and Argent, both of which were effectively out of business "for at least a year" after ACC Capital Holdings agreed in 2006 to pay $325 million to settle federal and state regulators' claims of deceptive lending practices.[122]

---

[120]    *See* Ex. P.
[121]    *See* Ex. Q.
[122]    Eric Dash, *Citigroup Buys Parts of a Troubled Mortgage Lender*, N.Y.TIMES, September 1, 2007(http://query.nytimes.com/gst/fullpage.html?res=9C04E4D61430F932A3575AC0A9619C8B63), *cited in Wells Fargo v. Farmer,* 19 Misc.3d 1141(A), 2008 WL 2309006, at *3 (N.Y.Sup. June 5, 2008).

118.     In other words, the "assignments" that PHS's representatives filed with the Recorder of Deeds for Berks County, Pennsylvania on October 11, 2007 purported to convey a legal interest in Plaintiff Bender's mortgage from (1) two mortgage companies that no longer existed to (2) a bank that two years before relinquished its duties as trustee for investors that owned Plaintiff Bender's mortgage.

119.     In addition, the "assignments" of the Bender mortgage, which were purportedly executed on September 20, 2004, predated the legal existence of the Series 2004-WWF1 PSA, which by its express terms is dated as of November 1, 2004. According to a Supplemental Prospectus filed with the U.S. Securities and Exchange Commission by Park Place Securities, Inc. ("Park Place," a direct and wholly owned subsidiary of Ameriquest, an "affiliate" of Argent and the "Depositor" under the Series 2004-WWF1 certificates), selection of the mortgage loan collateral deposited into this investment trust was not to occur until October 1, 2004, with the closing date of the entire transaction not scheduled until November 12, 2004.[123]

120.     The Supplemental Prospectus filed in connection with the Series 2004-WWF1 certificates also expressly states that Park Place, as the "Depositor" of the investment trust, was required to deliver to Deutsche Bank National Trust Company, as Custodian, an "assignment of [each] mortgage in recordable form endorsed in blank without recourse, reflecting [a] transfer of the Mortgage Loan."[124] Use of "blank" assignments facilitates fraudulent assignments of the type manipulated by PHS's "vendors" to manufacture legal standing in mortgage foreclosure actions like the one

---

[123]   *See* Summary of Prospectus Supplement for 2004-WWF1 asset backed, pass-through certificates ("Prospectus Summary") at S-2, obtained and excerpted from EDGAR service provided at www.sec.gov (Ex. R).
[124]   Prospectus Summary at S-80.

against Plaintiff Bender. A "blank" assignment is, as the Hon. Keith C. Long of Massachusetts held, mere "bearer paper … negotiable by whichever entity possessed it," which is an "ineffective" means of transferring legal title to a mortgage because they "are not themselves an assignment and they are certainly not in recordable form."[125]

121.    At about the same time that PHS and Hallinan committed fraud against Plaintiff Bender and the civil justice system in Berks County, Pennsylvania, almost 100 miles and another state away, PHS and Defendant Rosemarie Diamond were committing a virtually identical fraud against Plaintiffs Diane and Charles J. Giles and the civil justice system in Ocean County, New Jersey.

122.    On September 11, 2001, Plaintiff Charles Giles, a certified emergency medical technician supervisor working in New York City, was among the first responders to put his life on the line attempting to save people trapped in the burning ruins of the World Trade Center. Although he needed the assistance of a Port Authority police officer to save his own life after the second tower fell, sustaining injuries that required his admission to the Jacobi Medical Center in the Bronx, Mr. Giles returned to the rubble of Ground Zero to join the search for missing survivors. His lungs contaminated by dust and debris, Plaintiff Charles Giles was diagnosed in 2002 with disabling health problems that threaten his life today.

123.    After 9/11, Plaintiff Charles Giles moved to a home at the Jersey shore in Barnegat Township, where he lived with his wife, Diane, and two daughters, Kaitlin and Clarissa. Plaintiff Giles' lung, heart and other health problems worsened, putting him in the hospital on 13 separate occasions and leaving him unable to work. His medical bills

---

[125]    *U.S. Bank, N.A. et. al. v. Ibanez et. al.*, No.08 MISC 38675517; LCR 679; 2009 Mass. LCR LEXIS 134, at *28-29 (Mass. Land Court, Oct. 14, 2009).

skyrocketed past $200,000 as bureaucratic delays held up benefit payments from the New York State government.

124.     When Plaintiffs Diane and Charles Giles fell behind on their mortgage, PHS and Defendant Diamond brought a foreclosure action against them on February 23, 2007.[126] As with Plaintiff Bender, PHS and Diamond brought this action against Mr. and Mrs. Giles in the name of "Wachovia Bank, N.A., Trustee" for the Series 2004-WWF1 PSA -- despite Wachovia Bank's divestiture of its corporate trust and institutional custody businesses on December 30, 2005.[127] As with Plaintiff Bender, the servicer on Plaintiff Giles' mortgage was Defendant Wells Fargo, operating under its "America's Servicing Company" pseudonym.

125.     According to the Complaint that PHS and Diamond filed against Mr. and Mrs. Giles on February 23, 2007, the "holder of the obligation and Mortgage was Wachovia Bank, N.A., Trustee" for the Series 2004-WWF1 PSA, pursuant to a "written assignment" from Argent to Wachovia that was "about to be recorded."[128] The Complaint also alleged that, other than the mortgage originated by Argent, the prospective "Argent-to-Wachovia" assignment and legal documents evidencing Mr. and Mrs. Giles' marriage, "no other instruments appear of record which may affect the premises" in which the Giles lived.[129]

---

[126] Ex. S.
[127] *See* ¶ 115 and n. 119, above.
[128] *See* Ex. S at ¶ 4.
[129] *See* Ex. S at ¶ 6.

126.   In connection with the filing of this Complaint, which contained misrepresentations of material fact relating to ownership of the Giles' mortgage, Defendant Diamond also executed two false Certifications[130]:

> (a)   a Certification pursuant to Rule 4:5-1, attesting that "all parties who should be joined in this action have been joined"; and
>
> (b)   a Certification pursuant to Rule 4-5-1(b)(2), attesting that "prior to filing the within Complaint, [Diamond] caused a title search of the public record to be made for the purpose of identifying any lien holders  or other persons or entities with an interest in the property that is the subject of this foreclosure."

127.   Two months **after** PHS and Diamond filed their Complaint against Mr. and Mrs. Giles, on April 18, 2007, PHS's employees or agents simultaneously recorded two purported assignments of the Giles' mortgage with the County Clerk of Ocean County, New Jersey:

> a.   An "assignment" from Argent to Ameriquest, purportedly executed on September 28, 2004 by Matt Polansky, a purported "agent" of Argent, and notarized by Darline Jean Charles, whose New York State notary commission expired on December 3, 2006;[131]
>
> b.   An "assignment" from Ameriquest to Wachovia, as Trustee for the Series 2004-WWF1 PSA, also purportedly executed on September 28, 2004 by Matt Polansky, a purported "agent" of Ameriquest, and notarized by Darline Jean Charles, whose New York State notary commission expired on December 3, 2006.[132] Except for a different "corporate seal" and the addition of a handwritten entry identifying Wachovia as purported assignee, the Argent-to-Ameriquest "assignment" is

---

[130]   *See* Ex. S at p. 7, 8.
[131]   *See* Ex. T.
[132]   *See* Ex. U.

identical    to    the    purported    Ameriquest-to-Wachovia
assignment.

128.    On the basis of the false allegations in the foreclosure Complaint and
Certifications filed by Defendant Diamond in the Superior Court, Chancery Division, for
Ocean County, New Jersey, and based further on the manufactured "assignments"
identified in the immediately preceding paragraph, PHS, purportedly on behalf of
Wachovia, obtained a default foreclosure judgment against Mr. and Mrs. Giles on June 5,
2007,[133] which was jurisdictionally defective and without legal effect.

129.    While PHS, Diamond and representatives of Wells Fargo, on one hand,
and Mr. and Mrs. Giles, on the other hand, were still discussing a possible modification
of the mortgage, PHS and Diamond caused the Ocean County Sheriff's Department to
schedule a public auction of the Giles' home for August 21, 2007, after which Mr. and
Mrs. Giles retained the services of a real estate attorney who obtained statutory
adjournments of the sheriff's auction. On September 12, 2007, Plaintiff Charles Giles
himself filed an emergent application for a stay of the sheriffs' sale re-scheduled for
September 18, 2007. Over the objection of PHS, the Hon. Frank A. Buczynski of the
Superior Court for Ocean County granted Mr. Giles' application and postponed the
sheriffs' sale until October 30, 2007 (not coincidentally, only 19 days after PHS recorded
its nearly identical bogus "assignments" of Plaintiff Bender's mortgage with the Recorder
of Deeds in Berks County, Pennsylvania).

130.    Friends and supporters of Charles and Diane Giles appealed to Wachovia
Bank for assistance, while the Giles themselves shared their difficult circumstances with
the public through appearances on a nationally syndicated television program hosted by

---

[133]  *See* Ex  V.

legal reporter Star Jones.[134] Just days before the scheduled sheriffs' sale, on October 23, 2007, Mark A. Farmer, senior vice president and assistant general counsel of Wachovia Bank, sent an e-mail to Jerry Dasti, counsel for Mr. and Mrs. Giles, thanking Mr. Dasti for providing Wachovia Bank with "the name of the Plaintiffs firm" in the Giles foreclosure action (*i.e.*, PHS) and advising Mr. Dasti that Mr. Farmer had "contacted the attorney handling the matter and informed him that Wachovia has not been the Trustee of the subject Pooling and Servicing Agreement since 12/30/05."[135]

131.   On October 24, 2007, Mark A. Farmer sent a letter by U.S. mail and e-mail to Vladimir Palma, a litigation attorney working under the direction of Defendant Diamond. This verbatim text of this letter to PHS is reproduced below[136]:

> Dear Mr. Palma:
>
> This letter is to confirm your voice message to me this morning and our subsequent conversation wherein you advised that you were able to reach your client [*i.e.*, Wells Fargo] and verify that Wachovia Bank, N.A. is not the proper Plaintiff as named in the referenced foreclosure action. Accordingly, your client has voluntarily agreed to postpone the sale date to November 19, 2007. During the interim, it is my understanding that you are awaiting the name of the proper Plaintiff from your client. Thereafter, you will file a motion to correct the name of the Plaintiff and ensure that the County records properly reflect the name of the true holder of the mortgage.
>
> As you are aware since Wachovia Bank, N.A. is not the Trustee and not the holder of the subject mortgage we are unable to address Mr. Charles Giles' situation. Thank you for your prompt attention to this matter and your efforts to correct the public record. I look forward to receipt of an Order deleting the name Wachovia Bank, N.A. from the foreclosure action and recorded evidence correcting the public records.

---

[134]  *See* videoclips at (1) http://vids.myspace.com/index.cfm?fuseaction=vids.individual&VideoID=20841698; (2) http://vids.myspace.com/index.cfm?fuseaction=vids.individual&VideoID=21158096
[135]  *See* e-mail dated October 23, 2005 from Mark J. Farmer to Jerry J. Dasti (Ex. W).
[136]  *See* Ex. X.

Sincerely,

*/s/ Mark A. Farmer*

Mark A. Farmer

Senior Vice President & Assistant General Counsel
Wachovia Corporation for its subsidiary Wachovia Bank, N.A.

132.    This unusually candid admission resulted only through an outpouring of local and national support for Mr. and Mrs. Giles that was heard at the highest levels of Wachovia's corporate management. At the community level, on October 27, 2007, a fundraiser was held at the Pinewoods Estates Volunteer Fire Company in Barnegat, New Jersey, attended by the township's mayor, council members, about 100 firefighters and police officers, the Police Benevolent Association and other concerned neighbors. Through the generosity of these people and others, including students from the Kenneth R. Middle School in Tabernacle, New Jersey, about $ 5,000 was raised to help Mr. and Mrs. Giles in their time of need.

133.    The compassion of the Giles' friends and neighbors was not sufficient to save his home. To avoid PHS's continued mortgage foreclosure activities, Plaintiff Giles was forced to sell his home at a price far below its true market value. Even then, PHS attempted to impose on Mr. and Mrs. Giles a ludicrous charge of $7,817.50 for "legal fees and costs" in a lawsuit that PHS never had any legal authority to prosecute (*see* ¶ 109, above, and Ex. NN). Although Plaintiff Charles Giles in February, 2009 received a long overdue workers' compensation award from a New York judge in February, 2009, he is still haunted by the distress sale of his home in 2007, something that he says "hurts the most" among the painful experiences he has suffered since reporting for duty on the morning of September 11, 2001. *See* videoclip at http://angelusbell888.bravejournal.com/.

60

134.    The fraudulent practice of PHS in fabricating mortgage assignments to file foreclosure actions systematically harms thousands of vulnerable homeowners like Plaintiffs Charles and Diane Giles. **In the case of Plaintiff Bender, PHS continued its fictitious "representation" of Wachovia as the purported "Trustee" for the Series 2004-WWF1 PSA for more than __20 months__ after PHS received conclusive confirmation from Senior Vice President Mark A. Farmer that "Wachovia Bank, N.A. is not the Trustee and not the holder" of mortgages bundled into the Series 2004-WWF1 PSA investment instrument.**[137]

135.    When PHS believed it needed the assistance of more substantial legal brainpower in connection with its assertion of "Wachovia's" claims against Plaintiff Bender in bankruptcy court, it turned to one of its defense lawyers in **this** litigation, Jonathan J. Bart of Wilentz, Spitzer & Goldman, P.A., who on June 24, 2009 entered a formal appearance "on behalf of WACHOVIA BANK, N.A., as Trustee" in the Bender bankruptcy matter.[138] While this unauthorized representation of "Wachovia" would no doubt have come as a surprise to Wachovia Senior Vice President Mark Farmer, who in October 2007 explicitly instructed PHS to "correct the public record" and desist in its representation of "WACHOVIA BANK, N.A. as Trustee," this was just one of many instances where Mr. Bart and Wilentz, Spitzer & Goldman, P.A. have served as "house counsel" for PHS and other foreclosure law firms defending charges of impropriety by the UST and distressed homeowners. (*see* below at ¶ 175f and n. 179, 182).

---

[137]    *See, e.g.,* Bender Amended Proof of Claim dated April 7, 2009 (Ex. I).

[138]    *See* "Notice of Appearance and Demand for Service of Papers Pursuant to Section 1109(b) of the Bankruptcy Code and Rules 1020 and 2002 of the Federal Rules of Bankruptcy Procedure" filed by Jonathan J. Bart of Wilentz, Spitzer & Goldman, P.A. on June 24, 2009 in *In re Bender*, Bankr. No. 08-21193 REF (Bankr. E.D.Pa.) (capitalization in original)(Docket Item 55) (Ex. Y).

136.    Years after Wachovia sold its corporate trust and institutional custody businesses on December 30, 2005, and long after PHS learned authoritatively that it was improper for it to initiate foreclosure actions in the name of "Wachovia" as trustee for owners of securitized mortgages, PHS nevertheless continued to file and prosecute the same kind of improper foreclosure actions "on behalf" of Wachovia, "as Trustee." *See, e.g.,* Lebanon County Sheriff List of Valuable Real Estate to be sold on February 10, 2009, Sale No. 15, pursuant to a writ of execution obtained by PHS in an action entitled *Wachovia Bank, N.A., as Trustee for GSMPS 2005-RP3 v. Douglas A. Schultz.*[139]

137.    Another disturbing case is that of Victor and Enoabasi Ukpe, a self-employed taxi driver from Nigeria and his homemaker wife who support five children under 10-years-old.[140] After giving a ride to a passenger who worked as a mortgage broker, Victor Ukpe and his wife were persuaded to purchase a house and take out a $224,000 mortgage loan, based upon a household adjusted gross income of just $12,198 (an amount less than half the federal poverty guideline of $25,210 for a family of six).[141]

138.    The Ukpes were unable to afford their mortgage payments. On March 13, 2008, PHS and Defendant Diamond, purportedly on behalf of Bank of New York as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed Certificates Series 2005-AB-3,[142] filed a mortgage foreclosure complaint against the Ukpes in the Superior

---

[139] *See* Ex. Z at p. 2.
[140] *See Bank of New York v. Ukpe*, (D.N.J. Dec. 9, 2009) ("*Ukpe* Remand Order)."
[141] *See Bank of New York v. Ukpe*, 09-cv-01710-JHR-JS (D.N.J.), Excerpts from Brief of Defendant/Third-Party Plaintiffs Victor and Enoabasi Ukpe in Opposition to Motion to Daniel Bernheim, Esq. Pro Hac Vice and in Support of Cross-Motion to Disqualify Wilentz, Goldman & Spitzer, P.A., filed on September 8, 2009 (Docket Item 31) (Ex. A1 ) at 3.

Court, Chancery Division, for Atlantic County, New Jersey.[143] The action filed by PHS against the Ukpes was assigned to the Hon. William C. Todd III.

139.    With assistance from South Jersey Legal Services, Inc, the Ukpes filed an answer, affirmative defenses, counterclaims and a third-party complaint against PHS and other parties with an interest in the Ukpes' mortgage, including its servicer, Defendant herein Countrywide.[144] Among other things, the Ukpes alleged that PHS's "foreclosure complaint was based on a fraudulent assignment of a mortgage note from Mortgage Electronic Registration Systems, Inc. ['MERS'] to Plaintiff [Bank of New York]." Based on these allegations and on supporting evidence presented by counsel for the Ukpes, in January 2009, Judge Todd denied PHS's motions to strike the Ukpes' answer and for summary judgment.[145]

140.    With respect to the Ukpes' affirmative claims for relief against PHS and its clients, PHS refused to provide critical discovery requested by the Ukpes' counsel. Nevertheless, the Ukpes' counsel were able to obtain testimonial and documentary evidence to support allegations that (in the words of the Hon. Joseph H. Rodriguez of the United States District Court for the District of New Jersey):

> Francis Hallinan, a partner at the Phelan firm, executed the assignment in his capacity as a MERS officer, while the Phelan firm was a vendor to MERS, the assignor; the Phelan firm also represents the Plaintiff [Bank of New York] in this foreclosure action, as well as the mortgage servicer, Countrywide Home Loans Servicing, LP. The three Phelan firm named partners, including Hallinan, own Full Spectrum Holdings, which is comprised of Full Spectrum Legal Services, Inc. (FSLS) and Land Title Services. **The in-house notary for FSLS, Thomas Strain, testified during deposition that over the previous three years, he falsely**

---

[143]  See *Upke* Remand Order at 3.
[144]  *Id*.
[145]  *Id*. at 5.

**acknowledged tens of thousands of mortgage assignments for the Phelan firm, including the assignment in this case.[146]**

141.    In a telephone conference on January 16, 2009, Judge Todd "called for a plenary hearing" to:

> get to the bottom of what it viewed as a possible systemic problem involving the alleged false notarization of assignments in which a [PHS] lawyer played a central role in the process….The Court expressed a great deal of concern about the process by which the assignment in this and other cases was created, the circumstance that the lawyer, Mr. Hallinan, signed the assignment representing one party to the transaction while his law firm represented the other party. The Court expressed suspicion about the various roles played by Mr. Hallinan and noted the potential for conflicts. The major problem the Court had was not with the alleged false notarization by the notary. Rather the problem was the attorney's participation in the process. The Court also raised the issue of an appropriate remedy and recognized that the situation could impact a host of foreclosure cases. Ultimately, the Court expressed a goal to get to the bottom of the matter and to make sure "everybody gets it right."[147]

142.    Judge Todd entered an Order dated January 21, 2009, requiring PHS to "produce" Defendant Hallinan and notary Thomas Strain at the plenary hearing,[148] which was ultimately scheduled for April 20, 2009. Judge Todd also required PHS to produce at the hearing the "original" copy of Full Spectrum's "notarization logs."

143.    Having no desire for Judge Todd to learn the true facts or "get it right" at the April 20, 2009 hearing, defendants abruptly removed the Ukpe's action to federal court in Camden on April 9, 2009, where it was assigned to Judge Rodriguez. Upon motion by the Ukpes, Judge Rodriguez remanded the case to New Jersey Chancery Court by Order dated December 9, 2009.

---

[146] *Id*. at 6 (emphasis supplied).
[147] Letter dated April 11, 2009 to the Hon. William C. Todd, III, P.J.Ch., from Abigail B. Sullivan, counsel for the Ukpes. (Ex. B1) (emphasis supplied).
[148] Ex. C1 at ¶ 9.

144.    In the meantime, Judge Todd did not overlook the evidence presented to him by counsel for the Ukpes. Judge Todd took the extraordinary initiative of advising other Chancery Court judges in New Jersey about falsified mortgage assignments "associated" with PHS's office.[149] In a furtive attempt to rehabilitate the reputation of his firm, Defendant Lawrence Phelan sent an *ex parte* letter to Judge Todd (1) notifying the judge that PHS had at its own expense re-executed and re-recorded 2,921 mortgage assignments that were fraudulently notarized by Full Spectrum employee Thomas Strain at the behest of Defendant Hallinan, described in PHS's web site as the law firm's "'behind the scenes' manager who ensures that the job gets done"[150] – evidently by any means necessary; and (2) imploring the judge to "circulat[e]' PHS's "notification of [its] corrective actions" to other Chancery Court judges.

145.    As demonstrated throughout this Complaint, the so-called "corrective actions" described by Defendant Phelan are far too little and years too late. Even then, these "corrective actions" relating to improper land recording practices were transparently superficial and ineffective because they did not also extend to Pennsylvania homeowners like Plaintiff Rhodes, who were likewise sued in foreclosure actions by PHS on the basis of problematic "assignments" that were (1) executed by Defendant Hallinan, purportedly as "vice president" of MERS (2) to "Bank of New York as Certificateholders of [a] CWABS Asset Backed Certificate Series"; (3) acknowledged by notary Thomas Strain; and (4) recorded upon the ostensible authority of PHS's real client, mortgage servicer Countrywide. In the case of Plaintiff Rhodes' mortgage assignment, the "precise

---

[149]  *See* Letter dated May 8, 2009 from the Hon. William C. Todd III to Abigail B. Sullivan, Esq. of South Jersey Legal Services, Inc. and Dashika R. Wellington, Esq. of Wilentz, Goldman & Spitzer (there as here counsel for PHS), enclosing *ex parte* letter dated April 29, 2009 from Defendant Lawrence T. Phelan to the Hon. William C. Todd III. (Ex. D1).
[150]  www.fedphe.com/pages/FSH.htm

address" of the "named assignee" is listed as that of Countrywide rather the assignee specifically identified in the instrument, Bank of New York.[151]

146.     Six years ago, PHS spurned an opportunity to undertake real "corrective actions" to the wrongful practices that are so out of control today. In *Abramson v. Federman & Phelan, LLP*, 313 B.R. 195, 198 (Bank. W.D.Pa. 2004), PHS's predecessor firm (represented by Daniel Bernheim and Jonathan Bart, the same lawyers now acting as counsel for PHS in this litigation) persuaded the Hon. Warren W. Bentz of the United States Bankruptcy Court for the Western District of Pennsylvania to dismiss a proposed class action alleging that Federman & Phelan violated, *inter alia*, the FDCPA by virtue of the law firm's filing of bankruptcy "proofs of claim which overstated the mortgage arrears as part of a course of conduct in which mortgage arrears are regularly overstated." 313 B.R. at 196. Without making any determination concerning the truth of plaintiff's allegations, Judge Wentz felt constrained to limit plaintiff's remedies to those explicitly enumerated in the Bankruptcy Code, a conclusion not required by statutory or case law.[152]

147.     Emboldened by their "success" before Judge Wentz, PHS's lawyers proclaimed on a former web site that they are "Leader[s] In Protecting Lenders In Bankruptcy Class Actions."[153] These lawyers boasted that their supposed legal acumen provides their clients "a measure of security against the rapid expansion of class action

---

[151]   *See* "Assignment" of Plaintiff Rhodes' mortgage dated November 17, 2007 (Ex. E1).

[152]   *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the initial complaint in this litigation, filed on May 8, 2009 (Docket Item 3) at 14-19. *See also Kline v. Mortgage Electronic Security Systems, Inc.*, 2009 WL 3064660 (S.D.Ohio Sept. 21, 2009), *citing*, *Randolph v. IMBS, Inc.*, 368, 726, 730 (7th Cir. 2004) (rejecting magistrate's recommendation to dismiss FDCPA allegations involving the filing of false bankruptcy proof of claims because "there is no indication that the Bankruptcy Code … covers the whole subject of the FDCPA and was clearly intended as a substitute").

[153]   *See* Ex. F1.

litigation claims against lenders."[154] (*See* below at ¶¶ 175f and n. 179, 182). Rather than undertake remedial measures to amend the systematic problems brought to Judge Wentz' attention in 2004, as responsible lawyers would have done, PHS was so convinced of its "security" against class actions that it continued to conduct its illegal operations with impunity, an ongoing abuse of struggling homeowners and the judicial system that reflects neither conscience nor restraint.[155]

### 3. PHS's Wrongful Conduct Is Facilitated By Its Thoughtless, Mechanical Application of Client-Mandated Computer Programs

148.    In the words of PHS's own litigation counsel, "loan administration is generally automated, so if charges are erroneously inputted, incorrect charges will be generated."[156]

149.    By its own account, both of PHS's offices are "completely computerized" and equipped with "every case management and invoice reporting system[]" used by the mortgage foreclosure industry, including LenStar, VendorScape, NewTrak, iClear, Alltel and NewInvoice, all of which are "client-based web sites."[157]

150.    As demonstrated above at ¶¶ 56-65, many state and federal judges throughout the United States have found that accounting systems used by Defendants Countrywide and Wells Fargo are systematically incapable of generating reliable financial information about their borrowers' mortgages.

---

[154]    *Id.*
[155]    Defendant Rosemarie Diamond of PHS shared her insight into the topic of the "FDCPA and Class Actions" as a panelist at a meeting of the USFN trade group at the Grand Hyatt Hotel in Denver on July 19-20, 2007 (http://www.usfn.org/Content/NavigationMenu/SEMINARSTRAININGEVENTS/USFNSeminarArchive/2007LegalIssuesSeminar/LegIss07_Brochure_FINAL_06.01.07_Clickable_rev.pdf).
[156]    *Id.*
[157]    http://www.fedphe.com/. *See also* PHS listings in 2006 USFN Membership Directory at 11, 14 (http://www.zp-production.com/sm/pdf/ar-USFN06.pdf)

151.    As a condition of its retention by clients like Defendants Wells Fargo and Countrywide, PHS is required to use whatever case management and invoice reporting system is dictated by its clients. It is through these systems that PHS (1) receives its initial case referrals; (2) obtains financial and legal information used to perform its work assignments; (3) is required to submit periodic status reports; and (4) submits invoices and receives payments from its clients.

152.    These systems also permit PHS's clients to monitor the speed by which PHS performs its "services," which is measured against specific "timelines" for the completion of specified tasks during the foreclosure and bankruptcy processes.[158] PHS receives specific "grades" from its clients with respect to its performance vis-a-vis required timeliness. A "good" grade may translate into more case referrals. Conversely, a "bad" grade can result in a significant reduction of work assigned to PHS.[159] Thus, PHS's web site, which is used by PHS as a marketing tool to both existing and prospective clients, emphasizes (1) PHS's proficiency in the use of "every case management and

---

[158]    PHS and Wells Fargo are "default management" clients of Lender Processing Services, Inc. ("LPS"), as was Countrywide until its acquisition by Bank of America. LPS describes itself as "the nation's leading provider of mortgage processing services, settlement services, mortgage performance analytics, and default solutions, which are used by a "majority of the 50 largest U.S. banks" that "rely on" its services. (http://interchange.lendingsvcs.com/providers.html; (http://interchange.lendingsvcs.com/providers.html.

    According to LPS's web site, "[w]hen clients refer a loan to local counsel through LPS Foreclosure Solutions, Inc., the loan timeline is managed until resolution. Clients identify the unique requirements of their portfolios, and the loans are processed through LPS Foreclosure Solutions, Inc. to ensure the most efficient outcome. Internal time limitations for key events are set, and active monitoring is conducted to minimize the overall timeframe from referral to resolution. The loan-level data is reported to LPS partners on a daily basis using LPS Desktop, a Web-based default management technology"). (http://www.lpsvcs.com/DefaultSolutions/ForeclosureandBankruptcyOutsourcing/Pages/default.aspx).

[159]    *See Solving Foreclosure Management Challenges Series: Foreclosure Timeline Mangement*, FREDDIE MAC at 14 ("Refer business to the firms with the best timelines") and at 26 ("Communicate our foreclosure timeline requirements to all your staff and attorneys. Encourage them to actively decrease timelines. Instruct all of your staff and attorneys to strive for timelines that are less than our published state foreclosure timelines").
(http://74.125.93.132/search?q=cache:uQ22Vyvaj2kJ:www.freddiemac.com/learn/pdfs/service/sdmcftrec.pdf%20mortgage%20forecl osure%20counsel%20%20%20timelines&hl=en&gl=us )

invoice reporting system" in the industry; and (2) PHS's ability to "ensure as quick a turnaround time as humanly possible."[160]

153.    Given the substantial rewards that PHS receives from its single-minded devotion to rapid delivery of its "services," PHS demonstrates no concern about accurate billing of foreclosure costs, proper legal standing of its "clients" to bring foreclosure actions or the success of programs like Philadelphia's Residential Mortgage Foreclosure Diversion Pilot Program. For lawyers like PHS's Rosemarie Diamond, the cost/benefit analysis requires no difficult calculation. "Delay is "unproductive" and "waste[ful]"[161]; on the other hand, speed is highly profitable and the means by which PHS maintains its position as the "premier" mortgage foreclosure law firm in the Pennsylvania-New Jersey "region" and the "largest" such firm in Pennsylvania.[162] Stated another way, there is little for PHS to gain by doing its job responsibly or by giving distressed homeowners a fair opportunity to remain in their homes during a time of national financial crisis but, to quote a well-known phrase, there are millions of unearned dollars to be made by subscribing to the "greed is good" philosophy of doing business.

154.    On April 15, 2009, the Hon. Diane Weiss Sigmund of the United States Bankruptcy Court for the Eastern District of Pennsylvania wrote a 58-page opinion describing improper industry-wide practices of profit-obsessed foreclosure law firms like PHS.[163]

155.    In that case, Judge Sigmund granted the UST's request for discovery concerning use by foreclosure law firms of computerized mortgage "default solutions"

---

[160] http://www.fedphe.com/
[161] *See* ¶ 44, above.
[162] http://www.fedphe.com/.
[163] *In re Taylor*, 407 B.R. 618 (Bankr. E.D.Pa. 2009)

provided by LPS, including a product called NewTrak,[164] which is also part of PHS's smorgasbord of "client-based" computer programs.[165] After "four lengthy evidentiary hearings" in which the UST was invited to participate, Judge Sigmund found that one "high-volume" Philadelphia-area mortgage foreclosure law firm with a comparable attorney-to-staff member ratio to PHS,[166] on a "systemic" basis,[167] demonstrated a "slavish adherence"[168] to its client's "computer-driven models and communications to inexpensively traverse the path to foreclosure [that] offends the integrity of our American bankruptcy system."[169]

156. After evaluating the evidence presented during four evidentiary hearings, Judge Sigmund concluded that:

▪ "[M]ortgage lenders upload all or part of the mortgage documents and loan records of specified borrowers into the NewTrak system. Attorneys are engaged on a case by case basis through NewTrak to handle specified tasks. They get their assignments from NewTrak and report and/or seek further direction by "opening up an issue" on NewTrak."[170]

▪ The manager in charge of the law firm's bankruptcy department "relied on the NewTrak system for all factual information about the loan," without any direct contact with the firm's client. The law firm's "processors (including paralegals) were instructed to communicate by NewTrak and could only deviate from this practice by using [the law firm's] "escalation procedures, i.e., making a request of an assistant manager and then manager." Neither the bankruptcy department manager "nor anyone that she supervised was requested to check the accuracy of any of the NewTrak data"[171]

---

[164] *Id*. at 623.
[165] *See* ¶ 76, above.
[166] While PHS says that it has 17 attorneys and 250 staff members, the foreclosure law firm before Judge Sigmund has 10 lawyers and 130 staff members. *In re Taylor*, 407 B.R. at 626.
[167] *Id*. at 639
[168] *Id*. at 649
[169] *Id*. at 651
[170] *Id*. at 623.
[171] *Id*. at 632-33.

- "NewTrak interposes a LPS processor as intermediary" between mortgage lenders or servicers "and the law firm that the system engages from a list pre-approved" by the lender or servicer. With the loan data uploaded to a LPS system by the lender or servicer, "LPS responds to the perceived needs of retained counsel to perform the assigned task," at times addressing the lender or servicer electronically for further information. "The retained counsel does not address the client directly."[172]

- In a brief to the court (written by Messrs. Bernheim and Bart, who now represent PHS in this litigation), the foreclosure firm acknowledged that it "is one of many law firms that conduct a high volume foreclosure bankruptcy practice and if a lender requires that a law firm enter into an agreement with its agent, a servicing company such as Fidelity [National Information Services, also known as LPS], [the law firm] has no choice but to participate in such a program if it wants to do business."[173]

157.    In this context, Judge Sigmund agreed with an observation by the Hon. Jeff Bohn of the United States Bankruptcy Court for the Southern District of Texas, who remarked that mortgage lenders and servicers, together with their "high volume foreclosure law firms," have fostered a corrosive "assembly line" culture of practicing law.[174]

158.    In sanctioning the law firm before her, Judge Sigmund specifically criticized (1) a senior-level attorney for becoming "so enmeshed in the assembly line of managing the bankruptcy department's volume mortgage lender practice that she has lost sight of her duty to the court and has compromised her ethical obligations"[175] and (2) the firm's sole shareholder (who argued that "his firm's reliance on NewTrak and other such aids [was] essential to the economic structure of the law practice") for fostering a law

---

[172]  *Id.* at 637.
[173]    *Id.* at 638. *See also*, Michael Sasso, *Law Firm Gorges On Home Defaults*, TAMPA TRIB., January 3, 2010 ("Dubbed foreclosure mills by some in the industry, these [law firms] have turned the job into a factorylike process. Speed is the key to their success") (http://www2.tbo.com/content/2010/jan/03/na-law-firm-gorges-on-home-defaults/news-breaking/).
[174]    *In re Taylor*, 407 B.R. at 641, *quoting*, *In re Parsley*, 384 B.R. 138, 183  (Bankr. S.D.Tex. 2008).
[175]    *Id.* at 648.

firm "culture" that "appears to value production over professionalism, a priority acceptable for a business but potentially antagonistic to the practice of law."[176]

159.    Observing that the anomalies she identified "are not isolated to this case or to this residential mortgage lender law firm,"[177] Judge Sigmund expressed hope that her published opinion will lead to "systemic changes" in the institutionalized practices of high-volume foreclosure law firms, which (in their ambition to cultivate "advantageous … business relationships with [their] mortgage lender client base" and to enhance their "own bottom line") abandon their professional responsibilities through "rigid adherence" to their client's "automated procedures."[178]

159.    If the past is prologue to the future, PHS and law firms of its dollar-driven disposition will not serve voluntarily as constructive agents of "systemic change" in the foreclosure industry. Systemic change, if it comes at all, must result from judicial

---

[176]    *Id* at 648-49

[177]    *Id* at 649. Judge Sigmund's observation is borne out by an agenda distributed at USFN's "Fall Regional Default Servicing Seminar" at the Omni Hotel in San Diego on September 20-22, 2006, an event where Fidelity National Information Services (now LPS) acted as the "MVP Sponsor" and where PHS was identified among the foreclosure law firms listed as a "Heavy Hitter" and a "Gold" Sponsor. The "session outline" of group's meeting on September 21st reveals, as Judge Sigmund noted, that "timeline management" and "report cards," and strictly circumscribed day-to-day communication between attorneys and their servicer clients are issues of paramount importance to "America's Mortgage Banking Attorneys" and their corporate masters (*e.g.*, "Verbal Communication" is limited by "Contact Matrices," "Voice Mail Polic[ies]" and "Escalation" procedures, while "Non-Verbal Communication" is reserved for "SOS" or "Urgent Situations.") *See* http://www.southlaw.com/USFN.Fall.06.pdf. The "session outline" of group's meeting on September 22nd also reveals what this group believed to be the "Benefits of Standardization and Automation of Restatement Process": (a) "Reduction of Costs"; (b) "Increase in Speed" and (c) and, only then, as an evident afterthought, "Improvement of Accuracy." *Id*. Among the featured panelists at the USFN's soirée in San Diego was Jeff Niklawski of Defendant Wells Fargo. *Id*.

[178]    *In re Taylor*, 407 B.R. at 649, 645. While Judge Sigmund hopes that foreclosure attorneys will rely less on technology and more on their professional training, the reality is that the foreclosure industry is working in the opposite direction toward the objective of having "attorneys … do ***all*** of their work in their case management system." *See* http://www.usfn.org/AM/Template.cfm?Section=Home&CONTENTID=6867&TEMPLATE=/CM/HTMLDisplay.cfm&SECTION= Article_Library (emphasis supplied) ("Automating these critical business processes can provide maximum return on investment for firms by reducing labor overhead and building resource capacity to handle more files").

enforcement of homeowners' legal rights, a fundamental privilege of American citizenship ignored by PHS and its co-defendants.

## V.   CLASS ACTION ALLEGATIONS

160.   Plaintiffs bring this lawsuit individually and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class ("PHS Overcharge Class"):

> All homeowners who, during the period from January 15, 2004 through the present ("Class Period"), (1) were defendants in mortgage foreclosure actions prosecuted by Phelan Hallinan & Schmeig, LLP, Phelan Hallinan & Schmeig, P.C., Phelan Hallinan Schmeig & Diamond, P.C., their predecessors, affiliates, subsidiaries or attorneys ("PHS"); (2) obtained a stay of sheriffs' sale proceedings and (3) sustained damages resulting from inflated or fabricated mortgage foreclosure costs charged or claimed by PHS.

161.   Plaintiffs also bring this lawsuit individually and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class ("PHS Improper Representation Class"):

> All homeowners who, during the period from January 15, 2004 through the present ("Class Period"), were defendants in mortgage foreclosure actions (1) prosecuted by Phelan Hallinan & Schmeig, LLP,  Phelan Hallinan & Schmeig, P.C., Phelan Hallinan Schmeig & Diamond, P.C., their predecessors, affiliates, subsidiaries or attorneys ("PHS"); and (2) in which PHS purported to represent a party that lacked legal standing to bring a mortgage foreclosure action at the time PHS filed its complaint.

162.   The PHS Overcharge Class and the PHS Improper Representation Class are collectively referred to in this Complaint as the "Classes."

163.   This litigation is properly maintainable as a class action.

164.   The Classes are so numerous and geographically dispersed that joinder of all members is impracticable. Defendant PHS's web site boasts that it is the "largest