[residential mortgage foreclosure] firm in Pennsylvania" and "one of the few law firms to handle foreclosures, bankruptcies and asset recovery actions for the entire states of New Jersey and Pennsylvania." According to Defendant Hallinan, PHS handled an estimated 24,000 to 26,000 foreclosure prosecutions in Pennsylvania and New Jersey during 2008 alone, a fraction of the foreclosure actions prosecuted by PHS during the entire Class Period.[176]

165.    There are questions of law and fact common to the Classes. These common questions relate to the existence of the wrongful conduct alleged, and to the type and common pattern of injury sustained as a result thereof. The questions include but are not limited to:

a.    Whether Defendants as a matter of regular practice overstated or fabricated the amount of fees due from Plaintiffs and members of the Classes in connection with foreclosure sales that did not proceed to completion, including, *inter alia*, (1) sheriffs' deposit refunds; (2) attorneys' fees; (3) real estate title and litigation support costs; (4) property inspection and valuation fees; and (5) duplicative costs for "services" already included in independent charges.

b.    Whether PHS as a matter of regular practice misappropriated and converted to its own use (and/or the use of its clients) deposits refunded by county sheriffs to PHS in connection with foreclosure sales that did not proceed to completion, the amounts of which should have been credited without delay to the accounts of Plaintiffs and members of the Classes.

c.    Whether PHS as a matter of regular practice filed foreclosure actions

---

[176] *See* above at ¶ 75.

against homeowners in the name of "clients" that lacked proper legal standing to bring suit.

       d.    Whether PHS (or its employees or agents) as a matter of regular practice falsified or caused the falsification of mortgage and note assignments recorded with public agencies in connection with or after the filing of foreclosure actions prosecuted by PHS.

       e.    Whether PHS conducted its illegal practices with the assistance or knowing acquiescence of Defendants Countrywide and Wells Fargo.

       f.    The duration, sequence and character of the conduct alleged in this Complaint, including particular acts performed by Defendants and others that deprived Plaintiffs and members of the Classes of their legal rights and property.

       g.    The identity of other co-conspirators (including non-defendant lenders, mortgage servicers, litigation attorneys, computerized mortgage servicing program vendors, and mortgage foreclosure industry trade groups), and the extent of the co-conspirators' participation in the conduct complained of herein.

       h.    Whether the conduct alleged in this Complaint violated RICO.

       i.    Whether the conduct alleged in this Complaint violated the FDCPA.

       j.    Whether the conduct alleged in this Complaint violated the UTPCPL.

       k.    Whether the conduct alleged in this Complaint states a cause of action for common law fraud, breach of contract, breach of duty of good faith and fair dealing, money had and received, and/or negligent misrepresentation in violation of the common laws of the Commonwealth of Pennsylvania and the State of New Jersey.

       l.    Whether Defendants' conduct, as alleged in this Complaint, caused

injury to the person and property of Plaintiffs and other members of the Classes.

m.     The appropriate measure of damages sustained by Plaintiffs and other members of the Classes.

n.     Whether restitution and disgorgement of profits are appropriate forms of relief for the wrongful conduct alleged in this Complaint.

o.     Whether injunctive relief is warranted to restrain Defendants from continuing to engage in the wrongful conduct alleged in this Complaint, and

p.     Whether an auditor or special master should be appointed to (1) ascertain the amount of money wrongfully taken by Defendants, which should be disgorged to Plaintiffs and members of the Classes; (b) recommend specific business management and accounting procedures that Defendants must adopt and implement to avoid future repetition of the wrongful conduct documented throughout this Complaint; and (c) monitor Defendants' compliance with all business management or accounting procedures that may be ordered by the Court in granting injunctive relief in this action.

166.     Plaintiffs Bender, Giles (and probably Rhodes) are members of both Classes. All Plaintiffs are members of the PHS Overcharge Class. Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes. In addition, competent counsel experienced in the prosecution of class action litigation represents Plaintiffs.

167.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

168.     Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate injunctive relief with respect to the Classes as a whole.

169.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

170.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Members of the classes are readily ascertainable, *inter alia*, through records maintained in the regular course of business by PHS and other Defendants. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate substantively complex issues like those asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VII.   CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF 18 U.S.C. § 1962(c) (RICO)

171.     Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate by reference each of the allegations in the preceding paragraphs of this Complaint.

172.     This cause of action, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against all Defendants on behalf of the Classes.

173.     Plaintiffs, each member of the Classes, and each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

174.     At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the association-in-fact enterprises identified below, the affairs of which affected interstate commerce, through a pattern of racketeering activity.

## A.   The Enterprise

## The PHS Mortgage Foreclosure and Bankruptcy Enterprise

175.   The PHS  Mortgage Foreclosure and Bankruptcy Enterprise is an association-in-fact consisting of the following persons and entities:

a.       PHS, including defendants Lawrence T. Phelan, Francis S. Hallinan, Daniel G. Schmieg, Rosemarie Diamond, Judith T. Romano (and non-defendants Jay B. Jones, Andrew L. Spivack, Vladimir Palma, Peter J. Mulchay, Michelle Bradford, Brian Blake, Thomas Bodowski, Joseph Schalk and other salaried staff or contract lawyers), together with PHS's non-defendant managerial personnel, including but not limited to financial officer John Corporale, accounts receivable "team leaders" such as Eugene Jaskiewicz, and administrative officer Susan Hoers.

b.       Full Spectrum Services, Inc., Full Spectrum Legal Services, Inc., Full Spectrum Review Services, Inc., Foreclosure Review Services, Inc., Land Title Services of New Jersey, Inc., Land Title Services of Pennsylvania, LGI Abstract Agency, Inc., Creditors' Services, Inc., Eugene L. Terzano, Jr., Jean Mole, Jay Mullen, Thomas Strain, and other agents and representatives who provide foreclosure and bankruptcy-related

services to PHS in Pennsylvania and/or New Jersey, including, *inter alia*, property searches; duplication and filing of recorded mortgages, notes and assignments; notary public services; and the filing, service or publication of court documents. PHS uses these entities and individuals to implement its fraudulent foreclosure fee overcharge scheme, as well as its institutionalized practice of prosecuting legal proceedings on behalf of clients with no proper legal standing.

      c.    Mortgage servicers (including but not limited to Defendant Countrywide and Defendant Wells Fargo) that "refer" mortgage foreclosure and bankruptcy matters to PHS for prosecution. While monitoring and grading PHS on the "speed" of its performance, these mortgage servicers facilitate and profit from PHS's fraudulent foreclosure fee overcharge scheme, as well as from its institutionalized practice of prosecuting legal proceedings on behalf of clients with no proper legal standing. They accomplish this result, *inter alia*, through PHS's mandatory use of "client-based" case management and invoice reporting systems.

      d.    Non-defendant manufacturers, marketers and distributors of "client-based" case management and invoice reporting systems used throughout the residential mortgage foreclosure industry, including (1) Loan Processing Services, Inc. ("LPS," formerly known as Fidelity National Information Services, Inc.), a Delaware Corporation with principal executive offices at 601 Riverside Avenue, Jacksonville, Florida 32204; (2) The First American Corporation, a California Corporation with principal executive offices at 1 First American Way, Santa Ana, California 92707; and (3) ISGN Solutions, Inc., a subsidiary of a corporation owned by Indian company named CFCL Technologies Ltd., which maintains its United States headquarters at 3220 Tillman Drive, Suite 301,

Bensalem, Pennsylvania 19020. Through its use of the "client-based" case management and invoice reporting systems developed and sold by these parties, PHS, Wells Fargo and Countrywide implement the unlawful schemes identified throughout this Complaint.

e.    Non-defendant USFN (also known as "America's Mortgage Banking Attorneys"), a foreclosure industry trade association located at 14471 Chambers Road, Suite 260, Tustin California 92780, whose members include foreclosure law firms, mortgage servicers and lenders, and case management and invoice reporting system providers. Through its membership and leadership position in USFN, PHS cultivates key business relationships and exchanges inside information with other participants in the residential mortgage foreclosure industry, some of which are used by PHS to engage in the unlawful conduct identified in this Complaint. PHS is a "founding member" of the USFN.[177]

f.    Non-defendant lawyers Daniel S. Bernheim 3[d] ("Bernheim") and Jonathan J. Bart ("Bart") (both formerly affiliated with a defunct Philadelphia law firm named Silverman, Bernheim & Vogel, now resident lawyers in the Philadelphia office of New Jersey-based Wilentz, Goldman & Spitzer, P.A. ["Wilentz firm"]). Bernheim and Bart maintain a litigation practice that they claim establishes them as "Leader[s] In Protecting Lenders In Bankruptcy Class Actions," who provide their clients "a measure of security against the rapid expansion of class action litigation claims against lenders."[178] From their offices at 1500 Market Street, Two Penn Center Plaza, Suite 910, Philadelphia, Pennsylvania 19102, Bernheim and Bart have become veritable "house counsel" to PHS. Bernheim (who graduated with Defendant Lawrence Phelan in Villanova Law School's

---

[177]   http://www.fedphe.com/
[178]   *Id.*

Class of 1980) and/or Bart have defended PHS in, *inter alia*, the following actions other than this one[179]:

- *In re Bender*, Bankr. No. 08-21193 REF (Bankr. E.D.Pa.)

- *Abramson v. Federman & Phelan, LLP*, 313 B.R. 19 (Bankr. W.D.Pa. 2004)[180]

- *Bank of New York v. Ukpe*, 09-cv-01710-JHR-JS (D.N.J.), and No. F-10209-08 (Sup. Ct, Chan. Div. N.J.)[181]

- *Dalara v. Phelan, Hallinan& Schmieg,LLP*, No. 09-2704 (E.D.Pa.)

- *Wright v. Phelan, Hallinan & Schmieg, LLP*, No. 09-3538 (E.D.Pa.)

- *Shivone v. Washington Mutual Bank, N.A.*, No. 07-1038 (E.D.Pa.)

While representing PHS in this lawsuit, Bart and the Wilentz firm, at the instigation of PHS, entered a formal appearance in Plaintiff Bender's bankruptcy action, despite the fact that neither PHS nor the Wilentz firm had any legal authority to represent their illusory mutual "client," Wachovia Bank, N.A. – an entity with no legal standing to assert a claim in Plaintiff Bender's bankruptcy case. *See* ¶ 135 and n. 138, above. In actively assisting PHS in its professional misconduct and unlawful activities, Bart and the Wilentz firm have participated directly in the wrongdoing at issue in this litigation, thus making Bernheim, Bart and other Wilentz firm employees necessary and

---

[179]  Bernheim, Bart and the Wilentz firm have also applied the intimate perspective they gained their frequent collaborations with PHS to their representation of another high-volume foreclosure law firm, which was sanctioned for its misconduct in *In re Taylor*, 407 B.R. 618 (Bankr. E.D.Pa. 2009), now under appeal in No. 09-02479 (E.D.Pa.). *See also Fryson v. Udren Law Offices, PC*, 07-cv-00164-TON (E.D.Pa.)

[180]  *See* ¶¶ 146-147, above.

[181]  *See* ¶¶ 137-144, above.

important fact witnesses.[182]

176.    The PHS Mortgage Foreclosure and Bankruptcy Enterprise is an ongoing,

continuing group or unit of persons and entities associated together for the common purpose

of maximizing revenue through the prosecution of residential mortgage foreclosure lawsuits

and related bankruptcy court proceedings. The Enterprise operated continuously throughout

the Class Period.

177.    The PHS Mortgage Foreclosure and Bankruptcy Enterprise engages in, and

its activities affect, interstate commerce.

178.    While all Defendants participate in and are part of the PHS Mortgage

Foreclosure and Bankruptcy Enterprise, they also have an existence separate and distinct

from the Enterprise.

179.    The members of the PHS Mortgage Foreclosure and Bankruptcy Enterprise

---

[182]   In the absence of a voluntary withdrawal of the Wilentz firm, Plaintiffs will be required to file a motion to disqualify Bernheim, Bart and the Wilentz firm from further representation of PHS in this action. It should be noted that these lawyers and this law firm have also represented PHS in *Bank of New York v. Ukpe* under similar conflicts of interest, there simultaneously representing Bank of New York (the purported mortgage holder), MERS (the purported assignor of the mortgage), Countrywide (the mortgage servicer), in addition to Thomas Strain (the notary employed by Full Spectrum who testified that he falsified thousands of mortgage assignment acknowledgements on behalf of PHS, including the fraudulent assignment to Bank of New York). *See* ¶¶ 137-144, above. The active participation of Bernheim, Bart and the Wilentz firm in PHS's unlawful activities (together with their sustained involvement in the legal affairs of PHS, Full Spectrum and its former employee Thomas Strain) establish that Bernheim, Bart and the Wilentz firm act in effect as PHS's "house counsel," circumstances that should disqualify them from serving as counsel for PHS in this litigation. *See, e.g., United States v. Locasio*, 6 F.3d 924, 931-32 (2d. Cir. 1993), *citing* the "thoughtful and well-reasoned opinion" of the Hon. I. Leo Glasser in *United States v. Gotti*, 771 F.Supp. 552, 560 (E.D.N.Y.1991), which found that attorney Bruce Cutler, who "served as [John] Gotti's attorney in previous criminal trials in federal court … had acted as 'house counsel' to the Gambino Crime Family by receiving 'benefactor payments' from Gotti to represent others in the criminal enterprise." Here, there is little doubt that Bernheim and Bart received payments from PHS for their representation of Mr. Strain – as well as for their own unauthorized joint representation of Wachovia). Moreover, befitting their role as "enforcer" for the PHS Mortgage Foreclosure and Bankruptcy Enterprise, Bernheim and Bart attempt to intimidate adversaries through unseemly assaults on their character. *See, e.g., In re Taylor*, 407 B.R. at 648 n. 60 (Judge Sigmund criticized the "aggressive stance" taken on behalf of a sanctioned foreclosure firm represented by Bernheim and Bart, who failed to acknowledge "any deficiencies in the firm's practice," "blamed" debtor's counsel and the court for those deficiencies, and argued that "the problem was everyone but the responsible [sanctioned law firm] attorneys"; highlighting the disservice done to their client, Judge Sigmund said she hoped that the client's "posture" represented the overheated "advocacy of its counsel" rather than that of the client itself).

are linked systematically through contractual relationships, financial transactions and coordinated activities, much of which are executed through electronic case management and invoice reporting systems utilized by virtually the entire residential mortgage foreclosure industry.

## B. Defendants' Use of the U.S. Mails and Interstate Wire Facilities

180.     The PHS Mortgage Foreclosure and Bankruptcy Enterprise necessarily engaged in and affected interstate commerce by virtue of its members' physical locations in many different states throughout the United States: (1) PHS maintains offices, employees and controlled companies in both Pennsylvania and New Jersey; (2) Wells Fargo maintains corporate headquarters in California and conducts mortgage servicing business from offices in Iowa; (3) before its acquisition by Bank of America, Countrywide maintained corporate headquarters in California and conducted mortgage servicing business from offices in Texas; (4) Bank of America maintains corporate headquarters in North Carolina and, like Countrywide before it, conducts mortgage servicing business from offices in Texas; (5) the major providers of case management and invoice reporting systems used by the Enterprise are based in Florida, California and Pennsylvania; (6) the USFN ("America's Mortgage Banking Attorneys") is based in California and conducts "seminars" in resort locations throughout the nation; and (7) PHS "house counsel" Bernheim and Bart have offices in Pennsylvania, and they are shareholder and counsel of the New Jersey-based Wilentz firm.

181.     During the Class Period, Defendants' illegal conduct and wrongful practices were carried out by an array of legal and mortgage servicing personnel, working across state boundaries, who necessarily engaged in frequent transfers of correspondence, legal documents, loan data, information, products, invoices, account statements, financial

instruments and currency, in most cases by use of the U.S. mail and interstate wire facilities.

182. For purposes of executing and/or attempting to execute the above-detailed schemes to inflate or fabricate foreclosure costs and to initiate foreclosure actions in the name of parties without legal standing to bring them, Defendants, in violation of 18 U.S.C. § 1341, (a) placed in United States Post Offices and/or in other authorized repositories matters or things to be sent or delivered by the United States Postal Service; (b) caused matter and things to be sent or delivered by the Postal Service; (c) caused matter and things to be delivered by commercial interstate carriers, and (d) received matter and things delivered by the Postal Service and/or commercial interstate carriers. The matter and things described herein include, but are not limited to, correspondence, land records, court filings, legal agreements, property searches, invoices, reports, financial data, invoices, account statements, currency and all other documents regularly transmitted during the residential mortgage foreclosure process.

183. For purposes of executing and/or attempting to execute the above-detailed schemes to inflate or fabricate foreclosure costs charged to homeowners and to prosecute foreclosure lawsuits in the name of parties without legal standing to bring them, Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire or other electronic means of communication, matter and things, including, but not limited to, correspondence, land records, court filings, legal agreements, property searches, invoices, reports, financial data, invoices, account statements, currency and all other documents regularly transmitted during the residential mortgage foreclosure process.

184. Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud)

have been concealed by Defendants and cannot be alleged in complete detail here without access to Defendants' books and records. However, as alleged below, Plaintiffs can identify specific transactions in which Defendants used the U.S. mail and wire facilities, specific occasions on which RICO predicate acts of mail fraud and wire fraud occurred, and they can describe specifically how those acts were in furtherance of Defendants' schemes to inflate or fabricate foreclosure costs charged to homeowners and to prosecute foreclosure actions in the name of parties without legal standing to bring them.

185.    In 2007, Defendant Countrywide sent an electronic transmission to PHS, requesting PHS to initiate a mortgage foreclosure lawsuit against Plaintiff Rhodes on behalf of the Bank of New York, as trustee for investors of a mortgage-backed financial instrument. After it obtained a judgment against Plaintiff Rhodes, PHS used the U.S. mail and/or wire facilities to request the Sheriff of Berks County, Pennsylvania to conduct a sheriffs' sale of Plaintiff Rhodes' home on January 11, 2008, accompanied by the sum of $2,000 as a deposit for sheriffs' fees. After Plaintiff Rhodes filed a bankruptcy petition on January 10, 2008, PHS received an electronic transmission from Countrywide, instructing PHS to file a proof of claim against Plaintiff Rhodes on behalf of Bank of New York. To ascertain the amount of such claim, PHS presumably obtained invoices, reports and statements from Countrywide and PHS's "service providers," whether by mail or by electronic means. Through the federal court system's electronic filing system, PHS filed the false proof of claim dated January 28, 2008, identified above at ¶¶ 83, 109. Thereafter, on or about May 8, 2008, PHS received, either electronically or by U.S. mail, the sum of $ 909 from the Sheriff of Berks County, Pennsylvania, representing the partial return of Plaintiff Rhodes' sheriffs' deposit to be credited to Plaintiff Rhodes' account. However, upon receipt

of this money, PHS (electronically, by U.S. mail or otherwise) instead deposited the $ 909 into an unknown account (either an account of Countrywide or an account owned by PHS or one of its controlled entities). Either electronically or by U.S. mail, PHS received a receipt or statements reflecting Plaintiff Rhodes' sheriffs' refund into the unknown account, where that money remained or was put to other uses by PHS and/or Countrywide for eleven months before it was, only after the initiation of this lawsuit, finally credited to Plaintiff Rhodes' account through the electronic filing by PHS of an amended bankruptcy proof of claim dated April 7, 2009.

186.    In the days immediately before June 22, 2007, Defendant Wells Fargo sent an electronic transmission to PHS, requesting PHS to initiate a mortgage foreclosure lawsuit against Plaintiff Bender in the name of the Wachovia Bank, N.A, as trustee for the Series 2004-WWF1 PSA, which had no interest in Plaintiff Bender's mortgage. On June 22, 2007, PHS caused to be filed with the Court of Common Pleas for Berks County, Pennsylvania the false and misleading mortgage foreclosure complaint identified above at ¶¶ 112-115 and Ex. O. Electronically or through the U.S. mail, PHS communicated with Wells Fargo and its "service providers" about the necessity of preparing and filing two purported "assignments" of Plaintiff Bender's mortgage, one from Argent to Ameriquest, the other from Ameriquest to Wachovia, which were in fact recorded with the Recorder of Deeds for Berks County, Pennsylvania on October 11, 2007 (see ¶ 116 and Ex. P and Q). After PHS obtained a judgment against Plaintiff Bender, it used the U.S. mail and/or wire facilities to request the Sheriff of Berks County, Pennsylvania to conduct a sheriffs' sale of Plaintiff Bender's home, accompanied by the sum of $2,000 as a deposit for sheriffs' fees. After Plaintiff Bender filed a bankruptcy petition on June 4, 2008, PHS received an electronic

transmission from Wells Fargo, instructing PHS to file a proof of claim against Plaintiff Bender on behalf of Wachovia Bank. To ascertain the amount of such claim, PHS presumably obtained invoices, reports and statements from Wells Fargo and PHS's "service providers," whether by mail or by electronic means. Through the federal court system's electronic filing system, PHS filed the false proof of claim dated July 3, 2008, identified above at ¶¶ 88, 109. Thereafter, on or about October 9, 2008, PHS received, either electronically or by U.S. mail, the sum of $ 601 from the Sheriff of Berks County, Pennsylvania, representing the partial return of Plaintiff Bender's sheriffs' deposit to be credited to Plaintiff Bender's account. However, upon receipt of this money, PHS (electronically, by U.S. mail or otherwise) instead deposited the $ 601 into an unknown account (either an account of Wells Fargo or an account owned by PHS or one of its controlled entities). Either electronically or by U.S. mail, PHS received a receipt or statements reflecting Plaintiff Bender's sheriffs' refund into the unknown account, where that money remained or was put to other uses by PHS and/or Wells Fargo for six months before it was, only after the initiation of this lawsuit, finally credited to Plaintiff Bender's account through the electronic filing by PHS of an amended bankruptcy proof of claim dated April 7, 2009. PHS, through electronic means or otherwise, later requested Bart and the Wilentz firm to enter an appearance in Plaintiff Bender's bankruptcy case on behalf of Wachovia Bank (*see* ¶¶ 135, 175f, Ex. Y), which was in fact accomplished through the electronic filing in the United States Bankruptcy Court for the Eastern District of Pennsylvania of an entry of appearance of Bart and the Wilentz firm on behalf of Wachovia Bank on June 24, 2009.

187.   In 2005, Defendant Wells Fargo sent an electronic transmission to PHS,

requesting PHS to initiate a mortgage foreclosure lawsuit against Plaintiff Wolferd. After it obtained a judgment against Plaintiff Wolferd, PHS used the U.S. mail and/or wire facilities to request the Sheriff of Lancaster County, Pennsylvania to conduct a sheriffs' sale of Plaintiff Wolferd's home, accompanied by the sum of $2,500 as a deposit for sheriffs' fees. After Plaintiff Wolferd filed a bankruptcy petition on August 1, 2005, PHS received an electronic transmission from Wells Fargo, instructing PHS to file a proof of claim against Plaintiff Wolferd on its behalf. To ascertain the amount of such claim, PHS presumably obtained invoices, reports and statements from Wells Fargo and PHS's "service providers," whether by mail or by electronic means. Through the federal court system's electronic filing system, PHS filed the false proof of claim dated September 14, 2008, identified above at ¶¶ 92, 109. Thereafter, on or about October 31, 2005, PHS received, either electronically or by U.S. mail, the sum of $ 849.84 from the Sheriff of Lancaster County, Pennsylvania, representing the partial return of Plaintiff Wolferd's sheriffs' deposit to be credited to Plaintiff Wolferd's account. Upon receipt of this money, PHS (electronically, by U.S. mail or otherwise) instead deposited the $ 849.84 into an unknown account (either an account of Wells Fargo or an account owned by PHS or one of its controlled entities). Either electronically or by U.S. mail, PHS received a receipt or statements reflecting Plaintiff Wolferd's sheriffs' refund into the unknown account, where that money remained or was put to other uses by PHS and/or Wells Fargo until November 22, 2005 when, PHS, after receiving a telephone call from Plaintiff Wolferd's counsel, credited $ 849.84 to Plaintiff Wolferd's account through the electronic filing by PHS of an amended bankruptcy proof of claim. After Plaintiff Wolferd's bankruptcy action was dismissed, in the days immediately before February 10, 2009, Wells Fargo sent an

electronic transmission to PHS, requesting PHS to re-institute its mortgage foreclosure lawsuit against Plaintiff Wolferd. On February 10, 2009, PHS, electronically, by U.S. mail or otherwise, filed with the Prothonotary of Lancaster, Pennsylvania a praecipe for a writ of execution on Plaintiff Wolferd's property, and PHS caused to be forwarded to the Lancaster County Sheriff, by U.S. mail or by electronic means, a check in the amount of $2,500 for a sheriff's sale deposit. While representatives of Wells Fargo and Plaintiff Wolferd discussed by telephone Wells Fargo's non-negotiable terms for a loan modification, including retention of mortgage foreclosure costs by PHS (*see* ¶¶ 98-101), on July 23, 2009, September 22, 2009 and November 2, 2009, PHS sent facsimile transmissions to the Lancaster County Sheriff requesting continuations of the sheriffs' sale of Plaintiff Bender's property. On or about September 11, 2009, representatives of Wells Fargo and Plaintiff Wolferd, by electronic means and/or through U.S. mail, exchanged legal documentation concerning the proposed loan modification. On November 2, 2009, the Lancaster County Sheriff's Office stayed the writ of execution and, on November 3, 2009, it mailed a refund check to PHS in an amount of $ 503.32, which has not been credited to Plaintiff Wolferd's mortgage loan account as of the date of this Complaint.

188.    In the days immediately before February 23 2007, Defendant Wells Fargo sent an electronic transmission to PHS, requesting PHS to initiate a mortgage foreclosure lawsuit against Plaintiffs Diane and Charles Giles in the name of the Wachovia Bank, N.A, as trustee for the Series 2004-WWF1 PSA, which had no interest in Mr. and Mrs. Giles' mortgage. On February 23, 2007, PHS caused to be filed with the Superior Court, Chancery Division, for Ocean County, New Jersey the false and misleading mortgage foreclosure complaint identified above at ¶¶ 124-126 and Ex. S. On February 28, 2007,

Ralph P. Schritenthal of Full Spectrum executed an affidavit swearing that PHS' complaint was served on Plaintiff Charles Giles -- Schritenthal's signature was notarized by Thomas P. Strain, the same person who testified in *Bank of New York v. Ukpe* that he had falsely acknowledged thousands of mortgage assignments for PHS.  Electronically or through the U.S. mail, PHS communicated with Wells Fargo and its "service providers" about the necessity of preparing and filing purported "assignments" of Mr. and Mrs. Giles' mortgage, which were in fact recorded with the Clerk of Ocean County, New Jersey on April 18, 2007. After PHS obtained a default judgment against Plaintiff Diane and Charles Giles on June 5, 2007, it used the U.S. mail and/or wire facilities to request the Sheriff of Ocean County, New Jersey to conduct a sheriffs' sale of Plaintiff Giles' home.  On July 27, 2007, PHS sent a notice of sheriffs' sale to Plaintiffs Diane and Charles Giles by regular and certified U.S. mail. In the period between July 27, 2007 and October 24, 2007, there were numerous telephone and e-mail communications between Mr. and Mrs. Giles and attorney Jerry Dasti, on one hand, and representatives of PHS and Wells Fargo and the other, relating to (1) the scheduled sheriffs' sale of the Giles' home (2) a possible loan modification and (3) a possible distress sale of the Giles' home. On or about October 23 and 24, 2007, there were several telephone conversations, e-mails and letters exchanged between or among Wachovia Bank's Senior Vice President Mark A. Farmer, PHS attorney Vladimir Palma, other attorneys affiliated by PHS and representatives of Wells Fargo relating to (1) the improper commencement of a foreclosure action on behalf of Wachovia Bank against Mr. and Mrs. Giles and (2) the identity of the actual trustee of the Series 2004-WWF1 PSA (*see* ¶¶ 130-131 and Ex. W and X). By letter dated December 10, 2007 from PHS to counsel for Mr. and Mrs. Giles, PHS asserted a claim for  $7,817.50 for "legal

fees and costs" in connection with PHS's unauthorized and improper foreclosure lawsuit (*see* ¶¶ 109, 133 and Ex. NN). This letter was followed by telephone communications between and among counsel for Mr. and Mrs. Giles and representatives of PHS and Wells Fargo relating to the impropriety of that claim, which in turn was followed by a written payoff statement dated January 9, 2008 sent from Wells Fargo's mortgage servicing unit to Plaintiff Diane Giles, which abandoned PHS's claim for legal fees and costs (*see* ¶¶ 109 and Ex. NN).

189.     Defendants' use of the U.S. mail and interstate wire facilities to perpetuate Defendants' schemes to inflate or fabricate foreclosure costs charged to homeowners or to prosecute foreclosure actions in the name of parties without legal standing to bring them involved thousands of homeowners like Plaintifs Rhodes, Bender, Wolferd and Giles and thousands of communications similar to the ones identified specifically above.

## C.     Conduct of the RICO Enterprise's Affairs

190.     Throughout the Class Period, Defendants exerted control over the PHS Mortgage Foreclosure and Bankruptcy Enterprise and, in violation of 18 U.S.C. § 1962(c), Defendants conducted or participated in the conduct of the affairs of the Enterprise by inflating or fabricating foreclosure costs charged to homeowners or by prosecuting foreclosure actions in the name of parties without legal standing to bring them.

191.     PHS conducted or participated in the conduct of the affairs of the Enterprise, *inter alia*, in the following ways:

(a)     By soliciting from mortgage servicer clients (including Defendants Countrywide and Wells Fargo) referrals to prosecute foreclosure actions against homeowners with promises of rapid delivery of its services and rigid adherence to

"timelines" monitored by clients through mandated automated case management and invoicing systems. (Because the "timeliness" of PHS's performance is a primary factor in determining the volume of work assignments that PHS receives from servicer clients, PHS strives to compete with other high-volume foreclosure firms by recording even faster results than required by client "timelines");[183]

(b)    By racing to county courthouses to file thousands of foreclosure actions in the names of entities identified only by its servicer clients' case management systems, without making any meaningful independent determination that such entities have proper legal standing to bring them. (Despite this, PHS routinely makes affirmatively **false** allegations in its foreclosure complaints that entities named as plaintiffs by PHS **are** the legal owners of homeowners' mortgages);

(c)    By fabricating after-the-fact mortgage assignments filed by PHS's agents or representatives (many of them affiliated with PHS owned and controlled companies like Full Spectrum and Land Title Services) with government land recording agencies in an effort to manufacture legal standing for plaintiffs that lack legal standing at the time that PHS files its foreclosure complaints;

(d)    Together with mortgage servicer clients like Countrywide and Wells Fargo (and through PHS's use of clients' mandated automated case management and invoicing programs), by systematically misappropriating and converting sheriffs' deposit refunds that should be credited to the accounts of homeowners who avoid loss of their homes through sheriffs' sales;

(e)    Through PHS's use of owned and controlled companies like Full Spectrum and Land Title Services, by systematically overstating, inflating, fabricating and

---

[183] *See* ¶ 152 n. 159, above.

obsfuscating foreclosure costs charged to homeowners who avoid loss of their homes through sheriffs' sales;

(f)    Through PHS's day-to-day use and promotion of "every case management and invoice reporting system[]" used in the residential mortgage foreclosure industry,"[184] by advancing the common objective of PHS and vendors of such systems to enable foreclosure lawyers to "do all of their work in their case management system" so that high-volume foreclosure firm like PHS can obtain "maximum returns on investment" by "reducing labor overhead and building resource capacity to handle more files."[185]

(g)    Through its "founding" membership, active participation in, and financial support of the USFN, by "educating" (and by obtaining "education" from) other members about matters of common interest among participants in the residential foreclosure industry, including, *inter alia*, (1) how to satisfy mortgage servicers' demand for rapid and inexpensive legal representation in foreclosure and bankruptcy matters by means of automated case management programs that limit "verbal communication" between servicers and their outside counsel to "SOS" or "Urgent Situations;"[186] (2) avoidance of class actions brought under the FDCPA,[187] and (3) the supposed futility of mandatory mediation initiatives like Philadelphia's Residential Mortgage Foreclosure Pilot Program[188] (the latter two items being of special interest to Defendant Diamond).

(h)    Through PHS's longstanding collaboration with its "aggressive"[189] house counsel, Bernheim, Bart and the Wilentz firm, by systematically working in concert

---

[184] www.fedphe.com
[185] *See* ¶ 158 n.178, above.
[186] *See* ¶ 158 n. 177, above.
[187] *See* ¶ 147 n. 155, above.
[188] *See* ¶ 44 and n.30, above.
[189] *See* ¶ 175f and n.182, above.

to deny the legal rights of homeowners who have been abused by PHS's institutionalized unlawful conduct.

192.    Defendants Wells Fargo and Countrywide conducted or participated in the conduct of the affairs of the PHS Mortgage Foreclosure and Bankruptcy Enterprise, *inter alia*, by:

(a)   Indiscriminately filing residential mortgage foreclosure lawsuits, which are cheaper and faster than loan modifications,[190] and which present special incentives and opportunities to increase costs charged to homeowners that translate into massive corporate profits.[191]

(b)   Cultivating relationships with volume-driven foreclosure firms like PHS, which are in turn pitted against one another in competition for lucrative work assignments. As a condition of any work assignment they receive, foreclosure law firms like PHS are required to use "client-based" automated case management and invoicing systems that (1) refer work assignments to such firms; (2) monitor the speed of such firm's performance through "timelines" against which they are measured, which results

---

[190]   Report, *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and its Consequences*, NAT'L CONSUMER LAW CENTER, INC., October 2009 (http://www.nclc.org/issues/mortgage_servicing/content/Servicer-Report1009.pdf).

[191]   Peter S. Goodman, *Lucrative Fees May Deter Efforts to Alter Loans*, N.Y. TIMES, July 29, 2009 (http://www.nytimes.com/2009/07/30/business/30services.html?pagewanted=all).   ("[M]any mortgage companies are reluctant to give strapped homeowners a break because the companies collect lucrative fees on delinquent loans. Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure. So the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue — fees for insurance, appraisals, title searches and legal services"); *McDermott v. Countrywide Home Loans, Inc.*, Adv. No. 08-5031 (Bank. N.D. Ohio, July 31, 2009) at 8, *quoting* Porter Study at 126-27 ("Mortgage servicers earn revenue in three major ways. First, they receive a fixed fee for each loan. Typical arrangements pay servicers between 0.25% and 0.50% of the note principal for each loan. Second, servicers earn "float" income from interest accrued between when consumers pay and when those funds are remitted to investors. Third, servicers often are permitted to retain all, or part, of any default fees, such as late charges, that consumers pay. In this way, a borrower's default can boost a servicer's profits. A significant fraction of servicers' total revenue comes from retained-fee income. Because of this structure, servicers' incentives upon default may not align with investors' incentives. Servicers have incentives to make it difficult for consumers to cure defaults").

in specific "grades" that reward firms like PHS that perform with reckless haste; and (3) severely restrict the circumstances under which foreclosure law firms are permitted to communicate directly with their clients' "in-house" mortgage servicing personnel and counsel, with all but the most problematic issues expected to be resolved by foreclosure firms themselves through "mechanical" use of raw data appearing on computer screens.[192]

(c)   Uploading into their mandatory automated systems for use by PHS and other foreclosure firms of financial information that is, as demonstrated above at ¶¶ 56-65, the unreliable byproduct of accounting systems criticized by many courts as being systematically "wayward," "not reasonable," "reckless," "duplicitous and misleading," "so significantly erroneous that … reconciliation [is] not possible," and a "known problem" that evidences an "indifference to the truth" and "a disregard for diligence and accuracy."

(d)   Ignoring judicial orders and warnings to make systemic changes to their inaccurate and irresponsible accounting systems.[193]

(e)   Establishing, mandating and implementing rigid foreclosure and related bankruptcy processes that have both the purpose and effect of (1) rewarding foreclosure law firms for their speed and penalizing them for professional diligence that might ensure accuracy but impede prompt completion of assigned activities; and (2) creating an informational vacuum and absence of personal accountability that (i)

---

[192]   *In re Taylor*, 407 B.R. at 638. As Bernheim and Bart wrote in a brief in *In re Taylor*, their client (here as there) "is one of many law firms that conduct a high volume foreclosure bankruptcy practice and if a lender requires that a law firm enter into an agreement with its agent, [a provider of case management and invoice systems], [the law firm] has no choice but to participate in such a program if it wants to do business." *Id*. at 638.
[193]   *See* ¶¶ 56-65, above.

precipitates a race to the courthouse that encourages uninvestigated filing of improper foreclosure lawsuits by overzealous law firms like PHS and (ii) invites the inflation and fabrication of foreclosure costs charged as arrearages to homeowners who avoid sheriffs' sales through loan modifications, bankruptcy filings and distress sales, which might otherwise be detected and avoided through responsible human oversight.

193.   In foregoing ways and others, PHS and Wells Fargo and Countrywide, working as "attorney" and "client" infrequently and as co-dependent wrongdoers at all other times, each benefit from their unlawful conduct and participation in the affairs of the PHS Mortgage Foreclosure and Bankruptcy Enterprise.

## D.   Defendants' Pattern of Racketeering Activity

194.   Each Defendant conducted and participated in the affairs of the PHS Mortgage Foreclosure and Bankruptcy Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. Defendants' pattern of racketeering involved thousands of separate instances of use of the U.S. mails and interstate wire facilities in furtherance of their fraudulent schemes to inflate or fabricate foreclosure costs charged to homeowners and to prosecute foreclosure actions in the names of parties without legal standing to sue. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Plaintiffs and members of the Classes.

195.   Defendants' racketeering activities amount to a common course of conduct,

with similar pattern and purpose, intended to inflate or fabricate foreclosure costs charged to homeowners or to prosecute foreclosure actions in the name of parties without legal standing to bring them. Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims – Plaintiffs and members of the Classes. Each Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprises.

### E.        Damages Caused by the Defendants' Scheme

196.    Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Classes to be injured in their business or property because Plaintiffs and members of the Classes have lost substantial money by virtue of Defendants' schemes to inflate or fabricate foreclosure costs charged to homeowners and to prosecute foreclosure actions in the names of parties without legal standing to sue.

197.    Under 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### COUNT II

### VIOLATIONS OF 15 U.S.C. § 1692 *et seq.* (FDCPA)

198.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

199.    The Count is directed to Defendant PHS and its attorneys only.

200.    At all times relevant to this Complaint, Plaintiffs and all members of the Classes were "consumers" within the meaning of 15 U.S.C. § 1692a(3).

201.    At all times relevant to this Complaint, PHS and its attorneys have been "debt collectors" within the meaning of 15 U.S.C. § 1692a(6). *See also Heintz v. Jenkins*, 514 U.S. 291, 299 (1995) ("the Act applies to attorneys who 'regularly' engage in consumer-debt collection activity").

202.    Beginning before March 25, 2008 and continuing through the present, PHS and its attorneys have committed unfair practices proscribed by 15 U.S.C. § 1692(e)(2)(A) and (B) because, in systematically submitting inflated or fabricated claims against Plaintiffs and members of the Classes, PHS and its individual attorneys made false, deceptive, or misleading representations in connection with the collection of mortgage debt, concerning, *inter alia*, (1) the character, amount, or legal status of any debt and (2) services rendered or compensation which may be lawfully received by PHS for the collection of a debt.

203.    Beginning before March 25, 2008 and continuing through the present, PHS and its attorneys have committed unfair practices proscribed by 15 U.S.C. 1692f(1) because, in systematically submitting inflated or fabricated claims against Plaintiffs and members of the Classes, the amount of "debt" that Defendants sought to collect was not expressly authorized by any agreement creating the debt, and was not otherwise permitted by law.

204.    Beginning before March 25, 2008 and continuing through the present, PHS and its attorneys have committed unfair practices proscribed by 15 U.S.C. 1692g(2)

because, in systematically submitting unauthorized bankruptcy claims and lawsuits against Plaintiffs and members of the Classes on behalf of parties that lacked legal standing or interest, PHS and its attorneys have routinely misidentified the names of creditors to whom any debt may have been owed.

205.    PHS failed to maintain thorough, ongoing procedures reasonably calculated to prevent the foregoing violations of the FDCPA.

206.    As a direct and proximate result of foregoing violations of the FDCPA by PHS and its attorneys, Plaintiffs and members of the Classes have sustained actual and statutory damages for which PHS and the individual defendants are liable, together with reasonable attorneys fees and the costs of prosecuting this litigation.

## COUNT III

## VIOLATIONS OF 73 P.S. § 201-1 *et seq.* (UTPCPL)

207.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

208.    Defendants' practices constituted acts of trade or commerce within the meaning of 73 P.S. § 201-2(3).

209.    Defendants' practices constituted deceptive conduct that created a likelihood of confusion and/or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

210.    As documented in detail above, Defendants knowingly engaged in systematic scheme to impose inflated or fabricated foreclosure charges upon homeowners who averted loss of their homes to sheriffs' sale, including (1) misappropriation or conversion of sheriffs' deposit refunds that were not credited properly to homeowners'

accounts; (2) unreasonable attorney's fees or attorney fees that were not actually incurred; (3) excessive real estate title and litigation "support" costs generated through inside transactions with related companies owned and controlled by Defendants Lawrence T. Phelan, Francis S. Hallinan and Daniel G. Schmieg; (4) unessential property inspection and valuation fees; and (5) duplicative costs for "services" already included in independent charges assessed by Defendants, all of which Defendants attempted to conceal through impenetrable and cryptic statements of claims for payment of arrearages.

211. As further documented in detail above, Defendants, in a fraudulent scheme to generate the aforementioned foreclosure fees, knowingly and systematically filed mortgage foreclosure actions on behalf of entities that did not have legal standing to bring them. Among other things, Defendants and their agents (1) recorded phony assignments with county land record agencies; (2) throughout foreclosure litigation and related bankruptcy proceedings, maintained the false pretense of an attorney-client relationship with entities that had not retained or authorized PHS to represent its interests; and (3) filed false court filings and bankruptcy claims.

212. Plaintiffs and other members of the Classes relied justifiably on Defendants' false and misleading representations, having no reason to suspect that a law firm whose attorneys owe a duty of candor to the court would, *inter alia*, (1) systematically file verified or certified foreclosure complaints that contained misrepresentations of fact; (2) systematically overcharge or fabricate charges passed on to homeowners; (3) systematically file false bankruptcy proof of claims in defiance of the severe penalties for such conduct under 11 U.S.C. §§ 152 and 3557; and (4) systematically commit mail and wire fraud, and engage in the pattern of racketeering

identified above at ¶¶ 175-196.

213.    As a direct and proximate result of Defendants' fraudulent misrepresentations of material fact, Plaintiffs and members of the Class have sustained actual and statutory damages (including treble damages under 73 P.S. § 201-9.2) for which Defendants are liable, together with reasonable attorneys fees and costs of prosecuting this action.

**COUNT IV**

**COMMON LAW FRAUD**

214.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

215.    As documented in detail above, Defendants knowingly made misrepresentations of material fact relating to the amount of arrearages owed by homeowners who averted loss of their homes to sheriffs' sale, which appeared in loan modification and loan payoff statements and in bankruptcy proofs of claim. These misrepresentations concerned inflated or fabricated amounts charged for (1) sheriffs' fees; (2) attorney's fees; (3) real estate title and litigation "support" costs; (4) property inspection and valuation fees; and (5) duplicative or non-existent "services," the impropriety of which Defendants attempted to conceal through impenetrable and cryptic statements of claims for payment of arrearages.

216.    As further documented in detail above, Defendants, in a fraudulent scheme to generate the aforementioned fees, made false and misleading representations of material fact relating to foreclosure actions on behalf of entities that did not have legal standing to bring them. Among other things, Defendants and their agents (1) filed false

court documents; (2) recorded phony assignments with county land record agencies; (2) throughout foreclosure litigation and related bankruptcy proceedings, maintained the false pretense of an attorney-client relationship with entities that had not retained or authorized PHS to represent its interests; and (3) filed false creditor claims.

217.    Plaintiffs and other members of the Classes relied justifiably on Defendants' false and misleading representations, having no reason to suspect that a law firm whose attorneys owe a duty of candor to the court would, *inter alia*, (1) systematically file verified or certified foreclosure complaints that contained misrepresentations of fact; (2) systematically file false bankruptcy proof of claims in defiance of the severe penalties for such conduct under 11 U.S.C. §§ 152 and 3557; and (3) systematically commit mail and wire fraud, and engage in the pattern of racketeering identified above at ¶¶ 175-196.

218.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and members of the Class have sustained actual damages in an amount to be determined at trial, in addition to reasonable attorneys fees and the costs of prosecuting this action.

## COUNT V

## BREACH OF CONTRACT

219.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

220.    This Count is directed only to Defendants Countrywide and Wells Fargo.

221.    Plaintiffs and other members of the Class entered into contracts for mortgage loans originated by financial institutions that assigned their servicing rights to

Defendants Wells Fargo and Countrywide. None of these contracts permitted Wells Fargo or Countrywide to charge defaulted borrowers more than costs or expenses actually incurred for services actually performed in connection with any legal action to enforce the terms of the mortgages.[194]

222.    Defendants Wells Fargo and Countrywide breached the mortgage contracts with Plaintiffs and members of the Classes by causing and/or permitting its agents, including PHS and its individual lawyers, to charge homeowners for costs, fees and expenses in connection with foreclosure actions in amounts in excess of those actually or reasonably incurred by Wells Fargo, Countrywide and PHS.

223.    As a result of breaches of the mortgage contracts by Wells Fargo and Countrywide, Plaintiffs and members of the Classes were damaged by the amount of costs, fees and expenses that they overpaid in connection with foreclosure proceedings prosecuted against them by Wells Fargo, Countrywide, PHS and its individual lawyers. Plaintiffs and members of the Class have sustained actual damages in an amount to be determined at trial, in addition to reasonable attorneys' fees and the costs of prosecuting this action.

## COUNT VI

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

224.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

225.    This Count is directed only to Defendants Countrywide and Wells Fargo.

---

[194]    *See* Rhodes Mortgage (Ex. G1) at ¶ 9;  Bender Mortgage (Ex. H1) at ¶ 14; Wolferd Mortgage (Ex.I-1) at ¶ 18;

226.    Each of the mortgage contracts signed by Plaintiffs and other members of the Classes obligated the mortgages and their assignees, Wells Fargo or Countrywide, to discharge a duty of good faith and fair dealing toward Plaintiffs and other Class members. Included within this obligation was the duty to charge no more than its actual costs, fees and expenses, including attorneys' fees, in connection with foreclosure proceedings.

227.    Wells Fargo and Countrywide breached their duty of good faith and fair dealing by, *inter alia*, directly or indirectly, retaining PHS to pursue foreclosure proceedings and, subsequently, to cause, direct and or approve PHS's actions seeking payment of costs, fees and expenses from homeowners in excess of amounts that were actually incurred by Wells Fargo, Countrywide and PHS.

228**.**    As a result of breaches of their duty of good faith and fair dealing by Wells Fargo and Countrywide, Plaintiffs and members of the Classes were damaged by the amount of costs, fees and expenses that they overpaid in connection with foreclosure proceedings prosecuted against them by Wells Fargo, Countrywide, PHS and its lawyers. Plaintiffs and members of the Class have sustained actual damages in an amount to be determined at trial, in addition to reasonable attorneys' fees and the costs of prosecuting this action.

## COUNT VII

## MONEY HAD AND RECEIVED

229.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

230.    As further documented in detail above, Defendants demanded and collected amounts for sheriffs' deposits, attorneys' fees, real estate title and litigation support costs, property inspection and valuation fees, and duplicative costs, which were in excess of amounts permitted by contract or Pennsylvania and New Jersey law.

231.    In the process of charging inflated or fabricated fees to Plaintffs and members of the Classes, Defendants have come into the possession of money that they received and had no right to possess, either at law or in equity.

232.    It would be inequitable for Defendants to retain any such money or to exercise the use of money that they had no legal right to demand or collect.

233.    Defendants' inequitable retention and use of their money has damaged Plaintiffs and members of the Classes in an amount to be determined at trial. As a result of the wrongful conduct documented above, Plaintiffs and members of the Classes seek full disgorgement and restitution of Defendants' ill-gotten gains.

## COUNT VIII

## NEGLIGENT MISREPRESENTATION

234.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

235.    As documented in detail above, Defendants made misrepresentations of material fact relating to the amount of arrearages owed by homeowners who averted loss of their homes to sheriffs' sale, which appeared in loan modification and loan payoff statements and in bankruptcy proofs of claim. These misrepresentations and omissions concerned inflated or fabricated amounts charged for (1) sheriffs' fees; (2) attorneys'

fees; (3) real estate title and litigation support costs; (4) property inspection and valuation fees; and (5) duplicative or non-existent "services."

236.   As further documented in detail above, Defendants made false and misleading representations of material fact relating to mortgage foreclosure actions on behalf of entities that did not have legal standing to bring them, under which PHS purported to "establish" attorney-client relationships with entities that had neither retained nor authorized PHS to represent their interests in foreclosure and bankruptcy proceedings.

237.   While the evidence demonstrates overwhelmingly that Defendants made the foregoing misrepresentations and omissions of material fact with criminal or fraudulent intent, these misrepresentations and omissions were, at bare minimum, negligently made.

238.   As a direct and proximate cause of Defendants' negligence, Plaintiffs and members of the Classes sustained damages in an amount to be determined at trial.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demands a trial by jury of all of the claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that:

A.   The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.    The conduct of Defendants be determined to have violated the Racketeer Influenced and Corruption Act, 18 U.S.C. §1962(c).

C.     The conduct of Defendants be determined to have violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*

D.     The conduct of Defendants be determined to have violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et. seq.*

E.     Defendants be found liable to Plaintiffs and members of the class under the common laws of the Commonwealth of Pennsylvania and the State of New Jersey for (1) common law fraud; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; (4) money had and received; and (5) negligent misrepresentation.

F.     Judgment be entered against Defendants for damages sustained by Plaintiffs and the members Classes to the maximum extent allowed by law, together with the costs of this action, including reasonable attorneys' fees.

G.     Judgment be entered ordering an accounting, restitution and disgorgement of funds obtained by Defendants as a result of their wrongful conduct.

H.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be temporarily and permanently enjoined and ordered to:

    (1)   Establish and implement corrective policies and procedures designed to eliminate their practices of inflating or fabricating claims the amount of foreclosure costs, fees or expenses owed by homeowners who have averted loss of their homes through to sheriffs' sales; and

    (2)   Establish and implement corrective policies and procedures designed to eliminate their practices of initiating or prosecuting residential mortgage foreclosure lawsuits and related bankruptcy court claims in the absence

of explicit authorization by clients with actual legal standing to sue or legal interest to protect.

I.      The Court order the appointment of an auditor or special master to

(1)   Ascertain the amount of money wrongfully taken by Defendants from Plaintiffs and members of the Classes;

(2)   Recommend specific business management and accounting procedures that Defendants must adopt and implement to avoid future repetition of the wrongful conduct documented throughout this Complaint; and

(3)   Monitor Defendants' compliance with any business management or accounting procedures that may be ordered by the Court in granting injunctive relief in this action.

J.      Plaintiffs and members of the Classes have such other, further and different relief as the case may require and the Court may deem just and proper under the facts and circumstances of this case.

Dated: January 15, 2010                              Respectfully submitted,


**BURKE HESS & NARKIN**

By:  *John G. Narkin*_____
      John G. Narkin
      3000 Atrium Way, Suite 234
      Mount Laurel, New Jersey 08054
      Telephone: (856) 222-2913
      Facsimile: (856) 222-2912


**-and-**

108

**BURKE & HESS**

By:  _**Michael D. Hess**___
      Michael D. Hess
      951 Rohrerstown Road, Suite 102
      Lancaster, Pennsylvania 17601
      Telephone: (717) 391-2911
      Facsimile: (717) 391-5808

*Attorneys for Plaintiffs and the Proposed Classes*