**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DENNIS A. RHODES, | : |
| EDWARD H. WOLFERD, JR., | : |
| DIANE and CHARLES J. GILES, and | : |
| GERALD A. BENDER, SR., | : |
| individually and on behalf of all | : |
| others similarly situated, | : **Civil Action No. 5:09-cv-01302-CDJ** |
| | : |
| **Plaintiffs,** | : |
| v. | : **JURY TRIAL DEMANDED** |
| | : |
| BANK OF AMERICA CORPORATION, | : **AMENDED COMPLAINT-CLASS ACTION** |
| BANK OF AMERICA, N.A. | : |
| BAC HOME LOANS SERVICING LP, | : |
| COUNTRYWIDE HOME LOANS, INC., | : |
| WELLS FARGO & COMPANY | : |
| WELLS FARGO BANK, N.A. | : |
| PHELAN HALLINAN & SCHMIEG, LLP, | : |
| PHELAN HALLINAN & SCHMIEG, P.C., | : |
| LAWRENCE T. PHELAN, FRANCIS S. HALLINAN, | : |
| DANIEL G. SCHMIEG, ROSEMARIE DIAMOND, | : |
| FULL SPECTRUM SERVICES, INC., and | : |
| LAND TITLE SERVICES OF NEW JERSEY, INC., | : |
| | : |
| **Defendants.** | : |

## AMENDED CLASS ACTION COMPLAINT

**BHN LAW FIRM**
**John G. Narkin**
**Michael D. Hess**
**951 Roherestown Road, Suite 102**
**Lancaster, Pennsylvania 17601**
**Tel: 717.756.0834**
**www.bhn-law.com**

**Attorneys for Plaintiffs and the Proposed Class**

## TABLE OF CONTENTS

I.   SUMMARY OF ALLEGATIONS.................................................................................2

II.  JURISDICTION AND VENUE..................................................................................6

III. PARTIES....................................................................................................................7
     A.   The Representative Homeowners.....................................................................7
     B.   Defendants.......................................................................................................7

IV.  FACTUAL ALLEGATIONS..................................................................................10

     A.   Foreclosure Processes of the Phelan Firm, BofA and WFB....................10

     B.   Representative Homeowners and Members of the Class
          Have Been Systematically Exploited By Fraudulent
          Foreclosure Practices of the Phelan Firm, BofA and WFB.......................26

          Plaintiff Edward H. Wolferd, Jr. ...................................................................26

               The Phelan Firm's Foreclosure Action on Behalf of WFB................................26
               WFB's Loan Modification Terms.......................................................................30
               The Phelan Firm's Fraudulent Expense Claims.................................................31
               WFB's Fraudulent Expense Claims...................................................................32

          Plaintiff Dennis A. Rhodes.............................................................................33

               The Phelan Firm's Foreclosure Action................................................................33
               Fraudulent Expense Claims By the Phelan Firm and Countrywide ........................35

          Plaintiff Gerald A. Bender, Sr.......................................................................37

               The Phelan Firm's Foreclosure Action on Behalf of "Wachovia"................................37
               Fraudulent Expense Claims by the Phelan Firm and WFB ...........................................42

          Plaintiffs Charles J. and Diane Giles.............................................................45

               The Phelan Firm's Foreclosure Action on Behalf of "Wachovia"................................45

    C.    Other Homeowners Have Been Harmed By the Same Pattern
          of Fraudulent Misconduct by the Phelan Firm, WFB and BofA ........ 57

          The Phelan Firm ..................................................................................... 58
          Bank of America/Countrywide ........................................................ 64
          Wells Fargo Bank, N.A. ....................................................................... 69


    D.    The Foreclosure Fraud Scandal
          Confirms Defendants' Unlawful Practices

          The Scandal Unravels ......................................................................... 73
          Investigations Begin ........................................................................... 74
          Judicial Action in New Jersey ........................................................ 81
          Ongoing Federal and State Attorneys General Investigations .................................. 88

V.   CLASS ACTION ALLEGATIONS ........................................................... 97


COUNT ONE: VIOLATIONS OF 18 U.S.C. § 1962(c) (RICO) ............................................ 101

    A.    The Enterprise .............................................................................................
          The Phelan, Hallinan and Schmieg Foreclosure Enterprise ................ 102
    B.    Predicate Acts of Mail and Wire Fraud ............................................................ 103
          Fraudulent Schemes and Intent to Defraud ........................................... 103
          Fraudulent Use of Interstate Wire Facilities and U.S. Mail .................... 105
          Use of Interstate Wire Facilities and U.S. Mail For All Business .......... 108
    C.    Conduct of the Enterprise's Affairs ............................................................... 116
    D.    Defendants' Pattern of Racketeering Activity ................................. 119
    E.    Damages Caused by Defendants' Scheme ...................................... 121

COUNT TWO:    VIOLATIONS OF 15 U.S.C. § 1692 et seq. (FDCPA) ......................... 121

COUNT THREE:  VIOLATIONS OF 73 P.S. § 201-1 *et seq*. (UTPCPL) ............................ 116

COUNT FOUR:   VIOLATIONS OF N.J.S.A. § 56.8-1 *et seq*.(NJCFA) ................................ 117

COUNT FIVE:    BREACH OF CONTRACT ...................................................................... 118

COUNT SIX:     BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING ........... 120

COUNT SEVEN:  MONEY HAD AND RECEIVED ......................................................... 121

COUNT EIGHT:   NEGLIGENCE ........................................................................................ 122

JURY TRIAL DEMAND ........................................................................................................... 123

PRAYER FOR RELIEF ........................................................................................................... 123

On behalf of themselves and all others similiarly situated, Dennis A. Rhodes, Edward H. Wolferd, Jr., Diane and Charles J. Giles, and Gerald A. Bender, Sr. (collectively, "Plaintiffs," "Homeowners" or "Representative Homeowners") bring this proposed class action against Defendants for damages and injunctive relief.

Except for allegations concerning their own actions, the Representative Homeowners' allegations are based on information and belief obtained through a two-and-a half-year investigation undertaken by their counsel. This investigation includes, among other things:

1)      Witness information;

2)      Review and analysis of federal and state court filings and other public records;

3)      Review and analysis of legal journals, Congressional testimony, Securities and Exchange Commission ("SEC") filings, and news media reports;

4)      Review and analysis of documents disseminated by, among other government authorities, the United States Department of Justice, the Federal Trade Commission ("FTC"), the Federal Reserve System, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the United States Department of Housing and Urban Development, the Federal Housing Finance Agency, the Consumer Financial Protection Bureau;  members of the National Association of Attorneys General, and the New Jersey  Administrative Office of the Courts; and

5)       Review and analysis of documents disseminated by government-sponsored enterprises ("GSEs"), including the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

Additional evidentiary support confirming the truth of the Homeowners' allegations will be established through discovery from Defendants and non-parties with knowledge of the institutionalized misconduct alleged below.

## I.  <u>SUMMARY OF ALLEGATIONS</u>

1.     This is a proposed class action on behalf of all individuals in Pennsylvania and New Jersey who, during the period from January 1, 2005 through the present ("Class Period"), were (a) Defendants in mortgage foreclosure actions prosecuted by Phelan Hallinan & Schmieg LLP or Defendant Phelan Hallinan & Schmieg, P.C. (collectively the "Phelan firm") and (b) affected by abusive foreclosure practices, including Defendants':

> i)   Imposition of inflated or fabricated fees for "default management services"
>
> ii)  Failure to properly credit Sheriff's deposit refunds;
>
> iii) Preparation, execution and notarization of fraudulent legal documents and land records, including those used to initiate foreclosure actions in the name of entities without legal standing to sue.

2.     Fraudulent foreclosure-related fees obtained by Defendants from the Homeowners include, by way of non-exhaustive example:

a)     Theft of sheriffs' deposit refunds not credited properly to Homeowners' accounts (*see* ¶¶ 84-86, 96, 101, 103, 118-119 below);

b)     Overstated and unreasonable attorneys' fees not authorized by contract or otherwise permitted by law (*see* ¶¶ 113-116, 122, 139, 180, 313 below);

c)     Overstated and unreasonable fees for real estate title searches, not authorized by contract or otherwise permitted by law (*see* ¶¶ 56, 92, 99-100, 103, 117, 122, 134, 140-142 below);

d)      Overstated and unreasonable fees for property inspections (including so-called "broker price opinions" ("BPOs"), not authorized by contract or otherwise permitted by law (*see* ¶¶ 92-93, 107, 134, 144-147, 180, 182, 313, below);

f)      Overstated and unreasonable fees for property inspection and/or maintenance services, not authorized by contract or otherwise permitted by law (*see* ¶¶ 92, 103, 134, 148, 180, 182, 217, 222-223, 227, 241, 310, 313 below);

h)      Overstated and unreasonable charges for unspecified and undocumented "foreclosure fees and costs," including multiple or duplicated charges for the same "services" allegedly rendered (*see* ¶¶ 85, 98, 100, 107, 117, 134, 140-142, 307, 310 below).

The term "Piling On" describes the practice of "mortgage companies hitting families already in financial trouble with unfair fees and questionable practices to make it tougher for them to save their homes."[1] These spurious charges are also known as "junk fees."[2]

3.      One judge in the Eastern District of Louisiana who carefully examined the practices of WFB estimates that inflated or fabricated default management fees generate potentially "billions [of dollars] in improperly earned revenue" to WFB alone.[3] This conclusion is supported by estimates of government regulators and other experts, who have concluded that systematic abuses by the largest servicers in the United States (WFB

---

[1]    NBC's *Today* program, May 7, 2008, http://today.msnbc.msn.com/id/21134540/vp/24480566#24480566. *See also* Gretchen Morgenson and Jonathan D. Glaser, *Foreclosure Machine Thrives on Woes*, N.Y.TIMES, Mar. 30, 2008 http://www.nytimes.com/2008/03/30/business/30mills.html?_r=1&sq=morgenson&st=nyt&scp=8&pagewanted=all; Adam J. Levitan and Tara Twomey, *Mortgage Servicing* (2011), GEORGETOWN LAW FACULTY AND OTHER WORKS, Paper 498, at 41-45; 43, 28 Yale J. On Reg. 1 (2011) ("Levitan and Twomey Paper"), http://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=1497&context=facpub

[2]    Testimony dated December 1, 2010 by Chapman University School of Law Professor Kurt Eggert before the Senate Committee on Banking, Housing and Urban Affairs ("Eggert Testimony"), at 2, 8-10, http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=2ab0a78e-12ee-4cf8-bb70-745d0d0372ab

[3]    *In re Jones*, 2009 Bankr. LEXIS 3317, at *31, and n. 59 (Bankr. E.D.La. Oct. 1, 2009).

and BofA prominently among them) have caused more than $20 billion in damages to distressed homeowners nationwide.[4]

4.      As part of their scheme to pile on junk fees charged to homeowners threatened with loss of their homes, Defendants systematically bring foreclosure actions in the name of entities that do not possess (a) legal ownership of homeowners' mortgages and (b) legal standing to sue the homeowners. With speed and profit as their paramount objectives, Defendants file foreclosure lawsuits without undertaking even rudimentary investigation of basic facts concerning mortgage ownership and legal standing.

5.      Instead, to create an illusion of mortgage ownership and standing, Defendants routinely file (a) falsified mortgage assignments and other property documents with county land recording agencies and (b) false affidavits or certifications to state courts, swearing "on personal knowledge" to the truth of fictitious allegations in mortgage foreclosure complaints and other court documents (*See, e.g.,* ¶¶ 120-130, 153-164, 172-192, 201-210, 230-233, 256-257, below).

6.      While the *validity* of any foreclosure judgment obtained by Defendants is not in issue and is not challenged in this lawsuit, Plaintiffs do allege that Defendants are liable for the *fraudulent practices* they systematically employed in prosecuting their foreclosure actions and in thereby obtaining millions of dollars in junk fees from Pennsylvania and New Jersey homeowners.

---

[4]   *See* Gretchen Morgenson, *A Low Bid For Fixing a Big Mess*, N.Y. TIMES, May 14,, 2011, (http://www.nytimes.com/2011/05/15/business/15gret.html) (major mortgage servicers have "offered to pay $5 billion to settle allegations about robo-signing and other shady practices that quick-step troubled borrowers out of their homes," a "fraction" of the $20 billion or more sought by state attorneys general). *See also* Alan Zibel, *FDIC's Bair: Millions of Foreclosures Could Be "Infected,"* WALL ST. J., May 12, 2011, http://blogs.wsj.com/developments/2011/05/12/fdics-bair-millions-of-foreclosures-could-be-infected/.

7.      Defendants' false and misleading statements concerning mortgage ownership and legal standing operate as a fraud on the judicial system. They also (a) burden distressed homeowners with unnecessary attorneys' fees and other legal expenses and (b) contrive for Defendants illegitimate opportunities to foist inflated or fabricated foreclosure fees upon delinquent borrowers desperate to save their property.[5]

8.      This fraudulent scheme has been accomplished on an institutionalized basis through the knowing participation and coordination of each of the Defendants.

9.      The Homeowners have sustained damages in excess of five million dollars because of Defendants' wrongful conduct.

10.     The Homeowners seek equitable and injunctive relief, including Court appointment, at Defendants' expense, of:

- A forensic accounting firm to audit the Phelan firm's files for the purpose of quantifying Defendants' ill-gotten gains; and

- A special master to (a) recommend business management and accounting procedures that the Phelan firm must adopt and implement to avoid future mortgage foreclosure abuses and (b) monitor compliance by the Phelan firm with business management or accounting procedures directed by the Court.

---

[5] The pervasive practice among mortgage servicers and their law firms of filing fraudulently executed or notarized legal documents (sometimes called "robo-signing") has been reported extensively in the national news media since September 2010. *See, e.g.*, Scott Pelley, *Mortgage Paperwork Mess: The Next Housing Shock?*, CBS 60 MINUTES, April 3, 2011, http://www.cbsnews.com/video/watch/?id=7361572n&tag=related:photovideo and Lisa Myers, Rich Gardella and John W. Schoen, *No End In Sight To Foreclosure Quagmire*, NBC NIGHTLY NEWS/MSNBC.COM, May 9, 2011, http://www.msnbc.msn.com/id/42881365/.

## II.   <u>JURISDICTION AND VENUE</u>

11.    This proposed class action is instituted against Defendants for injuries sustained by financially distressed homeowners resulting from Defendants' violations of the Racketeer Influenced and Corruption Act ("RICO"), 18 U.S.C. §1962(c); the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692(e)(2)(A) and (B), 1692f(1), and 1692(g)(2); Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201 *et seq*.; and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56.8-1 *et seq*. To remedy these violations, Plaintiffs seek actual and statutory damages (including treble damages under RICO, the UTPCPL and the NJCFA), together with costs of suit and reasonable attorneys' fees. Federal question jurisdiction is conferred upon this Court by 18 U.S.C. § 1964(c); 15 U.S.C. § 1692k(d); and 28 U.S.C. §§ 1331, 1334 and 1337.

12.    The Homeowners also seek actual damages for breach of contract, breach of good faith and fair dealing, money had and received, and negligent misrepresentation.

13.    In addition to actual and statutory damages, the Homeowners seek equitable relief in the form identified above at ¶10.

14.    The Court may adjudicate the Homeowners' common law claims under principles of pendant jurisdiction.

15.    In addition, under the Class Action Fairness Act of 2005, federal jurisdiction over class actions exists where, as here, any member of a class of plaintiffs is a citizen of a State different from any Defendant, and the aggregated amount in controversy exceeds five million dollars. *See* 28 U.S.C. §§ 1332(d)(2) and (6).

16.    This Court has *in personam* jurisdiction over Defendants, *inter alia*, because

Defendants live in, maintain offices, have employees and agents, and regularly transact business within this District.

17.    Venue is proper in this District because many of the events giving rise to the Homeowners' claims occurred in this District.

### III.   PARTIES

#### A.   The Representative Homeowners

18.    Plaintiff Dennis A. Rhodes is a homeowner and a consumer within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Rhodes resides within this District in Berks County, Pennsylvania.

19.    Plaintiff Edward H. Wolferd, Jr. is a homeowner and a consumer within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Wolferd resides within this District in Lancaster County, Pennsylvania.

20.    Plaintiffs Diane and Charles J. Giles, husband and wife, were homeowners and consumers who reside in Ocean County, New Jersey.

21.    Plaintiff Gerald A. Bender is a homeowner and consumer within the meaning of 15 U.S.C. § 1692a(3). Plaintiff Bender resides within this District in Berks County, Pennsylvania.

#### B.   Defendants

22.    Defendant Phellan Hallinan & Schmieg, LLC ("Phelan LLC") is a high-volume mortgage foreclosure law firm having its principal place of business at 617 J.F.K. Boulevard, Suite 1400, Philadelphia, Pennsylvania 19103.

23.    Also organized and operating as a professional corporation under the laws of the State of New Jersey, the Phelan firm maintains an office at 400 Fellowship Road, Suite

100, Mount Laurel, New Jersey 08054. In New Jersey, the Phelan firm is known as Phelan Hallinan & Schmieg, P.C. ("Phelan P.C.") or sometimes as Phelan Hallinan Schmieg & Diamond, P.C.[6]

24.     Defendant Lawrence (a.k.a. "Larry") T. Phelan ("Larry Phelan") is the principal equity partner of the Phelan firm. Although he is not licensed to practice law in New Jersey, Larry Phelan serves as president and majority shareholder of Phelan P.C. He has an approximately 49% ownership interest in Phelan LLC and an approximately 41% ownership interest in Phelan P.C.

25.     Defendant Francis (a.k.a. "Frank") S. Hallinan ("Hallinan") is an equity partner of the Phelan firm. Hallinan is administrator of the firm.

26.     Defendant Daniel (a.k.a. "Dan") G. Schmieg ("Schmieg") is an equity partner of the Phelan firm.

27.     Defendant Rosemarie Diamond ("Diamond") is an attorney with the Phelan firm who has responsibility for the firm's New Jersey operations.

---

[6] *See* Fannie Mae Retained Attorney List, July 22, 2011, https://www.efanniemae.com/sf/technology/servinvreport/amn/pdf/retainedattorneylist.pdf

On November 1, 2010, the Phelan firm opened an office at 888 SE 3rd Ave, Suite 201, Fort Lauderdale, FL 33316 under the name Phelan Hallinan PLC. This attempt by Phelan to enter the lucrative Florida foreclosure market coincides with the implosion of a once profitable operation run by David J. Stern ("Stern"), who owned a high-volume foreclosure law practice similar to the Phelan firm, as well as a company known as DJSP Enterprises, which purportedly provided title searches, litigation support and other "default management services" to its foreclosure firm founder. *See* David McLaughlin, *Foreclosure Fortune Buys Bugatti, Yacht and Mansions for Attorney,*" BLOOMBERG, Oct. 19, 2010, http://www.bloomberg.com/news/2010-10-19/florida-attorney-buys-bugatti-yacht-mansion-with-his-foreclosure-fortune.html; Andy Kroll, *Fannie and Freddie's Foreclosure Barons,* MOTHER JONES, Aug. 4, 2010, http://motherjones.com/politics/2010/07/david-j-stern-djsp-foreclosure-fannie-freddie?page=1 The Stern firm has been terminated by clients like BofA, Citigroup, Fannie Mae and Freddie Mac, which resulted in collapse of the firm. Susan Taylor Martin, *Collapse of David J. Stern Law Firm Throws Foreclosure Courts into Disarray,* TAMPABAY.COM, Mar. 9, 2011, http://www.tampabay.com/news/courts/civil/collapse-of-david-j-stern-law-firm-throws-foreclosure-courts-into-disarray/1156011; Andy Kroll, *Foreclosure King David Stern Shuttering His Law Firm,* MOTHER JONES, Mar. 7, 2011, http://motherjones.com/2011/03/foreclosure-david-stern-shutters-law-firm-florida.

28.     Defendant Full Spectrum Services, Inc. ("Full Spectrum"), formerly known as Foreclosure Review Services, Inc., is a New Jersey corporation located at 400 Fellowship Road, Suite 200, Mount Laurel, New Jersey 08054. Full Spectrum is owned and controlled by Larry Phelan, Frank Hallinan and Dan Schmieg. Full Spectrum purportedly provides services to law firms in Pennsylvania and New Jersey, including process serving, mortgage and judgment searches, and publication of legal notices.

29.     Defendant Land Title Services of New Jersey, Inc. ("Land Title" or "LTS") is a New Jersey corporation located at 400 Fellowship Road, Suite 220, Mount Laurel, New Jersey 08054. Along with its affiliate, Land Services of PA, Land Title is owned and controlled by Larry Phelan, Frank Hallinan and Dan Schmieg. Land Title provides title searches and other real property services to the Phelan firm and its mortgage servicer clients.

30.     Defendant Wells Fargo & Company ("WFC"), a Delaware corporation, is a diversified financial services company maintaining its principal executive offices at 420 Montgomery Street, San Francisco, California 94163.

31.      Defendant Wells Fargo Bank, N.A. ("WFB") is a national banking association chartered in Sioux Falls, South Dakota, with principal offices at 420 Montgomery Street, San Francisco, California 94163. WFB originates and services residential mortgages through its division Wells Fargo Home Mortgage, also known as America's Servicing Company, which maintains its headquarters at 7000 Vista Dr., West Des Moines, Iowa 50266-93.

32.     Defendant Bank of America Corporation ("BAC"), organized and operating under Delaware law, is one of the world's largest financial institutions, maintaining its principal executive offices at 100 N. Tryon Street, Charlotte, North Carolina 28255.

33.     Defendant Bank of America, N.A. ("Bank of America") is a national banking association with its principal place of business at 100 N. Tryon Street, Charlotte, North Carolina. Bank of America is a wholly owned subsidiary through which BAC conducts its banking activities in the United States and throughout the world. The assets of Bank of America include those acquired by BAC from Countrywide Financial Corporation ("CFC") on July 1, 2008 in a transaction valued at $4.2 billion.

34.     Defendant BAC Home Loans Servicing LP ("BAC Servicing") is a Texas limited partnership doing business at 6400 Legacy Drive, Plano, Texas 75024-3609. Formerly known as Countrywide Home Loans Servicing LP, BAC Servicing services residential mortgages originated by Countrywide Home Loans, Inc. ("CHL"), Bank of America, Fannie Mae and Freddie Mac, among other financial institutions and government-sponsored enterprises ("GSEs").

35.     Defendant CHL was a New York corporation maintaining its principal executive offices at 4500 Park Granada, Calabasas, California 91302. Before its acquisition by BAC in July 2008, CHL was wholly owned subsidiary of CFC, a Delaware corporation that maintained its principal executive offices at Calabasas, California.

36.     Throughout this Complaint, the entities identified above at ¶¶32-35 are referred to collectively as "BofA"

### IV.   **FACTUAL ALLEGATIONS**

### A.   **Foreclosure Processes of the Phelan Firm, BofA and WFB**

37.     For the past decade, most residential mortgages have been sold (*i.e,* "securitized") by original lenders to investment banking firms that package the revenue streams of pooled mortgages into instruments known as Residential Mortgage Backed

Securities ("RMBS"). These instruments are purchased by investors and traded in the national securities markets.[7] Financial institutions (*i.e.*, "Trustees") are designated as legal owners of the securitized loans held in trusts administered by Trustees for the benefit of RMBS investors.

38.   Mortgage servicers like BofA and WFB are hired to collect income from homeowners' mortgage payments, which they transmit to Trustees for distribution to investors. When homeowners fail to make payments required under their mortgages (*i.e.*, they "default" on their obligations), servicers are authorized to take reasonable action, at the homeowners' expense, to cure the defaults (*i.e.*, recover past due payments and the costs incurred in doing so) and to restore the income-producing value of the mortgage assets, including, if necessary, commencement of foreclosure proceedings to liquidate mortgaged property at public auctions conducted by county sheriffs (*i.e.*, "Sheriff's Sales"). The legal duties of Trustees and mortgage servicers are defined in documents known as Pooling and Servicing Agreements ("PSAs").

39.   Mortgage servicers obtain revenue in three ways: (a) a fixed fee for each loan, typically between .25% and .50% of the principal amount; (b) "float" income from interest accrued between the time when servicers receive homeowners' mortgage payments and when those payments are transmitted to Trustees; and (c) "default management" fees charged to delinquent homeowners, which servicers are permitted by contract to retain as compensation for their services.

---

[7]   In 2009, nearly 90% of first-lien residential mortgages originated were securitized. Levitan and Twomey Paper at 12, *citing*, 2 INSIDE MORTG. FIN., THE 2010 MORTGAGE MARKET STATISTICAL ANNUAL 10 (2010) at 3.

40.     Fannie Mae and Freddie Mac are the largest mortgage investors in the United States, collectively owning or guaranteeing about half of all outstanding mortgage debt nationwide. Servicers hired by the GSEs are required to abide by very specific  guidelines, including the requirement that legal work for foreclosures must be referred to a few law firms in each state that have been granted "designated counsel" status.  Fannie Mae and Freddie Mac's guidelines define the maximum rate of fees that can be charged by foreclosure law firms, as well as the maximum time in which foreclosures must be brought to conclusion. *See* below at ¶¶46 n.13 and 139 n.51.  Because of their market dominance, Fannie Mae and Freddie Mac have effectively established the industry standards that govern mortgage servicers and their foreclosure law firms.

41.     Mortgage servicers like BofA and WFB are assisted by technologically sophisticated companies like Lender Processing Services, Inc. ("LPS") (and its wholly owned subsidiary, LPS Default Solutions, Inc. ("LPS Fidelity"))[8] and CoreLogic, Inc. (which on June 10, 2010 was spun off from the financial services business unit of The First American Corporation).[9]

42.     According to LPS, the company's mortgage servicing platform ("MSP") is "the undisputed market leader with more than 50 percent of mortgages in the U.S. by dollar volume serviced on this computer platform." MSP is an integrated program that automates all areas of loan servicing.[10]

---

[8] LPS is a Delaware corporation with principal executive offices at 601 Riverside Avenue Jacksonville, Florida 32204. LPS was formed in July of 2008 as a spin-off from Fidelity National Information Services, Inc. LPS Fidelity (formerly known as Fidelity National Foreclosure & Bankruptcy Solutions) maintains principal offices at 1270 Northland Drive, Suite 200, Saint Paul, Minnesota 55120-1176.
[9]  CoreLogic, Inc. is a Delaware corporation with principal executive offices at 4 First American Way, Santa Ana, California 92707-5913.
[10] http://www.lpsvcs.com/Products/Mortgage/Servicing/ServicingPlatform/MSP/Pages/default.aspx

43.     LPS's technology products include LPS Desktop®, a ubiquitous web-based "workflow" information system used by servicers to process communications, information and data throughout the entire lifecycle of residential mortgages.[11] VendorScape is a comparable product marketed to the foreclosure industry by CoreLogic.

44.     LPS also offers "default management services" free of charge to mortgage servicers, many of whom depend upon LPS technology products. Such services include administrative and support to assist servicers in managing the foreclosure process. To avail themselves of these no-cost amenities, mortgage servicers are required by LPS to execute confidential "Default Services Agreements" ("DSAs") with LPS Fidelity, under which the servicers must employ foreclosure lawyers who are members of an association of attorneys retained and managed by LPS Fidelity ("Fidelity Network"). CoreLogic also maintains an attorney network that operates in a similar fashion. Fidelity Network foreclosure attorneys receive case referrals and assignments from LPS Fidelity through LPS Desktop®.

45.     As a condition to membership in the Fidelity Network (and thus the opportunity to gain a steady flow of case referrals), foreclosure lawyers must enter into a "Network Agreement" with LPS Fidelity and Local Counsel Agreements with servicers using LPS's "default management services." These agreements obligate Fidelity Network members (a) to pay steep "technology" and "administrative" fees to LPS Fidelity, in exchange for which they obtain case referrals generating low, fixed-rate maximum fees for

---

[11] http://www.lpsvcs.com/Products/Mortgage/Default/BankruptcyandForeclosure/Pages/default.aspx and http://www.lpsvcs.com/Products/Mortgage/Servicing/ProcessManagement/Pages/default.aspx.

all legal services provided and (b) accept heavy demands on and oversight of their professional practices.[12]

46.    To push through foreclosures as quickly as possible (the bottom-line requirement of servicers and GSEs alike), Fidelity Network attorneys must comply with strict timeframes[13] in herding their cases through the judicial system. With speed as their overriding priority,[14] Fidelity Network attorneys have been discouraged from communicating with their mortgage servicer clients. Because all communications are transmitted through LPS Desktop®, LPS Fidelity effectively manages the flow of all information exchanged between mortgage servicers and Fidelity Network attorneys.

47.    LPS Fidelity tracks its network attorneys through an internal metric known as Attorney Performance Reviews ("APR"), which ranks foreclosure lawyers based on how fast they perform their tasks. Appearing on the computer screens of Fidelity Network attorneys equipped with LPS Desktop® are blinking "traffic" lights indicating the status of the attorneys' performance. Green represents satisfactory promptness. Yellow represents an alarming level of slowness. Red represents a warning of tardiness that could lead to

---

[12] An analysis of the operational interplay among LPS Fidelity, mortgage servicers and their high-volume foreclosure law firms is provided in *In re Taylor*, 407 B.R. 618, 623, 639, 649 and 651 (Bankr. E.D.Pa.. 2009), *rev'd*, 2010 U.S. Dist. LEXIS 16080 (E.D.Pa. Feb. 18, 2010). After several evidentiary hearings, Judge Diane Sigmund Weiss concluded that one small but high-volume foreclosure firm misrepresented information about borrowers' accounts on a "systemic" basis because of its "slavish adherence" to its servicer clients' "computer driven models" facilitated by LPS. As of the filing of this Complaint, an appeal is pending in *In re Taylor* before the U.S. Court of Appeals for the Third Circuit, Docket No. 10-2154.

[13] *See* Fannie Mae Servicing Guidelines, Foreclosure Timelines (June 6, 2011) (specifying "maximum number of allowable days between referral to attorney (or trustee) and foreclosure sale date"), https://www.efanniemae.com/sf/guides/ssg/relatedservicinginfo/pdf/foreclosuretimeframes.pdf. *See also* USFN, *Foreclosure Timelines Matrix™*, http://www.usfn.org/Content/NavigationMenu/PUBLICATIONSANDPRODUCTS/TimelineMatricesStatebyState/default.htm

[14] *See* Ariana Eunjung Cha and Zachary A. Goldfarb, *For Foreclosure Processors Hired By Mortgage Lenders, Speed Equaled Money*, WASH. POST, Oct. 16, 2010 ("Millions of homes have been seized by banks during the economic crisis through a mass production system of foreclosures that was set up to prioritize one thing over everything else: speed"), http://www.washingtonpost.com/wp-dyn/content/article/2010/10/15/AR2010101506541.html

financial penalties,[15] suspension of case referrals or termination from the network. If Fidelity Network attorneys fail to achieve minimally acceptable APR ratings, their ability to receive lucrative foreclosure work is impaired or eliminated. Conversely, high APR ratings obtained through very quick foreclosures translates into potentially thousands of new cases and enormous profits,[16] generated in large part by owned-and-controlled companies set up by foreclosure lawyers to charge fees for "default management services" such as title searches, BPOs and property inspections. *See* above at ¶¶ 23 n.6 and below at ¶¶ 53-56, 60-63, 69-70, 63, 217-224.

48. Network lawyers accept slim profit margins for their foreclosure work and they surrender their professional independence for one reason. To remain viable in their competitive industry, they have no alternative.

49. As New Jersey foreclosure lawyer Mark J. Udren testified in other litigation:

> [My firm] is one of many law firms that conduct a high volume foreclosure bankruptcy practice and if a lender requires that a law firm enter into an agreement with its agent, a servicing company such as Fidelity, [the law firm] has no choice but to participate in such a program if it wants to do business."[17]

---

[15] "Dilatory" servicers are subject to payment of "compensatory fees" to Freddie Mac and Fannie Mae if their foreclosure law firms do not meet mandatory timeline requirements. *See* Freddie Mac, *Servicer Alignment Initiative*, Pub. No. 887, June 3, 2011, at 5, http://www.freddiemac.com/service/factsheets/pdf/servicing_alignment.pdf, and Fannie Mae, *Servicer Alignment Initiative – Overview for Fannie Mae Servicers*, April 28, 2011, at 4, https://www.efanniemae.com/sf/servicing/pdf/saioverview.pdf

[16] As LPS explained, "[w]hen clients refer a loan to local counsel through LPS Foreclosure Solutions, Inc., the loan timeline is managed until resolution. Clients identify the unique requirements of their portfolios, and the loans are processed through LPS Foreclosure Solutions, Inc. to ensure the most efficient outcome. Internal time limitations for key events are set, and active monitoring is conducted to minimize the overall timeframe from referral to resolution. The loan-level data is reported to LPS partners on a daily basis using LPS Desktop...."

[17] *In re Taylor*, 407 B.R. at 638.

Foreclosure lawyers are encouraged to "do all of their work in their case management system." *See* http://www.usfn.org/AM/Template.cfm?Section=Home&CONTENTID=6867&TEMPLATE=/CM/HTMLDisplay.cfm&SECTION=Article_Library ("Automating these critical business processes can provide maximum return on investment for firms by reducing labor overhead and building resource capacity to handle more files").

50.     However understandable the foreclosure lawyers' economic justification may be, judges have for good reason criticized servicers and their high-volume foreclosure law firms for fostering a corrosive "assembly line" culture of practicing law.[18]

51.     Having outperformed its competition, the Phelan firm describes itself as the "premier default services operation" in Pennsylvania and New Jersey. The Phelan firm achieved this status through a barebones staff of about 20 lawyers. In 2008 alone, the Phelan firm handled an estimated 24,000 to 26,000 foreclosure cases in Pennsylvania and New Jersey, representing almost every loan servicer, including BofA and WFB. In 2009 and 2010, Phelan firm, Full Spectrum and LTS obtained approximately $48 million from just *one* of its many clients. *See* below at ¶¶ 64-68.

52.     Because of the colossal volume of foreclosure cases it handles and the haste with which it disposes of them, the Phelan firm is, in its geographic area, a Fannie Mae and Freddie Mac designated counsel.

53.     The Phelan firm's web site has boasted about the "speed and efficiency" with which the firm rams through its foreclosure cases. According to the Phelan firm, its speed is accomplished through (a) the firm's ability to "leverage technology" by "completely computeriz[ing]" its office with "every case management and invoice reporting syste[m]" used in the foreclosure industry and (b) the firm's ownership and control of the "majority of its vendors to ensure a turnaround time as quick as humanly possible."

54.     While severing a business relationship with a longstanding title search partner in March 2005, Larry Phelan described his "business model in the ever-changing foreclosure ... industry." In an e-mail to Anthony R. Angelo, president of Aracor Search and

---

[18] *In re Taylor*, 407 B.R. at 641, *quoting, In re Parsley*, 384 B.R. 138, 183  (Bankr. S.D.Tex. 2008).

Abstract Services, Inc. ("Aracor"),[19] Larry Phelan, on behalf of himself and his partners, explained:

- "Years ago, Freddie Mac asserted its investor rights over law firms nation-wide and instituted strict time frames. Law firms had to and continue to perform to the highest standards for the prized designated counsel status. [Predecessor firm] Federman & Phelan had to change over night [sic] or go out of business. Through hard and smart work, we adapted quickly and became one of the premier mortgage foreclosure firms in the country."

- "We are now experiencing another significant change in our industry. In-house [mortgage servicer] client default operations are being turned over to First American [now CoreLogic, Inc., which operates in a similar manner to LPS Fidelity][20] and [LPS] Fidelity. These two (2) title giants are outsourcing the foreclosure and bankruptcy referrals for a price, a very high price. … So, the title world has changed dramatically in the last two years, and *drastically* in just the last 9 months. So what do we do? We change. We have to change. We have to realize that the cheese has been moved and reinvent ourselves to protect our income streams." (Emphasis in original)

- Phelan Hallinan & Schmieg has three (3) equity partners and four (4) non-equity partners, with more associates looking to enhance their status. As important and key to the law firm's success is a core group [of] about twelve (12) middle managers, who are viewed as valued colleagues, all of whom are responsible for bringing in and keeping the legal work that creates the vendor related work, whether it is title, service [of process], investigations, closings etc."

- "The changes in the industry with outsource fees and other mandatory costs all cut deep into the firm's profit margins and leave the title area as one of the last areas of profit. We must therefore rearrange our business model. …"

---

[19]   Aracor is a Pennsylvania corporation formed in 1994 by Angelo, Phelan, Frank Federman (senior partner of the Phelan firm's predecessor in interest) and a fourth individual who divested his stock in Aracor in 1996. The three remaining shareholders held a one-third ownership in the company. Federman was Aracor's vice president. Phelan was secretary/treasurer.
[20] See http://www.corelogic.com/products/vendorscape-case-management-system-(vscms).aspx

> ▪ ***Land Title Services, LTS, a company fully controlled and managed by the law firm***,[21] was established in the beginning of [2005] and has moved quickly to adapt to the new title business environment. The goal was to implement a radical new approach to the title product process. ... LTS outsources almost all of the typing work to India. LTS, in conjunction with Foreclosure Review Services ("FRS"), hired a large number of courthouse abstractors as employees and positioned them throughout the state to handle a high volume of search work, resulting in a very low price per search. Then, LTS management instituted a business process utilizing local and India personnel to electronically process the work overseas and at night. ... Not only is the search work much less expensive than that charged by Aracor (or any other title search vendor), the expected turnaround time once fully operational is about three (3) to five (5) business days of a typed and examined product. ... Most important, under this process, LTS is making more than four (4) times the profit of Aracor, and with less than 80% the number of employees.  Accordingly, this is our new ***law firm-title business model***.[22] It would be stupid to do anything else." (Emphasis supplied)

55.    A copy of Larry Phelan's March 31, 2005 e-mail to Angelo is attached here as Exhibit A.

56.    The cost savings gained by the Phelan firm's "radical new approach to the title product process" have not been passed on to foreclosed-upon homeowners, who have instead been systematically overcharged for cut-rate "title products" delivered by LTS.  *See* below at ¶¶ 92, 99-100, 103, 117, 122, 134, 140-142 below. Moreover, "title products" obtained by the Phelan firm from its "fully controlled and managed" abstract company are

---

[21] *See* above, ¶¶ 28-29.

[22] The Phelan firm's "business model" violates the New Jersey Professional Services Corporation Act, N.J.S.A. 14A-17-9, which provides that, except for "investments" of a type not relevant here, "[n]o professional corporation shall engage in any business other than the rendering of professional services for which it was specifically incorporated." *See Chulsky v. Hudson Law Offices, P.C.,* 2011 U.S. Dist. LEXIS 29781, at *7-*15 (D.N.J. Mar. 22, 2011).

The "business model" also ignores Opinion No. 688 by the Advisory Committee on Professional Ethics of the New Jersey Supreme Court, which holds, among other things, that "principals of a law firm may [not] establish a separate title abstract company ... to provide title reports for their law firm's clients." Advisory Comm. On Prof. Ethics., Op. No. 688, 159 N.J.L.J. 1050 (Mar. 13, 2000), http://lawlibrary.rutgers.edu/ethics/acpe/acp688_1.html ("lawyers must keep their practices entirely separate from their business enterprises").

often worthless because they fail to accomplish their essential purpose – to identify the proper legal owners of properties and mortgages subject to the Phelan firm's foreclosure proceedings. *See* below at ¶¶120-130, 153-164, 172-192, 230-233, 256-257.

57. The Phelan firm's unreliable "title products" and its assembly-line foreclosure methods torment even financially secure homeowners who never miss a mortgage payment. One example was chronicled in June 2010 by KYW television reporter Ben Simmoneau, who interviewed Judi and Ed Worrall of Chester County, Pennsylvania concerning the Phelan firm's effort to kick them out of their home through a Sheriff's Sale – despite a glaring misidentification of the Worralls' address in foreclosure documents associated with the default of a neighbor. For several months, the Worralls repeatedly called the error to the attention of Phelan firm attorneys, who assured them that the firm was "aware of the situation" and had already "addressed" the issue. When the Worralls later discovered that -- despite the Phelan firm's false assurances -- their home was still scheduled for Sheriff's Sale, they contacted their local television station.

58. To help the Worralls, Simmoneau on four occasions unsuccessfully called the Phelan firm seeking cancellation of the Sheriff's Sale. Unable to persuade the Phelan firm to correct its obvious mistake, Simmoneau and his camera crew visited the Phelan firm's Center City Philadelphia offices, only to be refused entry to the firm's offices. This visit was captured on videotape, showing Simmoneau stranded at a closed and locked front door, trying in vain to discuss the seriousness of the Worrell's problem with a Phelan firm employee through a speaker box. After ignoring more than three months of persistent complaint by the Worralls and Simmoneau (and only when it was confronted with the

prospect of losing business because of negative publicity), the Phelan firm, without explaining its conduct, finally withdrew its Sheriff's Sale listing for the Worralls' home.[23]

59.     Other homeowners are not as fortunate as Mr. and Ms. Worrall. Nor is the trauma visited upon the Worrells an insubstantial or isolated mistake. Instead, this and similar improper speed-driven (and profit-maximizing) foreclosure activities by the Phelan firm and its servicer clients are institutionalized, systematic and inexpensively automated -- all dictated by the financial imperatives of the "ever-changing foreclosure industry" described by Larry Phelan at ¶¶ 53-56, above.

60.     The "business model" put into operation by the Phelan firm,[24] David J. Stern and others has been phenomenally successful. That success was recognized on Wall Street, which laid the foundation for the paradigm in the first place when it created esoteric investment vehicles like RMBSs.

61.     A Georgia company by the name of Prommis Solutions Holdings, Inc. ("Prommis") filed a prospectus dated June 21, 2010 with the SEC in connection with a proposed public stock offering ("Proposed IPO") underwritten by Credit Suisse and Deutsche Bank Securities. The prospectus stated that "the market for residential mortgage default resolution processing services in the United States was approximately $4.0 billion."

62.     Prommis, owned in majority part by Grant Hill Partners, LLC, a Boston-based hedge fund, was established on February 24, 2006. At that time, the fund paid $137 million for the non-legal "mortgage default resolution processing operations" (*i.e.*, "back-office

---

[23] *See* http://homeequitytheft-cases-articles.blogspot.com/2010/06/pa-couple-current-on-house-payments.html

[24] A casualty of "business model" implemented by Larry Phelan was his partner, Frank Federman, who was forced to "retire" from the law firm he founded. It also included the rebranding of the firm from "Federman & Phelan" to "Phelan, Hallinan & Schmieg."

operations") of McCalla Raymer, LLC, a large foreclosure law firm in Atlanta. The managing partner of McCalla, Daniel D. Phelan, retained a 9.4% ownership interest in Prommis, which he hoped to cash out and sell to investors in the Proposed IPO.[25] Daniel Phelan served as Chief Executive Officer of Prommis from February 2006 to January 2008, in addition to his duties as Chairman of the Board from February 2006 to May 1, 2010, when he became Prommis's Vice Chairman of the Board.

63.     Underscoring the economic interest of law firms and their interconnected "back-office operations" in favor of fee-generating foreclosures rather loan modifications, Prommis's prospectus disclosed to prospective investors the "risk" that:

> Government programs related to home ownership and the mortgage market and voluntary foreclosure relief efforts by mortgage lenders and servicers may reduce the number of foreclosures or restrict mortgage servicers' remedies in foreclosure, which may adversely affect our revenue and results of operations. Federal and state governments and agencies and certain courts have proposed and in many cases enacted or adopted programs, regulations and rules in response to the increasing number of mortgage defaults and foreclosures in recent years. Additional programs, regulations and rules may be implemented, any of which may impose new restrictions or requirements on the processing of foreclosures, decrease the number of foreclosures and bankruptcies that we process and adversely affect our revenue and results of operations.

64.     While the Homeowners at this time are unaware of any familial relationship between Defendant Larry Phelan and Daniel Phelan of Prommis, Larry Phelan does have a brother, Kenneth J. Phelan, who was Fannie Mae's Executive Vice President and Chief Risk Officer from April 2009 through February 2011.

---

[25] DSJ Enterprises, formed out of the "back-office operations" of the now defunct Law Offices of David J Stern (*see* above at ¶ 23 n.6), was formed through a similar public offering in which Stern personally received nearly $60 million. *See* Julie Creswell and Barry Meier, *Bet on Foreclosure Boom Turns Sour for Investors*, N.Y. TIMES, Feb. 1, 2011, http://www.nytimes.com/2011/02/02/business/02stern.html?pagewanted=all

65.     At page 240 of its Annual Report on Form 10-K filed with the S.E.C. on

February 24, 2011,[26] Fannie Mae disclosed that:

a) In 2010, Phelan LLC invoiced approximately $8.5 million in legal fees relating to work performed for Fannie Mae

b) In 2010, Phelan P.C. invoiced approximately $6.8 million in legal fees relating to work performed for Fannie Mae

c) In 2010, Phelan LLC invoiced approximately $17.9 million in "third-party costs" relating to Fannie Mae matters

d) In 2010, Phelan P.C. invoiced approximately $11.2 million in "third-party costs" relating to Fannie Mae matters

e) In 2009, Phelan LLC invoiced approximately $6.8 million in legal fees relating to work performed for Fannie Mae

f) In 2009, Phelan P.C. invoiced approximately $4.7 million in legal fees relating to work performed for Fannie Mae

g) In 2009, Phelan LLC invoiced approximately $15.3 million in "third-party costs" relating to Fannie Mae matters

h) In 2009, Phelan P.C. invoiced approximately $6.7 million in "third-party costs" relating to Fannie Mae matters

i) In 2010, Full Spectrum Holdings LLC[27] billed the Phelan firm approximately $12.9 million for "work" performed on Fannie Mae matters, approximately 44% of the third-party vendor fees identified in subparagraphs (c) and (d) above.

j) In 2009, Full Spectrum Holdings LLC billed the Phelan firm approximately $8.3 million for "work" performed on Fannie Mae matters, approximately 38% of the third-party vendor fees identified in subparagraphs (g) and (h) above.

66.     From Fannie Mae (*one single source*, not including profitable business from

other entities, including Freddie Mac, other GSEs and private mortgage servicers), the

---

[26]  *See* http://www.fanniemae.com/ir/pdf/earnings/2010/10k_2010.pdf
[27]  Full Spectrum Holdings LLC, the holding company for Full Spectrum and Land Title, is wholly owned by Larry Phelan, Frank Hallinan and Dan Schmieg.

Phelan firm, with only an undersized cadre of lawyers and three equity partners, obtained approximately $26.8 million in legal fees in 2009 and 2010 from Fannie Mae, whose flat-rate fee in Pennsylvania and New Jersey foreclosure actions is $1,300 per case.

67.     From *one single source* (Fannie Mae), Full Spectrum and Land Title obtained approximately $21.2 million in third-party vendor fees in 2009 and 2010.

68.     *From one single source (Fannie Mae), the Phelan firm, Full Spectrum and LTS obtained approximately $48 million in foreclosure fees in 2009 and 2010.*[28]

69.     As  Adam Levitin and Tara Twomey explained, the institutionalized piling on of junk fees by mortgage servicers and their foreclosure law firms (through captive "default management service" affiliates) is a consequence of misaligned economic incentives:

> Because servicers are permitted to retain ancillary fees, they have an incentive to charge borrowers as much in fees as they can, even if the fees are not provided for by the mortgage loan documents or a direct contract.....
>
> [A] defaulted homeowner is unlikely to have the presence of mind to notice an illegal fee, much less the financial means to fight it. Even if a mortgage is performing, a small fee is easily overlooked, especially as servicers are under no obligation to send borrowers detailed payment histories with the loan accounting, and typically send just an invoice. Thus, there is relatively low risk to imposing illegal fees upon

---

[28]  On September 6, 2008, both Fannie Mae and Freddie Mac were placed under the conservatorship of the Federal Housing Finance Agency ("FHFA") because they depleted all of their shareholders' equity and required financial support from the U.S. Department of Treasury to continue operations. In its Report to Congress dated June 13, 2011 ("FHFA Report"), the FHFA concluded that there remain "critical safety and soundness concerns" about Fannie Mae's business practices, which "exhibit severe financial, nonfinancial, operational, or compliance weaknesses." FHFA Report at 9. One concern singled out for "special review" by the FHFA is Fannie Mae's "retained attorney network program." The special review was deemed necessary because of "growing concerns about foreclosure activities conducted by third parties." FHFA Report at 11-12. *See* http://www.fhfa.gov/webfiles/21570/FHFA2010RepToCongress61311.pdf

In 2009 and 2010, while Fannie Mae paid about $48 million in fees to partnerships and companies owned by Larry Phelan, Frank Hallinan and Dan Schmieg, Fannie Mae sustained net losses of $86 billion. FHFA Report at 14. The overstated foreclosure fees obtained by the Phelan firm and its affiliates (which systematically exceeded maximum amounts permitted under Fannie Mae serving guidelines, *see* below at ¶¶ 85 n. 36,  139 n. 51) came at the expense of American taxpayers. FHFA Report at 4 ("FHFA recognizes that [GSE] losses become taxpayer losses").

defaulted accounts, and a significant upside. If challenged about an illegal fee, a servicer can easily refund the fee, apologize, and claim that it was a one-off mistake; the homeowner is unlikely to pursue legal action or to know if illegal fees are a systemic practice.....

Many servicers also insource activities like force-placed insurance, appraisals, title searches, and legal services to affiliated entities. Insourcing allows servicers affiliates to charge inflated fees that get passed along to the homeowner and can come at the expense of investors if a foreclosure does not produce sufficient income to repay them all. The profit potential of retained fee income gives servicers a financial incentive to overreach in imposing ancillary fees and to load up accounts with such fees. This practice lowers the ultimate return to investors by driving some borrowers into foreclosure in the first place or by reducing the share of foreclosure recoveries available to RRMBS investors because of the senior priority of servicers' fees.[29]

70.     Because it is so easy for them to pile on and hide junk fees, servicers like BofA and WFB (and lawyers like those in the Phelan firm) file as many foreclosure cases as they can -- quickly and by any means possible -- even if their overstretched staffs cannot handle them properly, and even when there is no evidence of ownership of allegedly defaulted mortgages.[30]

71.     According to the "*Interagency Review of Foreclosure Policies and Procedures*" released in April 2011 by the Federal Reserve System, the Office of the Comptroller of the Currency and the Office of Thrift Supervision, "At the end of the fourth quarter of 2010, nearly 54 million first-lien mortgage loans were outstanding, 2.4 million of which were at some point in the foreclosure process. Additionally, two million mortgages were 90 or

---

[29]  *See* Levitan and Twomey Paper at 43-45.

[30]  Levitan and Twomey Paper at 5 ("[A] a servicer is not necessarily interested in maximizing the value of a loan for the mortgage investors.. ... Defaulted homeowners find themselves streamlined to foreclosure, rather than to loan workouts. The result is elevated foreclosure levels"). *See also* Diane E. Thompson, Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior: Servicer Compensation and Its Consequences, NAT'L CONSUMER LAW CTR. (2009), and Prommis Prospectus quoted above at ¶ 63.

more days past due and at an elevated risk of foreclosure. New foreclosures are on pace to approach 2.5 million by the end of 2011."[31]

72.     Before foreclosure activity declined after the mortgage servicer scandal broke nationally in September 2010,[32] the volume of mortgage delinquencies and foreclosures exploded between January 1, 2005 and December, 2009.

73.     As the following chart illustrates,[33] in December 2005, fewer than five percent of the nation's 51.6 homes with mortgages were in default, with about .48 percent of them in foreclosure. By December 2009, the number of mortgaged homes in default spiked to nearly 11 percent, with 4 percent of these homes in foreclosure.



74.     Behind the statistics are families struggling during the continuing economic crisis known as the "Great Recession." As the Pew Charitable Trust stated in 2009, "[f]oreclosure can have a devastating impact on homeowners and their families. It can ruin their credit for years, adversely affect their jobs and children's schooling, and take away

---

[31] *See* Interagency Review at 5, available at http://cdn.americanbanker.com/media/pdfs/interagency-413.pdf
[32] *See* below at ¶¶ 234-283.
[33] *See* http://cr4re.com/charts/charts.html?Delinquency#category=Delinquency&chart=LPSMay2011.JPG

what for many Americans is their principal investment opportunity and chance to get ahead."[34]

75.     The lives of many of these families have been destroyed by the fraudulent mortgage foreclosure schemes alleged throughout this Complaint.

### B.   Representative Homeowners and Members of the Class Have Been Systematically Exploited By Fraudulent Foreclosure Practices of the Phelan Firm, BofA and WFB

77.     The machinery that processes their foreclosure juggernaut having been in operation since at least January 1, 2005,[35] the Phelan firm, BofA and WFB have aggressively used the institutionalized structure they set up to exploit distressed homeowners.

78.     Along with thousands of other Class members, each Representative Homeowner has been harmed by Defendants' systematic fraudulent foreclosure practices.

**Plaintiff Edward H. Wolferd, Jr.**

#### The Phelan Firm's Foreclosure Action on Behalf of WFB

79.     On December 15, 2004, the Phelan firm began a mortgage foreclosure action against Plaintiff Edward J. Wolferd, Jr. ("Wolferd") at the direction of WFB through the filing of a Complaint in the Court of Common Pleas for Lancaster County, Pennsylvania ("Lancaster County Court"), Case No. 04-11635.

80.     Wolferd did not answer the Complaint. The Phelan firm obtained a default judgment against him in favor of WFB on February 17, 2005.

---

[34] *See Defaulting on the American Dream*, PEW CHARITABLE TRUST, April 2009, at 11-12, www.pewcenteronthestates.org/uploadedFiles/PCS_DefaultingOnTheDream_Report_FINAL041508_01.pdf

[35] As Mark Pearce, Director of the FDIC's Depositor and Consumer Protection Division, explained, "[T]he roots of today's mortgage servicing problems began before the financial crisis. For example, the traditional structure of third-party mortgage servicing fees created perverse incentives to automate critical servicing activities and cut costs at the expense of the accuracy and reliability of loan documents and information." *See* Statement of Mark Pearce at hearing before subcommittees of the House Committee on Financial Services on July 7, 2011, at 2-3, http://financialservices.house.gov/UploadedFiles/070711pearce.pdf

81.     On August 1, 2005, the Phelan firm sent a fax to the Lancaster County Sheriff's Office ("Lancaster County Sheriff") requesting postponement of a Sheriff's Sale of Wolferd's property scheduled for August 1, 2005 due to Wolferd's filing of a petition for relief under 11 U.S.C. § 1301 *et seq*. The action initiated by Wolferd pursuant to that statute was subsequently dismissed in early 2009.

82.     On February 10, 2009, the Phelan firm filed in the Lancaster County Office of the Prothonotary ("Lancaster County Prothonotary") a praecipe for a writ of execution on the default judgment obtained on behalf of WFB on February 17, 2005 ("Wolferd foreclosure judgment"). The praecipe contained the following signature:

Daniel G. Schmieg, Esquire
Attorney for Filing Party
One Penn Center at Suburban Station
1617 John F. Kennedy Boulevard
Suite 1400
Philadelphia, PA 19103-1814
(215) 563-7000

83.     On February 17, 2005, before its foreclosure action was stayed pursuant to 11 U.S.C. § 362, the Phelan firm filed an earlier praecipe for a writ of execution on the Wolferd foreclosure judgment.  That praecipe, also purportedly executed by Dan Schmieg, contained the following signature:

Daniel G. Schmieg,

Attorney for Plaintiff
Suite 1400, One Penn

Philadelphia, PA 19104-

84.     On February 10, 2009, the Phelan firm delivered to the Lancaster County Prothonotary a check in the amount of $2,500, representing a deposit of the Lancaster County Sheriff's anticipated fee for a Sheriff's Sale of Wolferd's home scheduled for July 29, 2009.  The Lancaster County Prothonotary transmitted the $2,500 check (receipt number 165261) to the Lancaster County Sheriff on February 10, 2009, along with an original writ of execution.

85.     On May 26, 2009, the Phelan firm filed with the Lancaster County Court a document called "Motion to Reassess Damages," together with a supporting memorandum of law. In those court filings, the Phelan firm identified the following "costs of collection" and "other expenses" purportedly due as a result of Plaintiff Wolferd's default:

- "Legal fees" in an amount of $1, 250[36]

- "Costs of Suit and Title" in an amount of $1,682.25

- "Sheriff's Sale Costs" in an amount of $1,650.16

86.     The Phelan firm filed with the Lancaster County Court a proposed order incorporating the "expenses" identified above.  Although those "expenses" specifically *did* identify $1,650.16 as "Sheriff's Sale Costs," the proposed order states that "Sheriff's commission is not included" in the enumerated charges. The proposed order was signed by the Lancaster Court County on the day it was submitted by the Phelan firm, May 26, 2009.

---

[36] This amount is uncontested because it is consistent with the flat-rate fee (currently $1,300) established by Fannie Mae and other GSEs for legal services in residential property foreclosures in Pennsylvania. *See* Fannie Mae Servicing Guide, *Allowable Attorney and Trustee Fees* (June 11, 2011), at 2 ("This fee covers all legal actions necessary to complete the standard foreclosure in Pennsylvania, including motions to postpone or relist a sale and motions to reassess damages"), https://www.efanniemae.com/sf/guides/ssg/relatedservicinginfo/exhibits/pdf/allowattnyandtrustfrclfees.pdf

87.    On July 8, 2009, the Phelan firm filed with the Lancaster County Prothonotary a document, purportedly signed by Frank Hallinan,[37] which requested that the docket of its foreclosure action against Wolferd be changed to identify the defendant homeowner as "Edward H. Wolfred, Jr. A/K/A Edward H. Wolferd, Jr." This document stated that the change was needed because "defendant's name was erroneously listed in the caption" of the foreclosure complaint filed by the Phelan firm.

88.    On July 9, 2009, the Phelan firm filed an Affidavit of Service, purportedly signed by Carbon County Constable James Osborne, attesting under penalty of perjury that, on February 28, 2009, he personally served Wolferd with a Notice of Sheriff's sale. This affidavit, filed more than four months after its purported execution, was notarized by Thomas P. Strain ("Strain"), a Pennsylvania notary employed by Full Spectrum, whose offices are located in Mount Laurel, New Jersey. Given the timing of the filing of the affidavit on the eve of the scheduled Sheriff's Sale of Wolferd's home, and given 100-mile distance between Lancaster County and Mount Laurel (and the additional distance from Constable Osborne's residence in Weissport, Carbon County, Pennsylvania), it is probable that Strain was directed to, and did, provide a false notarization of Constable Osborne's affidavit.

89.    As alleged below at ¶¶ 201-212, 250-260, the authenticity of legal documents notarized by Strain on behalf of the Phelan firm and its servicer clients has questioned by the New Jersey judicial system. Between December 20, 2010 and August 15, 2011, uncontested foreclosures actions in the State of New Jersey were suspended because of systematic "irregularities" in legal documents filed with the courts by, prominently among

---

[37] As shown below at ¶¶ 201-212, 250-260, there are *bona fide* questions concerning the authenticity of foreclosure documents purportedly signed by Hallinan. Attached here as Exhibit B are representative samples of different signatures identified as that of Frank Hallinan in foreclosure documents filed by the Phelan firm.

others, BofA, WFB and the Phelan firm. Strain has been described in press reports as "the face of New Jersey's robo-signing scandal."[38]

### WFB's Loan Modification Terms

90.     On July 23, 2009, September 22, 2009 and November 2, 2009, the Phelan firm sent faxes to the Lancaster County Prothonotary requesting continuances of the Sheriff's Sale of Wolferd's home because of efforts among the parties to finalize a loan modification.

91.     A Loan Modification Agreement dated August 25, 2009 ("WFB Modification Agreement") was executed by Wolferd on September 11, 2009 and by a representative of WFB on September 22, 2009. Terms of the WFB Modification Agreement were set forth in a letter from WFB to Wolferd dated August 25, 2009 ("WFB Letter") and in a Loan Modification Settlement Statement ("WFB Statement") also dated August 25, 2009.

92.     The WFB Statement assessed $3,015.50 for undocumented and unexplained "Recoverable Expenses" allegedly incurred by Wolferd before the loan modification. The only description furnished by WFB for such expenses was the catch-all statement that "Recoverable Expenses may include, but are not limited to, Title, Attorney fees/costs, BPO/Appraisal, and/or Property Preservation/Property Inspections."

93.     In the WFB Letter, Wolferd was told that, as a condition to his loan modification, he needed to "provide" what WFB called a "contribution amount of $1,375" toward payment of the $3,015.50 in "Recoverable Expenses" listed in the WFB Statement. The remaining amount of the "Recoverable Expenses" was capitalized by WFB into the

---

[38] *See* Kaja Whitehouse, *Report Rips NJ Foreclosure Robo-signing Notary*, N.Y. POST, Dec. 29, 2010, http://www.nypost.com/p/news/business/sign_of_the_times_wOvGHrYMdbzZqEVgonGR4K

modified loan. Those "expenses" are now included in every monthly mortgage payment that Wolferd makes to WFB.

94.     When Wolferd's then-fiancé, Cheena Shirk-Wolferd, contacted WFB to challenge the amount of "Recoverable Expenses" allegedly due from Wolferd, a WFB "loan modification specialist" told her that "the [foreclosure] lawyer always keeps that money as its fees."

95.     Wolferd surrendered to WFB's non-negotiable demands rather than accept the alternative of losing his home to foreclosure.

96.     On November 3, 2009, the Phelan firm received a refund in the amount of $503.32 (check number 91097) from the Lancaster County Sheriff. The Phelan firm and WFB have not credited this amount to Wolferd's account.

### The Phelan Firm's Fraudulent Expense Claims

97.      The "costs of collection" and "other expenses" identified in the Phelan firm's "Motion to Reassess Damages" filed on May 26, 2009 contained fraudulent charges for overstated or fabricated junk fees.[39]

98.     The $1,682.25 charge attributed by the Phelan firm to "Costs of Suit and Title" was not incurred or was not reasonably incurred.

99.     As Frank Hallinan testified in other litigation, fees charged by the Phelan firm for "title products" obtained from its wholly owned subsidiary LTS (which come "at a very low price" to the firm[40]) "can vary anywhere from … $200 to $300, possibly $350."[41] The

---

[39] False statements by attorneys in complaints and other legal pleadings are actionable under Sections 1692e(2)(A) 1692e(10) and 1692f(1) of the FDCPA, 15 U.S.C. §§ 1692(2)(A), 1692e(10), 1692f(1). *Chulsky v. Hudson Law Offices, P.C.*, 2011 U.S. Dist. LEXIS 29781, at *23-*25 (D.N.J. Mar. 22, 2011).
[40] *See* above at ¶ 54.

true low cost and value of LTS "title products" bear no rational relationship to the severely marked-up amounts charged for them by the Phelan firm. Excessive profits are thus systematically taken by the Phelan firm for LTS "title products," which result in overstated fees charged to distressed homeowners.

100.    Even if the Phelan firm's title fees were reasonably incurred at a hypothetical $300 charge (a hypothesis unsupported by fact), there is no basis for the Phelan firm's claim that the "costs" of their foreclosure suits come anywhere near $1,382.25. The cost of filing a civil complaint with the Lancaster County Prothonotary is $135; other prothonotary fees are similarly priced.[42] The Lancaster County Sheriff served the Phelan firm's foreclosure Complaint upon Wolferd on January 12, 2005, for which the Sheriff was paid $150. A vague and cryptic charge for "costs of suit" in an amount of $1,382.25 is a prototypical example of a fraudulently manufactured junk fee.

101.    Neither the Phelan firm nor WFB sustained out-of-pocket expenses for "Sheriff's Sale Costs" in an amount of $1,650.16. Instead, the Phelan firm or WFB (or both) unlawfully misappropriated to their own use the $503 Sheriff's deposit refund received by the Phelan firm on November 3, 2009.

### WFB's Fraudulent Expense Claims

102.    The WFB Statement dated August 25, 2009 likewise contained fraudulent charges for overstated or fabricated junk fees that were wrongfully assessed to and paid by Plaintiff Wolferd.

---

[41] Transcript of Deposition Testimony of Frank Hallinan taken on March 3, 2009 ("Hallinan Transcript") in the matter titled *Bank of New York v. Ukpe*, Docket No. F-10209-08 (N.J. Super., Ch. Div., Atlantic Co.) at 49, lines 1-5. *See* http://www.scribd.com/doc/61750189/Hallinan-dep-1

[42] http://www.co.lancaster.pa.us/lanco/lib/lanco/2009_fee_bill_with_cover_sheet_1-1-2011.pdf

103.    WFB was entitled to reimbursement of $1,250 as a flat-rate fee paid to the Phelan firm for all foreclosure legal work it performed. However, the amount of $3,015.50 in "Recoverable Expenses" is excessive. Excluding a proper charge of $1,250 for legal fees, WFB charged Wolferd $1,765 for an indecipherable stew of foreclosure "costs" lumped into the category of "Title, costs, BPO/Appraisal, and/or Property Preservation/Property Inspections." For the reasons identified above at ¶¶ 99-100 and below at ¶¶ 139-148, this amount includes (on top of the uncredited $503 Sheriff's deposit refund) charges that could not possibly have been incurred reasonably by WFB.

**Plaintiff Dennis A. Rhodes**

### The Phelan Firm's Foreclosure Action

104.    At the direction of its servicer client, Countrywide, on September 17, 2007, the Phelan firm began a mortgage foreclosure action against Plaintiff Dennis A. Rhodes ("Rhodes") through the filing of a Complaint in the Court of Common Pleas for Berks County, Pennsylvania ("Berks County Court"), Case No. 07-10172. The Complaint, purportedly signed by Frank Hallinan,[43] claimed that the mortgagee seeking foreclosure of Bender's property was an entity called "Bank of New York ("Bank of New York") as Trustee for Certificateholders of CWABS, Inc. Asset-Back Certificates Series 2005-05 ("CWABS Trust").

105.    In paragraph 3 of the Complaint against Rhodes purportedly signed by Hallinan, the Phelan firm alleged that:

> On 04/14/05 mortgagor(s) made, executed and delivered a mortgage
> upon the premises hereinafter described to MORTGAGE ELECTRONIC
> REGISTRATION SYSTEMS, SOLELY AS NOMINEE FOR COUNTRYWIDE
> HOME LOANS, INC., which mortgage is recorded in the Office of the

---

[43] *Compare* different Hallinan "signatures" in Exhibit B.

Recorder of BERKS County, in Book 4600, Page: 2434. **PLAINTIFF [*i.e.*, Bank of New York] is now the legal owner of the mortgage and is in the process of formalizing an assignment of same**. The mortgage and assignment(s), if any, are matters of public record and are incorporated by reference in accordance with Pa.C.C.P. 1019(g); which rule relieves the Plaintiff from its obligation to attach documents to pleadings if those documents are of public record.

106.    Rhodes did not answer the Complaint. The Phelan firm obtained a default judgment against him in favor of Bank of New York on October 31, 2007.

107.    On November 13, 2007, the Phelan firm filed with the Berks County Court a document called "Motion to Reassess Damages," together with a supporting memorandum of law. In those court filings, the Phelan firm identified the following as among the "sums" purportedly "incurred or expended" on Rhodes' "behalf":

- ▪ "Legal fees" in an amount of $1,735

- ▪ "Costs of Suit and Title" in an amount of $ 689.10

108.    The Berks County Court entered an Order granting the Motion to Reassess Damages in the exact form proposed by the Phelan firm.

109.    On November 29, 2007, after the Phelan firm filed its foreclosure Complaint and after it obtained an Order granting its Motion to Reassess Damages, employees or agents of Larry Phelan, Frank Hallinan and Dan Schmieg recorded a purported assignment of Rhodes' mortgage with the Recorder of Deeds for Berks County, Pennsylvania ("Berks County Recorder").

110.    This "assignment," purportedly notarized by Full Spectrum employee Thomas Strain on November 17, 2007, ostensibly conveyed ownership of Rhodes' mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS") to Bank of New

York as Trustee of the CWABS Trust. The "assignment" was purportedly signed by Frank

Hallinan[44] in his professed capacity as "Assistant Vice President and Treasurer" of MERS.[45]

111.    The Phelan firm obtained a writ of execution scheduling a Sheriff's Sale of

Rhodes' home on January 11, 2008.

112.    On January 10, 2008, Rhodes filed a petition for relief under 11 U.S.C. § 1301

*et seq*. As a result, the Sheriff's Sale was postponed.

### Fraudulent Expense Claims By the Phelan Firm and Countrywide

113.    At paragraph 6 of its foreclosure Complaint against Rhodes dated September

17, 2007, the Phelan firm listed a charge of $1,250 for "Attorney's Fees," which is based

directly or indirectly on the customary flat-rate fee prescribed by GSEs like Fannie Mae.

114.    The larger amount of $1,735 claimed by the Phelan firm for in its Motion to

Reassess Damages for Legal Fees is overstated by $485. In a document filed in Rhodes'

proceeding under 11 U.S.C. § 1301 *et seq*., the Phelan firm asserted that Rhodes owed

$1,250 in legal fees and $425 for services attributed to its filing of a "petition to Amend

Judgment."

115.    The Phelan firm's charge for a so-called "petition to Amend Judgment" is a

misleading euphemism for the Phelan firm's Motion to Reassess Damages dated November

13, 2007.

---

[44] *Compare* different Hallinan "signatures" in Exhibit B.

[45] Although there are indications that Hallinan's signature may have been forged on this assignment (which was necessary to establish (a) Bank of New York's legal ownership of Rhodes' mortgage and (b) Bank of New York's legal standing to bring a foreclosure action against Rhodes) (*see* below at ¶¶ 201-210), the validity of the foreclosure judgment obtained by the Phelan firm against Rhodes is <u>not</u> in dispute in this litigation. However, the illegitimacy of legal documents signed by Hallinan and other members of the Phelan firm (one of several unlawful means used to maximize profits through fraudulently manufactured junk fees) is highly relevant to the Homeowners' claims.

116.    As the Phelan and Countrywide firm knew, the flat-rate fee for foreclosure work "covers all legal actions necessary to complete the standard foreclosure in Pennsylvania, including ... motions to reassess damages." *See* below at ¶ 139 n. 51. The excessive charge by the Phelan firm and Countrywide for an inartfully disguised "Motion to Reassess Damages" was a fraudulently manufactured junk fee.

117.    Likewise excessive was the Phelan firm's charge for "Costs of Suit and Title" in an amount of $ 689.10. As alleged in further detail above at ¶¶ 99-100 and below at ¶¶ 140-141, excessive profits are taken by the Phelan firm for Land Title Services "title products," which result in overstated fees charged to distressed homeowners. The true low cost and value of those "title products" bear no rational relationship to the severely marked-up amounts charged for them by the Phelan firm.

118.    The Phelan firm and Countrywide also cheated Plaintiff Rhodes and Class members in other underhanded ways, such as through their systematic failure to ensure that Sheriff's deposit refunds are properly credited to homeowners' accounts – a fraudulent scheme that harms individuals like Plaintiff Wolferd outside the protection of 11 U.S.C. § 1301 *et seq.* (*see* above at ¶¶84-86, 96, 101, 103), as well as those who do invoke protection of that law. *See Hannon v. Countrywide*, 421 B.R. 728, 732 (Bankr. M.D. Pa. 2009) (in five of 13 claims filed by Countrywide in the Middle District of Pennsylvania in December 2006, "the sheriff refunded monies to Countrywide [or its counsel], but Countrywide failed to reduce its claim accordingly, leaving the "implication" that "Countrywide engaged in a pattern of conduct tantamount to 'bad faith'....").

119.    Although this Court held that the Homeowners in this litigation cannot assert the claims alleged in their initial Complaint under the FDCPA (Doc. No. 1-3) (a holding

sustained by the Third Circuit on appeal), such claims remain actionable under RICO. They also are part of the "pattern" of racketeering activity establishing a RICO violation by BofA/Countrywide and the Phelan firm. *See* below at ¶¶322-331. The allegations in ¶¶40-51 of the initial Complaint are therefore incorporated by reference as if set forth in their entirety here.

**Plaintiff Gerald A. Bender, Sr.**

### The Phelan Firm's Foreclosure Action on Behalf of "Wachovia"

120.     At the direction of WFB, on June 27, 2007, the Phelan firm began a mortgage foreclosure action against Plaintiff Gerald A. Bender, Sr. ("Bender") through the filing of a Complaint in the Berks County Court, Case No. 07-6730. The Complaint, purportedly signed by Frank Hallinan,[46] averred that the mortgagee seeking foreclosure of Bender's property was an entity called "Wachovia Bank, N.A., Trustee for the Pooling and Servicing Agreement dated as of November 1, 2004, Asset-Backed Pass-Through Certificate Series 2004-WWF1" ("Park Place PSA"). The legal entity that was created through the Park Place PSA is referred to here as the "Park Place Trust."

121.     In paragraph 3 of the Complaint against Bender purportedly signed by Hallinan, the Phelan firm alleged that:

> On 09/24/2004 mortgagor(s) made, executed and delivered a mortgage upon the premises hereinafter described to ARGENT MORTGAGE COMPANY, LLC ("Argent") which mortgage is recorded in the Office of the Recorder of BERKS County, in Book 4157, Page: 265. PLAINTIFF (*i.e.*, **_Wachovia Bank, N.A_**. "Wachovia," Trustee for the Park Place Trust] **_is now the legal owner of the mortgage and is in the process of formalizing an assignment of same._** The mortgage and assignment(s), if any, are matters of public record and are incorporated by

---

[46] *Compare* different Hallinan "signatures" in Exhibit B.

> reference in accordance with Pa.C.C.P. 1019(g); which rule relieves the Plaintiff from its obligation to attach documents to pleadings if those documents are of public record.

(Emphasis supplied)

122.    In paragraph 6 of the Complaint purportedly signed by Hallinan, the Phelan firm alleged that amounts "due on the mortgage" included $1,250 in "Attorney's Fees" and $550 for "Cost of Title." The Phelan firm claimed that its attorney's fees were "based on work actually performed" and were "in conformity with the mortgage and Pennsylvania law," both of which are longstanding requirements of GSEs like Fannie Mae.[47]

123.    Accompanying its Complaint, the Phelan firm filed a verification, also allegedly signed by Hallinan. The verification attested to the truth of the following "facts":

a)  Hallinan was "attorney" for "Wachovia" in the foreclosure action against Bender

b)   Hallinan was "authorized" by "Wachovia" to make a verification on "Wachovia's" behalf

c)  Statements in the Complaint were "based on information provided" by "Wachovia," which Hallinan purportedly "believed to be true and correct to the best of its knowledge, information and belief"

d)  Hallinan "intended to substitute a verification" from Wachovia "upon receipt" and

e)  Hallinan understood that his verification was made "subject to the penalties of 18 Pa.C.S. Sec. 4904 relating to unsworn falsifications to authorities," a second-degree misdemeanor requiring "a fine of at least $1000."

---

[47] *See* Fannie Mae, Announcement 08-19**,** *New Foreclosure and Bankruptcy Attorney Network and Attorneys' Fees and Costs*, August 6, 2008 ("Fannie Mae Announcement 08-19") at 5 ("Fannie Mae reminds servicers of the *Servicing Guide's* requirements governing attorneys' fees, including the requirements that fees charged to borrowers be permitted under the terms of the note, security instrument, and applicable laws and be prorated to reasonably relate to the amount of work actually performed"),
https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2008/0819.pdf

With the probable exception of subpart (e) above, every one of these representations attributed to Hallinan was false.

124.   When the Complaint was filed and at all times since, the Phelan firm and Hallinan had no authority to act on behalf of Wachovia in connection with Bender's mortgage. Nevertheless, the Phelan firm, at the command of WFB and through fraudulent means, prosecuted a mortgage foreclosure action against Bender through default judgment, writ of execution and the scheduling of a Sheriff's Sale.

125.   On October 11, 2007, after the Phelan firm filed its foreclosure Complaint against Bender, employees or agents of Larry Phelan, Frank Hallinan and Dan Schmieg recorded two purported assignments of Bender's mortgage with the Berks County Recorder.

126.   The first "assignment," which was purportedly notarized on September 20, 2004, attempted to convey ownership of Bender's mortgage from Argent (the loan originator) to Ameriquest (the depositor of a pool of mortgages placed into the Park Place Trust). The purpose of this assignment was to ensure that Ameriquest had legal ownership of Bender's mortgage so that it could be included in the pool of mortgages that a securities affiliate of Ameriquest packaged into RMBS certificates sold to investors.

127.   The second "assignment," also purportedly notarized on September 20, 2004 and recorded simultaneously with the first, purportedly re-conveyed ownership of Bender's mortgage from Ameriquest to Wachovia, "as Trustee" of the Park Place Trust. The objective of this assignment was to re-transfer ownership of Bender's mortgage to a party that had ostensible legal standing to bring a mortgage foreclosure action against Bender.

128.   Whether or not the first "assignment" effectively transferred legal ownership of Bender's mortgage to Ameriquest,[48] *Wachovia was not Trustee of the Park Place Trust on June 27, 2007, when the Phelan firm filed its foreclosure Complaint against Bender on behalf of Wachovia, or on October 11, 2007, when the Phelan firm's employees or agents recorded the second "assignment," or at any time since.* In simple terms, Wachovia had no legal authority to act on behalf of the Park Place Trust. Neither WFB nor the Phelan firm had any legal authority to act on behalf of Wachovia.

129.   This is because, on December 30, 2005, Wachovia sold its entire corporate trust and institutional custody portfolio to a different financial institution, U.S. Bank, N.A. ("U.S. Bank"). After that sale, Wachovia had no ownership interest in Bender's mortgage, if it ever did, and it had no legal standing to sue Bender in the foreclosure action that WFB directed the Phelan firm to bring.

130.   Almost six years later, Wachovia *still* appears as the legal owner of Bender's mortgage in public records maintained by the Berks County Recorder.

131.   On March 26, 2008, the Phelan firm filed with the Berks County Court a document titled "Praecipe for Judgment and Assessment of Damages." This document, purportedly executed by Dan Schmieg, contained the following signature, very different again from the signatures identified above at ¶¶ 82-83:

*Daniel G. Schmieg*

Daniel G. Schmieg, Esquire
Attorney for Plaintiff

---

[48] For an analysis of other invalid assignments from Argent and Ameriquest in a mortgage foreclosure action brought by WFB, see *Wells Fargo v. Farmer*, 19 Misc. 3d 1141A; 867 N.Y.S.2d 21; 2008 N.Y. Misc. LEXIS 3248 (N.Y.Sup.Ct. June 5, 2008)

132.    On March 26, 2008, the Phelan firm obtained a foreclosure judgment against Bender and in favor of "Wachovia."[49]

133.    The Phelan firm subsequently filed a praecipe for a writ of execution on the judgment obtained on behalf of "Wachovia." The writ of execution was issued. A Sherriff's Sale of Bender's home was scheduled for June 6, 2008.

134.    On May 2, 2008, the Phelan firm mailed to the Berks County Court a document called "Motion to Reassess Damages," together with a supporting memorandum of law. In those court filings, the Phelan firm identified the following "sums" purportedly "incurred or expended" on behalf of "Wachovia":

- "Legal fees" in an amount of $2,250

- "Costs of Suit and Title" in an amount of $1,297.55

- "Appraisal/Brokers Price Opinions" in amount of $285

- "Property Inspections/Property Preservation," $120.

135.    Together with its "Motion to Reassess Damages," the Phelan firm filed with the Berks County Court a proposed order incorporating the "sums" identified above. The proposed order was signed by the Berks County Court in the exact form submitted by the Phelan firm.

136.    On June 4, 2008, the Phelan firm sent a fax to the Berks County Sheriff's Office requesting postponement of the scheduled Sheriff's Sale of Bender's property because Bender filed a petition for relief under 11 U.S.C. § 1301 *et seq*. The proceeding initiated by Bender pursuant to that statute was dismissed on March 31, 2011.

---

[49] Although a judgment in favor of "Wachovia" should not have been entered by Berks County Court in light of facts about the Phelan firm's fraudulent practices that were uncovered years after judgment was entered, the validity of that Berks County Court judgment is *not* contested in this litigation. Nor is the validity of that judgment relevant to the fraudulent foreclosure practices that lie at the heart of this litigation.

137.    In contrast to the immediate aggressive action it took with respect to Plaintiff Wolferd,[50] the Phelan firm has not resumed its quest to execute upon its foreclosure judgment against Bender because it is unable to produce evidence of a chain of title demonstrating ownership of Bender's mortgage.

**Fraudulent Expense Claims by the Phelan Firm and WFB**

138.    The "sums" purportedly "incurred or expended" on behalf of Wachovia, identified above at ¶134, contained overstated or fabricated junk fees.

139.    The $2,250 attributed by the Phelan firm to "Legal Fees" was not incurred or was not reasonably incurred. In the foreclosure Complaint against Bender purportedly signed by Hallinan and filed on June 27, 2007, the Phelan firm alleged that its attorney's fees were $1,250. *See* above at ¶122. That amount is consistent with the flat-rate fee established by GSEs for legal work in foreclosure actions. However, the cost of "Legal fees" claimed by the Phelan firm in its "Motion to Reassess Damages" filed on May 1, 2008 was artificially inflated by $1,000. In particular, the Phelan firm sought reimbursement of (a) $575 for preparation of a motion for summary judgment and (b) $425 for preparation of the false and misleading "Motion to Reassess Damages" purportedly "signed" by Dan Schmieg. Charges for "legal services" of this nature are *explicitly unrecoverable* by foreclosure law firms under Fannie Mae guidelines and they are, by definition, excessive and unreasonable.[51]

---

[50] *See* above at ¶¶ 81-83.

[51] *See* Fannie Mae Announcement 08-19, Attachment 1, at 2-3 n.10 (Flat-rate fee "covers all legal actions necessary to complete the standard foreclosure in Pennsylvania, including motions to postpone or relist a sale and motions to reassess damages") and Fannie Mae Announcement 08-19 at 6 (Flat-rate fee includes "[p]reparing legal papers for entry of foreclosure judgment, whether by default or through summary judgment process").

140.    The $ 1,297.55 attributed by the Phelan firm to "Costs of Suit and Title" was also not incurred or was not reasonably incurred.

141.    As Defendant Hallinan testified in other litigation, fees charged by the Phelan firm for "title products" obtained from its wholly owned subsidiary LTS (which come "at a very low price" to the firm) "can vary anywhere from ... $200 to $300, possibly $350." Excessive profits are taken by the Phelan firm for LTS "title products," which result in overstated fees charged to distressed homeowners. The true low cost and value of LTS "title products" bear no rational relationship to the severely marked-up amounts charged for them by the Phelan firm.

142.    In contrast to Hallinan's sworn deposition testimony, the foreclosure Complaint purportedly signed by Hallinan against Bender claimed that the amount "due on the mortgage" included charge of $550 for "Cost of Title."[52] The Phelan firm's charge for title abstract work is excessive on its face -- and it is even more inappropriate because it did not even accomplish its fundamental purpose of identifying the true owner of Bender's mortgage. This is another prototypical example of a fraudulently manufactured junk fee.

143.    The $285 charge attributed by the Phelan firm to "Appraisal/Brokers Price Opinions" was also not incurred or was not reasonably incurred.

144.    As of December 10, 2010, Fannie Mae's maximum reimbursable rate for an "exterior BPO" was $80 and $105 for an "interior BPO."[53] The true cost of a BPO is lower.

---

[52] *See* above at ¶122.
[53] *See* Fannie Mae, Servicing Notice, *BPO Providers and Pricing Structure*, Dec. 10. 2010, https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ntce121710a.pdf

According to the National Association of BPO Professionals, the cost of a BPO is "typically $30-$100."[54]

145.    As of April 2011, BofA's "LandSafe" title abstract subsidiary pays licensed real estate brokers $55 for each BPO they provide, out of which LandSafe extracts from brokers 10% of their fees for use of its proprietary system.

146.    After one foreclosure case in which nine BPOs were ordered and mischaracterized as "appraisals,[55] foreclosure counsel for WFB admitted to a Court that only $50 of each invoice represented the actual cost incurred by Wells Fargo for a BPO."[56] The Court held that [t]he remaining amounts ... were added to the actual costs by Wells Fargo" and "these additional charges are an undisclosed fee, disguised as a third party vendor cost, and illegally imposed by Wells Fargo."[57] *The $285 charge attributed by the Phelan firm on behalf of WFB to "Appraisal/Brokers Price Opinions" was likewise "illegally imposed."*[58]

147.    Some courts hold that fees for discretionary appraisals or BPOs are not reimbursable at all. *See In re Lisa Battle*, No. 07-12474-ELF (Bank. E.D.Pa. Order dated July 1, 2008), at 6 n.7 and 7 n. 10.[59]

148.    The $120 attributed by the Phelan firm to "Property Inspections/Property Maintenance" was also not incurred or was not reasonably incurred. As of March, 2011,

---

[54] http://www.nabpop.org/Advocacy-BPOBrief-2.php
[55] *In re Stewart*, 391 B.R. 327, 345 (Bankr. E,D. La. 2008), *aff'd in part, rev'd in part on other ground*s, 391 B.R. 577 (E.D.La. 2008).
[56] *Id.* at 346.
[57] *Id.*
[58]  WFB is a defendant in a proposed class action by homeowners asserting that WFB's systematic imposition of unlawful BPO fees violates RICO. *Young v. Wells Fargo*, 2009 U.S. Dist. LEXIS 100419 (S.D. Iowa Oct. 27, 2009). The Court in that action held that the homeowners' Complaint stated a claim for relief. *Id.*, at *87 ("[I]t is plausible that Wells Fargo acted with knowing intention when charging mortgagors excessive servicing fees and concealed the nature of those fees....").
[59]   Available at http://www.scribd.com/doc/60103382/Cco-Poc-Obj-Order

Fannie Mae's maximum reimbursable rate for property inspection fees was $60.[60] The condition of Bender's home was not such that the Phelan firm reasonably ordered any property maintenance services.

149.    In the "Motion to Reassess Damages" that contained these fraudulent overcharges (and its accompanying memorandum), the Phelan firm emphasized to the Berks County Court that (a) "the sole purpose" of its mortgage foreclosure action was to take [Bender's] mortgaged property to Sheriff's Sale," which requires a dollar amount to establish the parameters of third-party "bidding"; (b) its mortgage foreclosure action against Bender was "strictly *in rem*" and (c) its requested reassessment of "damages" did "not include any personal liability" against Bender.

150.    Despite its accurate description of Pennsylvania law, the Phelan firm actually does in other proceedings attempt to use these "*in rem*" judgments as a means of establishing the amount of homeowners' "personal liability."

**Plaintiffs Charles J. and Diane Giles**

**The Phelan Firm's Foreclosure Action on Behalf of "Wachovia"**

151.    Plaintiff Charles (a.k.a. "Charlie") J. Giles ("Charlie Giles") was an emergency medical technician who became medically disabled after trying to help others escape the fire and smoke of the World Trade Center on September 11, 2001 and during subsequent search efforts at Ground Zero. Dust and debris invaded Charlie Giles' lungs, which caused numerous hospitalizations, difficult medical procedures and constant pharmaceutical treatments. As the cost of his heroism, Charlie Giles lost his ability to earn a living. Charlie

---

[60] *See* Fannie Mae, Loan Servicing Solutions, *Form 571 Reference Guide*, March 2001, at 26, https://www.efanniemae.com/sf/servicing/pdf/571processguide.pdf

Giles' life-threatening health conditions continue to diminish the quality of his life every day.

152.   After September 11th, Charlie Giles moved to a home at the New Jersey shore in Barnegat Township, where he lived with his wife, Diane, and two daughters, Kaitlin and Clarissa. When Charlie Giles' physical problems worsened, he was unable to work. His medical bills skyrocketed past $200,000 as bureaucratic delays held up "first-responder" benefit payments from the New York State government.

153.   When Charlie and Diane Giles fell behind on their mortgage payments, the Phelan firm filed a foreclosure Complaint against them on February 16, 2007 in the Superior Court, Chancery Division for Ocean County, New Jersey ("Ocean County Court"), Docket No. F-4671-07. *As with Plaintiff Bender, the Phelan firm brought its foreclosure action against Charlie and Diane Giles in the name of "Wachovia Bank, N.A., Trustee" for the Park Place Trust. As with Plaintiff Bender, the servicer on the Giles' mortgage was WFB, operating in this instance under its "America's Servicing Company" trade name.*

154.   According to paragraph 4 of the foreclosure Complaint filed by the Phelan firm against Charlie and Diane Giles, which was purportedly signed by Defendant Rosemarie Diamond, the "holder of the obligation and Mortgage was *Wachovia Bank, N.A., Trustee" for the Park Place Trust*, pursuant to a "written assignment" from Argent to Wachovia that was "about to be recorded."

155.   Paragraph 6 of the foreclosure Complaint against Charlie and Diane Giles also alleged that, other than the mortgage originated by Argent, the prospective assignments and legal documents evidencing the Giles' marriage, "no other instruments appear of record which may affect the premises" in which the Giles lived.

156.    The following is Diamond's signature as it appears in the Complaint against Charlie and Diane Giles:

PHELAN, HALLINAN, & SCHMIEG, P.C.

Rosemarie Diamond, Esquire
Attorneys for Plaintiff

157.    In connection with the filing of this Complaint, Diamond also signed and filed with the Ocean County Court two Certifications: (a) one pursuant to Rule 4:5-1, attesting that "all parties who should be joined in this action have been joined" and (b) the other pursuant to Rule 4-5-1(b)(2), attesting that "prior to filing the within Complaint, [Diamond] caused a title search of the public record to be made for the purpose of identifying any lien holders  or other persons or entities with an interest in the property that is the subject of this foreclosure."

158.    Except perhaps for the one identified in ¶157(b) above, the above-referenced representations purportedly made by Diamond in the foreclosure Complaint and Certifications against Charlie and Diane Giles were false. Even if there was some literal truth mixed in with the falsity, Diamond's representation that she ordered a "title search of the public record" was materially misleading because any cut-rate title search obtained by the Phelan firm from LTS its foreclosure action against Charlie and Diane Giles was incomplete and inaccurate.

159.    When the Complaint was filed and at all times since, the Phelan firm and Diamond had no authority to act on behalf of Wachovia in connection with Charlie and Diane Giles' mortgage. However, the Phelan firm, at the command of WFB and through

fraudulent means, prosecuted a mortgage foreclosure action against the Giles through default judgment, writ of execution, the scheduling of a Sheriff's Sale, and a below-market distress sale of the Giles' home.

160.    On April 18, 2007, after the Phelan firm filed its foreclosure Complaint against Charlie and Diane Giles, employees or agents of Larry Phelan, Frank Hallinan and Dan Schmieg recorded two purported assignments of the Giles' mortgage with the County Clerk of Ocean County, New Jersey ("Ocean County Clerk").

161.    The first "assignment," which was purportedly notarized on September 28, 2004, attempted to convey ownership of the Giles' mortgage from Argent (the loan originator) to Ameriquest (the depositor of a pool of mortgages placed into the Park Place Trust). The purpose of this assignment was to ensure that Ameriquest had legal ownership of the Giles' mortgage so that it could be included in the pool of mortgages that a securities affiliate of Ameriquest packaged into RMBS certificates sold to investors.

162.    The second "assignment," also purportedly notarized on September 28, 2004 and recorded simultaneously with the first, purportedly re-conveyed ownership of the Giles' mortgage from Ameriquest to Wachovia, "as Trustee" of the Park Place Trust. The objective of this assignment was to re-transfer ownership of the Giles' mortgage to a party that had ostensible legal standing to bring a mortgage foreclosure action against Charlie and Diane Giles.

163.    Whether or not the first "assignment" effectively transfered legal ownership of the Giles' mortgage to Ameriquest, *Wachovia was not Trustee of the Park Place Trust on February 16, 2007, when the Phelan firm filed its foreclosure Complaint against Charlie and Diane Giles on behalf of Wachovia, or on April 18, 2007, when the Phelan firm's employees or*

*agents recorded the "assignments," or at any time since.* In simple terms, Wachovia had no legal authority to act on behalf of the Park Place Trust. Neither WFB nor the Phelan firm had any legal authority to act on behalf of Wachovia.

164.    This is because, on December 30, 2005, Wachovia sold its entire corporate trust and institutional custody portfolio to a different financial institution. After that sale, Wachovia had no ownership interest in Charlie and Diane Giles' mortgage, if it ever did, and it had no legal standing to sue the Giles in the foreclosure action that WFB directed the Phelan firm to bring.

165.    Charlie and Diane Giles did not contest the foreclosure Complaint. On April 5, 2008, the Phelan firm filed with the Ocean County Clerk: (a) a request for a default judgment against the Giles and (b) a certification of default. Both documents were purportedly signed by Diamond. As shown below, the signature attributed to Diamond on this document does not bear the slightest resemblance to handwriting attributed to Diamond on the foreclosure Complaint and Certifications:

PHELAN HALLINAN & SCHMIEG, PC

By: _Rosemarie Diamond_
Rosemarie Diamond

166.    On June 5, 2007, the Ocean County Court entered a final judgment against Charlie and Diane Giles, authorizing a Sheriff's Sale of their home and determining that "Wachovia" was entitled to recover from the Giles an amount of $204,391.70, plus costs of the foreclosure suit, and legal fees in an amount of $2,193.92.

167.    Charlie and Diane Giles put their house up for sale and attempted to negotiate a resolution of their debt with representatives of WFB and the Phelan firm, including Diamond.

168.    The Giles hired an attorney, Jerry J. Dasti, Esquire ("Dasti"), to protect their legal interests. By letter dated July 12, 2007, Dasti wrote to the Phelan firm: (a) advising it of his representation of Charlie and Diane Giles and (b) requesting that all future communications concerning his clients be forwarded to his office.

169.    The Phelan firm obtained a writ of execution on the judgment procured on behalf of "Wachovia." By certified letter dated July 27, 2007 from a Phelan firm paralegal, Charlie and Diane Giles, still believing that productive workout discussions were under way with Diamond and others, were stunned to learn for the first time that a Sheriff's Sale of their home had been scheduled for "August 21, 2207 [sic]." The Phelan firm did not send a copy of this communication to Dasti.

170.    The Sheriff's Sale scheduled for August 21, 2007 was adjourned by the Ocean County Sheriff.

171.    On September 12, 2007, Charlie Giles filed with the Ocean County Court an Emergent Application for a Stay of the Sheriff's sale, which had been subsequently adjourned to September 18, 2007. In his application, Charlie Giles explained his dire health conditions to the Court, as well as the reasons why he suffered from them. He also told the Court about his rising medical expenses, and the three-time reduction that he and Diane made to the asking price of the home they had put up for sale. Charlie Giles informed the Court that, according to a township-wide assessment, the fair market value of his home was $287,700.

172.   After the Ocean County Court postponed the Sheriffs' Sale until October 30, 2007, friends and supporters of Charles and Diane Giles asked Wachovia's corporate headquarters for help. It was only because of this appeal that Wachovia found out that the Phelan firm was acting without authorization on its behalf, a finding that Wachovia shared with Dasti.

173.   On October 23, 2007, Mark A. Farmer ("Farmer"), senior vice president and assistant general counsel of Wachovia, sent an e-mail to Dasti, thanking him for giving Wachovia "the name of the Plaintiffs firm" in the Giles foreclosure action (*i.e.*, the Phelan firm) and advising Dasti that Farmer had "contacted the attorney handling the matter and informed him that Wachovia has not been the Trustee of the subject Pooling and Servicing Agreement since 12/30/05."

174.   On October 24, 2007, Farmer sent a letter by U.S. mail and e-mail to Vladimir Palma, an associate attorney working under Diamond's direction. Farmer wrote:

> Dear Mr. Palma:
>
> This letter is to confirm your voice message to me this morning and our subsequent conversation wherein you advised that you were able to reach your client [*i.e.*, servicer WFB] and verify that Wachovia Bank, N.A. is not the proper Plaintiff as named in the referenced foreclosure action. Accordingly, your client has voluntarily agreed to postpone the sale date to November 19, 2007. During the interim, it is my understanding that you are awaiting the name of the proper Plaintiff from your client. Thereafter, you will file a motion to correct the name of the Plaintiff and ensure that the County records properly reflect the name of the true holder of the mortgage.
>
> As you are aware since Wachovia Bank, N.A. is not the Trustee and not the holder of the subject mortgage we are unable to address Mr. Charles Giles' situation. Thank you for your prompt attention to this matter and your efforts to correct the public record. I look forward to receipt of an Order deleting the name Wachovia Bank, N.A. from the foreclosure action and recorded evidence correcting the public records.

Sincerely,

*/s/ Mark A. Farmer*

Mark A. Farmer
Senior Vice President & Assistant General Counsel
Wachovia Corporation for its subsidiary Wachovia Bank, N.A.

A copy of Farmer's letter is attached here at Exhibit C.

175.   While the outpouring of support for Charlie and Diane Giles resonated at the highest levels of Wachovia's corporate management, a fundraiser was held at the community volunteer fire company in Barnegat on October 27, 2007. The fundraiser was attended by the township's mayor, council members, nearly 100 firefighters and police officers, the Police Benevolent Association and other concerned neighbors, including a group of middle-school students. They collected about $5,000. Given the overriding speed and cost-slashing automation that controls their actions, this was not nearly enough to convince the Phelan firm and WFB to allow Charles and Diane Giles more time to sell or save their home.

176.   On November 15, 2007, presumably in response to high-level objections raised by Farmer, the Phelan firm filed a motion with the Ocean County Court seeking an Order "[r]escinding the assignment [to Wachovia] and amending all pleadings to correct the Plaintiff to U.S. Bank as Trustee." While U.S. Bank did purchase Wachovia's corporate trust and institutional custody portfolio on December 30, 2005, the Phelan firm has at no time presented any evidence demonstrating that:

- legal ownership of the assets of the Park Place Trust was actually transferred to, and continuously resided in, U.S. Bank; and

▪ Charlie and Diane Giles' mortgage was actually transferred to, and at all times remained part of, the pool of securitized mortgages owned by the Park Place Trust.

177. Rather than prove a chain of title to the Giles' mortgage leading to U.S. Bank, the Phelan firm shifted the blame to WFB, whose "records, through mistake and inadvertence, named the holder of the note and mortgage as Wachovia Bank, N.A. as Trustee." According to a brief filed by the Phelan firm in support of its November 15, 2007 motion, this "servicer error" had "no effect on the validity of the subject mortgage" because "neither U.S. Bank nor Defendants are in no way prejudiced [sic]" insofar as Mr. and Ms. Giles "have always communicated with the servicer, America's Servicing Company [*i.e.*, WFB]."

178. However, under New Jersey law, a party seeking to foreclose a mortgage must own or control the underlying debt. *Bank of New York v. Raftogianis,* 2010 N.J. Super. LEXIS 221, at *3 (Ch. Div. 2010). Without a showing of such ownership or control, a purported mortgagee lacks standing to proceed with a foreclosure action, and a complaint must be dismissed. *Id.,* at *33. To establish standing to maintain a foreclosure action, a plaintiff must have had ownership or control of the underlying debt as of the date of the filing of the complaint. *Id.*, at *34. Under Rule 4:64-1(b)(10), when a foreclosure plaintiff is not the original mortgagee or the original nominee mortgagee, a complaint must recite "all assignments in the chain of title." *Id.*, at *45.[61] None of this information was provided by the Phelan firm or WFB in their foreclosure action against the Giles.

---

[61] Pennsylvania foreclosure law is similar. As the Court summarized in *In Re Michelin Alcide*, 2011 Bankr. LEXIS 1989, at *22-23 (Bankr. E.D.Pa. May 27, 2011), "a mortgage foreclosure action may be maintained by

179.    To stave off what they believed to be an inevitable loss of their home, and depleted of any remaining financial or emotional resources with which to oppose the unrelenting action of the Phelan firm and WFB, Charlie and Diane Giles accepted a "low ball" offer to buy their property in early December 2007.

180.    By an impersonal "Dear Mortgagor" letter dated and faxed on December 10, 2007, the Phelan firm responded to Dasti's request for a "payoff amount" on his clients' mortgage. In that letter, the Phelan firm represented that Charlie and Diane Giles owed $223,704 on their mortgage, including $7,817 in "Legal Fees and Costs through December 10, 2007" and "Property Inspections/BPO" fees in an amount of $340.

181.    Aware that his clients needed to keep every dollar owed to them, Dasti objected to the fraudulently manufactured junk fees sought by the Phelan firm and WFB.

182.    On January 15, 2008, Charlie and Diane Giles finally did lose their home. They sold it to eager buyers at a below-market price of $238,000 -- $49,000 less than its assessed value. Although Dasti's objections caused the removal by WFB of most of the bogus "Legal Fees and Costs" and "Property Inspections/BPO" fees claimed by the Phelan firm on December 10, 2007, the damage done to Charlie and Diane Giles was shattering. They found little consolation in their receipt of a check in the amount of $2,568.39.

183.    On January 18, 2008, the Ocean County Court cleaned up the legal debris left over from the foreclosure action brought by the Phelan firm and WFB. The Court entered an Order that, among other things, (a) granted the Phelan firm's November 15, 2007

---

the original holder of the mortgage or a subsequent assignee. ... In a foreclosure complaint, the plaintiff must allege its status as the holder of the mortgage and, if the plaintiff is an assignee, it must allege that it is the holder by assignment. See *Wells Fargo Bank, N.A. v. Lupori*, 2010 PA Super 205, 8 A.3d 919, 921-22 (Pa. Super. Ct. 2010). However, it is not necessary that the assignment be recorded prior to filing the complaint. *U.S. Bank, N.A. v. Mallory,* 2009 PA Super 182, 982 A.2d 986, 993 (Pa. Super. Ct. 2009).

motion to "rescind incorrect assignment and to amend all pleadings" and (b) preserved the Giles' rights "as to all affirmative claims" resulting from the Phelan firm's botched foreclosure action. The Phelan firm "voluntarily" dismissed its case. The harm done to Charlie and Diane Giles did not away.[62]

184.    Although the Ocean County Court granted the Phelan firm's request to "correct the public record" by rescinding the "incorrect" assignment to Wachovia, and to substitute in its place a purported assignment to U.S. Bank, the public record never was corrected by the Phelan firm. This despite assurances that the Phelan firm had given to Farmer, Wachovia's Vice President and Senior Counsel, that it would do so promptly.

185.    A purported assignment of the Giles mortgage from Ameriquest to U.S. Bank was created by the Phelan firm or WFB, but it was never filed with the Ocean County Clerk. This purported assignment was signed by alleged "officers" of Ameriquest and was notarized on October 26, 2007. However, Ameriquest was no longer in business on October 26, 2007. On that date, there were no officers who could act in any legal capacity on Ameriquest's behalf.

186.    On March 12, 2008, the Phelan firm filed one last document with the Ocean County Clerk, a discharge of a lis pendens placed on Charlie and Diane Giles' former property. Although the Phelan firm's November 15, 2007 motion argued to the Ocean County Court that it was necessary to "amen[d] all pleadings to correctly identify the foreclosing Plaintiff as U.S. Bank as Trustee," three months later Phelan firm continued to

---

[62]  See WCAU television interview with Mr. and Ms. Giles, available at http://angelusbell888.bravejournal.com/

identify Wachovia as plaintiff in the caption of the Discharge of Lis Pendens filed with the Ocean County Clerk.[63]

187.    The Discharge of Lis Pendens filed by the Phelan firm misrepresents to the public that "the matters and things in dispute have been amicably resolved by the parties." However, Mr. and Mrs. Giles never had any "dispute" with Wachovia, nor did Wachovia have any dispute with them.

188.    Diamond purportedly signed the Discharge of Lis Pendens. Her "signature" on the legal document appears below:[64]



189.    *Despite the Phelan firm's conclusive knowledge that Wachovia had no legal ownership interest in the pool of securitized mortgages held by the Park Place Trust, the Phelan firm continued to prosecute its similar Pennsylvania mortgage foreclosure action against Plaintiff Bender on behalf of "Wachovia."*

190.    On May 2, 2008, representing falsely that it was counsel for Wachovia, the Phelan firm mailed its "Motion to Reassess Damages" to the Berks County Court in its foreclosure action against Bender, a motion that sought payment of thousands of dollars in overloaded junk fees to the Phelan firm and WFB. *See* above at ¶134.

---

[63] When it is in its own economic interest, the Phelan firm can be fastidious in ensuring that parties to its foreclosure actions are properly identified. *See* above at ¶87 (Hallinan filed a motion to correct a foreclosure caption to reflect the correct *spelling* of Plaintiff Wolferd's name).

[64]  Compare this signature with the radically different handwriting shown at ¶¶156, 165, above.

191.    *Despite what it admitted to the Ocean County Court in its foreclosure action against Charles and Diane Giles, the Phelan firm continues to insist (in this Court and in the Third Circuit) that it had <u>bona fide</u> legal authority to bring and prosecute a foreclosure action against Bender in the name of Wachovia, as Trustee of the Park Place Trust.*[65]

192.    Despite the mortgage foreclosure scandal that unraveled nationally in September 2010 and intensified dramatically in New Jersey on December 20, 2010,[66] the Phelan firm *continues* to prosecute foreclosure actions in the name of "parties" without legal standing to bring them. *See*, *e.g.*, *U.S. Bank v. Spencer*, 2011 N.J. Super. Unpub. LEXIS 746, at \*33-\*34 (N.J. Super. Ch. Div. Bergen Co. March 22, 2011) (the Phelan firm, purportedly on behalf of U.S. Bank, "provided no documentation or support for its position [that U.S. Bank] is the trustee for [a RMBS trust], and therefore has not established its right to sue on behalf of [the Trust]").[67]

### C.    Other Homeowners Have Been Harmed By the Same Pattern of Fraudulent Misconduct by the Phelan Firm, WFB and BofA

193.    In isolation, some of the fraudulently manufactured junk fees identified above may not seem substantial to fortunate Americans. However, these overcharges are life-sustaining sums of money to families struggling to stay in their home. For established

---

[65] *See*, *e.g.*, Brief of Appellees filed on January 10, 2011 in *Rhodes v. Diamond*, Case No, 10-3431 (3d Cir.), Doc. No. 003110404142, at 8-10, 42. At page 10 of its brief, the Phelan firm made the following representation to the Third Circuit, the truth of which this Court can evaluate for itself: "Having reviewed the submissions [in connection with the Homeowners' motion to amend the complaint filed on January 15, 2010], including the transactional documents involving U.S. Bank, giving U.S. Bank the right to foreclose in the name of Wachovia ... [this Court] found that the proposed Amended Complaint was futile...." The Phelan firm's Third Circuit brief is available at http://www.scribd.com/doc/59953012/PHS-Bart-Brief.
[66] *See* below at ¶¶ 250-268.
[67] Earlier in this litigation, the Phelan firm asked the Court to adopt the principle that ownership status of RMBS trustees is irrelevant for purposes of standing because "the real party in interest is the trust, not the trustee." *See* Defendants' Supplemental Memorandum of Law in Response to This Court's Order of June 15, 2010 (Doc. No. 14), filed on July 2, 2010, at 6. Under the law of both New Jersey and Pennsylvania (*see* above at ¶178 and n.61), the argument urged upon this Court by Phelan firm is indefensible.

institutions like the Phelan firm, WFB and BofA, each overcharge, multiplied by millions of homeowners, represents billions of dollars in bottom-line profit.

**The Phelan Firm**

194.    The Phelan firm is, as it justifiably says, the "premier default services operation" in Pennsylvania and New Jersey. Like the Law Office of David J. Stern in Florida, it gained prominence and wealth by running its automated foreclosure steamroller over the backs of everyday people like Charlie and Diane Giles, Edward Wolferd, Dennis Rhodes and Gerald Bender.

195.    There is no shortage of other victims. One is Victor Ukpe, a self-employed taxi driver from Nigeria, who in 2005 was trying to support five children under 10-years-old.

196.    At the height of the artificially inflated housing bubble pumped up by predatory subprime lenders like Countrywide, Victor Ukpe had a passenger who worked as a mortgage broker. The broker driven by Victor Ukpe was so convincing that Mr. Ukpe and his homemaker wife, Enoabasi, were led to believe they could afford to buy a house big enough to accommodate their sprawling family. Victor and Enoabasi Ukpe applied for a $224,000 mortgage, even though their combined household adjusted gross income was just $12,198, an amount less than half the federal poverty guideline of $25,210 for a family of six. Despite the Ukpe's noticeable inability to make their mortgage payments, Countrywide lent them the money to buy the house. Predictably, they defaulted on the loan.

197.    On March 13, 2008, the Phelan firm and Diamond, purportedly on behalf of Bank of New York as Trustee for the Certificate Holders of CWABS, Inc., Asset-Backed

Certificates Series 2005-AB-3 ("CWABS Trust II"),[68] filed a foreclosure complaint against the Ukpes in the Superior Court, Chancery Division, for Atlantic County, New Jersey, Docket No. F-10209-08. The foreclosure action was assigned to the Hon. William C. Todd III ("Judge Todd").

198.     Represented by South Jersey Legal Services and its co-counsel, Victor and Enoabasi Ukpe filed an answer, affirmative defenses, counterclaims and a third-party complaint against the Phelan firm and other parties purporting to have an interest in the Ukpes' mortgage.

199.     Lawyers for Victor and Enoabasi Ukpe alleged that there was insufficient evidence of Bank of New York's standing to bring the foreclosure action filed by the Phelan firm.  Specifically, the lawyers alleged that the Phelan firm's foreclosure complaint was based on a fraudulent assignment of a mortgage from MERS to Plaintiff Bank of New York, as Trustee of the CWABS Trust II.

200.     In January 2009, Judge Todd considered these arguments and denied the Phelan firm's motions.

201.     Among the evidence presented to Judge Todd were facts demonstrating that:

> Francis Hallinan, a partner at the Phelan firm, executed [an] assignment in his capacity as a MERS officer.... The three Phelan firm named partners, including Hallinan, own Full Spectrum Holdings, which is comprised of Full Spectrum Legal Services, Inc. (FSLS) and Land Title Services. ***The in-house notary for FSLS, Thomas Strain, testified during deposition that over the previous three years, he falsely acknowledged tens of thousands of mortgage assignments for the Phelan firm, including the assignment in this case.***[69]

---

[68]  These allegations are virtually identical to those in the Phelan firm's foreclosure Complaint against Plaintiff Rhodes. *See* above at ¶¶ 104-110 and n.45.

[69]  *Bank of New York v. Ukpe*, 2009 U.S. Dist. LEXIS 115557, at *8-*9 (D.N.J. Dec. 9, 2009).

202.   On January 16, 2009, Judge Todd called a hearing to "get to the bottom of what it viewed as a possible systemic problem involving the alleged false notarization of assignments in which [Frank Hallinan] played a central role in the process."[70] Judge Todd "raised the issue of an appropriate remedy and recognized that the situation could impact a host of foreclosure cases. Ultimately, the Court expressed a goal to get to the bottom of the matter and to make sure 'everybody gets it right.'"[71]

203.   By Order dated January 21, 2009, Judge Todd required the Phelan firm to produce Frank Hallinan and his notary Thomas Strain at the hearing,[72] which was scheduled for April 20, 2009. Judge Todd also ordered the Phelan firm to produce the "original" copy of Full Spectrum's "notarization logs."

204.   The hearing called by Judge Todd did not take place. On April 9, 2009, Defendants improperly removed the Ukpe case to federal court in Camden, where it was assigned to Judge Joseph H. Rodriguez. By Order dated December 9, 2009, Judge Rodriguez remanded the case to Judge Todd's state court in Atlantic City.

205.   Soon after he was seemingly ousted from jurisdiction in the Ukpe matter by defendants' April 9th removal to federal court, Judge Todd warned Chancery Court judges throughout New Jersey about falsified mortgage assignments "associated" with the Phelan firm.[73]

---

[70] Letter dated April 11, 2009 to the Hon. William C. Todd, III, P.J.Ch., from Abigail B. Sullivan, counsel for the Ukpes. (Emphasis supplied) *See* http://www.scribd.com/doc/61754294/4-11-09-Letter-SJLS-to-Judge-Todd
[71] *Id.*
[72] Judge Todd's January 21, Order at ¶ 9, http://www.scribd.com/doc/61754869/Judge-Todd-Order-1-21-09
[73] *See* Letter dated May 8, 2009 from the Hon. William C. Todd III to Abigail B. Sullivan of South Jersey Legal Services, Inc. and Dashika R. Wellington of Wilentz, Goldman & Spitzer, enclosing *ex parte* letter dated April 29, 2009 from Larry Phelan to the Hon. William C. Todd III, http://www.scribd.com/doc/61755132/Phelan-Ex-Parte-Letter-to-Judge-Todd

206.    When Larry Phelan learned about what Judge Todd had done, he sent an *ex parte* letter to the Court dated April 29, 2009,[74] representing that the Phelan firm had, at its own expense, re-executed and re-recorded 2,921 mortgage assignments notarized by Thomas Strain at the behest of Frank Hallinan. Larry Phelan's April 29th letter also asked Judge Todd to circulate among other Chancery Court judges notice of the "corrective actions" purportedly taken by the Phelan firm.

207.    Forewarned by Judge Todd, the presiding judge of the Chancery Court in Hudson County, New Jersey, the Hon. Thomas P. Olivieri ("Judge Olivieri"), scheduled a hearing on May 27, 2009 to address his own "concern" regarding another mortgage assignment "executed" by Frank Hallinan and notarized by Thomas Strain. Judge Olivieri directed Hallinan to appear at the hearing.[75]

208.    At that hearing, Frank Hallinan and his co-counsel[76] told Judge Olivieri that the Phelan firm had recorded a new "corrective assignment" in the matter pending before him.[77] Of the Phelan firm's re-execution and re-recording of 2,921 mortgage assignments "signed" by Hallinan and "notarized" by Strain, Phelan firm counsel explained to the Court,

*"[W]e couldn't tell you on any given assignment which was or which wasn't [improper]. It was almost like asking the short order cook do you recall flipping which hamburger on which day."*[78]

---

[74] *Id.*
[75] See Transcript of May 27, 2009 Hearing, *U.S. Bank, N.A. v. Sinchegarcia*, No. F-18446-08 (Super. Ct., Ch. Div., Hudson Co.) ("5.27.09 Hearing Tr.") at 6 (lines 6-11) and 8 (lines 9-16), http://www.lsnj.org/keyRecentDevelopments/Foreclosure/materials/EXHIBITNHearing.PDF.
[76] Both Hallinan and his co-counsel, Daniel S. Bernheim 3d (defense attorney for the Phelan firm in this litigation), appeared before Judge Olivieri in their ostensible capacity as lawyers representing "U.S. Bank National Association, as trustee." 5.27.09 Hearing Tr. at 3, lines 3-12.
[77] *Id.*, at 5, lines 4-11.
[78] *Id.*, at 14, lines 10-19.

209.    Although Judge Olivieri said he was no longer "as concerned" about the propriety of the assignment in the case before him given its re-execution by another Phelan firm lawyer and its re-notarization by another Full Spectrum employee,[79] he cautioned counsel that the Phelan firm's professional responsibilities in prosecuting foreclosure actions are not comparable to a short order cook working for minimum wage at Jack-In-The-Box:

> I feel very strongly that regarding the foreclosure process, sometimes there are actions taken simply to move the matter along more quickly, … whereby instead of doing it properly the first first time, for the purpose of expediency it wasn't done properly. … [S]ometimes for the purpose of expediency and moving the matter along[,] certain formalities are overlooked or shunned or disregarded, and they may be simple formalities, they are important formalities.

> I think it is important that when a notary indicates that he or she saw the person, or the person was in his or her presence and signed the assignment, that that be accurate and not be something that is inaccurate….

> [G]oing forward I hope and trust that when other formalities – that when the [foreclosure] bar or the [foreclosing mortgagees] are faced with other formalities in the execution of documents regarding assignments, that these formalities are not overlooked….

> Honestly, the judges have spent a lot of time on this issue and it is unnecessary and the only reason why we are spending all this time is because a formality was overlooked or disregarded.

> For me, the formality is important because I think when we overlook or shun or disregard formalities such as these notarizations, and if the Bench countenances overlooking those types of formalities, it is a slippery slope that we start to climb, overlooking perhaps other more substantive formalities, and this is too important of a process, meaning the foreclosure process, to overlook those types of formalities….

> I am inferring that it won't happen again. And when I say again, I'm talking about inappropriate notarizations and other like formalities….

---

[79] *Id.*, at 8, lines 18-25.

It is too important. And it really sends, it sends an inappropriate message to the public that the Bar and the Bench would overlook those types of formalities.

5.27.09 Hearing Tr. at 10, line 6 – 13, line 3.

210.    On January 16, 2009, Judge Todd, aware of a "systemic problem involving the alleged false notarization of assignments in which [Frank Hallinan] played a central role in the process," first raised the issue of "an appropriate remedy and recognized that the situation could impact a host of foreclosure cases." On May 27, 2009, Judge Olivieri described the serious implications of the problems identified by Judge Todd. On December 20, 2010, the Hon. Stuart Rabner, Chief Justice of the New Jersey Supreme Court, confirmed the prescience of the observations by Judges Todd and Olivieri, and he ordered immediate corrective action. *See* below at ¶¶ 250-268.

211.    As demonstrated above, the Phelan firm has repeatedly disregarded – and continues to disregard – the most fundamental "substantive formalities," including the Constitutional requirement that a party in whose name a mortgage foreclosure action is brought must have legal standing to sue. The Phelan firm has repeatedly attempted to evade – and has evaded – this Constitutional requirement through fraudulent assignments from and to entities that do not own mortgages upon which foreclosure is sought. In some cases, these entities no longer exist, and they have no legal ability to execute any assignment at all. In other cases, legal documents were forged by individuals acting under command of Larry Phelan, Frank Hallinan and Dan Schmieg.

212.    While the validity of foreclosure judgments obtained through deceptive means is not an issue in this litigation, Defendants are liable for the unlawful means they have used to achieve their illegal objective: the multiplication of unearned profits by the

Phelan firm and its servicer clients through the systematic piling on of fraudulently manufactured junk fees and other unincurred expenses disguised as "reimbursable default management service" charges.

**Bank of America/Countrywide**

213.   On January 11, 2008, BAC issued a news release announcing that it had reached "a definitive agreement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4 billion."[80] The news release represented that "[t]he purchase will make Bank of America the nation's largest mortgage lender and loan servicer. This is an important advancement in the company's desire to help customers and clients meet all of their financial needs."

214.   Amid widespread allegations[81] that Countrywide was engaging in an institutionalized practice of piling on inflated or manufactured junk fees charged to financially troubled homeowners, the Senate Judiciary Subcommittee on Administrative Oversight and the Courts ("Subcommittee") convened a public hearing on May 6, 2008 in Washington, D.C.[82]

215.   Among the witnesses at the May 6th hearing was Steve Bailey, Countrywide's Chief Executive of Loan Administration. After swearing under oath to the Subcommittee

---

[80] News Release, *Bank of America Agrees to Purchase Countrywide Financial Corp.*, BANK OF AMERICA CORPORATION, Jan. 11, 2008, http://mediaroom.bankofamerica.com/phoenix.zhtml?c=234503&p=irol-newsArticle&ID=1389986&highlight=

[81] NBC Today show video, May 7, 2008, http://today.msnbc.msn.com/id/21134540/vp/24480566#24480566. *See also* Gretchen Morgenson and Jonathan D. Glaser, *Foreclosure Machine Thrives on Woes*, N.Y.TIMES, Mar. 30, 2008, http://www.nytimes.com/2008/03/30/business/30mills.html?_r=1&sq=morgenson&st=nyt&scp=8&pagewanted=all.

[82] A Real Player® video of the hearing is available on the Committee's web site at http://judiciary.senate.gov/hearings/hearing.cfm?id=e655f9e2809e5476862f735da13a009d.

that his organization's loan processing "mistakes" were "few in number," Bailey further

testified:[83]

> [M]edia reports alleging that mortgage servicers are systematically
> charging excessive fees … or abusing the process more generally are
> inaccurate. Moreover, those claims run completely counter to
> Countrywide's commitment to help borrowers avoid foreclosure
> whenever feasible. …

216.   The Subcommittee's Chairman was skeptical about Bailey's sworn testimony

about the magnitude of Countrywide's "mistakes":

> Countrywide today says problems exist in only a small number –
> maybe 1 percent of their cases…. But court records seem to tell a
> dramatically different story….
>
> [As] defaults rise and revenue streams dry up, I fear a vulture
> mentality is developing in some quarters. And that vulture mentality
> threatens to turn the dream of home ownership into an even worse
> nightmare than it has been for many already.[84]

217.    Apart from court records, just a few months before Bailey's testimony before

the Subcommittee, Countrywide's president, David Sambol, also told investment analysts a

different story. In an October 27, 2007 "earnings" call, Sambol explained that

Countrywide's rising expenses resulting from "increased delinquencies and lost mitigation

efforts … tend to be *fully offset by increases in ancillary income in our servicing operation,*

*greater fee income from items like late charges, and importantly from in-sourced vendor*

*functions that represent part of our diversification strategy, a counter-cyclical diversification*

---

[83]   *See* Testimony of Steve Bailey at 2, http://judiciary.senate.gov/pdf/08-05-06Steve_%20Bailey_Testimony.pdf

[84]   Paul Jackson, *Schumer Blasts "Vulture Mentality" of Servicers*, HOUSING WIRE, May 7, 2008, http://www.housingwire.com/2008/05/07/schumer-blasts-vulture-mentality-of-servicers-suggests-bofa-reconsider-countrywide-deal ("Jackson Report").

*strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services."*[85]

218.     Aware that this "counter-cyclical diversification strategy" was of central importance to Countrywide's financial viability, the Subcommittee Chairman questioned the wisdom of BofA's announced agreement to acquire Countrywide:

> I've always wondered why Bank of America – a fine institution with a good reputation – was willing to purchase Countrywide, given its recent history, and I understand that there has been encouragement by the financial regulators to make this transaction happen.... These latest revelations should make Bank of America think even harder about how they want to proceed with the deal.[86]

219.     Although it was aware of Countrywide's well-known predatory conduct, BofA went ahead and purchased Countrywide anyway. The transaction, valued at $4.2 billion, closed on July 1, 2008.

220.     Steve Bailey, who testified before the Senate Subcommittee on May 6, 2008, continued to pick up a paycheck from BofA as its Senior Managing Director for Loan Administration until he resigned in April 2010 -- just weeks before the revelations identified below at ¶¶ 222-223.

221.     In one of its last acts as an independent public company, Countrywide filed a quarterly report on Form 10-Q with the SEC on August 11, 2008. The Form 10-Q for the period ended June 30, 2008 disclosed that:

> Beginning in March 2008, certain news media reported that numerous industry participants, including the Company, were subject to an investigation by the Federal Bureau of Investigation ("FBI") in connection with mortgage business practices. The Department of Justice ("DOJ") has stated to the Company that the DOJ cannot confirm

---

[85]   *See* Countrywide Financial Q3 2007 Earnings Call Transcript, http://seekingalpha.com/article/51626-countrywide-financial-q3-2007-earnings-call-transcript?page=4

[86]   Jackson Report.

or deny whether the FBI is conducting an investigation of the Company.

The Federal Trade Commission has issued Civil Investigative Demands for Documentary Material and for Written Interrogatories and Report ("CIDs"). The CIDs direct the Company to provide various documents and items of information in connection with an investigation by the agency regarding whether any laws administered by the Commission have been violated in connection with certain aspects of the Company's loan servicing activities. The Company is cooperating with the investigation.[87]

222.   Almost two years later, on June 7, 2010, the results of the federal government's investigation into Countrywide's mortgage servicing practices were revealed to the public. At that time, the FTC issued a news release and held a press conference describing a Complaint and Consent Judgment that the Commission had filed against Countrywide Home Loans, Inc. and BAC Home Loans Servicing LP.[88] Under the terms of the Consent Judgment, Countrywide Home Loans, Inc. and BAC Home Loans Servicing LP agreed to:

- Pay $108 million to approximately 350,000 homeowners gouged by Countrywide's excessive foreclosure-related fees, and

- Reform their abusive business practices and accounting procedures.

223.   In his June 7, 2010 news conference,[89] FTC Chairman Jon Leibowitz denounced Countrywide's institutionalized behavior as "callous conduct [that] took advantage of consumers already at the end of their financial rope." In direct contradiction to the false sworn testimony given by Steve Bailey to the Subcommittee on May 6, 2008,

---

[87] Countrywide Form 10-Q dated August 11, 2008, at 52-53, http://sec.gov/Archives/edgar/data/25191/000104746908009150/a2187147z10-q.htm#toc_du46901_4

[88]   *See* Complaint for Permanent Injunction and Other Equitable Relief, *Federal Trade Commission v. Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP* , Civil Action No. Case 2:10-cv-04193-JFW-SS (C.D. Cal. June 7, 2010) ("FTC Action"), Consent Judgment and Order, and FTC News Release dated June 7, 2010) (all available for download at http://www.ftc.gov/os/caselist/0823205/index.shtm).

[89]   A transcript of the news conference can be found at http://htc-01.media.globix.net/COMP008760MOD1/ftc_web/transcripts/060710_press.pdf

Chairman Leibowitz explained:

> Countrywide took advantage of homeowners in ... utterly unprincipled ways. First, when homeowners fell behind in their payments, Countrywide overcharged them for default-related services, like property inspections, dramatically marking up the actual cost of those services. It did this by creating affiliated companies, companies that it controlled, which in turn hired third-party vendors[90] to perform the services, and the affiliates added a big markup, 100%, 200%, 400%, sometimes even more to what the services cost. Countrywide, of course, passed on those marked-up fees to borrowers. ... All of this was part of what Countrywide called its "counter-cyclical diversification strategy," which really is just a euphemism for a business model based on deceit, designed to ensure a steady stream of fees over the entire lifetime of a loan and illegally extract the last dollar out of the pockets of the most desperate consumers. Countrywide's mortgage contracts prohibited these inflated charges, but that didn't stop Countrywide from passing on [unlawful] markups. ...

224.    While the effectiveness and sufficiency of the FTC/Countrywide settlement was questioned when it was first announced,[91] in July 2011, some homeowners did begin to receive checks from the $108 settlement account funded by BofA.[92] However, the amount of money received out of this fund by Class members in this litigation, if any, does not compensate them adequately for their actual losses or for the statutory violations that caused them.

---

[90]  One of the affiliated companies controlled by Countrywide (now BAC Servicing) is LandSafe Title Company. One of the "third party vendors" that worked with Countrywide's affiliate in inflating fees charged for LandSafe Title's "services" was LTS, which is wholly owned and controlled by Larry Phelan, Frank Hallinan and Dan Schmieg. As Frank Hallinan testified, "Full Spectrum does ... courthouse abstracting on behalf of LandSafe Title....." *See* Transcript of Deposition Testimony of Frank Hallinan taken on March 17, 2009, in the matter titled *Bank of New York v. Ukpe*, Docket No. F-10209-08 (NJ Super. Ch. Div., Atlantic County) at 27, line 6  through 29, line 6. *See* http://www.scribd.com/doc/61756422/hallinan-dep-2

[91] *See, e.g.*, Michelle Singletary, *FTC Wins Countrywide Settlement, But Celebrates a Little Early*, WASH. POST, June 10, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/06/09/AR2010060905931.html;
Alain Sherter, *Countrywide's Foreclosure Scam: It's Not the Only Lender Ripping Off Homeowners*, BNET, June 8, 2010, http://www.bnet.com/blog/financial-business/countrywide-8217s-foreclosure-scam-it-8217s-not-the-only-lender-ripping-off-homeowners/6033; Edward Wyatt, *Countrywide Settles Fee Complaint*, N.Y. TIMES, June 7, 2010, http://www.nytimes.com/2010/06/08/business/08ftc.html?ref=business; Gretchen Morgenson, *Finally, Borrowers Score Points*, N.Y. TIMES, July 20, 2010, http://www.nytimes.com/2010/06/13/business/13gret.html

[92]  *See* Gretchen Morgenson, *Countrywide to Distribute Settlement to Its Clients*, N.Y. TIMES, July 20, 2011, http://www.nytimes.com/2011/07/21/business/countrywide-to-pay-borrowers-108-million-in-settlement.html

**Wells Fargo Bank, N.A.**

225.    Independent of its unlawful activities relating to the Representative Homeowners in this litigation, WFB has otherwise engaged in a longstanding pattern of institutionalized mortgage servicing abuse.

226.    For example, on April 28, 2008, the Hon. Elizabeth W. Manger ("Judge Manger") sanctioned WFB for the same kind of unlawful fee-gouging alleged here.[93] Among other things, Judge Manger found that WFB engaged in the practice of charging inflated BPO fees to distressed homeowners that were "disguised as a third party vendor cost" "illegally imposed by Wells Fargo." *See* above at ¶146.

227.    Judge Manger also found that WFB engaged in an unlawful practice (implemented through its robotic use of the Fidelity MPS computer platform) of charging fees to distressed homeowners for unnecessary property inspections -- even when homeowners' properties were occupied and not in any state of disrepair. These "inspections" were never read or reviewed by any WFB employee, demonstrating that the charges purportedly incurred were fraudulently manufactured junk fees, unrelated to any legitimate interest of WFB in preserving its secured interest in borrowers' properties.[94]

228.    Through multiple evidentiary hearings, Judge Manger acquired a deep knowledge and understanding of WFB's mortgage serving and accounting practices.  The conclusions drawn by Judge Manger are thus highly relevant to the continuing unlawful course of conduct alleged in this lawsuit. Among other things, Judge Manger found that:

---

[93] *In re Stewart*, 391 B.R. 327, 345 (Bankr. E.D. La. 2008), *vacated in part on other grounds*, 2011 U.S. App. LEXIS 15029, at *11 (5th Cir. July 22, 2011) ("While justification for the bankruptcy court's frustration is plentiful, its injunction lacks jurisdictional legs").

[94] *Id.*, at 343-334.

a) WFB's improper actions were "willful and egregious"[95]

b) WFB's "own representatives have admitted that [WFB] routinely misapplied payments on loans and improperly charged fees"[96]

c) "Wells Fargo has demonstrated a pattern of overcharging borrowers and misapplying payments"[97]

d) "At the heart of the problem is Wells Fargo's failure to disclose to its borrowers/debtors ... the nature or amount of fees and charges assessed"[98]

e) "Wells Fargo's practices are systematic...."[99]

f) WFB's persistent misconduct "reveals an arrogant defiance of federal law."[100]

229.    Other Courts have drawn similar conclusions about the institutionalized nature of WFB's mortgage servicing abuse in relation to foreclosure fee overcharges. *See*, for example:

a) *In re Moffitt*, 390 B.R. 368, 388 (Bankr. E.D. Ark. 2008) (WFB's "servicing procedures are not organized to ensure accuracy and accountability")

b) *In re Haque*, 395 B.R. 799, 803, 804, 805 (Bankr. S.D. Fla. 2008) (WFB's "wayward accounting" was "not unique to this case" and resulted in a "systematic process of turning out unexamined and form pleadings" -- an "abuse of process" that required sanctions to deter the "continued recklessness" of WFB and its foreclosure lawyers)

c) *In re Collins*, 2009 WL 1607737, at *7 (Bankr. S.D. Tex, June 8, 2009) (WFB asserted "intentionally inaccurate" claims)

d) *In re Nibbelink*, 403 B.R. 113 (Bankr. M.D.Fla., 2009)(imposing $15,000 for punitive damages and $21,177 in attorney's fees based on findings that WFB acted in an "intentional and egregious" manner by charging "improper fees" and attempting "to collect those improper fees ... by making numerous

---

[95]  *In re Jones*,  2009 Bankr. LEXIS 3317, at *20 (Bankr. E.D.La. Oct. 1, 2009).

[96]  *Id.*, at *23-*24.

[97]  *In re Stewart*, 2008 Bankr. LEXIS 3226, at *43 (Bankr.E.D.La. October 14 2008).

[98]  *In re Jones*,  2009 Bankr. LEXIS 3317, at *24-*25.

[99]  *Id.,* at *26.

[100] *Id.*, at *32.

telephone calls and sending numerous ominous letters to Plaintiffs demanding that Plaintiffs become current or face foreclosure").

230.   WFB has likewise demonstrated a sustained pattern of mortgage servicing abuse in orchestrating the filing of foreclosure actions in the names of entities without legal standing to bring them – the identical practice that WFB and the Phelan firm implemented in their wrongful prosecution of foreclosure cases "on behalf of Wachovia" against Charles and Diane Giles in New Jersey and Gerald Bender in Pennsylvania.

231.   The following are other non-exhaustive examples of WFB's institutionalized disregard of Constitutional legal standing requirements:

a) *U.S. Bank, N.A. et. al. v. Ibanez et al.*, 2009 Mass. LCR LEXIS 134, at *9 (Mass. Land Court, Oct. 14, 2009), *aff'd*, 2011 Mass. LEXIS 5 (S.J.C. Jan. 7. 2011) ("[N]either U.S. Bank (in *Ibanez*) nor Wells Fargo (in *Larace*) was the holder of the mortgage (either on or off record) at the time notice of the foreclosure sale was given or at the time the sale took place.... [A]s a matter of law, the sales were invalid")

b) *Wells Fargo Bank, N.A. v. Ford*, 418 N.J. Super. 592, 600; 15 A.3d 327, 331; 2011 N.J. Super. LEXIS 13 (App. Div. Jan. 28, 2011) ("Wells Fargo did not establish its standing to pursue this foreclosure action by competent evidence")

c) *Wells Fargo Bank, N.A. v. Lupori*, 2010 PA Super 205; 8 A.3d 919, 922; 2010 Pa. Super. LEXIS 3818, at *7 (Pa. Super. Nov. 12, 2010) ("The alleged April 1, 2005 assignment ... to Wells Fargo was *dehors* the record as of the time of the default judgment. Since the record did not support entry of the default judgment, the trial court erred in declining to strike the judgment from the record")

d) *Wells Fargo Bank v. Marchione*, 69 A.D.3d 204, 211; 887 N.Y.S.2d 615 (N.Y. App. Div., 2009) ("Wells Fargo had no standing to bring this action")

e) *Wells Fargo v. Jordan*, 2009 Ohio 1092; 2009 Ohio App. LEXIS 881, at *11, 12 (Ohio App., Eighth Jud. Dist., Mar. 12, 2009), app. den., 123 Ohio St. 3d 1407; 2009 Ohio 5031; 914 N.E.2d 204; 2009 Ohio LEXIS 2730 (Sept. 30, 2009) ("WFB lacked standing to bring a foreclosure action....")

f)  *In re Tandala*, 438 B.R. 52, 57 (Bankr. S.D.N.Y., 2010) ("As Wells Fargo has failed to prove it owns the Note, it has failed to establish that it has standing to pursue its state law remedies with regard to the Mortgage and Property")

g)  *Wells Fargo v. Farmer*, 19 Misc.3d 1141(A), 2008 WL 2309006, at *3 (N.Y. Sup. June 5, 2008). ("It is clear that plaintiff WELLS FARGO, with the invalid assignments of the instant mortgage and note from ARGENT, lacks standing to foreclose on the instant mortgage")

h)  *Wells Fargo v. Reyes*, 20 Misc.3d 1104(A), 2008 WL 2466257, at *1, 6 (N.Y. Sup. June 18, 2008). (WFB "lacks standing to prosecute this matter because ... it does not now, and has never owned the subject mortgage")

i)  *Wells Fargo Bank, N.A. v. Byrd,* 897 N.E.2d 722, 728; 178 Ohio App.3d 285, 292; 2008 Ohio 4603 (Ohio App., 2008) ("The trial court properly dismissed the foreclosure complaint filed by Wells Fargo in this case because, at the time the complaint was filed, it did not own the mortgage that was the basis for the suit")

232.    As the Hon. Keith C. Long observed in *Ibanez*, these are "not merely problems with paperwork or a matter of dotting i's and crossing t's. Instead, they lie at the heart of the [legal] protections given to homeowners and borrowers."[101]The observations of the U.S. District Court Judge Christopher A. Boyko are equally pertinent:

> There is nothing improper or wrong with financial institutions or law firms making a profit — to the contrary, they should be rewarded for sound business and legal practices. However, unchallenged by underfinanced opponents, the institutions worry less about jurisdictional requirements and more about maximizing returns. Unlike the focus of financial institutions, the federal courts must act as gatekeepers, assuring that only those who meet diversity and standing requirements are allowed to pass through.[102]

---

[101]  *Ibanez*, 2009 Mass. LCR LEXIS 134, at *61.
[102]  *In re Foreclosure Cases*, 2007 U.S. Dist. LEXIS 84011, at *8-*9 (N.D. Ohio, Oct. 31, 2007).

233.    Despite the efforts of conscientious judges, by September 2010, it was apparent that profit-maximizing financial institutions and their law firms had trampled those gates down, leaving in their wake a foreclosure fraud scandal of unfathomable proportions.

### D.   The Foreclosure Fraud Scandal
### Confirms Defendants' Unlawful Practices

#### The Scandal Unravels

234.    On September 20, 2010, Ally Financial ("Ally," also known as GMAC Mortgage) announced that it had temporarily suspended evictions of homeowners living in foreclosed properties in 23 states.  An Ally spokesman admitted that in a number of cases the legal documents in support of the foreclosure proceedings "may have been executed without direct personal knowledge stated in the affidavit" and were not signed in the presence of a notary public.[103]

235.    Thereafter, law enforcement officials from Connecticut, California, Illinois, Iowa, North Carolina and Texas opened investigations into practices of Ally and other servicers that "relied on shoddy or fabricated paperwork to deal with the massive pile" of foreclosure cases they filed with the courts.[104]

236.    On September 29, 2010, J.P. Morgan Chase announced that it was temporarily suspending 56,000 borrowers in 23 states because of allegations of forged documents and signatures and similar problems. Earlier, one of J.P. Morgan Chase "employees, Beth Ann

---

[103]   Ariana Eunjung Cha, *Ally Suspends Evictions on Foreclosed Homes*, WASH. POST, Sept. 20, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/09/20/AR2010092006175.html

[104]   Ariana Eunjung Cha and Brady Dennis, *Connecticut and California Join Probe of Ally, Order Foreclosures Freeze*, Sept. 27, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/09/27/AR2010092706190.html.

Cottrell, admitted that she and her team signed off on about 18,000 foreclosures a month without checking whether they were justified."[105]

237.    On September 30, 2010, John Walsh, acting director of the Office of the Comptroller of the Currency, directed BoA and WFB, among other mortgage servicers, to review their foreclosure processes. According to Walsh, these foreclosure processes "clearly had deficiencies."[106]

238.    On October 1, 2010, BofA announced that it was putting foreclosures on hold in 23 states because of concerns about the propriety of its legal documentation. BofA released a statement declaring that "[t]o be certain affidavits have followed the correct procedures, Bank of America will delay the process in order to amend all affidavits in foreclosure cases that have not yet gone to judgment." Earlier, BofA "executive Renee Hertzler testified in a deposition that she signed as many as 8,000 foreclosure documents a month without reviewing them."[107] BofA announced on October 8, 2010 that its action had expanded to all 50 states.[108]

### Investigations Begin

239.    On October 13, 2010, the National Association of Attorneys General issued a news release containing the following announcement:

> It has recently come to light that a number of mortgage loan servicers have submitted affidavits or signed other documents in support of either a judicial or non-judicial foreclosure that

---

[105] Ariana Eunjung Cha, *J.P. Morgan Chase to Freeze Foreclosures Over Flawed Paperwork*, WASH. POST, Sept. 29, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/09/29/AR2010092907268.html
[106] Ariana Eunjung Cha, *7 Major Lenders Ordered to Review Foreclosure Procedures*, WASH. POST, Sept. 30, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/09/30/AR2010093006563.html
[107] Ariana Eunjung Cha, *Bank of America Latest to Put Hold on Foreclosures Amid Paperwork Concerns*, WASH. POST, Oct. 1, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/10/01/AR2010100106678.html
[108] News Release, *Statement from Bank of America Home Loans*, Oct. 8, 2010, http://mediaroom.bankofamerica.com/phoenix.zhtml?c=234503&p=irol-newsArticle&ID=1480657&highlight=

appear to have procedural defects. In particular, it appears affidavits and other documents have been signed by persons who did not have personal knowledge of the facts asserted in the documents. In addition, it appears that many affidavits were signed outside of the presence of a notary public, contrary to state law. This process of signing documents without confirming their accuracy has come to be known as "robo-signing." We believe such a process may constitute a deceptive act and/or an unfair practice or otherwise violate state laws.

In order to handle this issue in the most efficient and consistent manner possible, the states have formed a bi-partisan multistate group to address issues common to a large number of states. The group is comprised of both state Attorneys General and the state bank and mortgage regulators. Fifty state Attorneys General have joined this coordinated multistate effort.... Through this process, the states will attempt to speak with one voice to the greatest extent possible.[109]

240.   In an article written for publication in the *Huffington Post* on October 17, 2010, U.S. Secretary for Housing and Urban Development Shaun Dovovan said that "[t]he recent revelations about foreclosure processing" are "shameful" and have "rightly outraged the American people."[110] Secretary Donovan promised that:

A comprehensive review of the situation [is] underway and [the government] will respond with the full force of the law where problems are found. The Financial Fraud Enforcement Task Force that President Obama established last November has made this issue priority number one. Bringing together more than 20 federal agencies, 94 US Attorney's Offices and dozens of state and local partners to form the broadest coalition of law enforcement, investigatory and regulatory agencies ever assembled to combat fraud, the Task Force is examining this issue and the Attorney General has said publicly that if it finds any wrongdoing the members of the task force

---

[109] News Release, *50 States Sign Mortgage Foreclosure Joint Statement*, THE NAT'L ASSOC. ATTY. GEN, Oct. 13, 2010, http://www.naag.org/joint-statement-of-the-mortgage-foreclosure-multistate-group.php
[110] Shaun Donovan, *How We Can Really Help Families*, HUFFINGTON POST, Oct. 17, 2010, http://www.huffingtonpost.com/shaun-donovan/how-we-can-really-help-fa_b_765528.html

will take the appropriate action. The Federal Housing Administration and Federal Housing Finance Agency have launched reviews to make sure servicers are in full compliance with the law. The Office of the Comptroller of the Currency has directed seven of the nation's largest servicers to review their foreclosure processes, fix the processing problems and determine whether there is specific harm that has been caused in individual cases.

The message all these institutions are sending is the same: banks must follow the law -- and those that haven't should immediately fix what is wrong.

241.   RMBS investors were also demanding that banks "immediately fix what is wrong." On October 18, 2010, a lawyer representing RMBS investors sent a letter formally notifying Countrywide that, as Master Servicer, it failed in material respects to observe and perform covenants and agreements imposed on it by the PSAs governing their investments. The RMBS investors (a group including the Federal Reserve Bank of New York, Freddie Mac, Metropolitan Life Insurance Corporation, Blackrock Financial Management, Inc., and PIMCO Investment Management Company LLC  ["N.Y. Fed Investor Group"]) asserted, *inter alia*, that Countrywide:

a)   "Failed to demand that sellers [of mortgages included in the securitized trust] cure deficiencies in mortgage records when deficient loan files and lien records are discovered"

b)   "Incurred wholly avoidable and unnecessary servicing fees and servicing advances to maintain mortgaged property, all as a direct result of the Master Servicer's deficient record-keeping"

c)   "Despite the [PSAs'] requirement that  Servicing Advances were to be incurred only for reasonable and necessary out of pocket costs, the Master Servicer instead utilized affiliated vendors -- who marked up their services to a level 100% or more above the market price -- to provide services related to the preservation, restoration, and protection of" Mortgaged Property, in a fraudulent, unauthorized, and deceptive effort to supplement its Servicing income"

d) "Despite [the PSAs'] requirement [that the Master Servicer 'shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage servicers'], the Master Servicer has repeatedly and deliberately failed to perform this covenant by:

a. Creating Countrywide-affiliated vendors to provide maintenance, inspection, and other services with regard to defaulted mortgages that should have been undertaken only if they were in the Certificateholders' best interest. The Federal Trade Commission, however, found that Countrywide repeatedly and deliberately overcharged for these services by as much as 100% or more in order to increase its profits from default-related service fees; and

b. As a result of these wrongful practices, Countrywide has increased the losses to the Trusts,"[111] which the investors could recover through a repurchase [*i.e.*, "buy-back" or "put-back"] of the defective mortgage loans comprising the Trusts.

242.   On June 29, 2011, BofA announced that it reached an $8.5 billion settlement with members of the N.Y. Fed Investor Group,[112] which has raised the ire of other investors and public officials who contend that the settlement is inadequate.[113]

243.   On October 18, 2010, BofA issued a press release announcing that it had "beg[un] the process of preparing foreclosure affidavits for submission in 102,000

---

[111] See Letter dated October 18, 2010 from Kathy D. Patrick to Countrywide et al. ("N.Y. Fed Investor Group letter"), http://www.scribd.com/doc/39686107/Bondholders-Letter-to-BofA-Over-Countrywide-Loans-inc-NY-Fed

[112] News Release, *Bank of America Announces Agreement on Legacy Countrywide Mortgage Repurchase and Servicing Claims*, BofA, June 29, 2011, http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-newsArticle&ID=1580643&highlight=

[113] The settlement, which requires court approval, is challenged by other RMBS investors, New York Attorney General Eric Schneiderman and Delaware Attorney General Beau Biden. *See* Gretchen Morgenson, *Mortgage Settlement Challenged*, N.Y. TIMES, Aug. 4, 2011,
http://www.nytimes.com/2011/08/05/business/new-york-moves-to-block-mortgage-settlement.html
Shahien Nasiripour, *Beau Biden, Delaware AG, Moves To Join Bank Of America Mortgage Deal, Signaling Concerns*, HUFFINGTON POST, Aug. 10, 2011, http://www.huffingtonpost.com/2011/08/05/beau-biden-delaware-bank-of-america_n_919865.html and Gretchen Morgenson, *Bank of America's Mortgage Deal Questioned*, N.Y. TIMES, July 12, 2011, http://www.nytimes.com/2011/07/13/business/bank-of-americas-mortgage-deal-questioned.html;

foreclosure actions, and that it would "resume" foreclosure proceedings the following week.[114]

244.    On October 19, 2010, former Ohio Attorney General Richard Cordray (now Director of Enforcement for the federal Consumer Financial Protection Bureau) "joined a chorus of outrage" over BofA's resumption of foreclosures two-and-a half weeks after it had suspended them because of falsified legal documentation. Mr. Cordray stated, "We will want to be very careful in reviewing whatever [BofA's] revised process purports to be.... I would caution that they still have significant financial exposure in many, many cases if they are now acknowledging that the evidence that they previously submitted to the courts was fraudulent."[115]

245.    On October 25, 2010, Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve Board addressed a conference in Arlington, Virginia on the subject of "Mortgage Foreclosure and the Future of Housing Finance." Chairman Bernanke told his audience that:

> [W]e have been concerned about reported irregularities in foreclosure practices at a number of large financial institutions. The federal banking agencies are working together to complete an in-depth review of practices at the largest mortgage servicing operations. We are looking intensively at the firms' policies, procedures and internal controls related to foreclosures and seeking to determine whether systematic weaknesses are leading to improper foreclosures. We take violations of proper procedures very seriously. [116]

---

[114] News Release, Statement from Bank of America Home Loans, Oct. 18, 2010, http://mediaroom.bankofamerica.com/phoenix.zhtml?c=234503&p=irol-newsArticle&ID=1483909&highlight=
[115] Teresa Dixon Murray, *Ohio Attorney General Richard Cordray Outraged That Bank of America is Resuming Foreclosures*, PLAIN DEALER, Oct. 19. 2011, http://www.cleveland.com/business/index.ssf/2010/10/ohio_attorney_general_richard_2.html
[116] *See* http://www.federalreserve.gov/newsevents/speech/bernanke20101025a.pdf

246.   On October 27, 2010, WFB finally joined other mortgage servicers that had already acknowledged systematic problems in their foreclosure documentation processes. While it expressed no intention to suspend foreclosures, WFB did say that it was submitting additional affidavits for about 55,000 foreclosures pending in 23 states.[117]

247.   On November 18, 2010, a subcommittee of the House Financial Services Committee held a hearing on the subject of "Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing." Among the experts invited to the hearing was Georgetown University Law Center Professor Adam J. Levitin, who testified:

> Servicers' business model … encourages them to cut costs wherever possible, even if this involves cutting corners on legal requirements, and to lard on junk fees and in-sourced expenses at inflated prices. The financial incentives of mortgage servicers also encourage them to foreclose, rather than modify loans in many cases, even when modification would maximize the net present value of the loan for investors.
>
> The chain of title problems are highly technical, but they pose a potential systemic risk to the US economy. … These problems are very serious. At best they present problems of fraud on the court, clouded title to properties coming out of foreclosure, and delay in foreclosures that will increase the shadow housing inventory and drive down home prices. At worst, they represent a systemic risk that would bring the US financial system back to the dark days of the fall of 2008.[118]

248.   At a meeting on November 23, 2010,[119]  former Assistant Treasury Secretary Thomas A. Barr told members of the Financial Stability Oversight Council ("FSOC")[120] that:

---

[117] Jia Lynn Yang, *Wells Fargo Acknowledges Problems in Foreclosure Paperwork*, WASH. POST, Oct. 27, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/10/27/AR2010102707361.html
[118] *See* http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf
[119]  A C-SPAN video of the meeting can be seen at http://www.c-spanarchives.org/program/OversightC.  *See also* Brady Dennis, *Foreclosure Process 'Must Be Fixed,' Treasury Official Says*, WASH. POST, Nov. 23, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/11/23/AR2010112305480.html
[120] Members of the FSOC include the Secretary of the Treasury, the Chairman of the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, the Director of the Bureau of Consumer Financial Protection, the Chairman of the Securities and Exchange Commission, the Chairperson of the Federal Deposit

a)   There are widespread and "inexcusable" breakdowns in basic controls in the foreclosure process

b)   "These problems must be fixed"

c)   Federal regulators have been conducting onsite examinations of the nation's largest mortgage servicers, designed to ensure that filed foreclosures meet legal requirements and that affidavits the firms are filing in the nation's courts are accurate, and

d)   The federal investigation includes (i) "an assessment of each servicer's foreclosure policies and procedures, organizational structure and staffing, vendor management, quality control, loan documentation, including custodial management, and foreclosure processes" and (ii) "interviews with personnel and reviewing samples of individual borrower foreclosure files from all 50 states that include both in-process and completed foreclosures."

249.    On December 1, 2010, the U.S. Senate's Committee on Banking, Housing and Urban Affairs convened a hearing on "Problems in Mortgage Servicing From Modification to Foreclosure." In his testimony before the Committee, Terence Edwards, Executive Vice President of Credit Portfolio Management for Fannie Mae, said that his organization was "closely monitoring the work performed" by members of its Retained Attorney Network, which resulted in the termination of its relationship with the Law Office of David J. Stern in Florida.[121] Edwards said that Fannie Mae was planning further steps "to establish a more robust regimen for monitoring our approved attorney network to ensure compliance with

---

Insurance Corporation and the Director of the Federal Housing Finance Agency. *See* FSOC 2011 Annual Report, issued July 26, 2011, http://www.treasury.gov/initiatives/fsoc/Pages/annual-report.aspx
[121] *See* above at ¶ 23 n.6. In February 2011, Fannie Mae took the same action against another high-volume foreclosure firm in Florida, Ben-Ezra & Katz. *See* below at ¶304 n.173.

proper procedures and operations," including "on-site monitoring and in-depth training."[122]

### Judicial Action in New Jersey

250.    In New Jersey, Supreme Court Chief Justice Stuart Rabner also recognized that it was necessary for his state's judicial system to take "more robust" measures.

251.    On December 20, 2010, the Administrative Office of the Courts in New Jersey issued three public documents: (a) a press release,[123] (b) a Notice to the Bar concerning "emergent amendments" to the Court rules governing residential mortgage foreclosures in New Jersey, and accompanying Order by Chief Justice Rabner,[124] and (c) Administrative Order 01-2010, signed by the Hon. Glenn A. Grant, Acting Administrative Director of the Courts ("Director Grant's Order"), requiring servicers filing 200 or more residential mortgage foreclosure actions in 2010 to "demonstrate affirmatively that there are no irregularities in their handling of foreclosure proceedings" through "submissions" to a retired judge acting as a special master.[125]

252.    Also on December 20, 2010, the Hon. Mary C. Jacobson, Presiding Judge of the Chancery Court in Mercer County, New Jersey, *sua sponte* initiated an action titled, *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No.  F -059553-10 ("*Foreclosure Irregularities Matter*"). Judge Jacobson issued an Order requiring BofA, WFB and four other major servicers to show cause why the Court should not suspend the processing of all of their uncontested foreclosure matters and appoint a

---

[122] *See* Testimony of Terence Edwards, December 1, 2010, at 8-9, http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=8081e67c-9d07-4e59-b0db-823834d7beeb
[123] http://www.judiciary.state.nj.us/superior/press_release.htm
[124] http://www.judiciary.state.nj.us/notices/2010/n101220a.pdf
[125] http://www.judiciary.state.nj.us/notices/2010/n101220b.pdf

Special Master to review their past and proposed foreclosure practices ("Show Cause Order"). *See* http://www.judiciary.state.nj.us/notices/2010/n101220c.pdf.

253.    In its December 20, 2010 press release, the Administrative Office of the Courts announced that Chief Justice Rabner had undertaken "a series of steps to protect the integrity of filings of foreclosures in New Jersey." Those steps included Judge Jacobson's Order directing BofA and WFB (among other servicers that "have been implicated in irregularities in connection with their foreclosure practices") to show cause why the processing of uncontested residential mortgage foreclosure actions they filed should not be suspended."

254.    As Chief Justice Rabner explained in the December 20th press release:

> Today's actions are intended to provide greater confidence that the tens of thousands of residential foreclosure proceedings underway in New Jersey are based on reliable information. Nearly 95 percent of those cases are uncontested, despite evidence of flaws in the foreclosure process. For judges to sign an order foreclosing on a person's home, they must first be able to rely on the accuracy of documents submitted by lenders. ***That step is critical to the integrity of the judicial process***.[126]

255.    In her Show Cause Order, Judge Jacobson likewise held that "the exigencies of the circumstances, especially the immediate need to restore integrity to foreclosure processing," required "an in-depth review of the [implicated servicers'] policies, procedures, processes and systems to ensure that sufficient, properly trained staff and adequate quality controls are in place to satisfy compliance with the Rules of Court and laws of New Jersey, and to prevent and/or cure any potential fraud upon the court, and to

---

[126] Emphasis supplied.

ensure that Plaintiffs' employees, agents, servants or third-party independent contractors acting on their behalf follow proper policies, procedures and processes."[127]

256.    BofA, WFB and four other implicated servicers were specifically identified by Judge Jacobson as having demonstrated "a *public record of questionable practices* that this court must address now in its supervisory capacity over the processing of foreclosure matters."[128]

257.    The "public record" referenced in the Show Cause Order is summarized in Director Grant's Order, which, among other things, singled out for special criticism the fraudulent notarization practices of the Phelan firm and Full Spectrum, described above at ¶¶ 201-210:

> In state court proceedings, Thomas Strain, an employee of a servicing company associated with the New Jersey and Pennsylvania law firm of Phelan, Hallinan & Schmieg, LLP (Phelan), admitted in a deposition to notarizing approximately fifty foreclosure-related documents per day, often outside the signer's presence. After New Jersey Chancery Division judges expressed concerns related to Phelan's mortgage assignment practices, Phelan spent $175,000 to redo approximately 3,000 assignments that Strain had notarized.[129]

258.    Citing *Bank of New York v. Raftogianis*, 2010 N.J. Super. LEXIS 221, at *3 (Ch. Div. 2010) (*see* above at ¶ 178), Director Grant's Order also observed:

> Questions have ... arisen as to whether plaintiffs filing foreclosure actions actually own the underlying mortgages. In a recent case, a New Jersey equity court found that a plaintiff attempting to foreclose a mortgage, which had been transferred through a series of securitizations, never obtained actual title to the underlying mortgage. Confounding the problem, the court found that plaintiff's filings made "no

---

[127] Show Cause Order at 2-4.
[128] *Id*., at 2 (Emphasis supplied).
[129] Admin. Order at 4-5. (Footnotes omitted)

meaningful attempt to comply with the provision of R. 4:64-1(b)(1) by 'reciting all assignments in the chain of title.'"[130]

259.   Director Grant's Order highlighted deposition testimony of WFB and BofA employees who admitted that they did not review or have personal knowledge of the facts in legal documents they signed in mass-produced fashion (relying instead on outside counsel or other servicer employees for accuracy).[131] The Order also took due note of Congressional testimony and other information coming from Washington, as well as developments in other states.[132]

260.   Based on information in the "public record," the New Jersey judiciary:

   a)  Effectively suspended uncontested foreclosure actions prosecuted by BofA, WFB and four other implicated servicers

   b)  Required servicers to justify their actions with detailed non-public information to be provided to a special master charged with determining the sufficiency of the servicers' foreclosure practices and processes, and

   c)  Established and implemented new court rules specifically requiring foreclosure law firms to identify steps they have taken to verify evidentiary support for factual statements in the legal documents they sign, including their compliance with Rule 4:64-1(b)(10), which requires that "if plaintiff is not the original mortgagee or original nominee mortgagee," a foreclosure complaint must provide "the name of the original mortgagee and a recital of all assignments in the chain of title."[133]

261.   On January 5, 2010, BofA filed its response to the Show Cause Order in the *Foreclosure Irregularities Matter.* According to BoA, the relief proposed by Judge Jacobson

---

[130] *Id.*, at 5. (Footnotes omitted)

[131] *Id.*, at 5-6, 9-10. (Footnotes omitted)

[132] *Id.*, at 11-13. (Footnotes omitted). *See also Report to Congressional Requesters: MORTGAGE FORECLOSURES Documentation Problems Reveal Need for Ongoing Regulatory Oversight*, U.S. GOV'T. ACC'T. OFF., May 2011 ("GAO-11-433"), at 40 ("some courts have been imposing their own new requirements to help ensure the accuracy of filings; for example in New York state and Cuyahoga County, Ohio, attorneys are required to sign statements affirming that the facts in affidavits are accurate"), http://www.gao.gov/new.items/d11433.pdf

[133]   *Id.*, at 14-18. (Footnotes omitted)

was "unnecessary" because of "actions" that were purportedly "already taken" by BofA.[134]
Apart from "enhanced" affidavit preparation and notarization procedures, BofA told Judge
Jacobson that it has "strengthened its oversight of outside foreclosure counsel."[135]

262.    According to BofA, its "enhanced" supervision of "outside counsel who
represent the Bank in foreclosure proceedings" includes:

a)    Requiring foreclosure lawyers like the Phelan firm to
acknowledge and abide by a "Code of Conduct" that:

- Reiterates Bank of America's policy that
foreclosure counsel must not advance any
process without a sound basis for the relief
being sought

- Reinforces contractual, legal, regulatory and
ethical obligations and requirements

- Imposes additional reporting requirements on
counsel, including notices to Bank of America
regarding any sanctions imposed on counsel

- Provides guidance with respect to statements
under oath and quality control measures,
including record retention and information
security

- Requires counsel to certify to Bank of America
that in counsel's professional judgment and to
the best of counsel's knowledge, it is
appropriate and consistent with applicable
law to proceed with a foreclosure.[136]

b)    Implementation of a Quality Assurance Program that focuses
primarily on qualitative assessments of outside counsel like
the Phelan attorneys and staff, including "onsite quality
assurance reviews of firms." The onsite reviews entail:

---

[134]  Bank of America d/b/a/ BAC Home Loan Servicing LLP's Response to Order to Show Cause, Jan. 6, 2011
("BofA Response") at 2, http://www.judiciary.state.nj.us/superior/BOA-BAC%20Home%20Response.pdf
[135]  *Id.,* at 6-10.
[136]  *Id.,* at 10-11.

- Review and assessment of law firm operations, written policies and procedures, and foreclosure files

- Assessment of compliance with applicable laws, regulations, and Service Level Agreements (retention agreements)

- Interviews of law firm personnel

- Shadowing law firm personnel as they process foreclosures.[137]

c)   Review of a sampling of foreclosure files to ensure accuracy, completeness, and compliance with all Bank of America requirements

d)   A "more robust attorney watch list process[138] to identify and address firms whose performance requires improvement," based on "five non-negotiable principles for outside counsel, violation of which will result in suspension or termination":

- Lost confidence in integrity
- Lost confidence in competence
- Lost confidence in compliance
- Lost confidence in productivity and timeliness
- Lost confidence in sustainability.[139]

263.   BofA informed Judge Jacobson that it had conducted onsite reviews of its outside foreclosure law firms in December 2010 and that such reviews would be ongoing through 2011. The Response also said that BofA was "conducting mandatory training of foreclosure counsel on the Bank's new policies and procedures" and that "[a]ttorneys who conduct foreclosures in New Jersey on Bank of America's behalf" were required to "atten[d]

---

[137] *Id.*, at 11.
[138] BofA's "criteria for placement of a law firm on the watch list include negative ratings with respect to timeliness, financial performance, onsite reviews, desktop assessments; notification by the law firm that it has been sanctioned; significant state attorney general attention, and Code of Conduct violations." *Id.*, at 12.
[139] *Id.*

training at the Bank's facilities in Texas on January 5, 2011," the same day when BofA filed its Response to the Show Cause Order.[140]

264.    On January 5, 2011, WFB also filed its Response to the Show Cause Order. Unlike BofA, WFB refused to acknowledge any institutionalized shortcomings in its foreclosure processes, either in its own serving operations or in those of its outside foreclosure counsel like the Phelan firm.[141] Instead, WFB challenged the Court's jurisdiction, the Constitutionality of the Court's action and the necessity of the special master procedure envisioned by the Show Cause Order. Despite compelling evidence in the public record concerning its systematic wrongdoing in foreclosure cases, WFB insisted that these issues must be addressed only in the context of individual foreclosure proceedings.

265.    Rather than present their arguments and evidence at a "Show Cause" hearing, on March 18, 2011, WFB, BofA and other implicated servicers agreed to a Stipulation providing for the appointment, at the servicer's expense, of a Special Master. Among other things, the Special Master has responsibility for (a) evaluating submissions that servicers must make in order to establish a *prima facia* case demonstrating that their processes and procedures are sufficiently reliable to permit resumption of uncontested foreclosure actions; (b) obtaining additional information necessary for making a determination of the sufficiency of the servicers' processes and procedures, and (c) making recommendations to Judge Jacobson.[142]

---

[140]  *Id.*, at 11-12.
[141]  Appearance of Wells Fargo, N.A., filed on January 5, 2011, Foreclosure Irregularities Matter, http://www.judiciary.state.nj.us/superior/Wells%20Fargo%20Response.pdf
[142]  Recommended Stipulation filed on March 18, 2011, http://www.judiciary.state.nj.us/superior/stipulation.pdf

266.    After a hearing in Trenton on March 29, 2011, Judge Jacobson entered an Order approving the Stipulation and appointing as Special Master the Hon. Richard J. Williams, a retired Chancery Court judge.[143]

267.    On June 9, 2011, Supreme Court Chief Justice Rabner entered an order finalizing amendments to the Court rules governing residential mortgage foreclosures in New Jersey.[144] Among other things, the Order requires foreclosure lawyers to execute certifications and affidavits providing specific information demonstrating that they have confirmed the accuracy of facts in foreclosure legal documents through direct communications with servicer employees.

268.    On August 15, 2011, based on the Special Master's reports accepting assurances by BofA and WFB that their "enhanced" and "more robust" foreclosure policies and procedures could now be relied upon by New Jersey courts, Judge Jacobson entered Orders permitting BofA and WFB to resume prosecution of uncontested foreclosure actions. The foreclosure activities of WFB, BoA and other implicated servicers will continue to be monitored for a period of one year.[145]

**Ongoing Federal and State Attorneys General Investigations**

269.    On February 24, 2011, BofA filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2010 ("BofA 10-K"). BofA disclosed that:

---

[143] http://www.judiciary.state.nj.us/superior/order_approving_stipulation.pdf
[144] http://www.scribd.com/doc/57947188/Residential-Mortgage-Foreclosure-Rules-and-Revised-Form-Certifications-Affidavits
[145] *See* http://www.judiciary.state.nj.us/superior/order_bank_of_america.pdf
 and http://www.judiciary.state.nj.us/superior/order_wells_fargo.pdf

Law enforcement authorities in all 50 states and the U.S. Department of Justice and other federal agencies, including certain bank supervisory authorities, continue to investigate alleged irregularities in the foreclosure practices of residential mortgage servicers....
The Corporation is cooperating with these investigations and is dedicating significant resource to address these issues.

The current environment of heightened regulatory scrutiny has the potential to subject the Corporation to inquiries or investigations that could significantly adversely affect its reputation. *Such investigations by state and federal authorities, as well as any other governmental or regulatory scrutiny of our foreclosure processes, could result in material fines, penalties, equitable remedies (including requiring default servicing or other process changes), or other enforcement actions, and result in significant legal costs in responding to governmental investigations and additional litigation.*

BofA 10-K at 10 (Emphasis supplied)

270.    On February 24, 2011, WFB likewise filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2010 ("WFB 10-K"), which incorporated by reference an Annual Report disseminated to shareholders. In a footnote to financial statements appearing at page 170 of that Annual Report, WFB disclosed that:

Several government agencies are conducting investigations or examinations of various mortgage related practices of WellsFargo Bank. The investigations relate ... whether Wells Fargo's practices and procedures relating to mortgage foreclosure affidavits and documents relating to the chain of title to notes and mortgage documents are adequate. *With regard to the investigations into foreclosure practices, it is likely that one or more of the government agencies will initiate some type of enforcement action against Wells Fargo, which may include civil money penalties.*[146] Wells Fargo continues to provide information requested by the various agencies.

---

[146] It is possible that more than "civil money penalties" may result from government investigations. As the U.S. General Accounting Office reported, the U.S. Department of Justice "is also taking actions to address foreclosure documentation issues. Justice staff could not comment on investigations, but told us that they are working with investigatory and regulatory partners to look into the servicers' foreclosure practices. While they said that federal civil and *criminal statutes could apply in complaints or charges in areas of mortgage fraud, including mail and wire fraud,* false statements, Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) civil actions, and fraud against the government, if the mortgage loans involved were federally insured or guaranteed, Justice staff told us that the state attorneys general and other regulators also have enforcement authority to address these issues. GAO-11-433 at 37. (Emphasis supplied)

(Emphasis supplied)

271.    As one component of the government investigations disclosed by BofA and WFB in February 2011, the Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("the Fed"), Federal Deposit Insurance Corporation ("FDIC"), and Office of Thrift Supervision ("OTS") jointly conducted "horizontal" examinations of foreclosure processing at the 14 largest federally regulated mortgage servicers, including BofA and WFB ("Interagency Review").[147]

272.    The OCC's First Senior Deputy Comptroller and Chief Counsel described the Interagency Review as follows:

> The primary objective of the examinations was to evaluate the adequacy of controls and governance over bank foreclosure processes, including compliance with applicable federal and state law. Examiners also evaluated bank self-assessments and remedial actions as part of this process, assessed foreclosure operating procedures and controls, interviewed bank staff involved in the preparation of foreclosure documents, and conducted an in-depth review of approximately 2,800 borrower foreclosure cases in various stages of foreclosure. Examiners focused on foreclosure policies and procedures; organizational structure and staffing; vendor management of third parties, including foreclosure attorneys; quality control and audits; accuracy and appropriateness of foreclosure filings; and loan document control, endorsement, and assignment.[148]

273.    On April 13, 2011, OCC, the Fed, FDIC, and OTS released a document titled, "Interagency Review of Foreclosure Policies and Practices" ("Interagency Report").[149] Among other things, the Interagency Report concluded:

---

[147]  *See* Testimony of Julie L. Williams, First Senior Deputy Comptroller and Chief Counsel of the OCC, at a July 7, 2011 hearing before subcommittees of the House Committee on Financial Services ("Williams Testimony") at 2-3, http://financialservices.house.gov/UploadedFiles/070711williams.pdf

[148]  Williams Testimony at 4.

[149]   The Interagency Report is available at http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf

a)      Deficiencies in servicers' processes, procedures, controls, and staffing resulted in numerous inaccurate affidavits and other foreclosure-related documents. Examiners found that most servicers had affidavit signing protocols that expedited the processes for signing foreclosure affidavits without ensuring that the individuals who signed the affidavits personally conducted the review or possessed the level of knowledge of the information that they attested to in those affidavits....[150]

b)      In the sample of foreclosure files reviewed,[151] examiners compared the accuracy of the amounts listed on affidavits of indebtedness to the documentation in the paper foreclosure file or computerized loan servicing systems.... [S]ome servicers failed to accurately complete or validate itemized amounts owed by those borrowers. At those servicers, this failure resulted in differences between the figures in the affidavit and the information in the servicing system or paper file. In nearly half of those instances, the differences -- which were typically less than $500 -- were adverse to the borrower.... For most of the servicers, examiners cited the lack of a clear auditable trail in reconciling foreclosure filings to source systems of record.[152]

c)      [T]he servicers reviewed generally did not properly structure, carefully conduct, or prudently manage their third-party-vendor relationships with outside law firms and other third-party foreclosure services providers. Failure to effectively manage third-party vendors resulted in increased reputational, legal, and financial risks to the servicers.[153]

d)      Servicers typically used third-party law firms to prepare affidavits and other legal documents, to file complaints and other pleadings with courts, and to litigate on their behalf in connection with foreclosure and foreclosure-related bankruptcy proceedings. The servicers reviewed generally showed insufficient guidance, policies, or procedures governing the initial selection, management, or termination of the law firms that handled their foreclosures.[154]

---

[150] Interagency Report at 8.

[151] *See* GAO-11-433 at 25 ("Examiners reviewed more than 2,800 loan files—which they noted was a relatively small number of foreclosure files given the volume of recent foreclosures processed by these servicers—comprising approximately 200 foreclosure loan files with a variety of characteristics from each servicer").

[152] *Id.* at 8 and 2 (Authors of the Interagency Report concede that "[e]xaminers may not have uncovered cases of ... unreasonable fees").

[153] *Id.*, at 9.

[154] *Id.*

e)    [P]roblems include instances in which law firms signed documents on behalf of servicers without having the authority to do so, or they changed the format and content of affidavits without the knowledge of the servicers. These defects could, depending upon the circumstances, raise concerns regarding the legality and propriety of the foreclosure even if the servicer had sufficient documentation available to demonstrate authority to foreclose.[155]

274.    Having found that WFB, BofA and others engaged in "unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing," the OCC announced on April 13, 2011 that it had taken enforcement action against WFB and BofA.[156]

275.    As part of that action, WFB and BofA entered into Consent Orders with the OCC,[157] which require them to:

a)    Correct the deficiencies in mortgage servicing and foreclosure processing identified in the Interagency Report

b)    Provide robust oversight and controls of third-party vendors, including outside legal counsel and vendors who provide default and foreclosure processing services to ensure that those who act on their behalf comply with these obligations as well as all laws and regulations, both state and federal

c)    Implement a comprehensive "revision" of their foreclosure processes for the purpose of restoring "integrity" to the foreclosure process; those revisions must be identified in "detailed Action Plans" acceptable to federal government regulators, and

---

[155] *Id.*, at 9-10

[156] News Release No. 2011-47, *OCC Takes Enforcement Action Against Eight Servicers for Unsafe and Unsound Foreclosure Practices*, OCC, April 13, 2011 ("OCC News Release"), http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html;

[157] Consent Order dated March 29, 2011 in the proceeding entitled *In the Matter of Bank of America N.A.*, The Comptroller of the Currency of the United States of America, No. AA-EC-11-12, http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf;
Consent Order dated March 31, 2011 in the proceeding entitled *In the Matter of Wells Fargo Bank, N.A.*, The Comptroller of the Currency of the United States of America,, No. AA-EC-11-19, http://www.occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf

d) Engage "independent firms" approved by federal government regulators for the purpose of conducting a "look-back" investigation to identify borrowers who (during the period from January 1, 2009 through December 31, 2010) suffered financial harm as a result of foreclosure processing deficiencies and to compensate them for financial injury.[158]

276.    According to Acting Comptroller of the Currency John Walsh:

These comprehensive enforcement actions, coordinated among the federal banking regulators, require major reforms in mortgage servicing operations....[159] Our enforcement actions are intended to fix what is broken, identify and compensate borrowers who suffered financial harm, and ensure a fair and orderly mortgage servicing process going forward.[160]

277.    On April 13, 2011, the Fed also announced enforcement actions against WFB and BofA,[161] which entered into Consent Orders similar to the ones obtained by the OCC.[162] In its press release, the Fed stated that forceful government action[163] was needed to "address a *pattern of misconduct* and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing," which "represent *significant and pervasive compliance failures and unsafe and unsound practices* at these institutions."[164]

---

[158] Williams Testimony at 5-7. *See also* GAO-11-433 at 30.

[160]   OCC News Release.
[161]   Press Release, the Fed, April 13, 2011 ("Fed Press Release"), http://www.federalreserve.gov/newsevents/press/enforcement/20110413a.htm
[162] Consent Order dated April 13, 2011 in the enforcement action titled *In the Matter of Bank of America Corporation*, Board of Governors of The Federal Reserve System, Docket No. 11-029-B-HC, http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a1.pdf; Consent Order dated April 13, 2011 in the enforcement action  titled *In the Matter of Wells Fargo & Company*, Board of Governors of The Federal Reserve System, Docket No. 11-025-B-HC, http://www.federalreserve.gov/newsevents/press/enforcement/enf20110413a10.pdf
[163]   Some have questioned the effectiveness and adequacy of relief obtained by the OCC and the Fed. *See, e.g.*, Joe Nocera, *Letting the Banks Off the Hook*, N.Y. TIMES, April 18. 2011, http://www.nytimes.com/2011/04/19/opinion/19nocera.html?_r=2&scp=3&sq=nocera&st=cse; Mark DeCambre, *Foreclosure Fix: Feds' Settlement With Banks a Wreck, Say Critics*, N.Y. POST, April 14, 2011, http://www.nypost.com/p/news/business/foreclosure_fix_qgZLNx7HZfZwms8yt85OXM#ixzz1TnGuQBHd
[164]   Fed Press Release (Emphasis supplied)

278.    As the OCC and the Fed were announcing their enforcement actions and Consent Orders, the FDIC, one of agencies responsible for the Interagency Review and Report, issued a separate press release on April 13, 2011. There, the FDIC placed the action of the Fed and OCC in the context of a broader government and private response to the foreclosure fraud scandal:

> The enforcement orders issued today are important, but they are only a first step in setting out a framework for these large institutions to remedy these deficiencies and to identify homeowners harmed as a result of servicer errors. While today's orders put these large servicers on a path to improving their management of the foreclosure process, they do not purport to fully identify and remedy past errors in mortgage-servicing operations of large institutions. Much work remains to ensure that the servicing process functions effectively, efficiently, and fairly going forward. Importantly, these enforcement orders do not contain monetary remedial measures. There is evidence that some level of wrongful foreclosures has occurred. It is important that servicers identify any harmed homeowners and provide appropriate remedies. This is essential to managing litigation and reputation risk, as well as fairness to borrowers. In addition, the FDIC continues to fully support the separate federal and state collaboration between the State Attorneys General and federal regulators led by the U.S. Department of Justice. The enforcement orders announced today complement, rather than preempt or impede, this ongoing collaboration.[165]

279.    In her testimony on May 26, 2011 before the House Subcommittee on Financial Institutions and Consumer Credit, Former FDIC Chairman Sheila C. Bair also emphasized that the OCC and Fed investigations and Consent Orders were not quick or all-encompassing solutions to the foreclosure fraud scandal:

> [E]ven though the FDIC is not the primary federal regulator for the largest loan servicers, our examiners participated with other regulators in horizontal reviews of these servicers, as well as two companies that facilitate the loan securitization process. In these

---

[165] Press Release, FDIC Statement on Enforcement Orders Against Large Servicers Related to Foreclosure Practices, FDIC, April 13, 2011, http://www.fdic.gov/news/news/press/2011/pr11069.html

reviews, federal regulators cited *"pervasive" misconduct in foreclosures* and significant weaknesses in mortgage servicing processes.

Unfortunately, the horizontal review only looked at processing issues. *Since the focus was so narrow, we do not yet really know the full extent of the problem.* The Consent Order … requires these servicers to retain independent, third parties to review residential mortgage foreclosure actions and report the results of those reviews back to the regulators. However, *we have heard concerns regarding the thoroughness and transparency of these reviews, and we continue to press for a comprehensive approach to this "look back"….*

The enforcement orders do not preclude additional supervisory actions or the imposition of civil money penalties.[166]

280.    As Mark Pearce, Director of the FDIC's Depositor and Consumer Protection Division also observed, the OCC and Fed Consent Orders "do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the interagency review did not include a review of …. the fees charged in the servicing process. Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward."[167]

281.    As of the filing of this Complaint, identification of "past errors" is far from complete. Despite official condemnation of unlawful practices by servicers and their foreclosure lawyers, it is also unclear whether foreclosure abuses have abated. In late July 2011, Reuters and Associated Press reported that mortgage servicers and their lawyers

---

[166] http://www.fdic.gov/news/news/speeches/chairman/spmay2611.html
[167] Statement of Mark Pearce at hearing before subcommittees of the House Committee on Financial Services on July 7, 2011, at 4 n.2, http://financialservices.house.gov/UploadedFiles/070711pearce.pdf

continue to file questionable documents in foreclosure cases, including false mortgage assignments.[168]

282.   On July 20, 2011, Sen. Robert Menendez (D-NJ), chairman of the Senate Subcommittee on Housing, Transportation and Community Development, and nine other senators sent a letter to Fed Chairman Ben Bernanke, Acting Comptroller of the Currency John Walsh and Acting FDIC Chairman Martin Gruenberg. The Senators' letter said, in part:

> We write today to urge you to make public critical information related to enforcement actions taken against mortgage servicers regarding their improper foreclosure practices. This is especially important given this week's allegations that mortgage servicers continue to engage in widespread "robo-signing" despite your assurances that these illegal actions would not continue.....
>
> [W]e believe that the full disclosure of these documents to the public is necessary given the recent reports by both the Associated Press and Reuters of the continued widespread practice of "robo-signing" among mortgage servicers. Both have alleged that servicers continue to file thousands of property documents that appear to be fabricated. Reuters also quoted top representatives from the mortgage servicing industry saying that the Consent Orders have "not put a stop to questionable practices." David Stevens, president of the Mortgage Bankers Association, tellingly said that some loan servicers "continue to cut corners" and "the real question is whether the servicer complied with all legal requirements."[169]

283.   Amid this uncertainty, the coalition of 50 states' attorneys general, along with the U.S. Department of Justice and the Department of Housing and Urban Development, continue their negotiations for a settlement with BofA, WFB and three other major servicers. According to multiple news reports, BofA, WFB and the other servicers

---

[168] *See* Scot J. Paltrow, *States Negotiating Immunity For Banks Over Foreclosures*, REUTERS, July 20, 2011, ("Reuters Report") http://www.reuters.com/article/2011/07/20/foreclosure-banks-immunity-idUSL3E7IK4EN20110720; Michelle Conlin and Pallavi Gogoi, *Mortgage 'Robo-Signing' Goes On*, A.P., July 19, 2011, http://abcnews.go.com/US/wireStory?id=14100463
[169] Letter dated July 20, 2011 from Senators Robert Menendez, Richard Blumenthal, Daniel Akaka, Al Franken, Bernard Sanders, Mark Begich, Maria Cantwell, John D. Rockefeller IV, Jon Tester and Sherrod Brown, http://menendez.senate.gov/imo/media/doc/Letter%20to%20regulators%20on%20transparency%20in%20foreclosure%20reviews.pdf

may be required to pay up to $25 billion in penalties and to comply with new uniform mortgage servicing rules.[170]

## V.   CLASS ACTION ALLEGATIONS

284.    The Representative Homeowners bring this lawsuit individually and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All individuals in Pennsylvania and New Jersey who, during the period from January 1, 2005 through the present ("Class Period") were (a) defendants in mortgage foreclosure actions prosecuted by the Phelan firm and (b) were affected by abusive foreclosure practices, including (i) imposition of inflated or fabricated fees for "default management services," (ii) failure to properly credit Sheriff's deposit refunds and/or (iii) preparation, execution and notarization of fraudulent legal documents and land records, including those used to initiate foreclosure actions in the name of entities without legal standing to sue.

285.    This litigation is properly maintainable as a class action.

286.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable. According to Frank Hallinan, the Phelan firm handled an estimated 24,000 to 26,000 foreclosure prosecutions in Pennsylvania and New Jersey during 2008 alone, a fraction of the foreclosure actions prosecuted by Phelan firm during the Class Period.

287.    There are questions of law and fact common to the Class. These common questions relate to the existence of the pattern of wrongful conduct alleged, and to the type

---

[170] Reuters Report;  Gretchen Morgenson, *A Low Bid For Fixing a Big Mess*, N.Y. TIMES, May 14,, 2011, http://www.nytimes.com/2011/05/15/business/15gret.html; David Savage, *Talks to Settle Foreclosure Probes Could Take Months*, L.A. TIMES, Mar. 25, 2011, http://articles.latimes.com/2011/mar/31/business/la-fi-foreclosure-talks-20110331

and common pattern of injury sustained as a result thereof. The questions include but are not limited to:

a)   Whether Defendants as a matter of regular practice overstated or fabricated the amount of "default management servicing" fees due from homeowners, including, *inter alia*,

- Attorneys' fees not authorized by contract or otherwise permitted by law

- Fees for real estate title searches not authorized by contract or otherwise permitted by law

- Fees for "appraisals" and BPOs not authorized by contract or otherwise permitted by law

- Fees for property inspections and maintenance services not authorized by contract or otherwise permitted by law

- Charges for unspecified and undocumented "foreclosure fees and costs," including multiple or duplicated charges for the same professional services allegedly rendered.

b)   Whether Defendants as a matter of regular practice misappropriated and converted to their own use deposits refunded by county Sheriffs to the Phelan firm, the amounts of which should have been credited to the accounts of the Representative Homeowners and members of the Class.

c)   Whether Defendants as a matter of regular practice falsified or caused the falsification of statements made in Complaints, Affidavits, Certifications and other legal documents filed by the Phelan firm with Pennsylvania and New Jersey courts in residential mortgage foreclosure proceedings.

d)   Whether Defendants as a matter of regular practice falsified or caused the falsification of mortgage and note assignments recorded with public agencies in connection

with or after the filing of foreclosure actions prosecuted by the Phelan firm.

e)    Whether Defendants as a matter of regular practice filed foreclosure actions against homeowners in the name of entities that lacked proper legal standing to bring suit.

f)    The duration, sequence and character of the conduct alleged in this Complaint, including particular acts performed by Defendants and others that deprived Plaintiffs and members of the Class of their legal rights and property.

g)    The identity of other possible co-conspirators (including non-defendant mortgage servicers, litigation attorneys, third-party default management service vendors, and mortgage foreclosure industry trade groups), and the extent of the co-conspirators' participation in the conduct complained of herein.

h)    Whether the conduct alleged in this Complaint violated RICO.

i)    Whether the conduct alleged in this Complaint violated the FDCPA.

j)    Whether the conduct alleged in this Complaint violated the UTPCPL.

k)    Whether the conduct alleged in this Complaint violated the NJCFA.

l)    Whether the conduct alleged in this Complaint states a cause of action for breach of contract, breach of duty of good faith and fair dealing, money had and received, and/or negligent misrepresentation in violation of the common laws of the Commonwealth of Pennsylvania and the State of New Jersey.

m)    Whether Defendants' conduct, as alleged in this Complaint, caused injury to the person and property of the Representative Plaintiffs and other members of the Class.

n)    The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

o)    Whether restitution and disgorgement of profits are appropriate forms of

relief for the wrongful conduct alleged in this Complaint.

p)    Whether injunctive relief is warranted to restrain the Phelan firm from continuing to engage in the wrongful conduct alleged in this Complaint, and

q)    Whether a forensic accounting firm and special master should be appointed to (i) quantify Defendants' ill-gotten gains, which should be disgorged to Plaintiffs and members of the Class; (ii) recommend specific business management and accounting procedures that the Phelan firm must adopt and implement to avoid future repetition of the wrongful conduct documented throughout this Complaint; and (iii) monitor the Phelan firm's compliance with business management or accounting procedures that may be ordered by the Court.

288.   All Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned closely with, and are not antagonistic to, those of the other members of the Class. In addition, competent counsel experienced in the prosecution of class action litigation represents Plaintiffs.

289.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

290.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate injunctive relief with respect to the Class as a whole.

291.   The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

292.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Members of the Class are readily ascertainable, *inter alia*, through records maintained in the regular course of business by the Phelan firm, BoA and WFB. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate substantively complex issues like those asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VII.   CLAIMS FOR RELIEF

## COUNT ONE: VIOLATIONS OF 18 U.S.C. § 1962(c) (RICO)

293.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate by reference each of the allegations in the preceding paragraphs of this Complaint.

294.    This cause of action, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against all Defendants on behalf of the Class.

295.    Plaintiffs, each member of the Class, and each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

296.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the association-in-fact enterprises identified below, the affairs of which affected interstate commerce, through a pattern of racketeering activity.

## A.   The Enterprise

### The Phelan, Hallinan and Schmieg Foreclosure Enterprise

297.   The Phelan, Hallinan and Schmieg Foreclosure Enterprise (the "Enterprise") is

an association-in-fact consisting of the following persons and entities:

a)  Larry Phelan, Frank Hallinan, Dan Schmieg and Rosemarie Diamond

b)  Phelan Hallinan & Schmieg, LLP

c)  Phelan Hallinan & Schmieg, P.C.

d)  Full Spectrum Holdings LLC, Full Spectrum Services, Inc., Full
Spectrum Legal Services, Inc., Full Spectrum Review Services, Inc.,
Foreclosure Review Services, Inc., Land Title Services of New Jersey,
Inc., Land Title Services of Pennsylvania

e)  BofA

f)  WFB

g)  Non-party mortgage servicers

h)  Non-party LPS[171]

i)  Non-party CoreLogic, Inc.

i)  Non-party Fannie Mae

j)  Non-party Freddie Mac.[172]

298.    The Enterprise is an ongoing, continuing group or unit of persons and entities

associated together for the common purpose of limiting costs and maximizing profits through

the rapid, automated prosecution of residential mortgage foreclosure lawsuits by the Phelan

---

[171]  LPS is embroiled in its own legal difficulties in the foreclosure fraud scandal, including an investigation by
the U.S. Attorney's Office for the Middle District of Florida; like WFB and BofA, LPS also agreed to Consent
Orders with the Fed and OCC. *See* LPS Form 10-Q for the period ended June 30, 2011, at 45,
http://phx.corporate-ir.net/phoenix.zhtml?c=222167&p=irol-
SECText&TEXT=aHR0cDovL2lyLmludC53ZXN0bGF3YnVzaW5lc3MuY29tL2RvY3VtZW50L3YxLzAwMDE0Mj
k3NzUtMTEtMDAwMDAzL3htbA%3d%3d

[172] Other institutions and individuals are also integral to the operation of the Enterprise, but it is unnecessary
to identify them at this time.

firm. The Enterprise operated continuously throughout the Class Period.

299.    The Enterprise engages in, and its activities affect, interstate commerce.

300.    While all Defendants participate in and are part of the Enterprise, they also have an existence separate and distinct from the Enterprise.

301.    Members of the Enterprise are linked systematically through contractual relationships, financial transactions and coordinated activities, including similar understandings concerning the selection, duties, performance and oversight of the Phelan firm's prosecution of mortgage foreclosure actions, as well as its choice of third-party vendors providing so-called default management services.

## B.   <u>Predicate Acts of Mail and Wire Fraud</u>

### Fraudulent Schemes and Intent to Defraud

302.    As alleged above, at the beginning of 2005, the Phelan firm adopted a "business model" whose purpose is to maximize profits and severely limit costs, while at the same time processing an exploding volume of foreclosure cases at breakneck speed and in assembly line fashion, all with only a handful of lawyers, a large support staff, and wholly-owned ancillary "service" providers.

303.    The template used by the Phelan firm is calculated to, and does, generate systematic overcharges assessed to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law. By design, the Phelan firm's system also misappropriates Sheriff's deposit refunds that should be credited to homeowners' accounts. In order to obtain the unearned profits that this system is set up to manufacture, the Phelan firm files foreclosure lawsuits on the basis of unsupported assertions of fact, which are included in court filings and land records that contain falsified

signatures and notarizations to facilitate the prosecution of foreclosure lawsuits in the name of entities without legal standing to bring them.

304.    The Phelan firm acts under the direction and command of BofA, WFB and other servicers, which themselves have established institutionalized means of maximizing profits and limiting costs. As a major source of revenue from their mortgage servicing operations, BofA, WFB and other servicers receive part of the proceeds of inflated and manufactured "default servicing" costs extracted from distressed homeowners by the Phelan firm and similar operations, such as the Law Office of David J. Stern and Ben-Ezra & Katz.[173] BofA, WFB and other servicers also regulate and control the activities of such law firms through their (a) use of default management "outsource" companies like LPS and CoreLogic; (b) selection of foreclosure law firms limited to those that have gained membership status in "attorney networks" run by LPS and CoreLogic or those that have achieved "designated counsel" status from Fannie Mae or Freddie Mac; and (c) monitoring of foreclosure lawyers' performance in meeting mandatory timelines through computerized mortgage servicing platforms like LPS Desktop®.

305.    Having achieved success in its industry -- an industry whose credibility has vanished -- the Phelan firm has consistently satisfied or exceeded the demands of BofA, WFB and other servicers. In turn, given the institutional constraints within which it operates, the Phelan firm has taken little or no action without the express approval or knowing

---

[173] Ben-Ezra & Katz is another Flordia foreclosure firm whose "designated counsel" status was terminated by Fannie Mae in February 2011. Miami-Dade Circuit Judge Maxine Cohen Lando also held the founding member of that firm, Marc Ben-Ezra, in contempt for filing "sham" foreclosure documents that were "a fraud upon the court." Kimberly Miller and Christine Stapleton, *Lawyer Held in Contempt Over 'Fraud' in Foreclosure Filing*, PALM BEACH POST, Feb. 12, 2011, http://www.palmbeachpost.com/money/foreclosures/lawyer-held-in-contempt-over-fraud-in-foreclosure-1248825.html

acquiescence of BofA, WFB and other servicer clients.

**Defendants' Fraudulent Use of Interstate Wire Facilities and U.S. Mail**

306.   Pursuant to these fraudulent schemes, mail and wire fraud was routinely committed by the Phelan firm, WFB and BofA. The following are non-exhaustive *examples* of fraudulent misrepresentations made by Defendants to the Representative Homeowners through use of the U.S. Mail or interstate wire facilities.

307.   Purportedly on May 22, 2009, the Phelan firm served upon Plaintiff Edward Wolferd by U.S. mail a document called "Motion to Reassess Damages," together with a supporting memorandum of law. Those documents, dated stamped by the Lancaster County Prothonotary on May 26, 2009, were ostensibly signed and served by Phelan firm attorney Sheetal R. Shah-Jani. They contained false representations that the "costs of collection" and "other expenses" due as a result of Plaintiff Wolferd's default included (a) "Costs of Suit and Title" in an amount of $1,682.25 and (b) "Sheriff's Sale Costs" in an amount of $1,650.16. The Phelan firm's misrepresentations on behalf of itself and WFB were false and misleading for the reasons specified above at ¶¶ 97-101.

308.   On August 25, 2009, WFB, without identifying its sender by name, faxed or mailed to Plaintiff Wolferd a letter enclosing a (a) Loan Modification Agreement and (b) Loan Modification Statement. Those documents falsely represented that Wolferd was obligated to pay WFB $3,015.50 for undocumented and unexplained "Recoverable Expenses." WFB's misrepresentations were false and misleading for the reasons specified above at ¶¶ 102-103.

309.   On October 11, 2007, currently unidentified representatives of the Phelan firm and WFB caused to be recorded two assignments of Bender's mortgage with the Recorder of

Deeds for Berks County, Pennsylvania. *See* above at ¶¶ 125-128. These assignments, which were transmitted by interstate wire facilities, were false, misleading and unlawfully fabricated by the Phelan firm and WSB for the sole purpose of filing a foreclosure action against Plaintiff Bender on behalf of Wachovia Bank, N.A., an entity that had no ownership in Bender's mortgage and an entity that had no legal standing to bring a foreclosure action against Bender.

310.   Purportedly on May 2, 2008, the Phelan firm served upon Plaintiff Gerald Bender by U.S. mail a document called "Motion to Reassess Damages," together with a supporting memorandum of law. Those documents, which were ostensibly signed and served by Phelan firm attorney Michelle M. Bradford, contained false representations that the following "sums" were "incurred or expended" by the Phelan firm on behalf of "Wachovia":  (a) "Legal fees" in an amount of $2,250; (b) "Costs of Suit and Title" in an amount of $1,297.55; (c) "Appraisal/Brokers Price Opinions" in an amount of $285 and (d) "Property Inspections/Property Preservation" in amount of $120. The Phelan firm's misrepresentations on behalf of itself and WFB were false and misleading for the reasons specified above at ¶¶ 138-148. Those misrepresentations were also false and misleading because the Phelan firm had not "incurred or expended" any costs on behalf of Wachovia in connection with foreclosure proceedings against Bender, and Bender had no legal obligation to pay the Phelan firm or WFB for any such "expenses." In addition, the Phelan's firm's representation that its foreclosure action against Bender was "strictly *in rem*" and that its requested reassessment of damages did not "include any personal liability" against Bender was false and misleading because the Phelan firm *does* use orders granting their motions for reassessment of damages for the purpose of seeking a determination of the personal liability

of foreclosed-upon homeowners. *See* above at ¶¶ 149-150.

311.    On April 18, 2007, currently unidentified representatives of the Phelan firm and WFB caused to be recorded two assignments of Diane and Charlie Giles' mortgage with the Clerk of Ocean County, New Jersey. *See* above at ¶¶ 160-164. These assignments, which were transmitted by interstate wire facilities, were false, misleading and unlawfully fabricated by the Phelan firm and WSB for the sole purpose of filing a foreclosure action against the Giles on behalf of Wachovia Bank, N.A., an entity that had no ownership in the Giles' mortgage and an entity that had no legal standing to bring a foreclosure action against them.

312.    On July 27, 2007, Debbie Williams, a legal assistant with the Phelan firm, sent a Notice of Sheriff's Sale to Charlie and Diane Giles via U.S. Postal Service, certified mail, return receipt requested, which was received by Mr. and Ms. Giles at 10:35 a.m. on August 1, 2007. The Notice of Sheriff's Sale (like the Phelan firm's foreclosure Complaint and Certifications dated February 16, 2007 and its Certification of Default dated April 5, 2007) falsely identified Wachovia Bank, N.A. as plaintiff in the mortgage foreclosure action wrongfully prosecuted against them by the Phelan firm and WFB. In fact, Wachovia Bank, N.A. did not own the Giles' mortgage and had no legal standing to sue them. *See* above at ¶ 169.

313.    On December 10, 2007, Jessica Hansbury, a Phelan firm employee, faxed a letter to Jerry Dasti, counsel to the Giles, falsely representing that Charlie and Diane Giles owed $7,817 in "Legal Fees and Costs through December 10, 2007" and "Property Inspections/BPO" fees in an amount of $340. The falsity of the Phelan firm's misrepresentation is demonstrated by the removal of most, but not all, of those manufactured fees on January 15, 2008, when the Giles were forced to sell their home at a

significantly below-market price. *See* above at ¶¶ 180-182.

**Defendants Depend On Interstate Wire Facilities and U.S. Mail For <u>All</u> Business Operations**

314.   The entirety of Defendants' business operations, not just their fraudulent activities, are carried out by an array of legal and mortgage servicing personnel, working across state boundaries, who engage in constant transfers of correspondence, legal documents, loan data, information, invoices, account statements, financial instruments and currency.  These transfers occur almost exclusively through use of interstate wire facilities or U.S. Mail.

315.   According to Timothy P. O'Brien, a Senior Vice President and WFB's "Manager of Default Documents:

- ▪ "The loan balance information included in judgment affidavits and certifications comes directly from the mortgage servicing computer programs that house all loan balance and related information of record for mortgage loans serviced by Wells Fargo. Wells Fargo refers to these systems as its systems of record or the Mortgage Servicing Platform ('MSP')"

- ▪ "Wells Fargo employees and Wells Fargo's third party vendors, including foreclosure counsel, have access to MSP borrower information"

- ▪ "Wells Fargo's New Jersey foreclosure counsel communicate with Wells Fargo primarily through a computer program known as Vendorscape. All of the law firms that represent Wells Fargo in residential mortgage foreclosures in New Jersey have the Vendorscape computer program. Vendorscape is used to manage the foreclosure process, including communications with foreclosure lawyers"

- ▪ "Vendorscape allows a foreclosure law firm to obtain information from Wells Fargo over a secure internet connection and provide status updates to Wells Fargo electronically. Vendorscape allows Wells Fargo and its foreclosure law firms to share electronic copies of loan documents and other loan related information."

- ▪ "Vendorscape is not the only source of communication between foreclosure counsel and Wells Fargo employees. Telephone, e-mail, and regular mail are all used to supplement the general updates utilized on Vendorscape."[174]

316.    The foreclosure process at BofA also depends upon electronic Internet-based communications transmitted by interstate wire facilities.  As BofA Assistant Vice President Jon T. Kuretich informed New Jersey Chancery Court Judge Jacobson in the *Foreclosure Irregularities Matter*, "there are various mechanisms by which foreclosure counsel, including counsel in New Jersey, communicate with BAC Servicing regarding ... issues concerning the prosecution of foreclosure matters on BAC Servicing's behalf." These include: (a) use of "LPS Desktop, which is a desktop managing solution used to exchange information and documents within BAC Servicing and with foreclosure counsel"; (b) "use of a group email box managed by the Bank's Vendor Management group [which] manages the relationship with foreclosure counsel, and provides quality control oversight"; (c) use of foreclosure counsel's own e-mail system; and (b) the telephone.[175]

317.    To the extent that the Phelan firm, BofA and WFB made any fraudulent misrepresentation to homeowners (and there is abundant evidence that they have made thousands of such misrepresentations to members of the Class), Defendants' systematic use of interstate wire facilities and the U.S. Mail were and are an indispensable part of their fraudulent schemes.

---

[174] Certification of Timothy P. O'Brien dated May 4, 2011, filed in the Foreclosure Irregularities Matter before Judge Jacobson in Mercer County, New Jersey, at ¶¶ 16, 20, 60, 61 and 64,
http://www.judiciary.state.nj.us/superior/F-59553-10-Wells%20Fargo/wells_fargo_1.pdf
[175]    Certification of Jon T. Kuretich dated June 7, 2011, filed in the Foreclosure Irregularities Matter before Judge Jacobson in Mercer County, New Jersey, at ¶¶ 2, 5, 7 and 8,
http://www.judiciary.state.nj.us/superior/cert_bac_kuretich.pdf

## C.   Conduct of the Enterprise's Affairs

318.   Throughout the Class Period, the Phelan firm, WFB and BofA exerted control over the Enterprise. In violation of 18 U.S.C. § 1962(c), they conducted or participated in the conduct of the affairs of the Enterprise by (a) systematically inflating or fabricating junk fees charged to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law; (b) misappropriating Sheriff's deposit refunds that should be credited to homeowners' accounts; (c) filing or directing the filing of foreclosure lawsuits on the basis of unsupported or untrue assertions of fact, which are included in court filings and land records that contain falsified signatures and notarizations, and which are in turn intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions.

319.   More specifically, WFB and BofA conducted or participated in the conduct of the affairs of the Enterprise, *inter alia,* by:

a)   Outsourcing the selection and monitoring of foreclosure law firms to LPS and CoreLogic, which (i) collect high fees from the Phelan firm as a condition to its membership in "networks" of attorneys deemed eligible for "referrals" of foreclosure cases from BofA and WFB, (ii) manage the flow of almost all information between BofA or WFB and the Phelan firm, and (iii) monitor the Phelan firm for the speed of its performance in meeting strict timelines established by Fannie Mae, Freddie Mac and others, the satisfaction of which is a condition to future referrals of foreclosure cases to the Phelan firm

b)   Directing or encouraging the Phelan firm to prepare, sign, notarize and record assignments of mortgages and notes that do not reflect actual transfers of ownership

c)   Directing or encouraging the Phelan firm to file Complaints, Affidavits, Certifications, Motions and other legal documents, which (a) contain false statements attesting to the personal knowledge of facts asserted therein and (b) are intended to (and do) mislead the Courts and homeowners concerning the

legal standing of the purported mortgagees in whose names the Phelan firm brings suit

d) Knowingly sharing in the proceeds of unlawfully inflated or fabricated junk fees charged to distressed homeowners for "default management services" ordered by the Phelan firm through its wholly owned affiliates, Full Spectrum and Land Title Services.

320.    The Phelan firm conducted or participated in the conduct of the affairs of

the Enterprise, *inter alia*, by:

a) Developing and implementing a "business model" designed to adapt to foreclosure industry "changes" mandated by GSEs and outsourced default management companies hired by BofA and WFB, including companies now known as LPS and CoreLogic. Recognizing the limitations of the flat-fee structure of attorneys' fees for foreclosure work; the "strict timeframes" for completion of foreclosures; and the "very high" "outsource fees and other mandatory costs [that] all cut deep" into the Phelan firm's "profit margins," the Phelan firm created Full Spectrum and Land Title Services to provide title searches and other non-legal functions ancillary to foreclosures. This was seen by the Phelan firm's as its "last areas of profit."[176] The benchmark of this business model is very low cost and very high speed, and disregard for the quality, effectiveness and propriety of services allegedly performed by Full Spectrum and Land Title Services

b) Meeting or exceeding "strict timelines" established by Fannie Mae, Freddie Mac, USFN and others by any means possible, including willful failure to perform necessary investigations to support the factual basis of claims made in foreclosure Complaints, Affidavits, Certifications, Motions and other legal documents. Instead, the Phelan firm and its agents prepare, sign, notarize and file such documents, which (a) contain false statements attesting to the personal knowledge of facts asserted therein and (b) are intended to (and do) mislead the Courts and homeowners concerning the legal standing of the purported mortgagees in whose names the Phelan firm brings suit at the direction and command of WFB and BofA

---

[176] *See above* at ¶¶ 54-55.

c) Preparing, signing, notarizing and recording of assignments of mortgages and notes that do not reflect actual transfers of ownership in order to manufacture superficial "support" for uninvestigated and/or factually baseless claims made by the Phelan firm in foreclosure Complaints, Affidavits, Certifications, Motions and other legal documents filed with Pennsylvania and New Jersey state courts at the direction and command of WFB and BofA, and

d) Through its wholly owned affiliates, Full Spectrum and Land Title Services, charging unlawfully inflated or fabricated junk fees to distressed homeowners for "default management services" ordered by the Phelan firm, a portion of which is kicked-back as profit to BofA and WFB.

321. In the foregoing and other ways, the Phelan firm, WFB and BofA each benefit from their unlawful conduct and participation in the affairs of the Enterprise.

### D. <u>Defendants' Pattern of Racketeering Activity</u>

322. Each Defendant conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

323. Defendants' pattern of racketeering can be discerned within their fraudulent conduct directed to the Representative Homeowners. *See* above at ¶¶ 79-192.

324. Defendants' pattern of racketeering can be discerned within their fraudulent conduct directed to other homeowners, as described by numerous federal and state judges who have identified and condemned Defendants' unlawful activities. *See* above at ¶¶ 194-233.

325. The pattern of racketeering pursued by Countrywide/BofA and the Phelan firm can be discerned within the investigation, Complaint and Consent Judgment in the matter of *Federal Trade Commission v. Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP*, Civil Action No. Case 2:10-cv-04193-JFW-SS (C.D. Cal. June 7, 2010). *See* above

at ¶¶ 222-223.

326.   The pattern of racketeering pursued by Countrywide/BofA and the Phelan firm in misappropriating Sheriff's deposit refunds can be discerned within the Opinions of the Hon. John J. Thomas  in  *Hannon v. Countrywide*, 421 B.R. 728 (Bankr. M.D. Pa. 2009) and  2010 Bankr. LEXIS 3690 (Bankr. M.D. Pa. October 18, 2010).  *See* above at ¶ 118.

327.   Defendants' pattern of racketeering can be discerned within the actions taken by the New Jersey courts at the direction of Supreme Court Chief Justice Stuart Rabner in *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Docket No.  F -059553-10 (N.J. Super. Ch. Div., Mercer Co.). *See* above at ¶¶ 250-268.

328.   Defendants' pattern of racketeering can be discerned within the investigations and actions of the Fed, OCC, FDIC and other federal regulators, including the *Interagency Review*, and the Complaints and Consent Orders announced on April 13, 2011. *See* above at ¶¶ 271-283 and ¶277 (Fed press release specifically denouncing Defendants' "*pattern of misconduct*").

329.   Defendants' pattern of racketeering can be also discerned within the investigations and anticipated actions of the coalition of 50 state attorneys general and the U.S. Department of Justice, which are now engaged in settlement negotiations with the nation's largest mortgage servicers, including BofA and WFB. *See* above at ¶283.

330.   On thousands of separate occasions, Defendants used the U.S. mails and interstate wire facilities in furtherance of their fraudulent schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B). Collectively, these violations constitute a

"pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud the Representative Homeowners and members of the Class.

331.   Defendants' racketeering activities constitute a common course of conduct, with similar pattern and purpose. Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims – the Representative Homeowners and members of the Class. Each Defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

### E.   Damages Caused by Defendants' Scheme

332.   Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused the Representative Homeowners and members of the Class to be injured in their property.

333.   Under 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### COUNT TWO: VIOLATIONS OF 15 U.S.C. § 1692 *et seq.* (FDCPA)

334.   The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

335.   The Count is directed solely to Larry Phelan, Frank Hallinan, Dan Schmieg, Rosemarie Diamond and the Phelan firm.

336.    At all times relevant to this Complaint, Plaintiffs and all members of the Class were "consumers" within the meaning of 15 U.S.C. § 1692a(3).

337.    At all times relevant to this Complaint, the Phelan firm and its attorneys have been "debt collectors" within the meaning of 15 U.S.C. § 1692a(6).

338.    Beginning before March 25, 2008 and continuing through the present, the Phelan firm and its attorneys have committed unfair practices proscribed by 15 U.S.C. § 1692(e)(2)(A) and (B) because, in systematically seeking payment of inflated or fabricated foreclosure fees from the Representative Homeowners and members of the Class, they made false, deceptive, or misleading representations in connection with the collection of mortgage debt, concerning, *inter alia*, (1) the character, amount, or legal status of any debt and (2) services rendered or compensation that may be lawfully received by the Phelan firm for collection of debt.

339.    Beginning before March 25, 2008 and continuing through the present, the Phelan firm and its attorneys have committed unfair practices proscribed by 15 U.S.C. § 1692f(1) because, in systematically seeking payment of inflated or fabricated foreclosure fees from the Representative Homeowners and members of the Class, the amount of "debt" they sought to collect was not expressly authorized by any agreement creating the debt, and was not otherwise permitted by law.

340.    Beginning before March 25, 2008 and continuing through the present, the Phelan firm and its attorneys have committed unfair practices proscribed by 15 U.S.C. § 1692g(2) because they have routinely misidentified the names of creditors to whom debt may have been owed.

341.    The Phelan firm failed to maintain thorough, ongoing procedures reasonably calculated to prevent the foregoing violations of the FDCPA.

342.    As a direct and proximate result of foregoing violations of the FDCPA by the Phelan firm and its attorneys, the Representative Homeowners and members of the Class have sustained actual and statutory damages for which Larry Phelan, Frank Hallinan, Dan Schmieg, Rosemarie Diamond and the Phelan firm are liable, together with reasonable attorneys' fees and the costs of prosecuting this litigation.

**COUNT THREE: VIOLATIONS OF 73 P.S. § 201-1 *et seq*. (UTPCPL)**

343.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

344.    Defendants' practices constituted acts of trade or commerce within the meaning of 73 P.S. § 201-2(3).

345.    Defendants' practices constituted deceptive conduct that created a likelihood of confusion and/or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi).

346.    As documented in detail above, Defendants knowingly engaged in systematic scheme to (a) inflate or manufacture junk fees charged to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law; (b) misappropriate Sheriff's deposit refunds that should be credited to homeowners' accounts; (c) file or direct the filing of foreclosure lawsuits on the basis of unsupported assertions of fact, which are included in court filings and land records that contain falsified signatures and notarizations, which are in turn intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions.

347.    Plaintiffs and other members of the Class relied justifiably on Defendants' false and misleading representations, having no reason to suspect that a law firm whose attorneys owe a duty of candor to the court would, on behalf of internationally respected financial institutions, *inter alia*, (a) systematically file verified or certified foreclosure Complaints and other legal pleadings that contained material misrepresentations of fact; (b) systematically inflate or fabricate foreclosure fees charged to struggling homeowners; and (3) systematically commit mail and wire fraud, and engage in the pattern of racketeering identified above at ¶¶ 322-331.

348.    As a direct and proximate result of Defendants' fraudulent misrepresentations of material fact, Plaintiffs and members of the Class have sustained actual and statutory damages (including treble damages under 73 P.S. § 201-9.2) for which Defendants are liable, together with reasonable attorneys' fees and costs of prosecuting this action.

## COUNT FOUR: VIOLATIONS OF N.J.S.A. § 56.8-1 *et seq.*(NJCFA)

349.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

350.    The Count is directed to all Defendants other than Rosemarie Diamond and the Phelan firm.

351.    As documented in detail above, Defendants knowingly engaged in systematic scheme to (a) inflate or manufacture junk fees charged to distressed homeowners for "default management services" that are unessential, unperformed, and unauthorized by contract or law; (b) misappropriate Sheriff's deposit refunds that should be credited to homeowners' accounts; (c) file or direct the filing of foreclosure lawsuits on the basis of

unsupported assertions of fact, which are included in court filings and land records that contain falsified signatures and notarizations, which are in turn intended to create the false appearance of legal standing to bring residential mortgage foreclosure actions.

352.   Defendants' systematic fraudulent misconduct has directly, foreseeably and proximately caused ascertainable damages and injuries to the Representative Homeowners and members of the Class, in amounts not currently quantified. These damages and injuries include, *inter alia*, (a) payment of inflated or manufactured foreclosure fees to avoid dispossession of their homes through Sheriff's Sales; and (b) payment of legal fees and costs to their own counsel to challenge Defendants' inflated or manufactured junk fees and/or Defendants' attempt to seize their property through foreclosure actions brought in the names of entities without legal standing to sue.

353.   Defendants' misconduct constitutes acts, uses or employment of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations of material fact, or the concealment, suppression or omission of material facts with the intent that others rely upon them, in connection with the sale or advertisement of merchandise or real estate in violation of the NJCFA.

354.   As a direct and proximate result of Defendants' fraudulent misrepresentations of material fact, Plaintiffs and members of the Class have sustained actual and statutory damages (including treble damages under N.J.S.A. 56:8-19) for which Defendants are liable, together with reasonable attorneys' fees and costs of prosecuting this action.

## COUNT FIVE: BREACH OF CONTRACT

355.   The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

356.   This Count is directed solely to BofA and WFB.

357.   The Representative Homeowners and other Class members entered into contracts for mortgage loans for which servicing rights were assigned to WFB and BofA. None of these contracts permitted WFB or BofA to charge defaulted borrowers more than costs or expenses actually incurred for services actually performed in connection with any legal action to enforce the terms of the mortgages. Nor did any of these mortgage contracts authorize WFB or BofA to cause the filing of foreclosure lawsuits on the basis of unsupported assertions of fact included in court filings and land records containing falsified signatures and notarizations, or to prosecute such actions in the name of entities lacking proper legal standing to sue.

358.   WFB and BofA breached mortgage contracts with the Representative Homeowners and Class members by causing and/or permitting its "third-party vendors," including the Phelan firm, Full Spectrum and Land Title Services, to charge homeowners for costs, fees and expenses in connection with foreclosure actions in amounts in excess of those actually or reasonably incurred. WFB and BofA also breached the contracts through false and misleading court documents filed by the Phelan firm and through falsified mortgage and note assignments recorded by the Phelan firm's agents.

359.   As a result of mortgage contract breaches by WFB and BofA, the Representative Homeowners and members of the Class were damaged by (a) the amount of costs, fees and expenses they overpaid in connection with foreclosure proceedings prosecuted against them by WFB, BofA, and the Phelan firm; and (b) the amount of legal fees and costs paid to their own counsel to challenge inflated or manufactured junk fees and/or attempts by WFB and BofA to seize property through foreclosure actions brought in

the names of entities without legal standing to sue.  The Representative Homeowners and Class members have sustained actual damages in an amount to be determined at trial, in addition to reasonable attorneys' fees and the costs of prosecuting this action.

### COUNT SIX: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

360.   The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

361.   This Count is directed solely to WFB and BofA.

362.   Each mortgage contract signed by the Representative Homeowners and other members of the Class obligated the mortgagees and their servicer agents, WFB or BofA, to discharge a duty of good faith and fair dealing toward the Representative Homeowners and other Class members. Included within this duty were the obligations to (a) charge no more than actual costs, fees and expenses necessitated by borrowers' defaults, including reasonable attorneys' fees incurred in connection with foreclosure proceedings; (b) refrain from filing foreclosure lawsuits on the basis of unsupported assertions of fact included in court filings and land records containing falsified signatures and notarizations; and (c) ensure that residential mortgage foreclosure actions are brought only in the name of entities having actual legal standing to sue.

363.   WFB and BofA breached their duty of good faith and fair dealing by, *inter alia*, directly or indirectly, retaining the Phelan firm to file and prosecute foreclosure actions on the basis of falsified legal and land record documentation, and subsequently, to cause, direct and or approve the Phelan firm's actions seeking payment of costs, fees and expenses from homeowners in excess of amounts actually incurred.

364**.**    As a result of breaches of the duty of good faith and fair dealing by WFB and BofA, the Representative Homeowners and Class members were damaged by (a) the amount of costs, fees and expenses they overpaid in connection with foreclosure lawsuits prosecuted by WFB, BofA and the Phelan firm and (b) the amount of legal fees and costs paid to their own counsel to challenge Defendants' inflated or manufactured junk fees and/or Defendants' attempt to seize their property through foreclosure actions brought in the names of entities without legal standing to sue. The Representative Homeowners and members of the Class have sustained actual damages in an amount to be determined at trial, in addition to reasonable attorneys' fees and the costs of prosecuting this action

## COUNT SEVEN: MONEY HAD AND RECEIVED

365.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

366.    As documented in detail above, Defendants demanded and collected amounts for purported foreclosure costs, which were in excess of amounts permitted by contract or by Pennsylvania and New Jersey law.

367.    In the process of charging inflated or fabricated fees to the Representative Homeowners and other members of the Class, the Phelan firm, BofA and WFB have come into possession of money they had no right to receive or retain, either at law or in equity.

368.    It would be inequitable for Defendants to retain any such money or to exercise the use of such money.

369.    Defendants' inequitable retention and use of their money has damaged the Representative Homeowners and other Class members in an amount to be determined at

trial. As a result of the wrongful conduct documented above, Plaintiffs and members of the Class seek complete restitution and disgorgement of Defendants' ill-gotten gains.

## **COUNT EIGHT:  NEGLIGENCE**

370.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if set forth fully herein.

371.    Defendants owed the Representative Homeowners and other Class members a duty of reasonable care in processing their foreclosure actions and in collecting only actual and reasonable costs incurred in connection with such actions.

372.    As documented in detail above, Defendants breached their duty of due care by making, or causing to be made, misrepresentations of material fact relating to the amount of foreclosure fees owed by homeowners who averted loss of their homes to Sheriffs' Sale.

373.    As documented in detail above, Defendants also breached their duty of due care by making, or causing to be made, misrepresentations of material fact in purported assignments of mortgages and notes, and in foreclosure Complaints, certifications, verifications, motions and other court filings in foreclosure actions brought on behalf of entities that did not have legal standing to bring them.

374.    While there is abundant evidence demonstrating that Defendants made the foregoing misrepresentations of material fact with criminal or fraudulent intent, these misrepresentations and omissions were, at minimum, negligently made.

375.    As a direct and proximate cause of Defendants' negligence, the Representative Homeowners and other Class members sustained damages in an amount to be determined at trial.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all triable claims asserted in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     The conduct of Defendants be determined to have violated the Racketeer Influenced and Corruption Act, 18 U.S.C. §1962(c).

C.     The conduct of Defendants be determined to have violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.

D.     The conduct of Defendants be determined to have violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq*.

E.     The conduct of Defendants be determined to have violated New Jersey's Consumer Fraud Act, N.J.S.A. § 56.8-1 *et seq*.

F.     Defendants be found liable to the Representative Homeowners and other Class members under the common laws of the Commonwealth of Pennsylvania and the State of New Jersey for (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) money had and received; and (4) negligent misrepresentation.

G.      Judgment be entered against Defendants for damages sustained by the Representative Plaintiffs and other Class members to the maximum extent allowed by law, together with the costs of this action, including reasonable attorneys' fees.

H.     Judgment be entered ordering an accounting, restitution and disgorgement of funds obtained by Defendants as a result of their wrongful conduct.

I.     The Court appoint a forensic accounting firm, at Defendants' expense, to audit the Phelan firm's files for the purpose of quantifying Defendants' ill-gotten gains; and

J.     The Court appoint a Special Master, at Defendants' expense, to (a) recommend business management and accounting procedures that the Phelan firm must adopt and implement to avoid future mortgage foreclosure abuses and (b) monitor compliance by the Phelan firm with business management or accounting procedures directed by the Court.

K.     Plaintiffs and members of the Class have such other, further and different relief as the Court may deem just and proper under the facts and circumstances of this case.

Dated: August 19, 2011                           Respectfully submitted,

                                                 **BHN LAW FIRM**

                                         By:  /s/ John G. Narkin
                                             John G. Narkin
                                             Michael D. Hess
                                             951 Rohrerstown Road, Suite 102
                                             Lancaster, Pennsylvania 19601
                                             Telephone: (717) 756-0835
                                             www.bhn-law.com

                                             **Attorneys for Plaintiffs and
                                             Members of the Proposed Class**